No. 25-7516

IN THE

# United States Court of Appeals
## for the Ninth Circuit

KALSHIEX, LLC,

*Plaintiff-Appellant,*

v.

KIRK D. HENDRICK, *et al.,*

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Nevada
No. 2:25-cv-575 (Gordon, C.J.)

## APPELLANT'S OPENING BRIEF

GRANT R. MAINLAND
ANDREW L. PORTER
DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

DENNIS L. KENNEDY
PAUL C. WILLIAMS
BAILEY ❖ KENNEDY
8984 Spanish Ridge Ave.
Las Vegas, NV 89148

December 26, 2025

NEAL KUMAR KATYAL
JOSHUA B. STERLING
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellant
KalshiEX LLC*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

STATEMENT OF JURISDICTION ............................................... 3

STATEMENT OF THE ISSUES PRESENTED ............................................... 4

PERTINENT STATUTES AND REUGLATIONS ........................................... 4

STATEMENT OF THE CASE ................................................................. 4

I.    LEGAL BACKGROUND ............................................................ 4

    A.    States Initially Regulate Derivatives As Gambling .................... 4

    B.    Congress Passes The CEA And Grants The CFTC Exclusive Jurisdiction Over Trading On DCMs .......................................... 6

    C.    CEA Amendments Underscore The CFTC's Exclusive Jurisdiction ................................................................................. 8

    D.    Congress Expands The CEA's Scope To Address New Derivatives, Including Event Contracts ................................... 10

    E.    Congress Sets Forth A Comprehensive Scheme For Regulating Derivatives Trading ................................................................. 15

II.    FACTUAL BACKGROUND ........................................................ 17

III.    PROCEDURAL HISTORY ......................................................... 20

SUMMARY OF ARGUMENT .................................................................... 22

STANDARD OF REVIEW ...................................................................... 25

ARGUMENT ......................................................................................... 26

I.    KALSHI IS LIKELY TO SUCCEED ON THE MERITS BECAUSE THE CEA PREEMPTS NEVADA'S GAMBLING LAWS AS APPLIED TO TRADING ON DCMS ............................................................... 26

## TABLE OF CONTENTS—Continued

A. Nevada's Gambling Laws Are Field Preempted As Applied To Kalshi .................................................................................... 27

B. Nevada's Gambling Laws Are Conflict Preempted As Applied To Kalshi .................................................................................... 36

II. THE DISTRICT COURT ERRED IN CREATING A CARVEOUT TO CEA PREEMPTION FOR KALSHI'S CONTRACTS ................................................. 40

A. The CEA Bars States From Second-Guessing Whether Instruments Traded On DCMs Are Proper Derivatives ........... 41

B. Kalshi's Contracts Are Properly Subject To The CFTC's Exclusive Jurisdiction ............................................................ 45

C. The District Court's Contrary Interpretation Is Wrong ........... 48

D. The District Court's Policy Concerns Are Misplaced ................ 57

III. THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR KALSHI ..................................................................................... 63

CONCLUSION .................................................................................... 69

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

ADDENDUM A: Pertinent Statutes and Regulations

ADDENDUM B: State Gambling and Bucket-Shop Laws Regulating Futures Before the Commodity Exchange Act's Enactment in 1936

# TABLE OF AUTHORITIES

**CASES:**                                                                    Page(s)

*Am. Agric. Movement v. Bd. of Trade of Chi.,*
    977 F.2d 1147 (7th Cir. 1992) ..................................2, 15, 32, 36, 41, 42, 43

*Am. Libr. Ass'n. v. FCC,*
    406 F.3d 689 (D.C. Cir. 2005)................................................................ 44

*Arizona Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) .............................................................. 66

*Arizona v. United States,*
    567 U.S. 387 (2012) ........................................................ 26, 34, 35, 38

*Assurance Wireless USA, L.P. v. Reynolds,*
    100 F.4th 1024 (9th Cir. 2024)............................................................. 25

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.,*
    198 U.S. 236 (1905) (Holmes, J.) ............................................................ 5

*Big Lagoon Rancheria v. California,*
    789 F.3d 947 (9th Cir. 2015).......................................................... 44, 45

*Botsford v. Blue Cross & Blue Shield of Mont., Inc.,*
    314 F.3d 390 (9th Cir. 2002)................................................................. 36

*California v. FERC,*
    495 U.S. 490 (1990)............................................................................... 39

*CFTC v. Erskine,*
    512 F.3d 309 (6th Cir. 2008)......................................................... 56, 62

*CFTC v. Trade Exch. Network Ltd.,*
    117 F. Supp. 3d 29 (D.D.C. 2015)........................................................ 49

*CFTC v. Zelener,*
    373 F.3d 861 (7th Cir. 2004) ........................................................ 56, 62

*Chi. Mercantile Exch. v. SEC,*
    883 F.2d 537 (7th Cir. 1989)................................................................ 32

iii

# TABLE OF AUTHORITIES—Continued

Page(s)

*Cothran v. Ellis,*
  16 N.E. 646 (Ill. 1888) ....................................................... 4, 60

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) ................................................ 26, 27, 36

*CSX Transp., Inc. v. Easterwood,*
  507 U.S. 658 (1993) ........................................................ 27

*Dickson v. Uhlmann Grain Co.,*
  288 U.S. 188 (1933) ....................................................... 6, 60

*Duke Energy Trading & Mktg., L.L.C. v. Davis,*
  267 F.3d 1042 (9th Cir. 2001) ........................................ 28

*Farina v. Nokia Inc.,*
  625 F.3d 97 (3d Cir. 2010) ............................................ 39

*Free v. Bland,*
  369 U.S. 663 (1962) ....................................................... 26

*FTC v. Ken Roberts Co.,*
  276 F.3d 583 (D.C. Cir. 2001) .................................... 31, 33

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) ........................................ 66

*Garcia v. United States,*
  469 U.S. 70 (1984) ........................................................ 33

*Hughes v. Talen Energy Mktg., LLC,*
  578 U.S. 150 (2016) ...................................................... 28

*Inv. Co. Inst. v. CFTC,*
  891 F. Supp. 2d 162 (D.D.C. 2012) ............................. 13

*Irwin v. Williar,*
  110 U.S. 499 (1884) ........................................................ 5

# TABLE OF AUTHORITIES—Continued

Page(s)

*Jacobellis v. State of Ohio,*
378 U.S. 184 (1964) ................................................................21

*KalshiEX LLC v. CFTC,*
No. 23-cv-3257, 2024 WL 4164694 (D.D.C. Sept. 12,
2024) ...................................................... 17, 18, 38, 49, 57, 61

*KalshiEX v. CFTC,*
No. 24-cv-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025)................. 18

*KalshiEX LLC v. Flaherty,*
No. 25-cv-2152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) ................... 39

*Karnoski v. Trump,*
926 F.3d 1180 (9th Cir. 2019)................................................ 25

*Leist v. Simplot,*
638 F.2d 283 (2d Cir. 1980) ..........................................2, 8, 31

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ......................................................... 32

*Loving v. IRS,*
742 F.3d 1013 (D.C. Cir. 2014)............................................... 53

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
456 U.S. 353 (1982) .................................................8, 15, 34

*Mississippi v. Louisiana,*
506 U.S. 73 (1992) .......................................................... 27

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992) ......................................................... 63

*N. Am. Derivatives Exch., Inc. v. NGCB,*
No. 2:25-cv-978, 2025 WL 2916151 (D. Nev. Oct. 14, 2025).............21, 58

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n,*
145 S. Ct. 2658 (2025) .................................................. 64, 65

## TABLE OF AUTHORITIES—Continued

Page(s)

*Nat'l Meat Ass'n v. Harris,*
565 U.S. 452 (2012) ..................................................................38

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.,*
477 F.3d 668 (9th Cir. 2007) ...................................................58

*Oklahoma v. Castro-Huerta,*
597 U.S. 629 (2022) ........................................................... 51, 57

*Omnipoint Commc'ns, Inc. v. City of Huntington Beach,*
738 F.3d 192 (9th Cir. 2013) .................................................. 29

*Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.,*
26 F.3d 1508 (10th Cir. 1994) ................................................ 49

*Pub. Util. Dist. No. 1 v. IDACORP Inc.,*
379 F.3d 641 (9th Cir. 2004) .................................................. 35

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.,*
608 F.2d 175 (5th Cir. 1979) ....................................................31

*Rice v. Bd. of Trade of Chi.,*
331 U.S. 247 (1947) ................................................................. 30

*Richardson v. Kruchko & Fries,*
966 F.2d 153 (4th Cir. 1992) .................................................. 28

*Sale v. Haitian Ctrs. Council, Inc.,*
509 U.S. 155 (1993) ................................................................. 30

*In re Scheer,*
819 F.3d 1206 (9th Cir. 2016) ................................................ 57

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
240 F.3d 832 (9th Cir. 2001) .................................................. 65

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.,*
108 F.4th 144 (3d Cir. 2024) .................................................. 28

# TABLE OF AUTHORITIES—Continued

Page(s)

*TRW Inc. v. Andrews,*
  534 U.S. 19 (2001) ................................................. 52

*United States v. Alvarez-Hernandez,*
  478 F.3d 1060 (9th Cir. 2007)............................. 32

*United States v. Brien,*
  617 F.2d 299 (1st Cir. 1980)................................ 31

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019)............................... 67

*United States v. Wilkinson,*
  986 F.3d 740 (7th Cir. 2021) ............................... 54

*Valle del Sol Inc. v. Whiting,*
  732 F.3d 1006 (9th Cir. 2013) ............................. 64

**CONSTITUTION:**

U.S. Const., art. VI, cl. 2 ....................................... 26

**STATUTES:**

5 U.S.C. § 551(13)..................................................... 44

7 U.S.C. § 1a(9) ...................................................... 10

7 U.S.C. § 1a(19)...................................................... 46

7 U.S.C. § 1a(19)(i).................................................. 11

7 U.S.C. § 1a(19)(ii)................................................ 11

7 U.S.C. § 1a(19)(iii)............................................... 11

7 U.S.C. § 1a(19)(iv) ................................. 11, 46, 51, 54

7 U.S.C. § 1a(27) ..................................................... 55

7 U.S.C. § 1a(36) ..................................................... 47

## TABLE OF AUTHORITIES—Continued

Page(s)

7 U.S.C. § 1a(40) ....................................................................12

7 U.S.C. § 1a(47)(A)(ii) ................................................. 13, 45, 51

7 U.S.C. § 1a(47)(A)(iv) ..........................................................14, 52

7 U.S.C. § 1a(47)(B) ........................................................... 52

7 U.S.C. §2(a) ...................................................................4, 61

7 U.S.C. § 2(a)(1)(A) ......................1, 7, 8, 13, 27, 29, 41, 44, 55

7 U.S.C. § 2(a)(1)(C)(ii)(I) ............................................... 56

7 U.S.C. § 2(e) ...................................................................61

7 U.S.C. § 6a ................................................................... 35

7 U.S.C. § 6b ............................................................19, 35

7 U.S.C. § 6c ........................................................19, 29, 35

7 U.S.C. § 7(a) ............................................................... 34

7 U.S.C. § 7(d) ...................................................................15

7 U.S.C. § 7a-1 ...................................................................16

7 U.S.C. § 7a-2(c)(1) ...........................................................16

7 U.S.C. § 7a-2(c)(5)(C)(i) ............................. 14, 35, 38, 47, 52, 58

7 U.S.C. § 7a-2(c)(5)(C)(ii) ...........................................14

7 U.S.C. § 7b-1(a)(1) ...................................................... 44

7 U.S.C. § 8b ...................................................................17

7 U.S.C. § 9 ................................................................. 17, 19, 35

7 U.S.C. § 9a ................................................................. 35

## TABLE OF AUTHORITIES—Continued

Page(s)

7 U.S.C. § 12c ......................................................................... 35

7 U.S.C. § 13 ............................................................... 17, 19, 35

7 U.S.C. § 13a ........................................................................ 35

7 U.S.C. § 13a-1 ..................................................................... 35

7 U.S.C. § 13a-2 ....................................................................... 8

7 U.S.C. § 13a-2(1) ................................................ 9, 17, 31, 42

7 U.S.C. § 13a-2(7) ................................................................. 42

7 U.S.C. § 16(e)(1) ................................................................9, 31

7 U.S.C. § 16(e)(1)(b)(i) .................................................... 41, 61

7 U.S.C. § 16(e)(2) .................................................................. 11

28 U.S.C. § 1292(a)(1) ............................................................... 3

28 U.S.C. § 1331 ......................................................................... 3

31 U.S.C. § 5362(1)(E)(ii) ....................................................... 63

Commodity Exchange Act of 1936,
    Pub. L. No. 74-674, 49 Stat. 1491 (1936) ................................ 6

Commodity Futures Modernization Act of 2000,
    Pub. L. No. 106-554, Appendix E, 114 Stat. 2763A-365,
    2763A-377 (2000) ........................................................ 11, 55

Dodd-Frank Act of 2010,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010) ............................13, 52, 55, 61

Grain Futures Act of 1922,
    Pub. L. No. 67-331, 42 Stat. 998 (1922)................................... 5

N.J. Stat. Ann. § 2C:37-1(b)........................................................60

ix

# TABLE OF AUTHORITIES—Continued

Page(s)

N.Y. Penal L. § 225.00(2) ........................................................ 60

Nev. Rev. Stat. § 463.0193 .................................................50, 60

Nev. Rev. Stat. § 463.360(3) ................................................... 67

**RULES AND REGULATIONS:**

17 C.F.R. pt. 38 ......................................................................15

17 C.F.R. § 1.3(b)(1) ...............................................................15

17 C.F.R. § 1.31(d)(1) .............................................................15

17 C.F.R. § 16.00 *et seq.*...................................................... 34

17 C.F.R. § 38.4 .................................................................... 43

17 C.F.R. §§ 38.4(b) ...............................................................16

17 C.F.R. § 38.5(b) ...........................................................16, 18

17 C.F.R. § 38.150(b) ............................................................ 34

17 C.F.R. § 38.151(b)....................................................15, 37, 65

17 C.F.R. § 38.155(a) ............................................................ 34

17 C.F.R. § 38.156 ...........................................................15, 34

17 C.F.R. § 38.200 ................................................................ 38

17 C.F.R. § 38.250.............................................................19, 65

17 C.F.R. § 38.251 .................................................................15

17 C.F.R. § 38.255 ................................................................ 38

17 C.F.R. § 38.256 .................................................................15

17 C.F.R. § 38.450 .........................................................15, 34

## TABLE OF AUTHORITIES—Continued

Page(s)

17 C.F.R. § 38.601 ................................................................. 16

17 C.F.R. § 38.602 ................................................................ 65

17 C.F.R. § 38.950 ......................................................... 15, 34

17 C.F.R. § 38.1101(a)(2) ............................................. 15, 35

17 C.F.R. § 40.2(a)(1) ......................................................... 16

17 C.F.R. § 40.2(c) ............................................................... 16

17 C.F.R. § 40.11 .......................................................... 14, 59

17 C.F.R. § 40.11(c) ...................................................... 16, 59

17 C.F.R. § 40.11(c)(2) ........................................................ 16

17 C.F.R. § 150.2 & App. E ................................................. 35

17 C.F.R. § 180.1 ........................................................... 19, 35

17 C.F.R. § 180.2 ........................................................... 19, 35

CFTC Ltr. No. 25-36, Comm. Fut. L. Rep. ¶ 35563
     (Sep. 30, 2025) ......................................................... 19, 36

*Concept Release*, 73 Fed. Reg. 25,669 (May 7, 2008) ..................... 12, 13, 47

*Contract Market Designation*, 40 Fed. Reg. 25,849
     (June 19, 1975) ................................................................ 16

*Event Contracts*, 89 Fed. Reg. 48,968 (June 10, 2024) ............ 47, 49, 58, 59

Fed. R. App. P. 4 ................................................................... 3

*Further Definition of "Swap,"* 77 Fed. Reg. 48,208 (Aug. 13,
     2012) ............................................................................. 62

NGCB, *Regulation 22: Race Books and Sports Pools* 14 (Nov.
     2024), https://perma.cc/TLH7-MBLV ........................... 37, 65

## TABLE OF AUTHORITIES—Continued

Page(s)

*Provisions Common to Registered Entities*, 76 Fed. Reg. 44,776
(July 27, 2011)........................................................................... 59

**LEGISLATIVE MATERIALS:**

120 Cong. Rec. 30,464 (Sept. 9, 1974)........................................ 30

H.R. Rep. No. 74-421 (1935) ..................................................... 6

H.R. Rep. No. 93-975 (1974) ............................................... 10, 54

H.R. Rep. No. 93-1383 (1974) .............................................. 1, 7, 33

H.R. Rep. No. 97-565, pt. 1 (1982) ....................................... 9, 10, 33

H.R. Rep. No. 106-711, pt. 2 (2000)................................... 12, 33, 41

*Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess.
(1973)..................................................................................... 6, 7

*Hearings Before the S. Comm. on Agric. & Forestry,* 93d Cong.,
2d Sess. (1974) ................................................................... 6, 7, 33

S. Rep. No. 93-1131 (1974)............................................... 7, 29, 30

S. Rep. No. 97-495 (1982) ........................................................ 9

**OTHER AUTHORITIES:**

Allen B. Paul, *The Role of Cash Settlement in Futures Contract
Specification, in* Futures Markets: Regulatory Issues 271
(Anne E. Peck ed., 1985)........................................................ 10

*Associated*, Oxford English Dictionary (3d. ed 2011) ................. 45

Brett Smiley, *Underdog Sports Preparing to Use Kalshi,
Prediction Markets For Its Own Risk Management*, In
Game (Oct. 22, 2025), https://perma.cc/BT4A-BK8T ................ 46

# TABLE OF AUTHORITIES—Continued

Page(s)

Chris Altruda, *Football Keys October Surge in Nevada
Sportsbook Revenue*, In Game (Nov. 25, 2025),
https://perma.cc/8JFH-FGB4 ............................................................ 66

*CME to Launch Hurricane Futures and Options on Futures
Contracts*, CME Group (Feb. 14, 2007),
https://perma.cc/5MKV-WCTH .......................................................... 46

*Contingency*, Merriam-Webster's Collegiate Dictionary (11th
ed. 2003) .......................................................................................... 49

*Contingency*, Webster's II New College Dictionary (3d ed.
2005) .............................................................................................. 49

*Event*, Oxford American Dictionary and Thesaurus (2d ed.
2009) .............................................................................................. 48

*Event*, Random House Webster's Pocket American Dictionary
(5th ed. 2008).................................................................................. 48

*Event*, Random House Webster's Unabridged Dictionary (2d
ed. 2001).......................................................................................... 48

*Event*, Webster's II New College Dictionary (3d ed. 2005) ...................... 48

*Exclusive*, American Heritage Dictionary (2d ed. 1980)............................ 28

*Inherent*, Random House Webster's Unabridged Dictionary (2d
ed. 2001).......................................................................................... 51

John V. Rainbolt II, *Regulating the Grain Gambler and His
Successors*, 6 Hofstra L. Rev. 1 (1977) ............................................... 4

John H. Stassen, *The Commodity Exchange Act In Perspective*,
39 Wash. & Lee L. Rev. 825 (1982) ..................................................... 5

## TABLE OF AUTHORITIES—Continued

Page(s)

Kelly Cloonan, *Betting markets nailed Trump's decisive win —
and it's a good reminder they can be more accurate than
polls*, Bus. Insider (Nov. 9, 2024), https://perma.cc/5W7W-
S76X..................................................................................... 18

Kevin T. Van Wart, *Preemption and the Commodity Exchange
Act*, 58 Chi.-Kent L. Rev. 657 (1982) ......................................... 8

## INTRODUCTION

In the seminal 1974 amendments to the Commodity Exchange Act ("CEA"), Congress created the Commodity Futures Trading Commission ("CFTC") and gave it "exclusive jurisdiction" over nationwide derivatives exchanges. 7 U.S.C. § 2(a)(1)(A). In the decision below, the district court authorized Nevada state regulators to vitiate that exclusive jurisdiction. These regulators have threatened to criminally prosecute KalshiEX LLC ("Kalshi") for offering certain event contracts, even though the CFTC has permitted these contracts and they are legal under federal law. After initially recognizing the CFTC's exclusive jurisdiction and granting a preliminary injunction, the court changed course, dissolving the injunction based on what it viewed as undesirable policy consequences of federal preemption. This Court should reverse.

Kalshi is a CFTC-licensed and regulated exchange, known as a designated contract market ("DCM"). Federal law therefore preempts state regulation of trading on Kalshi, as confirmed by every conceivable marker of legislative intent. The CEA's text grants the CFTC "exclusive jurisdiction" over trading on DCMs. 7 U.S.C. § 2(a)(1)(A). Congress in 1974 deleted the provision that had previously preserved concurrent state jurisdiction, noting its intent to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974). And

Congress repeatedly reaffirmed the CFTC's exclusive jurisdiction after courts uniformly and easily recognized that the CEA "preempts the application of state law" regarding trading on federal exchanges. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.).

The district court agreed that the CEA preempts states from regulating trading on DCMs, but accepted a workaround to let Defendants ban Kalshi's contracts anyway. According to the court, Kalshi's contracts are not true derivatives, and therefore do not belong on a DCM. Instead, stating "I know it when I see it," 1-ER-17, the court deemed Kalshi's contracts to be gambling that states are free to regulate.

That conclusion rested on multiple errors of law that compel reversal. The court effectively rewrote the CEA, adopting a results-oriented interpretation it acknowledged "isn't perfect" and that it repeatedly noted raises "serious questions" on the merits. 1-ER-6, 1-ER-25, 2-ER-45. Its decision cannot be reconciled with the CEA's text, contravenes the CFTC's acceptance of Kalshi's contracts as regulated derivatives, and undermines "Congress' intent to bring the markets under a uniform set of regulations." *Am. Agric. Movement v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). The court's decision was driven by concern that a contrary ruling would revoke states' authority to regulate gambling, but that concern is

misplaced. The CEA preempts state regulation of trading on DCMs while leaving states entirely free to regulate off-DCM transactions, including run-of-the-mill sports bets—which differ categorically from Kalshi's exchange-traded event contracts anyway.

If affirmed, the district court's decision would decimate the CFTC's exclusive jurisdiction. It would give state regulators free rein to regulate trading on DCMs as long as they argue that the instruments they seek to regulate are gambling rather than derivatives. Many states prohibited derivatives trading as gambling a century ago, but Congress in 1974 put an emphatic end to that practice. The district court's decision would restore it, nullifying the CFTC's exclusive authority and undermining the nationwide uniformity necessary for derivatives markets to work.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the U.S. Constitution. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The district court dissolved the injunction in an order dated November 24, 2025, 1-ER-30. Kalshi timely appealed the following day. 2-ER-117; *see also* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES PRESENTED

Section 2(a) of the CEA grants the CFTC "exclusive jurisdiction" over trading on CFTC-registered derivatives exchanges.  The issues presented are:

1. Whether Kalshi is likely to succeed on the merits of its claim that the CEA preempts Defendants from banning the trading of Kalshi's event contracts.

2. Whether the equitable preliminary injunction factors favor an injunction rather than allowing Defendants to prosecute Kalshi while this case proceeds.

## PERTINENT STATUTES AND REGULATIONS

The pertinent statutes and regulations are set forth in Addendum A to this brief.

## STATEMENT OF THE CASE

### I.  LEGAL BACKGROUND

### A.  States Initially Regulate Derivatives As Gambling.

This appeal involves derivatives: financial instruments whose value depends on underlying commodities.  Futures contracts, one type of derivative, developed in the United States in the 19th century as a tool to hedge against price fluctuations.  Because futures contracts involve risk-based speculation, many states initially decried them as "gambling in grain." *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888); *see also* John V. Rainbolt II,

*Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977) (documenting states' treatment of futures trading as unlawful gambling).  In fact, many "anti-gaming" and "anti-bucket shop" laws were enacted to make it "as difficult as humanly possible to trade futures."  John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825, 826 (1982) (quotation marks omitted).

In 1884, the Supreme Court agreed that a futures contract was "nothing more than a wager" if the parties intend cash settlement rather than actual delivery of the underlying commodity.  *Irwin v. Williar*, 110 U.S. 499, 508-509 (1884).  Then, in 1905, the Court acknowledged the legitimacy of cash settlement and blessed "[s]peculation" as a "means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want."  *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 246-249 (1905) (Holmes, J.).  In the 1920s, anti-futures sentiment intensified, prompting federal efforts to regulate futures.

Those efforts resulted in the Grain Futures Act of 1922, which sought to centralize futures trading on federally approved "contract market[s]."  Pub. L. No. 67-331, 42 Stat. 998, 1000-02.  The Grain Futures Act intentionally declined to preempt state laws, including state gambling laws.  Thus, in 1933, the Supreme Court upheld the application of a "Missouri law making

5

gambling in grain futures illegal." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

### B. Congress Passes The CEA And Grants The CFTC Exclusive Jurisdiction Over Trading On DCMs.

The Commodity Exchange Act of 1936 subjected additional types of futures to the framework governing grain futures and added anti-fraud protections for market participants. Pub. L. No. 74-674, 49 Stat. 1491, 1492-99. But Congress again stopped short of comprehensive federal regulation. It preserved "any State law applicable" to "transaction[s]" regulated by the Act. *Id.* at 1494. The drafters' "intention" was "not to occupy the field." H.R. Rep. No. 74-421, at 5 (1935). As markets matured over the following decades, however, that decision produced a patchwork of regulations, leading exchanges to recommend that "federal policy ... be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." *Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess. 121 (1973) [hereinafter *House Hearings*].

Congress responded in 1974 with legislation designed to "[b]ring[ ] all futures trading under federal regulation.*" Hearings Before the S. Comm. on Agric. & Forestry,* 93d Cong., 2d Sess. 848 (1974) [hereinafter *Senate Hearings*]. Most relevant here, Congress created the CFTC to oversee trading on DCMs. Congress recognized that federal regulation would only

be workable if it "prevent[ed] any possible conflicts over jurisdiction." *House Hearings* at 128. "[D]ifferent State laws would just lead to total chaos" absent "preemption." *Senate Hearings* at 685 (statement of Sen. Clark). Congress in Section 2(a) of the amended statute therefore explicitly vested the CFTC with "exclusive jurisdiction" over trading on DCMs. 7 U.S.C. § 2(a)(1)(A).

Congress deliberately reinforced the CFTC's exclusive jurisdiction in two respects. First, after House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." *Id.* at 6. Second, the Senate "struck" the existing provision preserving "any State law applicable" to derivatives transactions. H.R. Rep. No. 93-1383, at 35 (quotation marks omitted). The amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id.* Congress did "not contemplate that there will be a need for any supplementary regulation by the States." *Id.* at 36.

Courts immediately understood the preemptive effect of those amendments. Writing for the Second Circuit, Judge Friendly explained that

7

the CEA "preempts the application of state law" regarding trading on federal exchanges. *Leist*, 638 F.2d at 322. The CFTC likewise understood that the amendments preempted state laws that would otherwise treat futures as "illegal gambling contracts." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 700 (1982) (quotation omitted).

The 1974 amendments, however, did not preempt all state regulation of derivatives. Section 2(a)'s savings clause made clear that, beyond the CFTC's "exclusive jurisdiction" over trading on federal exchanges, the CEA did not "supersede or limit the jurisdiction" of "regulatory authorities under the laws … of any State" or "restrict [state] authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A).

## C. CEA Amendments Underscore The CFTC's Exclusive Jurisdiction.

After preempting state regulation in 1974, Congress sought to grant states a limited role in combatting commodities fraud. Congress in 1978 amended the CEA to authorize states "to bring *parens patriae* actions, seeking injunctive or monetary relief for certain violations of the CEA." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 366-367 (1982); *see* 7 U.S.C. § 13a-2. Congress, however, clarified that states' authority extended only to suits against defendants "*other than a*

8

*[designated] contract market*," 7 U.S.C. § 13a-2(1) (emphasis added), consistent with the CFTC's exclusive jurisdiction over DCMs.

Congress returned to the CEA in 1982. Congress recognized that the 1974 amendments already "bestowed on the CFTC exclusive jurisdiction to regulate futures trading [on DCMs] ... , thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, pt. 1, at 44 (1982). But Congress was concerned about "off-exchange commodities activities" and believed "States should be extensively involved in ... policing transactions outside those preserved exclusively" for the CFTC. *Id.* Congress was urged to implement "a partial lifting of the CEA's preemption to permit" state enforcement "against registered and unregistered commodity dealers *except for contract markets*." S. Rep. No. 97-495, at 50 (1982) (emphasis added).

Congress responded by amending the CEA to add what is now Section 16(e)(1), [1] clarifying that "[n]othing in this chapter shall supersede or preempt" the application of state law to a transaction "that is *not* conducted on or subject to the rules" of a DCM or to "any person required to be registered" as a DCM who fails to do so. 7 U.S.C. § 16(e)(1) (emphasis added). Congress thus reaffirmed its intent for "exclusive CFTC jurisdiction over

---

[1] For ease of reference, statutory provisions are referred to by their section in the U.S. Code rather than their section in the CEA.

9

exchange-traded futures" while permitting states to police "transactions outside those preserved exclusively for the jurisdiction of the CFTC." H.R. Rep. No. 97-565, pt. 1, at 44-45.

### D. Congress Expands The CEA's Scope To Address New Derivatives, Including Event Contracts.

The CEA originally covered agricultural commodities. In 1974, Congress re-defined "commodity" to reach "all services, rights, and interests ... in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). That broad definition ensured that the CFTC's exclusive jurisdiction would cover "all futures trading that might now exist or might develop in the future." H.R. Rep. No. 93-975, at 76 (1974). Since 1974, Congress has periodically revisited the instruments the CEA regulates. Two changes are relevant here.

*First*, in the 1980s, the CFTC approved futures in intangible commodities, including interest-rate futures and stock-index futures. Allen B. Paul, *The Role of Cash Settlement in Futures Contract Specification*, *in* Futures Markets: Regulatory Issues 271, 280 (Anne E. Peck ed., 1985). These contracts required the parties to agree to make cash payments based on the value the underlying commodity at settlement. *Id.*

In 2000, Congress amended the CEA in the Commodity Futures Modernization Act ("CFMA") to approve these instruments by including a

new term in the CEA: "excluded commodity." Excluded commodities included intangibles such as an "interest rate" and a "commercial index." 7 U.S.C. § 1a(19)(i)-(iii). They also included an "occurrence" or "contingency" that is "beyond the control of the parties" to a "transaction" and "associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). The CFMA did not prohibit transactions in excluded commodities. Instead, these commodities were "excluded" because the CFMA permitted sophisticated market participants to enter transactions involving excluded commodities over-the-counter, without being subject to the CEA's on-DCM requirement. Pub. L. No. 106-554, Appendix E, 114 Stat. 2763A-365, 2763A-377 (2000). But Congress likewise made clear that transactions in excluded commodities that occurred on "trading facilit[ies]" such as DCMs remained subject to the CEA, and to the CFTC's exclusive jurisdiction. *Id.*

Because the CFTC's exclusive jurisdiction applied only on-exchange, over-the-counter transactions in excluded commodities fell outside that exclusive jurisdiction. To prevent state gambling laws from interfering with these transactions, the CFMA amended what is now Section 16(e)(2) to "supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops" as to transactions "excluded" from CEA coverage. 7 U.S.C. § 16(e)(2). The

committee report reaffirmed that "the current" CEA already "supersedes and preempts" state laws "in the case of transactions conducted on a registered entity," a category that includes DCMs. H.R. Rep. No. 106-711, pt. 2, at 71 (2000). The new preemption provision clarified that the CEA also "supersedes and preempts State gaming and bucket shop laws" as to excluded off-DCM transactions. *Id.*; *see* 7 U.S.C. § 1a(40) (defining "registered entity" to include DCMs).

*Second*, following Congress's expansion of commodities to include occurrences, instruments known as "event contracts" gained prominence. Event contracts ask whether an occurrence will occur as a yes-or-no proposition, and they expire when the occurrence either does or does not occur. The contract's price up to its expiration is determined by the trading activity of market participants, and therefore fluctuates according to changing perceptions about the likelihood the event will occur.

In 2008, the CFTC solicited public comment regarding "the appropriate regulatory treatment of" such "event contracts," which may be based on "varied" eventualities such as "the results of political elections, or the outcome of particular entertainment events," and which "can be designed to exhibit the attributes of either options or futures contracts." *Concept Release*, 73 Fed. Reg. 25,669, 25,669-70 (May 7, 2008). It explained that the

CEA "supersedes and preempts other laws, including state and local gaming ... laws, with respect to transactions executed on" DCMs and sought comments on "the implications of possibly preempting state gaming laws with respect to event contracts." *Id.* at 25,673.

Before the CFTC's contemplated rulemaking was finalized, Congress in the Dodd-Frank Act of 2010 added event contracts to the CFTC's jurisdiction by extending the CFTC's exclusive jurisdiction to exchange-traded "swaps." *See* Pub. L. No. 111-203, 124 Stat. 1376, 1666, 1672.

Congress in 2000 had generally "excluded swap transactions from CFTC oversight under the CEA." *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 196 (D.D.C. 2012). But, following the 2008 financial crisis, Congress withdrew that exemption and brought swaps within the CFTC's jurisdiction. Section 2(a) now provides that the CFTC "shall have exclusive jurisdiction ... with respect to ... transactions involving swaps or contracts of sale of a commodity for future delivery ... traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A).

Congress defined "swap" to encompass, among other things, contracts providing for payment "dependent on the occurrence ... of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). Congress also defined "swap" to include

any "transaction that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv).

Dodd-Frank also created a "Special Rule" regarding certain "agreements, contracts, transactions, or swaps in excluded commodities that are based upon ... occurrence[s]"—*i.e.*, "[e]vent contracts." *Id.* § 7a-2(c)(5)(C)(i). Recognizing that certain categories of event contracts warranted closer CFTC scrutiny, Congress authorized the CFTC to review and prohibit six categories of contracts if it concludes they are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(ii). The Special Rule provides that the CFTC "may"—but need not—"determine" event contracts to be contrary to the public interest if they "involve":

> (I)   activity that is unlawful under any Federal or State law;
> (II)  terrorism;
> (III) assassination;
> (IV)  war;
> (V)   gaming; or
> (VI)  other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.* § 7a-2(c)(5)(C)(i); *see* 17 C.F.R. § 40.11. No such contract "determined by the Commission to be contrary to the public interest" may be listed. 7 U.S.C. § 7a-2(c)(5)(C)(ii). Absent an adverse public-interest determination, however, an exchange may list event contracts involving the Special Rule's enumerated activities, subject to the CFTC's exclusive jurisdiction.

### E.  Congress Sets Forth A Comprehensive Scheme For Regulating Derivatives Trading.

The CEA today sets out a "comprehensive regulatory structure" for entities seeking to offer derivatives.  *Curran*, 456 U.S. at 356 (citation omitted).  The principal requirement is that exchanges become "designated" as contract markets, known as DCMs.  DCMs must comply with myriad federal obligations designed to ensure orderly trading and prevent "price manipulation, cornering and other market disturbances."  *Am. Agric.*, 977 F.2d at 1151.

To obtain CFTC designation, exchanges must prove they can comply with 23 "Core Principles" identified in the CEA and CFTC regulations.  *See* 7 U.S.C. § 7(d); 17 C.F.R. pt. 38.  For instance, DCMs must make daily disclosures regarding market volume, 17 C.F.R. § 38.450; keep five years' worth of trading records, *id.* §§ 38.950, 1.31(b)(1); offer "impartial access" to their platforms, *id.* § 38.151(b); make their records "open to inspection by" federal regulators, *id.* § 1.31(d)(1); and maintain capital reserves sufficient to cover "operating costs for a period of at least one year," *id.* § 38.1101(a)(2).  DCMs must also create and maintain a "system capable of detecting and investigating potential trade practice violations," *id.* § 38.156, monitor for "manipulation," *id.* § 38.251, and "have the ability to comprehensively and accurately reconstruct all trading" on their exchanges, *id.* § 38.256.

15

Additionally, DCMs must use a CFTC-regulated clearinghouse, ensuring that financial obligations of all trade counterparties are met by entities with sufficient liquidity. 17 C.F.R. § 38.601; 7 U.S.C. § 7a-1.

The CEA prescribes a detailed system for the approval and listing of contracts on DCMs. Until 2000, the CEA required DCMs to obtain CFTC preapproval before listing any new contract and subjected all contracts to an "economic purpose" test. *See Contract Market Designation*, 40 Fed. Reg. 25,849, 25,850 (June 19, 1975). But this preapproval process proved onerous and inefficient, causing Congress in 2000 to eliminate the test and allow DCMs to list derivatives contracts by self-certifying their compliance with applicable CEA requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §§ 38.4(b), 40.2(a)(1). The CFTC may stay the listing of a self-certified contract in certain circumstances. *See* 17 C.F.R. § 40.2(c). The CFTC also may require a DCM to submit a "written demonstration" that it is "in compliance" with one or more Core Principles at any time. *Id.* § 38.5(b).

If the CFTC concludes that an event contract may fall within an enumerated category in the Special Rule, it may subject the contract to a 90-day public-interest review. *See id.* § 40.11(c). Following review, the CFTC "shall issue an order approving or disapproving" the contract. *Id.* § 40.11(c)(2).

The CEA also sets out a detailed enforcement scheme. If a DCM violates the CEA, the CFTC has recourse to an array of enforcement mechanisms, including but not limited to civil penalties, 7 U.S.C. § 9, revocation of licensing, *id.* § 8b, and referral for criminal enforcement, *id.* § 13. Following the 1978 CEA amendments, appropriate officials "of any State" may sue over violations of the CEA or its regulations, but, consistent with the CFTC's exclusive jurisdiction over DCMs, only against parties "other than a [designated] contract market." *Id.* § 13a-2(1).

## II. FACTUAL BACKGROUND

In 2020, the CFTC certified Kalshi as a DCM. *See KalshiEX LLC v. CFTC,* No. 23-cv-3257, 2024 WL 4164694, at *4 (D.D.C. Sept. 12, 2024). Since then, Kalshi has been regulated under federal law alongside entities like the Chicago Mercantile Exchange.

Kalshi offers many kinds of event contracts related to climate, technology, health, popular culture, and economics. For example, Kalshi allows users to trade on who will win the next U.S. presidential election, whether India will meet its 2030 climate goals, and what the top movie on Netflix will be next week. These contracts allow customers to hedge and trade based on financially significant events. Because prices are driven by

market forces, these contracts have significant predictive value.[2] Two kinds of contracts offered by Kalshi are relevant to this appeal.

*Election Contracts.* In June 2023, Kalshi began offering contracts on election outcomes. The CFTC sought to prohibit them under the Special Rule, asserting that they involved "gaming" and "unlawful" activity under certain state laws and were contrary to the public interest. *KalshiEX*, 2024 WL 4164694, at *5-6. Kalshi sued the CFTC in the D.C. District Court, which held that the contracts did not involve gaming or unlawful activity, so the CFTC had to permit them. *Id.* at *13. The D.C. Circuit denied a stay pending appeal, after which the CFTC dismissed its appeal, making the district court's decision final. *See* No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025).

*Sports Contracts.* In January 2025, Kalshi began offering contracts on sports events. When Kalshi first self-certified its sports contracts, the CFTC requested, pursuant to 17 C.F.R. § 38.5(b), that Kalshi submit a written "[d]emonstration of compliance" with the CEA. Kalshi responded with detailed filings describing the contracts' compliance with the CEA and CFTC regulations. 3-ER-138-166. The CFTC took no further action, thereby allowing Kalshi to list the contracts. The CFTC has reserved the right to

---

[2] Kelly Cloonan, *Betting markets nailed Trump's decisive win — and it's a good reminder they can be more accurate than polls*, Bus. Insider (Nov. 9, 2024), https://perma.cc/5W7W-S76X.

subject these contracts to public-interest review, *see* CFTC Ltr. No. 25-36, Comm. Fut. L. Rep. ¶ 35563 (Sep. 30, 2025), but has not initiated review, meaning that these contracts are legal under federal law.

Kalshi's contracts differ fundamentally from bets offered by sportsbooks. Unlike a traditional casino or "house," Kalshi's exchange is not the counterparty to any trade, does not set betting odds, does not profit when its customers lose, and has no incentives to favor itself at customers' expense. 2-ER-88-89, 2-ER-105-106. Traders instead enter into trades against other traders, they may exit their positions at any time before a contract concludes, and, as in other financial markets, prices are set by supply and demand rather than the exchange. *Id.* These distinctions explain why the CEA imposes a comprehensive scheme for regulating *market* conduct—by requiring real-time surveillance of trading activity and prohibiting fraud, manipulation and disruptive trading. *See* 7 U.S.C. §§ 6b, 6c, 9, 13; 17 C.F.R. §§ 38.250, 180.1, 180.2.

## III. PROCEDURAL HISTORY

On March 4, 2025, the Nevada Gaming Control Board ("NGCB") sent Kalshi a cease-and-desist letter, asserting that Kalshi's election and sports contracts violate Nevada law and demanding that Kalshi cease offering them in Nevada within 10 days of receipt (a deadline later extended to March 28).

2-ER-98. The NGCB "expressly reserve[d] all rights to pursue criminal and civil actions based on Kalshi's past and future conduct within the state." 2-ER-98. Faced with the threat of civil and criminal enforcement, Kalshi brought this suit on the ground that the CEA preempts state regulation of trading on DCMs like Kalshi. Kalshi also sought a preliminary injunction.

The district court initially granted a preliminary injunction. The court explained that "section 2's plain and unambiguous language ... reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges." 2-ER-76. Because Kalshi's event contracts are "legal under federal law ... the defendants cannot pursue civil or criminal liability against Kalshi for offering those contracts." 2-ER-77. The court also determined that Kalshi would suffer irreparable harm absent relief and that "[t]he balance of hardships tips in Kalshi's favor given that it is facing substantial monetary expenditures, reputational damage, or civil and criminal prosecution," and Defendants could "prosecute Kalshi later for its conduct" if the court was wrong on preemption. 2-ER-79. The district court observed that shuttering Kalshi's operations in Nevada would "disrupt[]" "third parties' contracts and investment expectations," as well as "impact counterparties to those

contracts who are neither based in Nevada nor signed the event contracts while in Nevada." 2-ER-80. Defendants opted not to appeal.

Six months later, the district court reversed course. In a separate proceeding, it denied a preliminary injunction to a different DCM that raised a similar preemption argument as to sports-event contracts (but not election contracts). *N. Am. Derivatives Exch., Inc. v. NGCB* ("*Crypto*"), No. 2:25-cv-978, 2025 WL 2916151, at *9, 14 (D. Nev. Oct. 14, 2025). Based on that decision, Defendants moved to dissolve Kalshi's preliminary injunction. *See* D. Ct. ECF No. 142.

The district court granted dissolution. The court did not disturb its earlier conclusion that the CEA preempts state gambling laws as applied to "swaps" or other derivatives on DCMs. Instead, the court concluded that Kalshi's event contracts do not qualify as "swaps" or "contracts of sale of a commodity for future delivery" subject to the CFTC's exclusive jurisdiction in the first place. According to the court, Kalshi's contracts are sports wagers, not derivatives. *See* 1-ER-17 ("'I know it when I see it.'" (quoting *Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring))). The court conducted no analysis regarding Kalshi's election contracts.

Even as it dissolved the injunction, the district court recognized that Kalshi "has raised serious questions on the merits." 1-ER-25. The court also

did not reverse its earlier finding that Kalshi would suffer irreparable harm absent the preliminary injunction. But the court departed from its ruling on the equities, determining that the equities favored dissolution because Defendants "have strong interests in regulating gaming in Nevada," and licensed gaming companies and the Nevada economy faced harm from Kalshi's operations. 1-ER-27-29.

Kalshi appealed the following day.

## SUMMARY OF ARGUMENT

**I.A.** Starting with the plain text, every marker of congressional intent confirms that Congress preempted the field of trading on DCMs like Kalshi. Congress granted the CFTC "exclusive jurisdiction" over trading on DCMs, displacing state regulation. Congress deleted a provision that would have preserved state regulation. And Congress's avowed purpose in establishing a uniform set of rules for trading on DCMs was to "preempt the field."

**B.** Nevada's gambling laws are also conflict preempted as applied to Kalshi. Allowing 50 states to regulate trading on DCMs would thwart Congress's objective of uniform federal regulation of DCMs. It would also be impossible for Kalshi to comply with Nevada law—which limits the locations from which entities can accept what Nevada calls wagers—while complying with federal obligations to provide impartial access to its nationwide

exchange. Nevada's laws also create a conflict in enforcement because they purport to criminalize conduct that the CFTC, exercising discretion expressly delegated by Congress, has allowed.

**II.** The district court acknowledged that the CEA preempts the field, but adopted a workaround to allow Defendants to ban Kalshi's contracts anyway. The court's conclusion that Kalshi's contracts are not swaps or futures contracts was mistaken on multiple grounds.

**A.** The CEA preempts states from second-guessing whether instruments traded on DCMs are derivatives. Otherwise, states applying their own understanding of what is and what is not a derivative could exercise jurisdiction over the exact same instruments as the CFTC—undermining Congress's purpose of uniform federal regulation of DCMs. The gravamen of Defendants' argument is that the CFTC should not permit Kalshi's contracts. But that is a dispute with the CFTC, and Defendants cannot circumvent the procedures for challenging agency decisions by bringing an enforcement action directly against Kalshi for offering contracts that its exclusive federal regulator has permitted.

**B.** Regardless, Kalshi's contracts are indeed derivatives subject to the CFTC's exclusive jurisdiction. They are swaps under the CEA's intentionally

broad definition, and they are no different from futures that have traded on DCMs for decades.  The CFTC itself has repeatedly recognized as much.

**C.**  The district court had to effectively rewrite the CEA to allow state regulation.  The district court's conclusions—that the term "event" does not encompass outcomes, that a swap can only be based on an event "inherently" associated with financial consequences, and that a futures contract cannot be based on an "excluded commodity"—are flatly inconsistent with the CEA's text and decades of settled practice.

**D.**  The district court's decision was grounded on the view that Congress did not intend "gambling" to occur on DCMs.  But the Special Rule is irrefutable textual proof that Congress intended the CFTC—not 50 states—to make a public-interest determination regarding swaps and event contracts involving "gaming."  Nor would treating Kalshi's contracts as derivatives disturb state regulation of sports betting.  The CEA does not apply to state-regulated, off-exchange transactions like sports bets.

**III.**  In granting Kalshi an injunction, the district court correctly found that Kalshi would suffer irreparable harm absent an injunction, and it did not revisit that conclusion when it dissolved the injunction.  But it erred in holding that the balance of harms favored allowing Defendants to prosecute Kalshi.  Kalshi's concrete, irreparable harms—including harms to its users

24

nationwide—outweigh the speculative, reparable harms Defendants have alleged, and the public interest supports enforcing the Supremacy Clause.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (citation omitted). This Court applies a "sliding scale" approach, warranting a preliminary injunction where the movant raises "a 'serious question' on the merits when the balance of hardships tips sharply in their favor." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) (citation omitted).

The Court "review[s] an order regarding preliminary injunctive relief for abuse of discretion, but review[s] any underlying issues of law de novo." *Karnoski*, 926 F.3d at 1198. The party seeking dissolution "bears the burden of establishing that a significant change in facts or law warrants … dissolution." *Id.* (citation omitted).

## ARGUMENT

The plain text of the CEA, along with every other marker of congressional intent, makes clear that only the CFTC may regulate trading on DCMs.

The district court initially agreed, but then created an extratextual exception for Kalshi's contracts based on its view that they constitute gambling. Even the district court acknowledged that its interpretation "isn't perfect" and its ruling raised "serious questions" on the merits. 1-ER-25; 2-ER-37. For numerous reasons, this Court should reverse.

## I.  KALSHI IS LIKELY TO SUCCEED ON THE MERITS BECAUSE THE CEA PREEMPTS NEVADA'S GAMBLING LAWS AS APPLIED TO TRADING ON DCMs.

The Supreme Court sets out a "fundamental principle of the Constitution" that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); U.S. Const., art. VI, cl. 2. Federal law has preemptive effect no matter how "clearly within a State's acknowledged power" the state's law resides. *Free v. Bland*, 369 U.S. 663, 666 (1962). One type of preemption, known as field preemption, occurs where states regulate in a field that Congress "has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). State laws are also preempted where they conflict with federal law, including when compliance with both is an "impossibility" or state law stands as an "obstacle" to Congress's objectives. *Id.* (citations omitted). Overwhelming evidence establishes that Nevada gambling laws are both field and conflict preempted as applied to Kalshi.

### A. Nevada's Gambling Laws Are Field Preempted As Applied To Kalshi.

The CEA leaves no room for state regulation of trading on DCMs. "Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). Here, every indicator of congressional intent confirms that the CEA preempts the field of regulating trading on DCMs—both through its express text and by setting out a comprehensive scheme that displaces state regulation. *See Crosby*, 530 U.S. at 372 n.6 ("'*field*' preemption may fall into any of the categories of express, implied, or conflict preemption" (citation omitted)).

1. "[I]n the first instance," this Court must "focus on the plain wording of" the CEA. *CSX Transp.*, 507 U.S. at 664. Here, "section 2's plain and unambiguous language ... reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges." 2-ER-76. Section 2(a) expressly preempts state law by granting the CFTC "exclusive jurisdiction" over all "transactions involving swaps," "option[s]," and contracts for "future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A). The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities not named in that provision. *Mississippi v.*

27

*Louisiana*, 506 U.S. 73, 77-78 (1992); *see also Exclusive*, American Heritage Dictionary (2d ed. 1980) ("Not divided or shared with others"; "sole"; "separate; incompatible"). Kalshi's sports and election contracts are traded on a DCM, which necessarily denies jurisdiction to other regulators.

The Supreme Court has recognized that a grant of "exclusive jurisdiction" to a federal agency preempts state efforts to intrude on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC,* 578 U.S. 150, 163 (2016). This Court and others have likewise repeatedly recognized that where a federal authority has exclusive jurisdiction over a field, state regulators lack concurrent jurisdiction. *See, e.g.*, *Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1057 (9th Cir. 2001) (where there is "exclusive federal jurisdiction," "the States cannot have jurisdiction" (quotation marks and citation omitted)); *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024) (an "explicit statutory conferral of exclusive jurisdiction ... withdraws any concurrent jurisdiction"); *Richardson v. Kruchko & Fries*, 966 F.2d 153, 158 (4th Cir. 1992) (state-law claims preempted where they fell within federal agency's "exclusive jurisdiction"). The CFTC's exclusive jurisdiction over trading on DCMs is no different.

Other features of Section 2(a)'s text confirm its field-preemptive effect. Section 2(a) contains a savings clause providing that it does not "supersede" the jurisdiction of "other regulatory authorities" under the laws "of any State." 7 U.S.C. § 2(a)(1)(A). Crucially, the clause applies "*[e]xcept as hereinabove provided*" by the grant of exclusive jurisdiction to the CFTC over trading on DCMs. *Id*. (emphasis added). That language enables a "logical inference" of preemption as to matters within the CFTC's exclusive jurisdiction. *See Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 194-196 (9th Cir. 2013) (interpreting savings clause with an "*[e]xcept as provided*" proviso). Because the savings clause clarifies that state law is not "supersede[d]" as to *off-DCM* transactions, it confirms that state law is superseded as to *on-DCM* transactions. Indeed, Congress added the proviso specifically to ensure that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6.

2. The backdrop against which Congress regulated in 1974 confirms its preemptive intent. When Congress considered the 1974 amendments, the CEA did not "impair any State law applicable to any transaction" regulated by the statute. 7 U.S.C. § 6c (1936). The Supreme Court had explained that *without* this proviso, the CEA would "almost certainly" preempt state laws,

29

but that this proviso "serve[d] the function of preventing supersedure and preserving state control." *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947). Senate drafters accordingly "deleted" this clause "to assure that Federal preemption is complete." 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statement of Sen. Curtis). The Senate also qualified the state-law savings clause by clarifying that it applied "except as hereinabove provided" by the CFTC's exclusive jurisdiction over on-DCM trading. S. Rep. No. 93-1131, at 31. These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court had previously relied on "to hold that the CEA did not preempt state regulation." Van Wart, *supra*, at 692-693. They would be incomprehensible if Congress intended to preserve state authority to regulate trading on DCMs. *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 168 n.16 (1993) ("Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded." (citation omitted)).

3. Later-enacted provisions further confirm that the CFTC's exclusive jurisdiction over trading on DCMs preempts state regulation. Following the 1974 amendments, Congress enacted other provisions relevant to the states' role, but each one *excludes* the right to regulate trading on DCMs. The 1978 amendments authorize state officials to sue over "any act or practice constituting a violation of any provision of this chapter or any [CFTC] rule."

7 U.S.C. § 13a-2(1). But states may *only* enforce the CEA against parties "*other than a [designated] contract market.*" *Id.* (emphasis added). Congress enacted this carveout because it "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC." Van Wart, *supra*, at 708. Similarly, the 1982 amendments instruct that the statute shall *not* "supersede or preempt" the application of state law to transactions "*not* conducted on" a DCM. 7 U.S.C. § 16(e)(1) (emphasis added). The only coherent inference of specifying no preemption as to off-DCM transactions is that Congress *did* intend preemption as to on-DCM transactions.

4. Precedent further reinforces this conclusion. By the time Congress revisited the CEA in Dodd-Frank, courts of appeals had repeatedly and uniformly agreed that the CEA's exclusive jurisdiction over DCMs preempts other regulation. *Leist*, 638 F.2d at 322 ("the CEA preempts the application of state law"); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (state-law "commercial gambling" claim could not proceed because "the Commodity Exchange Act preempts all state laws inconsistent with its provisions"); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("Congress intended the CFTC to occupy the entire field of commodities futures regulation."); *FTC v. Ken Roberts Co.*, 276 F.3d

31

583, 590-591 (D.C. Cir. 2001) (the CFTC's jurisdiction is "exclusive with regard to the trading of futures *on organized contract markets*" (citation omitted)); *Am. Agric.*, 977 F.2d at 1157 (state-law claims "are preempted by the CEA" as applied to "the operation of a contract market"); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive").

This Court "presume[s] that Congress acts with awareness of relevant judicial decisions." *United States v. Alvarez-Hernandez*, 478 F.3d 1060, 1065 (9th Cir. 2007) (quotation marks and citation omitted). When it returned to the CEA in 2010, Congress would have been aware of the uniform interpretation of every court that had addressed preemption. And Congress would have understood that confirming the CFTC's jurisdiction over event contracts preempted state law as applied to trading those instruments on DCMs.

The CFTC shares this view. In litigation involving the CFTC's authority to regulate Kalshi's election contracts, the CFTC recently acknowledged that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant's Br. 27, *KalshiEX v. CFTC*, No. 24-cv-5205 (D.C. Cir. Oct. 16, 2024); *see Loper Bright Enters. v. Raimondo*, 603 U.S.

369, 402 (2024) (courts may account for an agency's "body of experience and informed judgment" in interpreting a statute (citation omitted)).

5. While this Court need not consider legislative history given the clear statutory text and context, legislative history eliminates any doubt about preemption. Congress emphasized in the lead-up to the 1974 amendments that it sought to "avoid unnecessary, overlapping and duplicative regulation" in the derivatives markets. *Ken Roberts*, 276 F.3d at 588 (citation omitted). The Senate understood that the proposed amendments would bring "the futures markets" "under Federal regulation" because "different State laws would just lead to total chaos." *Senate Hearings* at 249, 685 (statement of Sen. Clark). And the conference report to the 1974 amendments emphasized Congress's desire to "*preempt the field* insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (emphasis added); *see Garcia v. United States,* 469 U.S. 70, 76 (1984) (when resort to legislative history is warranted, committee reports are the "authoritative source").

Legislative history further underscores that when Congress returned to the CEA after 1974, it understood that the 1974 amendments had already "bestowed on the CFTC exclusi[ve] jurisdiction to regulate futures trading" on DCMs, "thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, pt. 1, at 44; *see also* H.R. Rep. No. 106-711, pt. 2, at 71 ("the current"

CEA already "supersedes and preempts" state laws "in the case of transactions conducted on a registered entity"). Subsequent CEA amendments allowing states to regulate *off-DCM* trading rested critically on Congress's recognition that the 1974 amendments prohibited states from regulating *on-DCM* trading.

6. Finally, the "pervasive" regulatory framework for regulating trading on DCMs confirms that Congress preempted the field. *Arizona*, 567 U.S. at 399 (citation omitted). Congress in the CEA created "a comprehensive regulatory structure" to oversee the "futures trading complex." *Curran*, 456 U.S. at 356 (citation omitted). That scheme leaves no room for parallel state regulation.

CFTC regulation covers the lifecycle of an exchange. To list derivatives contracts, an exchange must receive CFTC designation. *See* 7 U.S.C. § 7(a). That process requires an application demonstrating myriad capabilities, including the capacities to detect and investigate actors who violate CFTC rules, 17 C.F.R. § 38.150(b), retain adequate compliance staff, *id.* § 38.155(a), surveil trades executed on its platform, *id.* § 38.156, and more. Once the market becomes a DCM, it is subject to extensive oversight, including recordkeeping requirements, *id.* § 38.950, reporting obligations, *id.*

34

§§ 38.450, 16.00 *et seq.*, liquidity standards, *id.* § 38.1101(a)(2), and penalties, 7 U.S.C. §§ 9a, 12c.

CFTC regulation also covers transactions *on* DCMs. The CEA sets out comprehensive rules governing DCMs, including prohibitions on fraud, manipulation, and disruptive trading, as well as requirements for position-size limits in certain transactions. 7 U.S.C. §§ 6a, 6b, 6c, 9; *see* 17 C.F.R. §§ 150.2 & App. E, 180.1, 180.2. In the case of event contracts subject to the Special Rule, Congress chose *not* to exempt these contracts from the preempted field, but instead granted the CFTC discretion to determine whether they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CEA rounds out the scheme by authorizing an array of sanctions, including civil penalties, revocation of licensing, and referral for criminal enforcement. *Id.* §§ 9a, 12c, 13, 13a, 13a-1.

The CFTC's comprehensive regime leaves "no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (citation omitted). Instead, "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction," by making the CFTC's jurisdiction over trading on DCMs "plenary." *Pub. Util. Dist. No. 1 v. IDACORP Inc.*, 379 F.3d 641, 646-647 (9th Cir. 2004) (citation omitted).

35

### B. Nevada's Gambling Laws Are Conflict Preempted As Applied To Kalshi.

Even if field preemption did not bar Nevada from regulating Kalshi's event contracts, conflict preemption would. In at least three respects, complying with Nevada law would be "impossible" for Kalshi or pose an "obstacle" to the CEA's purposes. *Crosby*, 530 U.S. at 372-373 (citations omitted).

1. Nevada's application of its gambling laws to Kalshi subverts Congress's aim of bringing futures markets "under a uniform set of regulations." *Am. Agric.*, 977 F.2d at 1156. State regulation brings the specter of "varying and potentially contradictory legal standards" which would not only hamper DCM operations, but potentially prevent them from operating "at all." *Id.* The Seventh Circuit has accordingly held that "[w]hen application of state law would directly affect trading on or the operation of a [DCM], it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation omitted). The same principles prohibit Nevada's efforts to directly regulate trading on DCMs like Kalshi. *See Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390, 395 (9th Cir. 2002) (finding conflict preemption where "[t]he application of different state standards

would disrupt the nationally uniform administration" provided by federal statute).

2.   Compliance with both federal and Nevada law is outright impossible for Kalshi.  Nevada law allows sports bets only by persons physically located in Nevada or specified other states.  NGCB, *Regulation 22: Race Books and Sports Pools* 14 (Nov. 2024), https://perma.cc/TLH7-MBLV.   But compliance with that geographical requirement is impossible for a nationwide DCM like Kalshi, where traders do not take positions against Kalshi, but rather enter into contracts with other traders across the country.  Worse, if Nevada is permitted to impose that requirement here, 49 other states could equally attempt to subject Kalshi to their own geographical limitations.

Even if Kalshi could overcome that hurdle, doing so would bring Kalshi out of compliance with the Core Principles on which its federal designation depends.  Core Principle 2 requires Kalshi to provide "impartial access to its markets and services."  17 C.F.R. § 38.151(b).  A scheme that grants every state the power to dictate which contracts are and are not permitted in that state would violate that impartial-access requirement—creating 50 different markets rather than the single nationwide market Congress commanded.  Cutting off access in Nevada and unwinding existing positions, as

37

Defendants have demanded, would also conflict with Kalshi's obligation to avoid "market disruptions" and increase the risk of price "manipulation"—additional violations of Core Principles. *See* 17 C.F.R. §§ 38.255, 38.200. This is a quintessential case of impossibility preemption—where federal law "forbids what the state law requires." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012).

3. Allowing Defendants to criminally prosecute Kalshi would conflict with Congress's chosen "method of enforcement." *Arizona*, 567 U.S. at 406. Congress in the Special Rule gave the CFTC authority to prohibit the trading of an event contract if it determines the contract involves "gaming" and is "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). Allowing states to interfere with that method of enforcement produces yet another conflict.

The conflict is obvious with respect to Kalshi's election contracts. As the D.C. District Court has squarely held, these contracts do not involve "gaming" under the Special Rule, and the CEA therefore *requires the CFTC to permit them.* *KalshiEX*, 2024 WL 4164694, at *13. It is difficult to conceive of a clearer case for conflict preemption than a state purporting to prohibit contracts even though the comprehensive federal regime governing Kalshi's exclusive federal regulator *requires* that they be permitted.

Much the same is true with Kalshi's sports contracts. When Kalshi offered these contracts, the CFTC asked Kalshi for a "demonstration of compliance" with the CEA, and upon reviewing Kalshi's response, *see* 3-ER-138-166, opted to permit them. Thus, "by their very existence," these contracts reflect "the CFTC's exercise of its discretion and implicit decision to permit them." *See KalshiEX LLC v. Flaherty*, No. 25-cv-2152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025). The CFTC has noted that it "has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under CEA," and has reserved the right to do so. *See* CFTC Ltr. No. 25-36, *supra*, at 2 n.4. But until then, the agency has opted not to prohibit them.

States may not take actions that "would disturb and conflict with the balance embodied" in a discretionary judgment Congress delegated to a federal agency. *California v. FERC*, 495 U.S. 490, 506 (1990). When Congress entrusts a decision to an agency's discretion, "it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives," and therefore intends to bar states from "re-balancing" those considerations. *Farina v. Nokia Inc.*, 625 F.3d 97, 123 (3d Cir. 2010). Nevada seeks not just to ban Kalshi's contracts, but has threatened *criminal* penalties against Kalshi for

offering them. *See* 2-ER-98. Allowing Nevada—not to mention 49 other states—to subject Kalshi to criminal penalties for offering contracts that the CFTC has opted to permit would render the CFTC's judgment utterly meaningless.

## II. THE DISTRICT COURT ERRED IN CREATING A CARVEOUT TO CEA PREEMPTION FOR KALSHI'S CONTRACTS.

The district court acknowledged that the "plain and unambiguous language" of the CEA preempts state laws, 2-ER-76, but adopted a workaround to allow Defendants to ban Kalshi's contracts anyway. Citing policy concerns, the court embraced a gerrymandered understanding of CFTC jurisdiction to conclude that Kalshi's contracts are not swaps or futures, and therefore do not fall within the CFTC's exclusive jurisdiction. That conclusion rested on multiple independent errors of law that compel reversal.

### A. The CEA Bars States From Second-Guessing Whether Instruments Traded On DCMs Are Proper Derivatives.

The district court believed it could second-guess whether Kalshi's contracts are swaps or other derivatives as a "threshold issue" to addressing preemption. 2-ER-47. Not so. The CEA preempts regulation of trading on DCMs—full stop. Kalshi's contracts undisputedly trade on a DCM, and the

CEA therefore reserves the authority to regulate these contracts exclusively for the CFTC.

Section 2(a) of the CEA gives the CFTC "exclusive jurisdiction" to regulate instruments "traded or executed *on*" DCMs. 7 U.S.C. § 2(a)(1)(A) (emphasis added). Its savings clause makes clear that this exclusive jurisdiction does not extend to trading *off* DCMs. *Id.* Section 16 confirms that the CEA does not "supersede or preempt" "State statute[s]" as to "any transaction" "that is *not* conducted on or subject to the rules of a registered entity." 7 U.S.C. § 16(e)(1)(b)(i) (emphasis added). Congress thus drew a clear line: States may regulate off-exchange trading, but regulation of trading on DCMs is reserved for the CFTC. As Congress has repeatedly recognized, the CEA "supersedes and preempts" state laws "in the case of transactions conducted *on a registered entity*." H.R. Rep. No. 106-711, pt. 2, at 71 (2000) (emphasis added).

That exclusive jurisdiction necessarily precludes states from attempting to prohibit instruments offered on DCMs by claiming that they are not derivatives. Such efforts would allow states to "directly affect trading on or the operation of a futures market"—the very type of regulation Congress "preempted." *Am. Agric.*, 977 F.2d at 1156-57.

That conclusion is reinforced by the limited role the CEA grants to states. Section 13a-2 of the CEA permits states to sue "any person" that has "engaged in" a violation of the CEA—but not a "contract market" such as Kalshi. 7 U.S.C. § 13a-2(1). A claim that a DCM is offering an improper instrument is simply a claim that the DCM has violated the CEA—exactly the type of claim Congress prohibited. Section 13a-2 contains the additional proviso that state officials may enforce "any general civil or criminal antifraud statute of such State." *Id.* § 13a-2(7). The CEA thus specifies the authority it preserves for states as to DCMs, even under state law. *See Am. Agric.*, 977 F.2d at 1156 (noting that state antifraud statutes are not preempted because they "have little or no bearing upon the actual operation of the commodity futures markets"). It is inconceivable that Congress nonetheless silently intended to allow states to bring criminal charges against DCMs on the theory that instruments it offers are not derivatives under the CEA.

The district court's contrary conclusion would permit states to thwart the CFTC's exclusive jurisdiction. State regulators with incentives to construe federal authority narrowly could claim that certain instruments do not properly belong on DCMs because they are not derivatives, even though the CFTC clearly believes that they are. The result would be parallel

regulation of the exact same instruments by states and the CFTC—a recipe for "total chaos" that Congress sought to avoid in the 1974 amendments. *Id.* This difficulty would be compounded exponentially if state regulators (as Defendants seek to do below) could scrutinize every contract offered on every DCM, contract-by-contract, to determine whether any of tens of thousands of contracts may or may not qualify as a derivative—all with the looming threat of criminal prosecution if the regulators conclude that any such contract is not a derivative after all. If permitted, this regime would raise "the same unwelcome specter of non-uniformity" that Congress stamped out when it created the CFTC. *Id.* at 1156-57. Neither the district court nor Defendants have identified any case, decided by any court, permitting a state to second-guess instruments offered by a DCM in this manner.

The district court's contrary conclusion resulted from its belief that the CEA is agnostic as to the types of instruments that DCMs may offer, such that certain instruments may trade on DCMs even though they are not subject to CFTC jurisdiction. *See* 1-ER-12. But that belief is mistaken. "[F]utures, swaps and option products" may trade on DCMs. 17 C.F.R. § 38.4. These are the same instruments over which the CEA grants the CFTC exclusive

jurisdiction. *See* 7 U.S.C. § 2(a)(1)(A).[3] But the CFTC's jurisdiction is necessarily limited to instruments enumerated in the CEA, because an agency has "no power to act … unless and until Congress confers power upon it." *Am. Libr. Ass'n. v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005) (citation omitted).

The necessary implication of Defendants' argument is that the CFTC has violated the CEA by permitting Kalshi to offer its contracts. But that is not a claim against Kalshi; it is a claim against the CFTC. The Administrative Procedure Act ("APA") provides a remedy for parties aggrieved by "agency action," including a "failure to act." 5 U.S.C. § 551(13). But, as the en banc Ninth Circuit held in *Big Lagoon Rancheria v. California*, the APA does not allow parties to "use a collateral proceeding to end-run the procedural requirements governing appeals of administrative decisions." 789 F.3d 947, 953 (9th Cir. 2015) (en banc) (citation omitted). The district court distinguished *Big Lagoon* on the ground that Defendants' APA claims against the CFTC may not succeed, but that was precisely the posture of *Big*

---

[3] Congress by statute provided for concurrent CFTC and SEC jurisdiction over "security futures," but Congress specifically prohibited them from trading alongside other commodity futures to avoid SEC interference with the CFTC's exclusive jurisdiction. Security futures can trade only on an exchange that "lists or trades no other contracts of sale for future delivery, except for security futures products." 7 U.S.C. § 7b-1(a)(1).

*Lagoon*:  The state's potential APA claim was barred by the statute of limitations, and this Court declined to allow the state to mount a "collateral attack" the APA would bar.  *Id.* at 953.  Whatever remedy Defendants may have under the APA, they may not threaten Kalshi with criminal prosecution for offering contracts that its exclusive federal regulator has permitted.

### B.  Kalshi's Contracts Are Properly Subject To The CFTC's Exclusive Jurisdiction.

Even if the question were properly before it, the district court erred in holding that Kalshi's contracts are not swaps or other derivatives subject to the CEA's exclusive jurisdiction.

Kalshi's contracts are swaps, because they "provide[ ]" for payment based on the "occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).  "Associated" commonly means "connect[ed]."  *See Associated*, Oxford English Dictionary (3d. ed 2011).  A swap thus requires an event connected to a potential financial, economic, or commercial consequence.

Election and sports contracts both fit comfortably within this definition. The outcomes of political events such as elections are connected to obvious financial consequences.   The outcomes of sporting events likewise are connected with financial consequences—often significant ones—for a broad

ecosystem of stakeholders, including team sponsors, advertisers, television networks, franchises, local communities, and more. They also have direct economic consequences for state-regulated sportsbooks themselves, which face substantial financial risks associated with sports events (if their customers win, they lose, providing a natural hedging need). Some sportsbooks have turned to Kalshi's contracts to hedge their financial risks accordingly.[4]

Kalshi's contracts are also futures or options in "excluded commodities." Excluded commodities include intangibles such as commercial benchmarks. *See* 7 U.S.C. § 1a(19). Congress also expressly defined "excluded commodity" to include "occurrence[s]" that are "associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). An "occurrence"-based futures contract or option results in a payment based on a specified occurrence or extent of an occurrence—for example, the occurrence or severity of a hurricane.[5] Kalshi's event contracts likewise pay out based on financially significant occurrences and thus are "of the character of" futures and

---

[4] Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets For Its Own Risk Management*, In Game (Oct. 22, 2025), https://perma.cc/BT4A-BK8T.

[5] *See CME to Launch Hurricane Futures and Options on Futures Contracts*, CME Group (Feb. 14, 2007), https://perma.cc/5MKV-WCTH.

options, as understood by derivatives markets. *See id.* § 1a(36) (defining "option").

The Special Rule confirms that Congress considered "event contracts" to be subject to CFTC jurisdiction, regardless of whether they are understood as swaps or futures. *Id.* § 7a-2(c)(5)(C)(i). That provision gives the CFTC jurisdiction to review specified types of "agreements, contracts, transactions, or swaps in excluded commodities." *Id.* The CFTC itself has repeatedly confirmed that it understands Kalshi's contracts to fall within that provision. In 2008, before the CFTC's jurisdiction encompassed swaps, it recognized that event contracts, which may be based on "varied" eventualities such as "the results of political elections, or the outcome of particular entertainment events," could be structured as "futures" or "options." *Concept Release*, 73 Fed. Reg. 25,669, 25,669-71 (May 7, 2008). In 2023, after Congress added "swaps," the CFTC subjected Kalshi's election contracts to public-interest review, a review that was predicated on these contracts being subject to CFTC jurisdiction. Last year, it proposed a rule (never adopted) that turned on the understanding that contracts based on the "outcome of a political contest" or a "sporting event" are "agreements, contracts, transactions, or swaps in excluded commodities" subject to its jurisdiction. *Event Contracts*, 89 Fed. Reg. 48,968, 48,974-75 (June 10, 2024). And the CFTC has allowed

47

thousands of election and sports contracts to be traded on Kalshi and its competitors, underscoring its conclusion that these contracts are subject to its jurisdiction.

### C. The District Court's Contrary Interpretation Is Wrong.

The district court adopted a gerrymandered understanding of the CFTC's jurisdiction to permit states to regulate Kalshi's contracts. None of the district court's conclusions can be reconciled with the CEA's text.

1. The district court held that an "outcome"—such as an outcome of a sporting event or election—is not an "event" or "contingency" that may underlie a swap. 1-ER-12. But an outcome plainly is an event. Dictionaries define "event" to include "the *outcome*, issue, or result of anything." *Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001) (emphasis added); *see also, e.g.*, *Event*, Webster's II New College Dictionary (3d ed. 2005) ("[t]he actual outcome or final result"). More generally, dictionaries define "event" broadly to mean "[s]omething that happens." *Event*, Random House Webster's Pocket American Dictionary (5th ed. 2008); *see also, e.g.*, *Event*, Oxford American Dictionary and Thesaurus (2d ed. 2009) ("a thing that happens or takes place"). An outcome is quite naturally understood to be "something that happens." The 2024 U.S. presidential election happened, but so did Donald Trump's victory.

Similarly, "contingency" includes "something liable to happen as an adjunct to *or result* of something else." *Contingency*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (emphasis added); *see also, e.g.*, *Contingency*, Webster's II New College Dictionary (3d ed. 2005) ("[s]omething incidental to something else"). That definition comfortably encompasses outcomes.

Courts have broadly recognized that an "event" is "the outcome or consequence of anything." *Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*, 26 F.3d 1508, 1514-15 (10th Cir. 1994) (citation omitted). And courts have applied this conclusion specifically to event contracts. *KalshiEX*, 2024 WL 4164694, at *1 ("event contracts" are "a type of derivative contract whose payoff is based on the outcome of a contingent event"); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 32, 35 (D.D.C. 2015) (CEA applies to contracts tied to "the outcome of real-world events").

The CFTC likewise recognized last year that "event contracts are generally understood to be a type of derivative contract ... based on the *outcome* of an underlying occurrence or event." 89 Fed. Reg. at 48,969 (emphasis added). An event contract thus may be based on "the *outcome* of an awards contest" or "game in which one or more athletes compete." *Id.* at

48,975 (emphasis added). The district court's extratextual definition contravenes the CFTC's position.

A rule providing that event contracts cannot be based on outcomes would yield intractable interpretive difficulties. Almost any event can be recharacterized as the outcome of a different event. The passage of a law could be framed as the outcome of a legislative vote. The inauguration of a President could be framed as the outcome of an election. Construing the CFTC's exclusive jurisdiction to turn on the distinction between events and outcomes would call into question the validity of almost every conceivable event contract, resulting in uncertainty, litigation, and paralysis. The same goes for the court's conclusion that an "event" underlying a swap must be "a happening of some significance"—a concept the court never attempted to define. 1-ER-12. This uncertainty would be all the more problematic if—as the district court held—states may regulate event contracts whenever they allege that the contracts turn on outcomes rather than events, or whenever they turn on events that are insufficiently "significant."

The district court's interpretation would also vitiate Defendants' own jurisdiction. Nevada law defines a "sports pool" as a business that accepts wagers "on sporting *events*," not outcomes. Nev. Rev. Stat. § 463.0193 (emphasis added). If an outcome is not an event, that would compel the

50

absurd conclusion that the very law Defendants seek to enforce here does not allow them to regulate wagers on the outcomes of sporting events in the first place.

2. The district court held that an event underlying a swap must be "inherently joined or connected" to financial consequences, such that mere "downstream" consequences would not qualify. 1-ER-13-14. "The fundamental problem" with this holding "is that the text of the [CEA] says no such thing." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). In both the definition of "swap" and "excluded commodity," the CEA requires only that an underlying event be "associated with" financial consequences. 7 U.S.C. §§ 1a(19)(iv), (47)(A)(ii). Nothing about that definition requires the association to be *inherent*—that is, "permanent and inseparable." *Inherent*, Random House Webster's Unabridged Dictionary (2d ed. 2001). Indeed, to underlie a swap, an event's financial consequences need only be "potential"— effectively the opposite of "inherent." 7 U.S.C. § 1a(47)(A)(ii). Nor does anything in the statute exclude "downstream" consequences. Traders often seek to hedge against risk from non-financial events with downstream financial consequences, such as weather events.

The Special Rule would make no sense if only inherently financial events qualified. It contemplates CFTC jurisdiction over event contracts—

"swaps"—based on "terrorism," "assassination," "war," and "gaming," none of which is inherently financial. *Id.* § 7a-2(c)(5)(C)(i).

The district court stated that its "inherent[ ]" requirement derived from reading "subpart (ii) [of the swap definition] in context of the surrounding subparts." 1-ER-15. But canons of construction like that cannot be used "to create ambiguity where the statute's text and structure suggest none." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008). Nor does the narrowing construction make sense given the context. The CEA defines "swap" broadly in six ways, including as an agreement "that is, *or in the future becomes*, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv) (emphasis added). That language negates any inference that Congress intended a narrowing construction. And Congress specified ten exclusions from the definition, *id.* § 1a(47)(B), and authorized the CFTC and SEC to "further define" swap by regulation, *see* Dodd-Frank § 712(d)(1), 124 Stat. at 1644, underscoring that it did not want courts to add limitations of their own. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (citation omitted)). Moreover, as the court acknowledged, other swap subparts refer to instruments—like "weather swap" or "emissions

swap"—that cannot be understood as inherently financial, 1-ER-14, undermining the court's narrowing construction still further.

The district court stated that adhering to subpart (ii)'s plain meaning would "render superfluous the rest of the swap definition." 1-ER-20. But overlap is not the same as superfluity, and overlap is equally inevitable under the court's construction because many of the swaps listed in the rest of the swap definition are "inherently financial." This overlap confirms Congress's intent to define swap broadly, and weighs strongly against any artificial narrowing. *See Loving v. IRS*, 742 F.3d 1013, 1019 (D.C. Cir. 2014) (Kavanaugh, J.) ("lawmakers, like Shakespeare characters, sometimes employ overlap or redundancy so as to remove any doubt and make doubly sure").

Besides being inconsistent with the CEA's text, the district court's reading is unworkable. It is entirely unclear what consequences qualify as "inherent" or "downstream" in the district court's view. For example, the district court stated that "a sports game *might be* inherently associated with a potential financial consequence" if "people pay to attend." 1-ER-19 (emphasis added). But if the consequences depend on whether people pay, they are contingent, not inherent. Nor is it clear why paying to see a game creates inherent financial consequences while sponsorship deals following

from the game's outcome are merely downstream. The same interpretive issues would arise with respect to other derivatives. Weather events underlying weather derivatives have no obvious inherent connection to financial consequences. The district court's ruling would render these hedging instruments improper.

3. The district court next held that Kalshi's contracts are not proper derivatives because their underlying events are not commodities. 1-ER-24-25. That was a clear error of law. The CEA treats "occurrence[s]" as "excluded commodit[ies]." 7 U.S.C. § 1a(19)(iv). Excluded commodities in turn are one type of commodity, as courts have recognized. *See United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021) (holding that "excluded commodities" "remain 'commodities' under the Act as a whole"). Indeed, many excluded-commodity-based futures, including interest-rate futures, traded long before the definition of excluded commodity was added to the CEA in 2000. *See* Paul, *supra*, at 280. Congress in 1974 intended to capture "all futures trading that might now exist or might develop in the future." H.R. Rep. No. 93-975, at 76.

The term "excluded" commodity does *not* mean these instruments fall outside of the CFTC's exclusive jurisdiction. Excluded commodities are "excluded" because, when Congress defined them in 2000, it excluded from

CEA coverage over-the-counter transactions in excluded commodities between "eligible contract participants"—*i.e.*, sophisticated non-retail market participants. CFMA § 103, 114 Stat. at 2763A-377. But Congress left the CFTC's exclusive jurisdiction in place over DCM-based transactions in excluded commodities. *Id.* In 2010, Congress largely reversed its decision to allow over-the-counter transactions in excluded commodities. Dodd-Frank § 723, 124 Stat. at 1675 (striking provision referenced above). Again, that is consistent with Congress's intent to preempt the field of trading on DCMs.

The district court held that treating excluded commodities as commodities does not "logically make sense" because the CEA refers to contracts of sale of a commodity "for future delivery," 7 U.S.C. § 2(a)(1)(A), and intangible commodities cannot be delivered. 1-ER-24. But it has long been accepted that cash settlement qualifies as a form of future delivery. *See* Paul, *supra*, at 271 (noting that "cash settlement" was first applied "[i]n 1981"). Indeed, the CEA defines "future delivery" to exclude "any sale of any cash commodity for deferred shipment or delivery," but not to exclude contracts where no underlying delivery occurs. 7 U.S.C. § 1a(27). And the CEA *requires* that "delivery on" stock index futures "*shall be effected in cash* or by means other than the transfer or receipt of any security." *Id.*

§ 2(a)(1)(C)(ii)(I) (emphasis added). Courts accordingly recognize that "[f]inancial futures … are cash settled and do not entail 'delivery' to any participant." *CFTC v. Erskine*, 512 F.3d 309, 320 (6th Cir. 2008); *see CFTC v. Zelener*, 373 F.3d 861, 864 (7th Cir. 2004) ("futures" on intangible commodities "do not allow delivery").

The district court's contrary ruling would upend derivatives law. Myriad futures are based on undeliverable intangibles such as interest-rate benchmarks and stock indexes, and these have always been cash-settled. Paul, *supra*, at 280. If the district court is right, none of these instruments is a futures contract, the CFTC would be powerless to stop any of them from trading on unregistered exchanges, and states would be free to criminalize them even when traded on DCMs. That would obliterate the CFTC's ability to oversee derivatives markets and undermine these contracts' important price-discovery and hedging function.

5. The district court focused on Kalshi's sports contracts but did not address election contracts, even though Defendants seek to ban these contracts as well. Many of the district court's grounds for excluding sports contracts from the swap definition—such as its conclusion that an outcome is not an event or its conclusion that sports outcomes are insufficiently financial—do not apply to election contracts. Moreover, the D.C. District

Court decided last year that Kalshi's election contracts do not involve gaming. *KalshiEX*, 2024 WL 4164694, at *13. The district court's decision effectively nullified the D.C. District Court's ruling, allowing Defendants to prohibit the trading of contracts that are legal under federal law.

### D. The District Court's Policy Concerns Are Misplaced.

The district court acknowledged its interpretation "isn't perfect" but contended that a contrary reading would be "worse" because it would contravene "congressional intent" and "federalism." 2-ER-45. Again, that conclusion was mistaken.

1. Stating "I know it when I see it," the district court concluded that Kalshi's contracts are "sports wagers" and that Congress did not intend for such "gambling" to happen on DCMs. 1-ER-17-18 (citation omitted). But the Supreme Court "has repeatedly stated" that "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Castro-Huerta*, 597 U.S. at 642. This Court has criticized decisions applying an "I know it when I see it approach," noting that it "untether[s] statutory interpretation from the statutory language." *In re Scheer*, 819 F.3d 1206, 1210 (9th Cir. 2016).

The CEA's text does not exclude contracts from the preempted field on the ground that a state may view them as gambling. Rather than excluding

"gambling" contracts from the CFTC's jurisdiction, Congress instead made the CFTC's jurisdiction over such contracts unmistakably clear in the Special Rule, which provides that the CFTC "*may* determine" that contracts involving "gaming" are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). That text does not forbid "gaming" contracts; it allows the CFTC to decide whether to permit them. The district court cited isolated statements by legislators, *Crypto*, 2025 WL 2916151, at *10, but "legislative history, untethered to text in an enacted statute, has no compulsive legal effect," *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 682 (9th Cir. 2007). In any event, those statements make clear that the legislators intended to *give the CFTC*—"and the CFTC alone"— authority to bar contracts involving gaming. *See* Members of Congress Br. 5, Dkt. No. 66, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. July 31, 2025).

The district court's selective reliance on the CFTC's statements about gaming contracts makes a similar error. While the district court focused on the CFTC's statement that it "is not a gaming regulator," 1-ER-21 (quoting 89 Fed. Reg. at 48,982-83), that statement explained why the CFTC *proposed* to conclude that gaming-related event contracts were contrary to the public

interest.[6] But that proposal was *never adopted*, which means the CFTC never actually made a public-interest determination regarding Kalshi's contracts. Kalshi has never disputed the CFTC's authority to conduct a public-interest review for gaming-related contracts; the key point is that the CFTC has never concluded that Kalshi's contracts involve gaming or are contrary to the public interest. In fact, the same proposed rulemaking on which the district court relied made clear that CFTC inaction regarding Kalshi's contracts would "*permit [them] to avoid*" state gambling laws. 1-ER-21 (quoting 89 Fed. Reg. at 48,983) (emphasis added). The abandoned rulemaking only underscores the agency's recognition that event contracts involving elections and sports are subject to its jurisdiction—further proof that these contracts cannot be regulated by states.

2. Even if speculating about legislative motives were permissible, more than a century of history refutes the district court's belief that Congress did

---

[6] The district court stated that a CFTC regulation, 17 C.F.R. § 40.11, prohibits gaming-related event contracts. 1-ER-28. That is wrong. While subsection (a) generally prohibits contracts involving the enumerated categories, subsection (c) permits the CFTC to review such contracts on a case-by-case basis. *See* 17 C.F.R. § 40.11(c). The CFTC itself has recognized as much. *See Provisions Common to Registered Entities*, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011) (explaining that DCMs "may always" self-certify contracts, and that Section 40.11 operates to allow review "on a case-by-case basis"). Regardless, Section 40.11(a) has nothing to do with whether Kalshi's contracts are swaps or futures.

not intend the CEA to preempt state gambling laws. Before Congress enacted the CEA, dozens of states sought to regulate futures trading as gambling. *See* Addendum B. In 1888, the Illinois Supreme Court declared that "dealing in 'futures'" is "a crime"—"a species of gambling [that] has become emphatically and pre-eminently the national sin." *Cothran*, 16 N.E. at 648. Just three years before the CEA's passage, the Supreme Court held that the Grain Futures Act "did not supersede any applicable provisions of the Missouri law making gambling in grain futures illegal." *Dickson*, 288 U.S. at 197. Against that backdrop, it is inconceivable that when Congress granted the CFTC "exclusive jurisdiction" in 1974, Congress nonetheless intended to let states apply their gambling laws to DCMs.

The district court's contrary conclusion would have radical repercussions. Many states—including Nevada—define gambling sufficiently broadly to permit regulation of *any* financial position on any event. *See* Nev. Rev. Stat. § 463.0193 (regulating all entities "accepting wagers on sporting events *or other events*" (emphasis added)); N.J. Stat. Ann. § 2C:37-1(b) (defining gambling as "staking or risking something of value upon … a future contingent event"); N.Y. Penal L. § 225.00(2) (same). If the district court were right, it would let states prohibit any event contract they consider "gambling," in direct conflict with one of the overarching aims

of the CEA. *See KalshiEX*, 2024 WL 4164694, at *12 (noting that this is not a "plausible" outcome, in part "because the CEA specifically preempts the application of state law over derivative markets").

3. The district court thought a contrary reading "would sweep nearly all sports wagering into the CFTC's exclusive jurisdiction even though the states historically have regulated gambling." 1-ER-18 (citation omitted). But nothing about Kalshi's position leads to that implausible result.

The CEA preempts state law as to on-DCM trading but leaves states free to regulate off-DCM transactions like bets offered by sportsbooks. Section 2(a) contains a savings clause making clear that, except as provided by the grant of exclusive jurisdiction to the CFTC over *on-DCM* trading, "nothing" in the remainder of Section 2 shall "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws." 7 U.S.C. § 2(a); *see id.* § 16(e)(1)(B)(i) ("[n]othing" in the CEA "shall supersede or preempt" state law applied to off-exchange transactions). Thus, the CEA's exchange-trading requirement for swaps, *see id.* § 2(e), does not interfere with state regulation of traditional sportsbooks.

Nor does it follow from treating Kalshi's sports contracts as swaps that run-of-the-mill sports bets must also be swaps. Acting pursuant to an express delegation from Congress, *see* Dodd-Frank § 712(d)(1), 124 Stat. at

1644, the CFTC has explained that derivatives such as swaps, unlike sports bets, are "*traded* on organized markets and over the counter." *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,217 (Aug. 13, 2012) (emphasis added). But "consumer and commercial transactions" that "are not traded on an organized market or over-the-counter"—such as sports bets—are not. *Id.* at 48,247.

While the district court criticized this distinction as "circular," 1-ER-19, courts routinely apply similar reasoning to distinguish between instruments that are subject to CFTC jurisdiction from those that are not. *See Erskine*, 512 F.3d at 323-324 (distinguishing futures subject to the CEA's exchange-trading requirement, which are "standardized," "fungible," and "traded on an exchange," from forwards not subject to the CEA's exchange-trading requirement, which are not (citations omitted)); *Zelener*, 373 F.3d at 864 (similar). The CFTC distinguishes insurance contracts from swaps on similar grounds—*i.e.*, they are "not traded" and are "regulated as insurance under applicable state law." 77 Fed. Reg. at 48,212-13. Thus, nothing about Kalshi's position would withdraw state jurisdiction over traditional sportsbooks.

Congress, moreover, has recognized that certain derivatives traded on DCMs may have attributes that resemble gambling, and it intended the CFTC

to regulate them while allowing the states to regulate off-DCM trading. In the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"), Congress generally adopted state-law definitions of "bet or wager" but expressly provided that "bet or wager" "*does not include*" "any transaction conducted on or subject to the rules of a" DCM. 31 U.S.C. § 5362(1)(E)(ii) (emphasis added). UIGEA confirms Congress's judgment that on-DCM transactions should be regulated by the CFTC, with off-DCM transactions regulated by states.

## III. THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR KALSHI.

The equities sharply favor an injunction. The district court's contrary conclusion rested on the erroneous premise that Kalshi was unlikely to succeed on the merits. If Kalshi meets its merits burden, the remaining factors unquestionably favor an injunction.

*First*, Kalshi will suffer significant irreparable harms absent an injunction. Absent relief, Kalshi faces a "Hobson's choice" of "violat[ing]" state law and "expos[ing]" itself "to potentially huge liability," or "suffer[ing]" the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). If Kalshi does not comply with Defendants' demand, the "credible threat of prosecution" under preempted state statutes constitutes

63

"irreparable harm." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). But if Kalshi attempts compliance, it will face a host of other irreparable harms. The district court recognized these harms when it granted an injunction, 2-ER-78-79, and it did not dispute them when it dissolved the injunction.

To cease offering event contracts in Nevada would require Kalshi to implement geofencing capabilities it lacks. Doing so would take months and cost Kalshi tens of millions of dollars annually. 2-ER-57-58, 2-ER-87-88. Because Defendants are immune from an action for money damages, it is undisputed that Kalshi could not recover those costs even if it ultimately prevails. Although "the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped.'" *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025) (per curiam) (citation omitted).

In addition, abruptly terminating trading for users in Nevada would irreparably harm Kalshi and its users—both users in Nevada and their counterparties in other states. 2-ER-61-63, 2-ER-88-92. Closing out existing positions would impose significant financial harm on Kalshi to make those users whole and would potentially subject Kalshi to liability. *Id.* And closing contracts midstream would harm Kalshi's reputation, not only with

its users, but with its partners who provide their own users access to trade on Kalshi's exchange. *Id.*; *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 838 (9th Cir. 2001) ("harm to ... business reputation and goodwill" is "irreparable"). Because unwinding these trades would affect counterparties outside of Nevada, these same harms extend to users in other states, including New Jersey, where Kalshi has obtained a preliminary injunction.

Moreover, compliance with Nevada law would jeopardize Kalshi's compliance with federal law. Immediately cutting off Nevada traders would violate Kalshi's obligation to provide "impartial access" to its exchange, 17 C.F.R. § 38.151(b); impair its ability to prevent "manipulation, price distortion, and disruptions," *id.* § 38.250; and compromise the "financial integrity" of trading, *id.* § 38.602—all violations of CFTC Core Principles. Even if Kalshi could obtain a Nevada gaming license while this case proceeds, Nevada allows sports bets only by persons physically located in Nevada or specified other states. NCGB, *Regulation 22*, *supra*, at 14-16. Other states impose similar requirements. Attempting to operate state-by-state while this action proceeds would be exceptionally damaging for Kalshi.

*Second*, neither Defendants nor the public will suffer harm if this Court grants an injunction to prevent enforcement of preempted state laws.

Defendants' own actions belie any assertion that an injunction would cause them irreparable harm. For one thing, Defendants declined to appeal the injunction when it was issued nearly nine months ago. *Cf. Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) ("long delay before seeking" relief "implies a lack of urgency and irreparable harm" (citation omitted)). For another, Defendants have voluntarily permitted one of Kalshi's competitors to offer sports contracts to the more than *50 million* annual visitors to Nevada as long as it does not offer contracts to *3.3 million* Nevada residents. 2-ER-35-36. This agreement substantially undermines Defendants' claim that they will be irreparably harmed if Kalshi is permitted to continue operating in Nevada pending final judgment.

The district court maintained that Defendants "have strong interests in regulating gaming in Nevada." 1-ER-27. But a state has no cognizable interest in enforcing preempted law. *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). The district court also cited "the State of Nevada's financial interests in tax revenues." 1-ER-26. But Nevada sportsbook revenue has been "surg[ing]" even after Kalshi began offering sports contracts.[7] Regardless, Defendants have conceded that if

---

[7] *See* Chris Altruda, *Football Keys October Surge in Nevada Sportsbook Revenue*, In Game (Nov. 25, 2025), https://perma.cc/8JFH-FGB4.

they ultimately prevail, they can bring an action against Kalshi to recover "profit" Kalshi generated from its business in Nevada. *See* D. Ct. ECF No. 250 at 24 n.13; Nev. Rev. Stat. § 463.360(3), as amended by S.B. 256, 83rd Sess. (Nev. 2025). The district court erred in concluding that Defendants' *reparable* monetary harms could outweigh Kalshi's *irreparable* harms, including Kalshi's irreparable monetary and reputational harm.

*Third*, as this Court has held, "preventing a violation of the Supremacy Clause serves the public interest." *United States v. California*, 921 F.3d 865, 894 (9th Cir. 2019). The district court identified no negative consequences from the CFTC serving as Kalshi's exclusive regulator in Nevada. Kalshi is subject to "rigorous regulations and oversight" from the CFTC, 1-ER-27-28, and has implemented additional consumer protection measures, such as allowing users to self-exclude from trading, take trading breaks, and set personal funding caps that limit deposits to Kalshi. 2-ER-59; *see also* 2-ER-80 ("there is no evidence before me that anyone, Nevada resident or otherwise, has complained of harm from entering into Kalshi's contracts."). The only harm Nevada faces is a brief delay in enforcement of its gaming laws against Kalshi. That is not enough to outweigh the myriad irreparable harms Kalshi stands to suffer.

## CONCLUSION

The dissolution order should be reversed.

Date: December 26, 2025   /s/ Neal Kumar Katyal

GRANT R. MAINLAND    NEAL KUMAR KATYAL
ANDREW L. PORTER     JOSHUA B. STERLING
DAVIS CAMPBELL      WILLIAM E. HAVEMANN
MILBANK LLP       SAMANTHA K. ILAGAN
55 Hudson Yards      MILBANK LLP
New York, NY 10001     1101 New York Ave., NW
            Washington, DC 20005
DENNIS L. KENNEDY    (202) 835-7505
PAUL C. WILLIAMS     nkatyal@milbank.com
BAILEY ❖ KENNEDY
8984 Spanish Ridge Ave.   *Counsel for Plaintiff-Appellant*
Las Vegas, NV 89148    *KalshiEX LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-7516

I am the attorney or self-represented party.

**This brief contains** | 13963 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Neal Kumar Katyal | **Date** | December 26, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** | 25-7516

The undersigned attorney or self-represented party states the following:

○ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◉ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

The following cases raise the same or closely related issues: 1) Robinhood Derivatives, LLC v. Dreitzer, et al., 25-7831, appealing denial of preliminary injunction of Nevada Gaming Control Board ("NGCB") Cease and Desist ("C&D") letter based on determination that Commodity Exchange Act ("CEA") does not preempt Nevada gambling laws; 2) North American Derivatives Exchange, Inc. ("Crypto") v. Nevada, et al., 25-7187, appealing denial of preliminary injunction of NGCB C&D letter to Crypto on same grounds; 3) Blue Lake Rancheria, et al. v. Kalshi, Inc. et al., 25-7504, appealing denial of preliminary injunction against Kalshi's event contract offerings on ground that they do not violate the CEA and are not subject to the Indian Gaming Regulatory Act.

**Signature** | s/Neal Kumar Katyal    **Date** | December 26, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17**      *New 12/01/2018*

**ADDENDUM A:**

**Pertinent Statutes and Regulations**

# TABLE OF CONTENTS

Provisions from the Commodity Exchange Act (as codified at 7 U.S.C.): ... A1

    7 U.S.C. § 1a(9) ................................................................ A1

    7 U.S.C. § 1a(19) .............................................................. A1

    7 U.S.C. § 1a(27) .............................................................. A2

    7 U.S.C. § 1a(36) .............................................................. A2

    7 U.S.C. § 1a(47) .............................................................. A2

    7 U.S.C. § 2(a)(1)(A) ........................................................ A8

    7 U.S.C. § 2(e) .................................................................. A8

    7 U.S.C. § 7a-2(c)(5)(C) ................................................... A8

    7 U.S.C. § 13a-2 ............................................................. A10

    7 U.S.C. § 16(e) .............................................................. A12

Provisions from the Commodity Futures Modernization Act of 2000 (Pub L. No. 106-554, Appendix E, 114 Stat. 2763A-365 (2000)) ...................... A13

    Section 103 – 114 Stat. at 2763A-377-78 ............................... A13

Provisions from the Dodd-Frank Act of 2010 (Pub. L. No. 111-203, 124 Stat. 1376 (2010)): ..................................................................... A14

    Section 712(d)(1) – 124 Stat. at 1644 ..................................... A14

Provisions from Title 17 of the Code of Federal Regulations: ................... A14

    17 C.F.R. § 38.4 ............................................................... A14

    17 C.F.R. § 38.5 ............................................................... A15

    17 C.F.R. § 40.2 ............................................................... A16

    17 C.F.R. § 40.3 ............................................................... A19

    17 C.F.R. § 40.11 ............................................................. A22

## Provisions from the Commodity Exchange Act (as codified at 7 U.S.C.):

## 7 U.S.C. § 1a(9)

The term "commodity" means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13–1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

## 7 U.S.C. § 1a(19)

The term "excluded commodity" means—

(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

(I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

(II) based solely on one or more commodities that have no cash market;

(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

(iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

A1

(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and

(II) associated with a financial, commercial, or economic consequence.

## 7 U.S.C. § 1a(27)

The term "future delivery" does not include any sale of any cash commodity for deferred shipment or delivery.

## 7 U.S.C. § 1a(36)

The term "option" means an agreement, contract, or transaction that is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty".

## 7 U.S.C. § 1a(47)

(A) In general

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction—

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk

associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—

(I) an interest rate swap;

(II) a rate floor;

(III) a rate cap;

(IV) a rate collar;

(V) a cross-currency rate swap;

(VI) a basis swap;

(VII) a currency swap;

(VIII) a foreign exchange swap;

(IX) a total return swap;

(X) an equity index swap;

(XI) an equity swap;

(XII) a debt index swap;

(XIII) a debt swap;

(XIV) a credit spread;

(XV) a credit default swap;

(XVI) a credit swap;

(XVII) a weather swap;

(XVIII) an energy swap;

(XIX) a metal swap;

(XX) an agricultural swap;

A3

(XXI) an emissions swap; and

(XXII) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

(B) Exclusions

The term "swap" does not include—

(i) any contract of sale of a commodity for future delivery (or option on such a contract), leverage contract authorized under section 23 of this title, security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

(ii) any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled;

(iii) any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof, that is subject to—

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(iv) any put, call, straddle, option, or privilege relating to a foreign currency entered into on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a));

A4

(v) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a fixed basis that is subject to—

    (I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

    (II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(vi) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a contingent basis that is subject to the Securities Act of 1933 (15 U.S.C. 77a et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), unless the agreement, contract, or transaction predicates the purchase or sale on the occurrence of a bona fide contingency that might reasonably be expected to affect or be affected by the creditworthiness of a party other than a party to the agreement, contract, or transaction;

(vii) any note, bond, or evidence of indebtedness that is a security, as defined in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1));

(viii) any agreement, contract, or transaction that is—

    (I) based on a security; and

    (II) entered into directly or through an underwriter (as defined in section 2(a)(11) of the Securities Act of 1933 (15 U.S.C. 77b(a)(11)) by the issuer of such security for the purposes of raising capital, unless the agreement, contract, or transaction is entered into to manage a risk associated with capital raising;

(ix) any agreement, contract, or transaction a counterparty of which is a Federal Reserve bank, the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States; and

(x) any security-based swap, other than a security-based swap as described in subparagraph (D).

(C) Rule of construction regarding master agreements

    (i) In general

Except as provided in clause (ii), the term "swap" includes a master agreement that provides for an agreement, contract, or transaction that is a swap under subparagraph (A), together with each supplement to any master agreement, without regard to whether the master agreement contains an agreement, contract, or transaction that is not a swap pursuant to subparagraph (A).

(ii) Exception

For purposes of clause (i), the master agreement shall be considered to be a swap only with respect to each agreement, contract, or transaction covered by the master agreement that is a swap pursuant to subparagraph (A).

(D) Mixed swap

The term "security-based swap" includes any agreement, contract, or transaction that is as described in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)) and also is based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence (other than an event described in subparagraph (A)(iii)).

(E) Treatment of foreign exchange swaps and forwards

(i) In general

Foreign exchange swaps and foreign exchange forwards shall be considered swaps under this paragraph unless the Secretary makes a written determination under section 1b of this title that either foreign exchange swaps or foreign exchange forwards or both—

(I) should be not be regulated as swaps under this chapter; and

(II) are not structured to evade the Dodd-Frank Wall Street Reform and Consumer Protection Act in violation of any rule promulgated by the Commission pursuant to section 721(c) of that Act.

(ii) Congressional notice; effectiveness

The Secretary shall submit any written determination under clause (i) to the appropriate committees of Congress, including the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives. Any such written determination by the Secretary shall not be effective until it is submitted to the appropriate committees of Congress.

(iii) Reporting

Notwithstanding a written determination by the Secretary under clause (i), all foreign exchange swaps and foreign exchange forwards shall be reported to either a swap data repository, or, if there is no swap data repository that would accept such swaps or forwards, to the Commission pursuant to section 6r of this title within such time period as the Commission may by rule or regulation prescribe.

(iv) Business standards

Notwithstanding a written determination by the Secretary pursuant to clause (i), any party to a foreign exchange swap or forward that is a swap dealer or major swap participant shall conform to the business conduct standards contained in section 6s(h) of this title.

(v) Secretary

For purposes of this subparagraph, the term "Secretary" means the Secretary of the Treasury.

(F) Exception for certain foreign exchange swaps and forwards

(i) Registered entities

Any foreign exchange swap and any foreign exchange forward that is listed and traded on or subject to the rules of a designated contract market or a swap execution facility, or that is cleared by a derivatives clearing organization, shall not be exempt from any provision of this chapter or amendments made by the Wall Street Transparency and Accountability Act of 2010 prohibiting fraud or manipulation.

(ii) Retail transactions

Nothing in subparagraph (E) shall affect, or be construed to affect, the applicability of this chapter or the jurisdiction of the Commission with respect to agreements, contracts, or transactions in foreign currency pursuant to section 2(c)(2) of this title.

## 7 U.S.C. § 2(a)(1)(A)

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

## 7 U.S.C. § 2(e)

It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.

## 7 U.S.C. § 7a-2(c)(5)(C)

(i) Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent

of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i)2 of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

> (I) activity that is unlawful under any Federal or State law;

> (II) terrorism;

> (III) assassination;

> (IV) war;

> (V) gaming; or

> (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

(ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

(iii) Swaps contracts

> (I) In general

> In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

> (II) Requirements

> Any such criteria, conditions, or rules shall consider—

>> (aa) the financial integrity of the derivatives clearing organization; and

(bb) any other factors which the Commission determines may be appropriate.

(iv) Deadline

The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation.

## 7 U.S.C. § 13a-2

(1) Whenever it shall appear to the attorney general of any State, the administrator of the securities laws of any State, or such other official as a State may designate, that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader) has engaged in, is engaging or is about to engage in, any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity or an action at law on behalf of its residents to enjoin such act or practice, to enforce compliance with this chapter, or any rule, regulation, or order of the Commission thereunder, to obtain damages on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

(2) The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia, shall have jurisdiction of all suits in equity and actions at law brought under this section to enforce any liability or duty created by this chapter or any rule, regulation, or order of the Commission thereunder, or to obtain damages or other relief with respect thereto. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder, including the requirement that the defendant take such action as is necessary to remove the danger of violation of this chapter or of any such rule, regulation, or order. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

(3) Immediately upon instituting any such suit or action, the State shall serve written notice thereof upon the Commission and provide the Commission with a copy of its complaint, and the Commission shall have the right to (A) intervene in the suit or action and, upon doing so, shall be heard on all matters arising therein, and (B) file petitions for appeal.

(4) Any suit or action brought under this section in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

(5) For purposes of bringing any suit or action under this section, nothing in this chapter shall prevent the attorney general, the administrator of the State securities laws, or other duly authorized State officials from exercising the powers conferred on them by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

(6) For purposes of this section, "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

(7) Nothing contained in this section shall prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State.

(8)(A) Nothing in this chapter shall prohibit an authorized State official from proceeding in a State court against any person registered under this chapter (other than a floor broker, floor trader, or registered futures association) for an alleged violation of any antifraud provision of this chapter or any antifraud rule, regulation, or order issued pursuant to the chapter.

(B) The State shall give the Commission prior written notice of its intent to proceed before instituting a proceeding in State court as described in this subsection and shall furnish the Commission with a copy of its complaint immediately upon instituting any such proceeding. The Commission shall have the right to (i) intervene in the proceeding and, upon doing so, shall be heard on all matters arising therein, and (ii) file a petition for appeal. The

Commission or the defendant may remove such proceeding to the district court of the United States for the proper district by following the procedure for removal otherwise provided by law, except that the petition for removal shall be filed within sixty days after service of the summons and complaint upon the defendant. The Commission shall have the right to appear as amicus curiae in any such proceeding.

### 7 U.S.C. § 16(e)

(1) Nothing in this chapter shall supersede or preempt—

    (A) criminal prosecution under any Federal criminal statute;

    (B) the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest—

        (i) that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

        (ii) (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

        (iii) that is not subject to regulation by the Commission under section 6c or 23 of this title; or

    (C) the application of any Federal or State statute, including any rule or regulation thereunder, to any person required to be registered or designated under this chapter who shall fail or refuse to obtain such registration or designation.

(2) This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of—

    (A) an electronic trading facility excluded under section 2(e) of this title; and

(B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

## Provisions from the Commodity Futures Modernization Act of 2000 (Pub L. No. 106-554, Appendix E, 114 Stat. 2763A-365 (2000))

### Section 103 – 114 Stat. at 2763A-377-78

Section 2 of the Commodity Exchange Act (7 U.S.C. 2, 2a, 3, 4, 4a) is further amended by adding at the end the following:

"(d) EXCLUDED DERIVATIVE TRANSACTIONS.—

"(1) IN GENERAL.—Nothing in this Act (other than section 5b or 12(e)(2)(B)) governs or applies to an agreement, contract, or transaction in an excluded commodity if—

"(A) the agreement, contract, or transaction is entered into only between persons that are eligible contract participants at the time at which the persons enter into the agreement, contract, or transaction; and

"(B) the agreement, contract, or transaction is not executed or traded on a trading facility.

"(2) ELECTRONIC TRADING FACILITY EXCLUSION.—Nothing in this Act (other than section 5a (to the extent provided in section 5a(g)), 5b, 5d, or 12(e)(2)(B)) governs or applies to an agreement, contract, or transaction in an excluded commodity if—

"(A) the agreement, contract, or transaction is entered into on a principal-to-principal basis between parties trading for their own accounts or as described in section 1a(12)(B)(ii);

"(B) the agreement, contract, or transaction is entered into only between persons that are eligible contract participants described in subparagraph (A), (B)(ii), or (C) of section 1a(12)) at the time at which the persons enter into the agreement, contract, or transaction; and

"(C) the agreement, contract, or transaction is executed or traded on an electronic trading facility.".

## Provisions from the Dodd-Frank Act of 2010 (Pub. L. No. 111-203, 124 Stat. 1376 (2010)):

### Section 712(d)(1) – 124 Stat. at 1644

IN GENERAL.—Notwithstanding any other provision of this title and subsections (b) and (c), the Commodity Futures Trading Commission and the Securities and Exchange Commission, in consultation with the Board of Governors, shall further define the terms "swap", "security-based swap", "swap dealer", "security-based swap dealer", "major swap participant", "major security-based swap participant", "eligible contract participant", and "security-based swap agreement" in section 1a(47)(A)(v) of the Commodity Exchange Act (7 U.S.C. 1a(47)(A)(v)) and section 3(a)(78) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(78)).

## Provisions from Title 17 of the Code of Federal Regulations:

### 17 C.F.R. § 38.4

(a) Request for Commission approval of rules and products.

(1) An applicant for designation, or a designated contract market, may request that the Commission approve under section 5c(c) of the Act, any or all of its rules and contract terms and conditions, and subsequent amendments thereto, prior to their implementation or, notwithstanding the provisions of section 5c(c)(4) of the Act, at any time thereafter, under the procedures of § 40.3 or § 40.5 of this chapter, as applicable. A designated contract market may label a future, swap or options product in its rules as "Listed for trading pursuant to Commission approval," if the future, swap or options product and its terms or conditions have been approved by the Commission, and it may label as "Approved by the Commission" only those rules that have been so approved.

(2) Notwithstanding the timeline under §§ 40.3(c) and 40.5(c) of this chapter, the operating rules, and terms and conditions of futures, swaps and option products that have been submitted for Commission approval at the same time as an application for contract market designation or an application under § 38.3(b) of this part to reinstate

A14

the designation of a dormant designated contract market, as defined in § 40.1 of this chapter, or while one of the foregoing is pending, will be deemed approved by the Commission no earlier than when the facility is deemed to be designated or reinstated.

(b) Self-certification of rules and products. Rules of a designated contract market and subsequent amendments thereto, including both operational rules and the terms or conditions of futures, swaps and option products listed for trading on the facility, not voluntarily submitted for prior Commission approval pursuant to paragraph (a) of this section, must be submitted to the Commission with a certification that the rule, rule amendment or futures, swap or options product complies with the Act or rules thereunder pursuant to the procedures of § 40.6 of this chapter, as applicable. Provided, however, any rule or rule amendment that would, for a delivery month having open interest, materially change a term or condition of a swap or a contract for future delivery in an agricultural commodity enumerated in section 1a(9) of the Act, or of an option on such contract or commodity, must be submitted to the Commission prior to its implementation for review and approval under § 40.4 of this chapter.

(c) An applicant for designation, or a designated contract market, may request that the Commission consider under the provisions of section 15(b) of the Act any of the contract market's rules or policies, including both operational rules and the terms or conditions of products listed for trading.

## 17 C.F.R. § 38.5

(a) Requests for information. Upon request by the Commission, a designated contract market must file with the Commission information related to its business as a designated contract market, including information relating to data entry and trade details, in the form and manner and within the time specified by the Commission in its request.

(b) Demonstration of compliance. Upon request by the Commission, a designated contract market must file with the Commission a written demonstration, containing supporting data, information and documents, in the form and manner and within the time specified by the Commission, that the designated contract market is in compliance with one or more core principles as specified in the request, or that is requested by the Commission to show that the designated contract market satisfies its obligations under the Act.

(c) Equity interest transfers.

(1) Equity interest transfer notification. A designated contract market shall file with the Commission a notification of each transaction that the designated contract market enters into involving the transfer of ten percent or more of the equity interest in the designated contract market.

(2) Timing of Notification. The equity transfer notice described in paragraph (1) shall be filed electronically with the Secretary of the Commission at its Washington, DC headquarters at submissions@cftc.gov and the Division of Market Oversight at DMOSubmissions@cftc.gov, at the earliest possible time but in no event later than the open of business ten business days following the date upon which the designated contract market enters into a firm obligation to transfer the equity interest.

(3) Rule filing. Notwithstanding the foregoing, any aspect of an equity interest transfer described in paragraph (c)(1) of this section that necessitates the filing of a rule as defined in part 40 of this chapter shall comply with the requirements of 5c(c) of the Act and part 40 of this chapter, and all other applicable Commission regulations.

(d) Delegation of authority. The Commission hereby delegates, until it orders otherwise, the authority set forth in paragraph (b) of this section to the Director of the Division of Market Oversight or such other employee or employees as the Director may designate from time to time. The Director may submit to the Commission for its consideration any matter that has been delegated in this paragraph. Nothing in this paragraph prohibits the Commission, at its election, from exercising the authority delegated in this paragraph.

## 17 C.F.R. § 40.2

(a) Submission requirements. A designated contract market or a swap execution facility must comply with the submission requirements of this section prior to listing a product for trading that has not been approved under § 40.3. A submission shall comply with the following conditions:

(1) The designated contract market or the swap execution facility has filed its submission electronically in a format and manner specified by the Commission;

(2) The Commission has received the submission by the open of business on the business day preceding the product's listing; and

(3) The submission includes:

(i) The information required by appendix D to this part;

(ii) A copy of the rules that set forth the contract's terms and conditions;

(iii) The intended listing date;

(iv) A certification by the designated contract market or the swap execution facility that the product to be listed complies with the Act and Commission regulations thereunder;

(v) A concise explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder. This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(vi) A certification that the registered entity posted a notice of a pending product certification with the Commission and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website. Information that the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(c)(4); and

(vii) A request for confidential treatment, if appropriate, as permitted under § 40.8.

(b) Additional information. If requested by Commission staff, a registered entity shall provide any additional evidence, information or data that demonstrates that the contract meets, initially or on a continuing basis, the requirements of the Act or the Commission's regulations or policies thereunder.

(c) Stay. The Commission may stay the listing of a contract pursuant to paragraph (a) of this section during the pendency of Commission proceedings for filing a false certification or during the pendency of a petition to alter or amend the contract terms and conditions pursuant to Section 8a(7) of the Act. The decision to stay the listing of a contract in such circumstances shall not be delegable to any employee of the Commission.

(d) Class certification of swaps.

(1) A designated contract market or swap execution facility may list or facilitate trading in any swap or number of swaps based upon an "excluded commodity," as defined in section 1a(19)(i) of the Act, not including any security, security index, and currency other than the United States Dollar and a "major foreign currency," as defined in § 15.03(a) of this chapter, or an "excluded commodity," as defined in section 1a(19)(ii)-(iv) of the Act, provided the designated contract market or swap execution facility certifies, under paragraphs (a)(1) and (2) and (a)(3)(i), (iv), and (vi) of this section, the following:

(i) Each particular swap within the certified class of swaps is based upon an excluded commodity specified in paragraph (d)(1) of this section;

(ii) Each particular swap within the certified class of swaps is based upon an excluded commodity with an identical pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations;

(iii) The pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in each particular swap within the certified class of swaps is identical to a pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in a product previously submitted to the Commission and certified or approved pursuant to this section or § 40.3; and

(iv) Each particular swap within the certified class of swaps is based upon an excluded commodity involving an identical currency or identical currencies.

(2) The Commission may in its discretion require a registered entity to withdraw its certification under paragraph (d)(1) of this section and to

A18

submit each individual swap or certain individual swaps within the submission for Commission review pursuant to this section or § 40.3.

## 17 C.F.R. § 40.3

(a) Request for approval. Pursuant to section 5c(c) of the Act, a designated contract market, a swap execution facility, or a derivatives clearing organization may request that the Commission approve a new product prior to listing the product for trading or accepting the product for clearing, or if a product was initially submitted under § 40.2 or § 39.5 of this chapter, subsequent to listing the product for trading or accepting the product for clearing. A submission requesting approval shall:

(1) Be filed electronically in a format and manner specified by the Commission;

(2) Include the information required by appendix D to this part;

(3) Include a copy of the rules that set forth the contract's terms and conditions;

(4) Include an explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder. This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with the applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(5) Describe any agreements or contracts entered into with other parties that enable the registered entity to carry out its responsibilities;

(6) Include the certifications required in § 41.22 for product approval of a commodity that is a security future or a security futures product as defined in Sections 1a(44) or 1a(45) of the Act, respectively;

(7) Include, if appropriate, a request for confidential treatment as permitted under § 40.8;

(8) Include the filing fee required under appendix A to this part;

(9) Certify that the registered entity posted a notice of its request for Commission approval of the new product and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website. Information the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(c)(4); and

(10) Include, if requested by Commission staff, additional evidence, information or data demonstrating that the contract meets, initially or on a continuing basis, the requirements of the Act, or other requirement for designation or registration under the Act, or the Commission's regulations or policies thereunder. The registered entity shall submit the requested information by the time specified by Commission staff, or at the conclusion of any extended period agreed to by Commission staff after timely receipt of a written request from the registered entity.

(b) Standard for review and approval. The Commission shall approve a new product unless the terms and conditions of the product violate the Act or the Commission's regulations.

(c) Commission review.

(1) All products submitted for Commission approval pursuant to, and in compliance with the submission requirements of, paragraph (a) of this section shall be subject to review by the Commission for a period of 45 days after receipt by the Commission.

(2) The Commission may extend the initial 45–day review period for up to an additional 45 days if the product raises novel or complex issues that require additional time to analyze, the submission is incomplete or the requestor does not respond completely to Commission questions in a timely manner, in which case the Commission shall notify the submitting registered entity within the initial 45–day review period and shall briefly describe the nature of the specific issues for which additional time for review shall be required.

(3) At any time during its review of a proposed product under this section, the Commission may extend the review period for any period of time to which the registered entity agrees in writing.

(4) Any amendment or supplementation made by the registered entity to the submission will be treated as the filing of a new submission under this section and be subject to the initial 45–day review period in accordance with paragraph (c)(1) of this section, unless the amendment or supplementation is requested by the Commission or is made for correction of typographical errors, renumbering or other non-substantive revisions.

(5) If the review period described in paragraph (c)(1) of this section would end on a day that is not a business day, such review period shall instead be extended to end on the next business day.

(d) Commission Determination—

(1) Approval. Any product submitted for Commission approval in compliance with paragraph (a) of this section shall be deemed approved by the Commission under section 5c(c) of the Act at the conclusion of the applicable review period under paragraph (c) of this section, unless the Commission issues a notice of non-approval to the registered entity under paragraph (d)(2) of this section within the applicable review period.

(2) Notice of non-approval. Any time during its review under this section, the Commission may notify the registered entity that it will not, or is unable to, approve the new product. This notification will briefly specify the nature of the issues raised and the specific provision of the Act or the Commission's regulations, including the form or content requirements of this section, with which the new product is inconsistent or appears to be inconsistent with the Act or the Commission's regulations.

(e) Effect of non-approval.

(1) Notification to a registered entity under paragraph (d)(2) of this section of the Commission's determination not to approve a product does not prevent the entity from subsequently submitting a revised version of the product for Commission approval, or from submitting the product as initially proposed, in a supplemented submission; the revised or supplemented submission will be reviewed without prejudice.

(2) Notification to a registered entity under paragraph (d)(2) of this section of the Commission's determination not to approve a product shall be presumptive evidence that the entity may not truthfully certify under § 40.2 that the same, or substantially the same, product complies with the Act and the Commission's regulations thereunder.

(f) [Redesignated as subsection (e) by 89 FR 88624]

**17 C.F.R. § 40.11**

(a) Prohibition. A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

(1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

(2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b) [Reserved]

(c) 90–day review and approval of certain event contracts. The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90–day review. The 90–day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

(1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's

A22

90–day review period. The Commission shall post on the Web site a notification of the intent to carry out a 90–day review.

(2) Final determination. The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90–day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at the conclusion of such extended period agreed to or requested by the registered entity.

**ADDENDUM B:**

**State Gambling and Bucket-Shop Laws Regulating Futures Before the Commodity Exchange Act's Enactment in 1936**

### ALABAMA

- "If any person, corporation, or other association of persons ... shall establish or open an office or other place of business in this state for the purpose of carrying on or engaging in any business of making contracts to sell and deliver any cotton, Indian corn, wheat, rye, oats, tobacco, meal, lard, bacon, salt pork, salt fish, beef cattle, sugar, coffee, stocks, bonds, or choses ... when ... **it is not intended by the parties thereto that the articles or things so agreed to be sold and delivered shall be actually delivered or the value thereof paid**, but it is intended and understood by then, that money or other thing of value shall be paid to the one party by the other, ... he shall be guilty of a misdemeanor." Ala. Code § 3579 (1928).

### ARKANSAS

- "[T]he buying or selling or otherwise [dealing] in what is known as futures, either in cotton, grain or anything whatsoever, with a view to profit, is hereby declared to be **gambling**." Act of March 30, 1883, 1883 Ark. Acts 29.

### CALIFORNIA

- Outlawing "'[b]ucketing' or 'bucket shopping,'" which "shall mean," in relevant part, "[t]he making of or offering to make any contract respecting the purchase or sale of any securities or commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in and **without a bona fide purchase or sale of the same**." Cal. Gen. L., tit. 75, § 2 (1923).

### COLORADO

- Outlawing bucket-shop transactions "respecting the purchase or sale ... of any ... commodities, ... intending that such contract or other transaction shall be terminated, closed or settled according to, or upon the basis of the public market quotations of or prices made on any board of trade or exchange or market upon which such commodities ...

are dealt in, **and without intending a bona fide purchase or sale of the same**." Colo. L. ch. 57, § 1(a) (1931).

- "All contracts, agreements, trades or transactions of the nature described in Section 1 of this Act [on bucket shops]," including those "respecting the purchase or sale" of "commodities, not intending the actual bona fide receipt or delivery of any such ... commodities, but intending a settlement of such contract or other transaction based upon the difference in such public market quotations of or such prices at which said ... commodities are, or are asserted to be, bought or sold," "are hereby declared **gambling** and criminal Acts and absolutely null and void." Colo. L., ch. 57, §§ 1(c), 5 (1931).

## CONNECTICUT

- Outlawing bucket shops, which are defined as, in relevant part, "office[s], store[s] or other place[s] wherein the proprietor or keeper thereof ... shall conduct the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of any [ ] grain, provisions or other commodity ... , wherein both parties thereto, or such proprietor or keeper, shall contemplate or intend that such contracts, agreements, trades or transactions shall be or may be closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which the commodities ... referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Conn. Gen. Stat. §§ 6345-6346 (1930).

## DISTRICT OF COLUMBIA

- Outlawing "'[b]ucketing' or 'bucket-shopping,'" which "shall mean," in relevant part, "[t]he making of or offering to make any contract respecting the purchase or sale ... of any ... commodities wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said ... commodities are dealt in and **without a bona fide purchase or sale of the same**." D.C. Code tit. 6, §§ 158-159 (1929).

## FLORIDA

- "[D]eclaring unlawful all the transactions conducted in and through a bucket shop," which is defined "to be an office, store, or other place wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of any … cotton, grain, provisions or other commodities … wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades or transactions shall be or may be closed, adjusted, or settled according to or on the basis of the market quotations or prices made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in and **without a bona fide transaction on such board of trade or exchange**." Fla. Comp. L. § 7899 (1927).

## GEORGIA

- Futures contracts are valid when they are "(1) made in accordance with the rules of any board of trade, exchange, or similar institution, and (2) actually executed on the floor of such board of trade, exchange, or similar institution, and performed or discharged according to the rules thereof, and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution, organized under the laws of the State of Georgia or any other State." Ga. Code Ann. § 4264(2) (1926 Code, 1930 Supp.).

- Outlawing bucket shops, which are "defined to be and mean any place of business where" persons make "any contract of sale for future delivery of cotton, grain, stocks, or other commodities, **where it is not the bona fide intention of parties that the things mentioned therein are to be delivered**, but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, **without any actual bona fide execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution**, in accordance with the rules thereof." Ga. Code Ann. §§ 4264(3)-(4) (1926 Code, 1930 Supp.).

B3

**ILLINOIS**

- "Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, or other commodity ... shall be fined not less than $10 nor more than $1,000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered **gambling contracts**, and shall be void." Ill. Rev. Stat. Crim. Code § 130 (1874).

- Outlawing "any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of ... petroleum, cotton, grain, provisions or other produce ... **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Ill. Rev. Stat. ch. 38, §§ 317-318 (1931).

**INDIANA**

- Outlawing bucket shops, which are defined, in relevant part, "to be [ ] office[s], store[s] or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any [ ] grain, provisions, or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities ... referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Act of April 10, 1907 §§ 3837-3838.

**IOWA**

- Outlawing bucket shops, which are defined to include "office[s], store[s], or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale, or purchase and sale, of any [ ] grain, provisions, cotton, or other

commodity…" "[w]herein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be, or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades, or transactions are dealt in by competitive buying and selling, and **without a bona fide transaction on such board of trade or exchange**." Iowa Code §§ 9895, 9899, 9901 (1931).

### KANSAS

- Outlawing bucket shops, which are defined, in relevant part, "to be [ ] office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any [ ] grain, provisions, cotton or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that the contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Kan. Rev. Stat. Ann., ch. 50, § 122 (1923) (citing Kan. L., ch. 121 § 2 (1909)).

- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts." Kan. Rev. Stat. Ann., ch. 50, § 123 (1923) (citing Kan. L., ch. 121 § 2 (1909)).

### MAINE

- Outlawing bucket shops, which are defined, in relevant part, "to be [ ] office[s], store[s], or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make,

contracts, agreements, trades, or transactions respecting the purchase or sale of any [ ], grain, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be, or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities **…** referred to in such contracts, agreements, trades, or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Me. Rev. Stat., ch. 136, §§ 14-15 (1930).

**MASSACHUSETTS**

- Outlawing bucket shops, which are defined to include places where "[t]he making of, or offering to make, any contract respecting the purchase or sale … of any … commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which said … commodities are dealt in, and **without a bona fide purchase or sale of the same**" takes place.  Mass. Gen. L., ch. 271, §§ 35-36 (1921).

**MICHIGAN**

- Outlawing bucket shops, which are defined, in relevant part, "to be [ ] office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale of any [ ] grains, provisions or other commodity … wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades or transactions shall be, or may be closed, adjusted or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**."  Mich. Acts, no. 328 §§ 126-128 (1931).

- The "pretended buying or selling of … petroleum, cotton, grain, provisions or other produce, … without any intention of receiving and

paying for the property so bought or of delivering the property so sold" is "hereby declared **gambling** and [a] criminal act[]." Mich. Acts, no. 328 § 311 (1931).

## MINNESOTA

- Outlawing bucket shops, which are defined, in relevant part, to be "office[s], store[s] or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any [ ] grain, provisions, or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplates or intends that such contracts, agreement, trades or transactions, shall be, or may be, closed, adjusted or settled, according to, or upon the basis of the public market quotations, of prices made on any board of trade or exchange, upon which the commodities ... referred to in said contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Minn. Stat. §§ 10488-10489 (1927).

## MISSISSIPPI

- As "**[g]ambling [c]ontracts**," "contract[s] for the purchase or sale of a commodity of any kind, to be delivered at a future date, the parties not intending that the commodity is to be actually delivered in kind and the price paid, shall not be enforced by any court; nor shall any contract of the kind commonly called 'futures' be enforced ... ." Miss. Code Ann., ch. 31, § 2034 (1927) (citing 1882 Miss. Laws 140).

## MISSOURI

- Outlawing bucket shops, which are defined as "place[s] wherein the person carrying on the bucket shop, then and there, either as principal or agent, pretends to buy or sell, or goes through the form of buying or selling, to or for any other person or persons, ... petroleum, cotton, grain, provisions and other commodities, or any one or more of the same, at prices fixed or pretended to be fixed by trades or transactions made or offered to be made in same on boards of exchange or otherwise, but **wherein there is in fact no actual purchase and sale, or sale and purchase of such commodity for or on**

**account of the party or parties thereto**." Mo. Rev. Stat. §§ 4316-4318 (1929) (citing Mo. Rev. Stat. § 3565 (1919)).

- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts." Mo. Rev. Stat. § 4318 (1929) (citing Mo. Rev. Stat. § 3566 (1919)).

### NEBRASKA

- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, where there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts." Neb. Comp. Stat. § 9813 (1922) (citing Neb. Rev. Stat. § 8817 (1913)).

- Outlawing bucket shops, which are defined, in relevant part, to be "office[s], store[s], **board-of-trade room[s]**, or other place[s] wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or purchase and sale, of any [ ] grains, provisions, cotton or other commodity … wherein said proprietor or keeper or patron contemplates or intends that the contracts, agreements, trades or transactions shall be or may be, closed, adjusted or settled according to or upon the basis of the market quotations or prices made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board-of-trade**." Neb. Comp. Stat. §§ 28-955, 28-959 (1929).

### NEW HAMPSHIRE

- Considered a form of "**[g]ambling**," "[n]o person or corporation shall keep, or cause to be kept, an office, store, or other place in which is conducted or permitted the pretended buying or selling of … petroleum, cotton, grain, provisions, pork or other produce… without any intention of receiving and paying for the property so bought, or of

delivering the property so sold, or in which is conducted or permitted the pretended buying or selling of such property on margins, or when the party buying, or offering to buy, such property, does not intend actually to receive the same if purchased, or deliver it if sold." N. H. Pub. L., ch. 384, § 23 (1925).

## NEW YORK

- Outlawing bucket shops, which are defined to include places where a person "[m]ake[s] or offer[s] to make, or assist[s] in making or offering to make any contract respecting the purchase or sale ... of any ... commodities ... intending that such contract shall be terminated, closed or settled according to, or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which such commodities ... are dealt in, and **without intending a bona fide purchase or sale of the same**." N. Y. Penal Law § 390 (1909).

## NORTH CAROLINA

- "The test of the validity of a contract for 'future' which this section requires is the 'intention not to actually deliver' the articles bought or sold for future delivery. No matter how explicit the words in any contract which may require a delivery, if in fact there is no intention to deliver, but the real understanding is that on the stipulated date the losing party shall pay to the other the difference between the market price and the contract price, this is a **gambling contract**." Ed.'s Note, N.C. Code Ann. § 2144 (1931).

## NORTH DAKOTA

- Bucket shops, considered a "place for **gaming**," are "unlawful" where they are used for "the pretended buying or selling of grain, pork, lard or any mercantile or agricultural products on margins, without any intention of future delivery." N. D. Comp. L. Ann. § 9699 (1913).

## OHIO

- "[I]t shall be unlawful for any corporation, association, chamber of commerce, **board of trade,** copartnership or person to keep or cause to be kept within this state any bucket shop, office or other place

wherein is conducted or permitted the pretended buying or selling of ... petroleum, cotton, grain, provisions or other produce ... **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Ohio Gen. Code § 6934a-1 (1902).

- It is unlawful for a person to use a building for a "'bucket shop' or grain **gambling**." Ohio Gen. Code § 6934a-5 (1902).

## OKLAHOMA

- "[A]ll contracts of sales for future delivery of cotton, grain, stocks or other commodities" that are "(1) made in accordance with the rules of any board of trade, exchange or similar institution where such contracts of sale are executed and (2) actually executed on the floor of such board of trade, exchange or similar institution and performed or discharged according to the rules thereof; and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton, exchange, grain exchange, board of trade, or similar institution organized under the laws of the State of Oklahoma or any other State shall be, and they are hereby declared to be valid and enforceable in the courts of this State according to their terms." Okla. Comp. Stat. Ann. § 3883 (1921).

- Prohibiting bucket shops, which are "defined to be and mean any place of business wherein are made" "contract[s] of sale for the future delivery of cotton, grain, stocks or other commodities, which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange or similar institutions, upon which contracts of sale for future delivery are executed and dealt in **without any actual bonafide execution and the carrying out or discharge of such contracts upon the floor of such exchange, board of trade, or similar institution in accordance with the rules thereof**." Okla. Comp. Stat. Ann. §§ 3885-3888 (1921).

## OREGON

- Outlawing when a person, "as broker," "[m]ake[s] or offer[s] to make, or assist[s] in making or offering to make any contract respecting the purchase or sale ... of any ... commodities, intending that such contract

shall be terminated, closed or settled according to, or upon the basis of the public market quotations of or prices made on any board of trade or exchange or market upon which such commodities … are dealt in, and **without intending a bona fide purchase or sale of the same**." Ore. L., ch. 395, § 2 (1931).

## PENNSYLVANIA

- Outlawing bucket shops, which are defined to include "an office, store, or other place, wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale, or purchase and sale, of any [ ] grains, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices, made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades, or transactions, are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Dig. Pa. Stat. L. § 2413 (1920) (citing Act of June 1, 1907).

- "All contracts, agreements, trades, or transactions of the nature described in section one of this act [on bucket shops] are hereby declared **gambling**, and criminal acts, and absolutely null and void." Dig. Pa. Stat. L. § 2418 (1920) (citing Act of June 1, 1907).

## RHODE ISLAND

- Outlawing bucket-shopping, which includes "[t]he making of or offering to make any contract respecting the purchase or sale … of any … commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in, and **without a bona fide purchase or sale of the same**." R. I. Gen. L., ch. 406, § 1 (1923) (citing R. I. Gen. L., ch. 353 (1909)).

**SOUTH CAROLINA**

- "[A]ll contracts of sale for future delivery of cotton, grain, stocks, or other commodities, (1) made in accordance with the rules of any board of trade, exchange, or similar institution, and (2) actually executed on the floor of such board of trade, exchange or similar institution, and performed or discharged according to the rules thereof , and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution, organized under the laws of the State of South Carolina, or any other State, shall be and they hereby are declared to be valid and enforceable in the Courts of this State, according to their terms." S. C. Acts, no. 711 § 2 (1928).

- Bucket shops are unlawful; "[a]ny contract of sale for future delivery of cotton, grain, stocks, or other commodities **where it is not the *bona fide* intention of parties that the things mentioned therein are to be delivered** but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, **without any actual *bona fide* execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution, in accordance with the rules thereof**, shall be null and void and unenforceable in any Court of this State, and no action shall be maintainable thereon at the suit of any party." S. C. Acts, no. 711 §§ 3-4 (1928).

**SOUTH DAKOTA**

- Bucket shops, as a form of "**[g]ambling in [f]utures**," are unlawful where they are used for "the pretended buying or selling of grain, pork, lard or any mercantile, mining or agricultural products or corporation stocks, on margins, without any intention of future delivery, whether such pretended contracts are to be performed within or without the state." S. D. Comp. L. § 3925 (1929).

**TENNESSEE**

- "[H]ereafter any sale, contract or agreement for the sale of ... grain, cotton or other produce, property, commodity, article or thing, for

future delivery, where either of the contracting parties, buyer or seller, in dealing simply for the margin, or on the prospective rise or fall in the price of the article or thing sold, and where either of the said contracting parties have had no intention or purpose of making actual delivery or receiving the property or thing in specie, shall be deemed and is hereby declared **gambling**." Act of March 30, 1883, 1883 Tenn. Pub. Acts 331.

## VERMONT

- As a form of "**[g]ambling**," a bucket shop is unlawful where it is used for "the pretended buying or selling of ... petroleum, cotton, grain, provisions, pork or other produce ... **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Vt. Gen. L. § 7081 (1917).

## VIRGINIA

- Outlawing "bucket-shopping," which includes "[t]he making of, or offering to make, any contract respecting the purchase or sale ... of any ... commodities wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which said ... commodities are dealt in, and **without a bona fide purchase or sale of the same**." Va. Code Ann. §§ 4714-4715 (1924).

## WASHINGTON

- Outlawing bucket shops, which are "defined to be shed[s], tent[s], tenement[s], booth[s], building[s], float[s] or vessel[s], or any part thereof, wherein may be made contracts respecting the purchase or sale ... of any commodities ... wherein both parties, intend that such contract shall or may be terminated, closed and settled" **(1) "[u]pon the basis of the market prices quoted or made on any board of trade or exchange upon which such commodities ... may be dealt in," (2) "[w]hen the market prices for such commodities ... shall reach a certain figure in any such board of trade or exchange," or (3) "[o]n the basis of the difference in the market prices at which said commodities ... are, or purport to be, bought and sold**." Wash. Code § 8932 (1919).

B13

## WEST VIRGINIA

- "If any person shall carry on in this State what is commonly known as a bucket shop, or act as agent for any person, firm or corporation carrying on such business, or engage in transactions for the purchase or sale for others of grain, provisions, ... or other property wherein the parties thereto or the broker intend that such transaction shall be settled according to the public market quotations on any board of trade or exchange, or intend that such transaction may be deemed terminated when such public market quotations shall reach a certain figure, or intend that such property shall be resold before or at the time fixed in such transaction for the delivery of such property and that the difference between the contract price and the market price thereof shall be paid or received **without the prior receipt or delivery of such property under the former sale**, he shall be guilty of a felony, and, upon conviction thereof, shall be confined in the penitentiary not less than two nor more than five years." W. Va. Code, ch. 61, art. 10, § 18 (1930).

## WISCONSIN

- Outlawing bucket shops, which are "defined to be an office, store or other place wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any [ ] grains, provisions or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities ... referred to in such contract, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Wis. Stat. §§ 348.175-348.178 (1929).

## WYOMING

- It is "unlawful for any corporation, association, co-partnership or person to keep or cause to be kept within this state any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of the shares of stocks or bonds of any

corporation, or petroleum … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold** or wherein is conducted or permitted the pretended buying or selling of such property on margins."  Wyo. Rev. Stat. Ann. § 32-924 (1931).