**No. 25-7516**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

KALSHIEX, LLC,
*Plaintiff-Appellant,*

v.

KIRK D. HENDRICK; GEORGE ASSAD; CHANDENI K. SENDALL,
Deputy City Attorney; NEVADA GAMING CONTROL BOARD;
JENNIFER TOGLIATTI; ROSA SOLIS-RAINEY; BRIAN KROLICKI;
GEORGE MARKANTONIS; ABBI SILVER; AARON D. FORD;
NEVADA GAMING COMMISSION,
*Defendants-Appellees,*

NEVADA RESORT ASSOCIATION,
*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court for the
District of Nevada, No. 2:25-cv-575 (Hon. Andrew P. Gordon)

**STATE DEFENDANTS' ANSWERING BRIEF**

Nicole A. Saharsky
Minh Nguyen-Dang
Matthew Bisanz
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000

Rory K. Schneider
Alexander S. Mendelson
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

Aaron D. Ford
 Attorney General of Nevada
Heidi Parry Stern
 Solicitor General
Jessica E. Whelan
 Chief Deputy Solicitor General—
 Litigation
Sabrena K. Clinton
Abigail L. Pace
State of Nevada,
 Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420

*(additional counsel on inside cover)*

*(continued from front cover)*

Preston R. Michelson
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ...........................................................2

STATEMENT OF THE ISSUE .................................................................3

STATUTORY AND REGULATORY AUTHORITIES ..............................3

STATEMENT OF THE CASE....................................................................3

    A.    Legal Background........................................................................3

            1.    Nevada Comprehensively Regulates Gaming .........................3

            2.    The CFTC Regulates Commodity Futures Trading ...............6

    B.    Factual Background .....................................................................9

    C.    Procedural History.....................................................................12

SUMMARY OF THE ARGUMENT............................................................14

STANDARD OF REVIEW .........................................................................18

ARGUMENT...............................................................................................19

I.    KALSHI IS NOT LIKELY TO SUCCEED ON THE MERITS.............19

    A.    Kalshi's Sports and Election Contracts Are Not "Swaps," "Option[s]," or "Contracts of Sale of a Commodity for Future Delivery" Under the CEA...........................................................22

            1.    The CFTC Does Not Have "Exclusive Jurisdiction" Over Any Contract Traded on a DCM............................................22

            2.    Kalshi's Contracts Are Not "Swaps".....................................23

                    a.    Kalshi's interpretation is contrary to the statutory text .................................................................................24

                    b.    Kalshi's interpretation of "swaps" makes no sense in context ...........................................................30

                    c.    Kalshi's interpretation is inconsistent with Congress's purposes and the CFTC's guidance..............33

            3.    Kalshi's Contracts Are Not "Option[s]" or "Contracts of Sale of a Commodity for Future Delivery"............................35

i

# TABLE OF CONTENTS
## (continued)

Page

4. Kalshi's Position Would Require All Sports Betting to Be Regulated Only by the CFTC ............................................. 37

5. This Court Can Decide the Threshold Issue of Whether the CEA Applies ........................................................... 41

B. The CEA Does Not Preempt State Gaming Law ........................... 44

    1. Field Preemption Does Not Apply ........................................ 45

        a. The CEA's text does not show a clear intent to preempt state gaming law .............................................. 45

        b. The CEA contains no comprehensive regulatory scheme for gaming ......................................................... 48

        c. There is no evidence that Congress intended to federalize all sports betting ............................................. 52

        d. Kalshi's view would require impliedly repealing other important federal laws ........................................... 53

    2. Conflict Preemption Does Not Apply ................................... 55

        a. It is not impossible for Kalshi to comply with Nevada law and the CEA ............................................... 55

        b. Enforcing Nevada gaming law does not pose an obstacle to the CEA's objectives .................................... 57

II. THE BALANCE OF HARDSHIPS WEIGHS HEAVILY AGAINST KALSHI ........................................................................... 58

A. Kalshi Identifies No Irreparable Harm ......................................... 59

B. The Balance of Equities and Public Interest Favor State Defendants ....................................................................................... 63

CONCLUSION ............................................................................................ 68

ADDENDUM—STATUTORY AND REGULATORY AUTHORITIES ...... 1a

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Adidas Am., Inc. v. Skechers USA, Inc.*,
890 F.3d 747 (9th Cir. 2018) .................................................................19

*Ah Sin v. Wittman*,
198 U.S. 500 (1905) .................................................................6, 21

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) .................................................................60

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) .................................................................21, 45

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*,
977 F.2d 1147 (7th Cir. 1992) .................................................................50

*Am. Apparel & Footwear Ass'n v. Baden*,
107 F.4th 934 (9th Cir. 2024) .................................................................55, 57

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
148 F.4th 648 (9th Cir. 2025) .................................................................63

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014) .................................................................67

*Arizona v. United States*,
567 U.S. 387 (2012) .................................................................58

*Artichoke Joe's Cal. Grand Casino v. Norton*,
353 F.3d 712 (9th Cir. 2003) .................................................................21, 38

*Beecham v. United States*,
511 U.S. 368 (1994) .................................................................31

*Big Lagoon Rancheria v. California*,
789 F.3d 947 (9th Cir. 2015) .................................................................43

*Black Unity League of Ky. v. Miller*,
394 U.S. 100 (1969) .................................................................63

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                                **Page(s)**

*Bond v. United States,*
572 U.S. 844 (2014) ........................................................................21, 52

*Carter v. Carter Coal Co.,*
298 U.S. 238 (1936) .............................................................................44

*CFTC v. Frankwell Bullion Ltd.,*
99 F.3d 299 (9th Cir. 1996) ................................................................39

*CFTC v. Noble Metals Int'l, Inc.,*
67 F.3d 766 (9th Cir. 1995) ..................................................................6

*CFTC v. Trade Exch. Network Ltd.,*
117 F. Supp. 3d 29 (D.D.C. 2015) .......................................................27

*CFTC v. White Pine Tr. Corp.,*
574 F.3d 1219 (9th Cir. 2009) .........................................................7, 37

*D.T. v. Sumner Cnty. Schs.,*
942 F.3d 324 (6th Cir. 2019) ...............................................................62

*Drakes Bay Oyster Co. v. Jewell,*
747 F.3d 1073 (9th Cir. 2014) .............................................................19

*Drapich v. Donovan,*
693 F.2d 1296 (9th Cir. 1982) .............................................................26

*Duke Energy Trading & Mktg., L.L.C. v. Davis,*
267 F.3d 1042 (9th Cir. 2001) .............................................................47

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018) .............................................................................53

*FCC v. Consumers' Rsch.,*
606 U.S. 656 (2025) ........................................................................44, 49

*Fisher v. Dean Witter Reynolds, Inc.,*
526 F. Supp. 558 (E.D. Pa. 1981)........................................................37

iv

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                     **Page(s)**

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*
98 F.4th 1180 (9th Cir. 2024) .................................................................19

*Flynt v. Bonta,*
131 F.4th 918 (9th Cir. 2025) ...........................................................21, 52

*Freightliner Corp. v. Myrick,*
514 U.S. 280 (1995) .................................................................................46

*GCIU-Emp. Ret. Fund v. MNG Enters., Inc.,*
51 F.4th 1092 (9th Cir. 2022) ................................................................32

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
527 U.S. 173 (1999) .......................................................................21, 51, 52

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) .................................................................................52

*Griffin v. Oceanic Contractors, Inc.,*
458 U.S. 564 (1982) .................................................................................38

*Haaland v. Brackeen,*
599 U.S. 255 (2023) .................................................................................43

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.,*
736 F.3d 1239 (9th Cir. 2013) ...............................................................60

*Hughes Props. v. State,*
100 Nev. 295 (1984) ................................................................................11

*Hughes v. Talen Energy Mktg., LLC,*
578 U.S. 150 (2016) .................................................................................47

*Int'l Paper Co. v. Oullette,*
479 U.S. 481 (1987) .................................................................................48

*Inv. Co. Inst. v. CFTC,*
891 F. Supp. 2d 162 (D.D.C. 2012) .......................................................34

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                    **Page(s)**

*John Doe Co. v. CFPB,*
235 F. Supp. 3d 194 (D.D.C. 2017) ........................................................61

*KalshiEX LLC v. CFTC,*
2024 WL 4164694 (D.D.C. Sept. 12, 2024)......................................27, 28

*KalshiEX LLC v. Flaherty,*
2025 WL 1218313 (D.N.J. Apr. 28, 2025) ..............................................20

*KalshiEX LLC v. Martin,*
793 F. Supp. 3d 667 (D. Md. 2025) ...................................................*passim*

*Karnoski v. Trump,*
926 F.3d 1180 (9th Cir. 2019) .................................................................18

*Latimore v. Cnty. of Contra Costa,*
77 F.3d 489 (9th Cir. 1996) .....................................................................19

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .................................................................................41

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803)............................................................41, 44

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) .....................................................................20, 44, 45

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
456 U.S. 353 (1982) ........................................................................7, 46, 51

*Mississippi v. Louisiana,*
506 U.S. 73 (1992) ...................................................................................47

*Montalvo v. Spirit Airlines,*
508 F.3d 464 (9th Cir. 2007) ...................................................................58

*Murphy v. NCAA,*
584 U.S. 453 (2018) ...........................................................................*passim*

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                          **Page(s)**

*N. Am. Derivatives Exch., Inc. v. Nevada,*
2025 WL 2916151 (D. Nev. Oct. 14, 2025) .......................................*passim*

*Nat'l Fed'n of the Blind v. United Airlines Inc.,*
813 F.3d 718 (9th Cir. 2016) ...................................................................45

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev.*
*Comm'n,*
461 U.S. 190 (1983) .................................................................................55

*In re Palmer,*
207 F.3d 566 (9th Cir. 2000) ...................................................................42

*Plaskett v. Wormuth,*
18 F.4th 1072 (9th Cir. 2021)...................................................................42

*Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.,*
26 F.3d 1508 (10th Cir. 1994) .................................................................27

*Richardson v. Kruchko & Fries,*
966 F.2d 153 (4th Cir. 1992) ...................................................................47

*Rissetto v. Plumbers & Steamfitters Loc. 343,*
94 F.3d 597 (9th Cir. 1996) .....................................................................36

*Robinhood Derivatives, LLC v. Dreitzer,*
2025 WL 3283308 (D. Nev. Nov. 25, 2025) .............................................13

*Saberi v. CFTC,*
488 F.3d 1207 (9th Cir. 2007) .................................................................37

*Sacco v. State,*
105 Nev. 844 (1989)..................................................................................67

*Sackett v. EPA,*
598 U.S. 651 (2023) .................................................................................45

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                       **Page(s)**

*Sikkelee v. Precision Airmotive Corp.,*
882 F.3d 680 (3d Cir. 2016)................................................................45

*Sports Form, Inc. v. Leroy's Horse & Sports Place,*
108 Nev. 37 (1992) ...........................................................................64

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n,*
322 F.3d 1039 (9th Cir. 2003) .......................................................7, 23

*Transcon. Gas Pipe Line Co. v. Pa. Envy Hearing Bd.,*
108 F.4th 144 (3d Cir. 2024) .............................................................47

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ..........................................................................63

*United States v. Lucero,*
989 F.3d 1088 (9th Cir. 2021) ...........................................................23

*Valle del Sol Inc. v. Whiting,*
732 F.3d 1006 (9th Cir. 2013) ...........................................................62

*Vietnam Veterans of Am. v. CIA,*
811 F.3d 1068 (9th Cir. 2016) ...........................................................42

*West Virginia v. EPA,*
597 U.S. 697 (2022) .......................................................... 20, 44, 52, 53

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001) .......................................................................1, 52

*Winter v. NRDC, Inc.,*
555 U.S. 7 (2008) .........................................................................18, 19

*Wyeth v. Levine,*
555 U.S. 555 (2009) ......................................................................55, 58

*Yates v. United States,*
574 U.S. 528 (2015) ..........................................................................31

# TABLE OF AUTHORITIES
## (continued)

**Statutes, Rules, and Regulations**                                    **Page(s)**

Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ...................................41

    5 U.S.C. § 706.................................................................................................42

Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ..............................................3

    7 U.S.C. § 1a(18) ...........................................................................................39

    7 U.S.C. § 1a(19)(iii) .....................................................................................36

    7 U.S.C. § 1a(36) ...........................................................................................37

    7 U.S.C. § 1a(47)(A) ................................................................... 8, 23, 31, 40

    7 U.S.C. § 1a(47)(A)(i) ..................................................................................31

    7 U.S.C. § 1a(47)(A)(ii) ...................................................................*passim*

    7 U.S.C. § 1a(47)(A)(iii) ..........................................................................30, 31

    7 U.S.C. § 1a(47)(A)(iii)(XVII)......................................................................30

    7 U.S.C. § 1a(47)(A)(iv).............................................................................31, 32

    7 U.S.C. § 1a(47)(A)(v)..................................................................................31

    7 U.S.C. § 1a(47)(A)(vi).................................................................................31

    7 U.S.C. § 1a(47)(B) ......................................................................................32

    7 U.S.C. § 1a(47)(B)(i) ..................................................................................36

    7 U.S.C. § 2.....................................................................................................42

    7 U.S.C. § 2(a) (1974)......................................................................................7

    7 U.S.C. § 2(a)(1)(A)..........................................................................*passim*

    7 U.S.C. § 2(e) ............................................................................. 8, 37, 39, 40

# TABLE OF AUTHORITIES
## (continued)

**Statutes, Rules, and Regulations (continued)**           **Page(s)**

7 U.S.C. § 5(a) ...................................................................................51

7 U.S.C. § 6(a) .............................................................................*passim*

7 U.S.C. § 6a(a) ...............................................................................48

7 U.S.C. § 6c(c) ........................................................................37, 39, 40

7 U.S.C. § 7 (1936) .............................................................................6

7 U.S.C. § 7a......................................................................................8

7 U.S.C. § 7a-2(c)(1)..........................................................................8

7 U.S.C. § 7a-2(c)(2)..........................................................................8

7 U.S.C. § 7a-2(c)(3)..........................................................................8

7 U.S.C. § 7a-2(c)(5)..........................................................................8

7 U.S.C. § 7a-2(c)(5)(C)(i) ..........................................................*passim*

7 U.S.C. § 13......................................................................................48

7 U.S.C. § 13a-2(1) ...........................................................................43

7 U.S.C. § 16(e)(2) .............................................................................46

7 U.S.C. § 16(h)(2) .............................................................................46

15 U.S.C. § 717r(d)(1).........................................................................47

15 U.S.C. § 3001(a)(1) ........................................................................21

15 U.S.C. § 3001(a)(2) ........................................................................21

Wire Act, 18 U.S.C. § 1084...................................................................53

18 U.S.C. § 1084(a) .............................................................................54

# TABLE OF AUTHORITIES
## (continued)

**Statutes, Rules, and Regulations (continued)**          **Page(s)**

Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ...........................53

    25 U.S.C. § 2701(5) .......................................................................53

    25 U.S.C. § 2710 ...........................................................................54

25 U.S.C. § 5108 ..............................................................................43

25 U.S.C. § 5131 ..............................................................................43

28 U.S.C. § 1251(a) ..........................................................................47

Professional and Amateur Sports Protection Act,
    28 U.S.C. § 3701 *et seq.* .................................................................5

30 U.S.C. § 1254(a)(3) ......................................................................47

30 U.S.C. § 1254(g) ..........................................................................47

Unlawful Internet Gambling Enforcement Act,
    31 U.S.C. § 5361 *et seq.* ...............................................................54

    31 U.S.C. § 5361(b) .......................................................................54

    31 U.S.C. § 5362(1)(E)(ii) .............................................................54

    31 U.S.C. § 5363 ...........................................................................54

Pub. L. No. 74-675, § 3, 40 Stat. 1491, 1491 (1936) .....................................6

Pub. L. No. 93-463, § 201(b), 88 Stat. 1389 (1974) .......................................7

Pub. L. No. 111-203, pt. II, 124 Stat. 1376, 1658-754 (2010) ........................7

17 C.F.R. § 1.3.................................................................................35

17 C.F.R. § 33.3(a) .................................................................8, 37, 39

17 C.F.R. § 38.4(b) ....................................................................8, 36

## TABLE OF AUTHORITIES
### (continued)

| Statutes, Rules, and Regulations (continued) | Page(s) |
|---|---|
| 17 C.F.R. § 38.151(b) | 56 |
| 17 C.F.R. § 40.11(a) | *passim* |
| 17 C.F.R. § 40.11(c) | 33 |
| 17 C.F.R. pt. 38, App'x C | 36 |
| NRS § 172.015 | 63 |
| NRS § 173.035 | 63 |
| NRS § 463.0129(1)(a) | 3, 66 |
| NRS § 463.0129(1)(b) | 3 |
| NRS § 463.0129(1)(c) | 4 |
| NRS § 463.0129(b) | 64 |
| NRS § 463.0129(c) | 64 |
| NRS § 463.150(2) | 4 |
| NRS § 463.151 | 4 |
| NRS § 463.160(1) | 4 |
| NRS § 463.170 | 4 |
| NRS § 463.0193 | 5, 27 |
| NRS § 463.343 | 62 |
| NRS § 463.350(1)(a) | 4, 66 |
| NRS § 463.360(3) | 67 |
| NRS § 463.370 | 67 |

# TABLE OF AUTHORITIES
## (continued)

**Statutes, Rules, and Regulations (continued)**      **Page(s)**

NRS § 463.01962 ..................................................................................5

NRS § 463.01962 ................................................................................27

1959 Nev. Stat. 427 .............................................................................4

Nev. Gaming Reg. 5.170.......................................................................5

Nev. Gaming Reg. 5.225(18)(a)..........................................................66

Nev. Gaming Reg. 5.225(18)(b)..........................................................66

Nev. Gaming Reg. 22.1201(2)(c) ........................................................65

Nev. Gaming Reg. 22.1205....................................................................5

Nev. Gaming Reg. 22.1205..................................................................64

Nev. Gaming Reg. 22.1205(2) ..............................................................5

Nev. Gaming Reg. 22.140(1) ..............................................................55

## Other Authorities

156 Cong. Rec. S5906 (July 15, 2010) .............................................34

@DustinGouker, X (Nov. 28, 2025).....................................................10

Am. Gaming Ass'n, *State of the States 2025* (May 13, 2025)...................6, 52

*Black's Law Dictionary* (12th ed. 2024) ...........................................7

Kendall Baker, *NCAA President Charlie Baker on Sports Betting*,
Yahoo! Sports (Dec. 11, 2025) .......................................................65

Dan Bernstein, *A Frequent Kalshi Claim Is Being Undermined by
Nevada, CFTC*, Sportico (Nov. 12, 2025) ......................................56

Dan Bernstein & Eben Novy-Williams, *Fanatics Launches a
Prediction Market-Without the G-Word*, Sportico (Dec. 3, 2025)............56

# TABLE OF AUTHORITIES
## (continued)

**Other Authorities (continued)**      **Page(s)**

Mick Bransfield, *Summary of Legal Actions Involving Sports Event Contracts* (Jan. 21, 2026) ..................................................................61

CFTC, *Acting Chairman Pham Announces First-Ever Listed Spot Crypto Trading on U.S. Regulated Exchanges* (Dec. 4, 2025) ...............23

CFTC, *Designated Contract Market Products—KEX*...................................36

*CFTC Reauthorization: Stakeholder Perspectives Before the H. Comm. on Agric.*, 119th Cong. (2025)......................................................65

Chi. Mercantile Exch., *Rulebook* ch. 13 ...................................................23

Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act* (2017).................................................................7

Core Principles and Other Requirements for DCMs, 75 Fed. Reg. 80572 (Dec. 22, 2010) ..............................................................................56

Deloitte, *Hedge Accounting* (2025) ...........................................................26

Event Contracts, 89 Fed. Reg. 48968 (proposed June 10, 2024).........*passim*

Danny Funt, *America's Betting Craze Has Spread to Its News Networks*, New Yorker (Dec. 12, 2025)....................................................66

Further Definition of "Swap," 77 Fed. Reg. 48208-01 (Aug. 13, 2012) ........................................................................34, 35, 40

Evan Gach, *Finance Bro Thinks It Would Be Cool to Turn Your Entire Life Into the Stock Market*, Kotaku (Dec. 3, 2025).......................12

Dustin Gouker, *Kalshi Says It's 'Kind of Addicting' In Instagram Post*, Event Horizon (Oct. 21, 2025) .......................................................66

Becky Harris & Husna Alikhan, *Nevada, Over 60 Years Regulating Gambling-A Jurisdictional Overview*, 23 Gaming L. Rev. 645 (2019)...............................................................3, 4

# TABLE OF AUTHORITIES
## (continued)

**Other Authorities (continued)**                                    **Page(s)**

Kalshi Help Center, *Signing Up as an Individual* (2025)............................66

Kalshi, *Los Angeles at Carolina* ...........................................................9, 10

Kalshi, *Member Agreement* (Oct. 12, 2025)........................................59

Kalshi, *Oscar for Best Actor*.................................................................11

Kalshi, *What Flavors Will JUUL Relaunch* .........................................12

Kalshi, *What Will Eric Cartman Say During the South Park Season 27 Episode 3* ....................................................................................12

Kalshi, *Who Are You Trading With* (Feb. 27, 2025)................................11

Sam Learner, *Prediction Markets Barely Make Money; Sportsbooks Make Money*, Fin. Times (Dec. 19, 2025) ...................................11

Nev. Gaming Control Bd., *Monthly Revenue Report* (Nov. 2025) ................5

Nev. Resort Ass'n, *2025 Nevada Gaming Fact Book* (2025)....................5, 67

Emily Nicolle & Justina Lee, *Coinbase CEO Stunt Exposes Prediction Market Vulnerability*, Bloomberg (Oct. 31, 2025) .................65

Marc Novicoff, *The Company Making a Mockery of State Gambling Bans*, Atlantic (Oct. 26, 2025).............................................................9

Daniel O'Boyle, *DraftKings Enters Prediction Markets With Quite A Few Questions Unanswered*, InGame (Dec. 22, 2025)...........................57

*Oxford English Dictionary* (2025) ............................................ 25, 26, 28, 29

Provisions Common to Registered Entities, 76 Fed. Reg. 44776-01 (July 27, 2011) ................................................................................33

Marina Temkin, *Source: Kalshi's Valuation Jumps to $11B After Raising Massive $1B Round*, TechCrunch (Nov. 20, 2025) ...................11

# TABLE OF AUTHORITIES
## (continued)

**Other Authorities (continued)**        **Page(s)**

Sean Treppedi, *FanDuel Launching Prediction Markets App to Target Non-Sports Betting States*, N.Y. Post (Nov. 13, 2025)..................57

U.S. Treas., Fin. Crimes Enf't Network, *FinCEN Assesses $3.5 Million Penalty Against Paxful for Facilitating Suspicious Activity Involving Illicit Actors* (Dec. 9, 2025) .......................................................59

*Webster's New World College Dictionary* (4th ed. 2004) ...................25, 26, 28

## INTRODUCTION

KalshiEX LLC (Kalshi) advertises its products as "legal sports betting in all 50 states." But it does not comply with the gaming laws in Nevada or any other State.

Instead, Kalshi argues that it can be regulated only by the Commodity Futures Trading Commission (CFTC). That is wrong. The CFTC is responsible for regulating trading in commodity futures, not gambling. Nothing in the Commodity Exchange Act (CEA) shows that Congress intended to take away the States' and Indian Tribes' historic powers to regulate gambling and give them all to the CFTC. Indeed, Kalshi's products are not even within the CFTC's jurisdiction, so Kalshi's preemption argument fails at the outset.

The implications of Kalshi's position are truly staggering. Under Kalshi's view of the CEA, *all* sports wagers are "swaps" that can be regulated *only* by the CFTC. In Kalshi's retelling, when Congress amended the CEA in response to the financial crisis, it both legalized sports betting nationwide and made the CFTC the Nation's sole gaming regulator. And then no one noticed for over a decade—not even the Supreme Court, which reaffirmed the States' historic power to regulate sports betting in *Murphy v. NCAA*, 584 U.S. 453 (2018). Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). It did

not secretly preempt all state gaming regulation in a law about commodity-futures trading.

Apart from the merits, a preliminary injunction is not warranted because the balance of equities tips strongly against Kalshi. Kalshi wants to keep profiting from unlicensed sports betting. But its harms are self-inflicted; the district court and the CFTC warned Kalshi of the risks of expanding its business, and Kalshi did it anyway. Kalshi's claimed harms also are unsubstantiated, as the district court thoroughly explained.

On the other hand, Kalshi's continued operation poses an existential threat to Nevada's gaming industry, which is at the core of Nevada's economy. Kalshi's refusal to follow the same rules as its competitors threatens the integrity of that industry and deprives the State of critical revenue. Kalshi's operation also harms the public by offering gambling without Nevada's restrictions on gambling by minors, problem gambling, insider betting, and criminal conduct. Every day Kalshi operates causes irreparable harm to Nevada, its gaming industry, and the public.

Kalshi cites no decision where a court enjoined a State from enforcing a presumptively valid law to allow a private business to continue profiting from violating that law. This Court should not be the first.

## JURISDICTIONAL STATEMENT

The jurisdictional statement in Kalshi's brief is correct.

2

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in dissolving the preliminary injunction, when (1) Kalshi is unlikely to succeed in showing that the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, preempts Nevada gaming law with respect to Kalshi's election and sports contracts, and (2) the balance of equities tips heavily against Kalshi.

## STATUTORY AND REGULATORY AUTHORITIES

Pertinent statutes and rules are set out in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Legal Background

#### 1. Nevada Comprehensively Regulates Gaming

Nevada is the "gaming capital of the world." Becky Harris & Husna Alikhan, *Nevada, Over 60 Years Regulating Gambling—A Jurisdictional Overview*, 23 Gaming L. Rev. 645, 647 (2019) (Harris & Alikhan). Millions of people visit Nevada each year to gamble at its hundreds of casinos; for many, "gambling" and "Nevada" are "synonymous." *Id.* at 645.

The "public policy" of Nevada, expressed through the Legislature, is that the "[t]he gaming industry is vitally important to the economy of the State and the general welfare of the inhabitants." NRS § 463.0129(1)(a). The "continued growth and success" of the industry "is dependent upon public confidence and trust" that gaming is "conducted honestly and competitively" and "free from criminal and corruptive elements." *Id.*

3

§ 463.0129(1)(b). That confidence and trust "can only be maintained by strict regulation" of all gaming activities in Nevada. *Id.* § 463.0129(1)(c).

Nevada's comprehensive regulatory scheme is the "gold standard in gaming regulation." Harris & Alikhan 645. Starting in 1869, Nevada progressively legalized gaming, first by allowing local governments to authorize gaming. *Id.* at 648. Then, in the 1940s, Nevada began regulating gaming at the state level. *Id.* at 651-54. In 1959, the Gaming Control Act centralized gaming regulation in the Nevada Gaming Control Board (Board) and the Nevada Gaming Commission. *See* 1959 Nev. Stat. 427.

Nevada law imposes stringent licensing requirements on all gaming operators. NRS § 463.160(1). The Board thoroughly investigates each applicant's background to ensure that it is competent to conduct gaming, is financially sound, and is not connected to criminal activity. *Id.* §§ 463.170, 463.1405(1). The Board strictly prescribes the "games and devices" that may be offered to ensure that the games are fair and consistent with the public interest. *Id.* § 463.150(2). The Board also maintains a list of persons who are excluded from gaming in the State based on criminal or other serious violations. *Id.* § 463.151.

Many provisions of Nevada gaming law protect the public. Only people who are at least 21 years old may gamble. NRS § 463.350(1)(a). Licensees must allow patrons to set betting limits, conspicuously display information about responsible-gaming resources, train employees to identify

4

signs of problem gaming, and refrain from marketing to customers who have excluded themselves. Nev. Gaming Reg. 5.170.

Nevada specifically regulates sports and event betting. State law permits wagering on organized sports events (*i.e.*, operating "sports pools"), NRS §§ 463.0193, 463.01962, but not on elections or events that lack effective supervision, Nev. Gaming Reg. 22.1205. Among other things, Nevada requires licensees to verify that insiders (such as players or coaches) do not wager on their own events. *Id.* at 22.1205(2).

The gaming industry is vital to Nevada's economy. Licensed sports pools report more than $548 million in revenue each year. *See* Nev. Gaming Control Bd., *Monthly Revenue Report* 1 (Nov. 2025), perma.cc/DFE3-V8J4. The gaming industry accounts for over one-third of Nevada's economy and supports over 436,000 jobs. Nev. Resort Ass'n, *2025 Nevada Gaming Fact Book* 2 (2025), perma.cc/NRH9-5NGV (NRA, *Fact Book*). The industry contributes over $2 billion in taxes—over one-third of Nevada's general fund. *Id.* at 65. Those taxes pay for essential services across the State, including schools, roads, and public utilities.

Before 2018, Nevada was the only State that allowed casino-style sports betting because of the Professional and Amateur Sports Protection Act (PASPA), 28 U.S.C. § 3701 *et seq. Murphy*, 584 U.S. at 462. After the Supreme Court invalidated PASPA, other States became free to choose whether, and to what extent, they would allow sports betting. Now, 38 other

5

States and the District of Columbia allow some form of sports betting, either statewide or only on tribal lands. *See* Am. Gaming Ass'n, *State of the States 2025*, at 12-13 (May 13, 2025), perma.cc/J27S-WLSB (AGA, *States*). Other States, including California, Hawaii, and Utah, completely prohibit sports betting. *See id.*

As the Supreme Court has recognized, regulating gaming is within the traditional "police powers of a state," *Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905), and federal law "respect[s] the policy choices of the people of each State on the controversial issue of gambling," *Murphy*, 584 U.S. at 484.

### 2. The CFTC Regulates Commodity Futures Trading

The CFTC regulates trading in commodity derivatives—financial instruments that companies use to manage risk. It is not a gaming regulator.

In 1936, Congress enacted the CEA to regulate trading in futures in wheat, corn, and other agricultural commodities. Pub. L. No. 74-675, § 3, 40 Stat. 1491, 1491 (1936). A "future" is a contract to buy or sell a quantity of a commodity at a specified price on a future date. *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995). Businesses use futures to hedge against price volatility. *Id.* Futures can be traded on organized markets or entered into directly between two parties. *Id.* at 766. The CEA initially authorized the Secretary of Agriculture to register "designated contract markets" (DCMs) for futures trading. 7 U.S.C. § 7 (1936).

In 1974, Congress expanded the CEA to cover nearly all commodities, including non-agricultural commodities, and to cover other derivatives, including "options." Pub. L. No. 93-463, § 201(b), 88 Stat. 1389 (1974). A "derivative" is a contract whose value depends on the performance of an underlying asset, such as a commodity. *Black's Law Dictionary* (12th ed. 2024). An "option" is a contract that "grants to the purchaser the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price." *CFTC v. White Pine Tr. Corp.*, 574 F.3d 1219, 1226 (9th Cir. 2009) (internal quotation marks omitted).

Also in 1974, Congress created the CFTC "to consolidate federal regulation of commodity futures trading" in one agency. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386-87 (1982). To that end, Congress gave the CFTC "exclusive jurisdiction" over futures and options that are traded on DCMs or other markets. *Id.*; *see* 7 U.S.C. § 2(a) (1974).

In 2010, Congress enacted the Dodd-Frank Act, which expanded the CEA to cover "swaps." Pub. L. No. 111-203, pt. II, 124 Stat. 1376, 1658-754 (2010). A "swap" is an agreement between two parties to exchange (or swap) cash flows on financial obligations (such as interest payments), to hedge risk on those obligations. *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042-43 (9th Cir. 2003). Congress added "swaps" to the CEA because certain swaps, known as "credit default swaps," had exacerbated the financial crisis. Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street*

*Reform and Consumer Protection Act* 3 (2017). To capture the various forms of swaps in the market, Congress provided a detailed, six-part definition of "swap." 7 U.S.C. § 1a(47)(A). If a contract qualifies as a swap, option, or future, it *only* can be traded on a CFTC-registered DCM (unless both parties are banks, major corporations, or the like). *See id.* § 2(e) (swaps); *id.* § 6(a) (futures); 17 C.F.R. § 33.3(a) (options).

To offer a contract for trading, a DCM can self-certify that the contract complies with the CEA and immediately start trading, without any action by the CFTC. 7 U.S.C. § 7a-2(c)(1)-(2). In its self-certification, the DCM must identify whether the contract is a swap, option, or future. *See* 17 C.F.R. § 38.4(b). The CFTC can review a self-certification and disallow a contract that fails to comply with the CEA's requirements. 7 U.S.C. § 7a-2(c)(3). Further, under the "Special Rule," the CFTC may disallow a contract that involves "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or "gaming." *Id.* § 7a-2(c)(5).

The CFTC has repeatedly recognized that it is not a gaming regulator and that gaming should not occur on DCMs. Exercising its authority under the Special Rule, the CFTC categorically prohibited contracts "that involve[], relate[] to, or reference[]" "gaming." 17 C.F.R. § 40.11(a). Further, the CFTC explained that it "does not believe that it has the statutory mandate nor specialized experience appropriate to oversee" gaming. Event Con-

8

tracts, 89 Fed. Reg. 48968, 48976 (proposed June 10, 2024). And when companies like Kalshi began offering sports betting on DCMs, the CFTC emphasized it has not "taken any official action" to approve those contracts and warned the companies that they could be subject to state regulatory action. 1-StateSER-41 & n.4.

### B. Factual Background

Kalshi operates a CFTC-registered DCM where users can buy "event contracts" on sports, elections, and other events. 2-ER-110 (¶¶ 42-44). Those contracts are wagers: The user buys a contract on whether a particular outcome will occur and receives a payout if it occurs. 2-ER-105 (¶ 25). In 2023, Kalshi began offering contracts on the outcomes of elections. 2-ER-110-11 (¶¶ 45-47). In January 2025, Kalshi began offering contracts on the outcomes of sports events. 2-ER-110-12 (¶¶ 45, 53).

Kalshi initially offered sports contracts only on the winners or losers of games, but since has expanded to "prop" bets (bets on outcomes within a game, such as the winning margin or total number of points scored) and "parlays" (chained bets on two or more outcomes). *See* Marc Novicoff, *The Company Making a Mockery of State Gambling Bans*, Atlantic (Oct. 26, 2025), perma.cc/8TAG-NJSJ. For example, on January 7, 2026, a Kalshi user could buy a contract for $0.18 that would pay $1 if the Panthers won their playoff game against the Rams. Kalshi, *Los Angeles at Carolina*, perma.cc/2YHT-SRVH (visited Jan. 7, 2026). The user also could bet on the

total number of points scored, the winning margin, and which players would score touchdowns. *Id.*

Kalshi's products "are sports wagers and everyone who sees them knows it." 1-ER-17. The following screenshots illustrate the point, showing that Kalshi's offerings are just like those of sportsbooks like DraftKings:



**DraftKings**                                    **Kalshi**

@DustinGouker, X (Nov. 28, 2025), perma.cc/7QCF-HF7C.

Kalshi does not deny that it offers sports betting. Indeed, Kalshi advertises itself as providing "legal sports betting in all 50 states":



10

1-StateSER-10. But Kalshi does not possess a state gaming license from Nevada or any other State. 1-ER-2.

Kalshi argues (Br. 19) that it functions differently from a traditional sportsbook because it connects bettors and does not act as the "house." But many forms of gambling involve players betting directly with each other, with the casino taking a cut of the wager. *See Hughes Props. v. State*, 100 Nev. 295, 297 (1984). Besides, Kalshi admits that an affiliate, Kalshi Trading, is the counterparty to (and thus the house for) a "significant" number of bets on its DCM. Kalshi, *Who Are You Trading With* (Feb. 27, 2025), perma.cc/8QQD-8QXR.

Kalshi's business has grown exponentially during this lawsuit. By mid-October 2025, Kalshi reached $50 billion in annualized trading volume, "more than a thousandfold increase" from the previous year. Marina Temkin, *Source: Kalshi's Valuation Jumps to $11B After Raising Massive $1B Round*, TechCrunch (Nov. 20, 2025), perma.cc/CUB3-9XHC. Over 90% of those trades, representing 95% of Kalshi's revenues, are on sports. Sam Learner, *Prediction Markets Barely Make Money; Sportsbooks Make Money*, Fin. Times (Dec. 19, 2025), perma.cc/CB9N-SN6P.

Although Kalshi's business is almost all sports betting, it is constantly expanding into other events. For example, users could wager on the winner of the Oscar for Best Actor, Kalshi, *Oscar for Best Actor*, perma.cc/TQ4N-D7GX (visited Jan. 10, 2026); whether the fictional character Eric Cartman

would say "mom" in an upcoming episode of South Park, Kalshi, *What Will Eric Cartman Say During the South Park Season 27 Episode 3*, perma.cc/ K4PPM-JHDE (visited Aug. 22, 2025); and what flavors vape company Juul would launch in 2026, Kalshi, *What Flavors Will JUUL Relaunch*, perma.cc/ C2YN-2VMY (visited Jan 18, 2026). According to its CEO, Kalshi's "long-term vision" is to allow betting on "any difference in opinion." Evan Gach, *Finance Bro Thinks It Would Be Cool to Turn Your Entire Life Into the Stock Market*, Kotaku (Dec. 3, 2025), perma.cc/VKA7-EPJE (internal quotation marks omitted).

## C.    Procedural History

In March 2025, the Board sent Kalshi a cease-and-desist letter, explaining that Kalshi is violating Nevada law by offering unlicensed gambling on sports and elections. 2-ER-112-13 (¶ 55). In response, Kalshi filed this lawsuit, arguing that because it registered its DCM with the CFTC, the CFTC has "exclusive jurisdiction" over any product Kalshi has listed or ever will list for trading on its DCM. 2-ER-114-15 (¶¶ 64-70).

In an expedited proceeding, the district court granted Kalshi a preliminary injunction, holding that the CEA likely preempts Nevada's gaming laws. *See* 2-ER-65-81. The court did not address the threshold question whether Kalshi's contracts are "swaps" or other commodity derivatives subject to the CEA. 2-ER-74-77. And the court cautioned Kalshi that it was "proceeding at its own risk and creating its own harms." 2-ER-80. Despite

12

that warning (and the similar warning from the CFTC, 1-StateSER-41), Kalshi "greatly expanded its offerings," 1-ER-27.

Kalshi's competitor Crypto.com then filed a similar lawsuit, *see* 1-ER-3, as did Kalshi's partner Robinhood, *see* 1-ER-4. Both sought preliminary injunctions. The district court denied those requests. *See N. Am. Derivatives Exch., Inc. v. Nevada* (*Crypto.com*), 2025 WL 2916151, at *6-11 (D. Nev. Oct. 14, 2025), *appeal docketed*, No. 25-7187 (9th Cir. Nov. 14, 2025); *Robinhood Derivatives, LLC v. Dreitzer*, 2025 WL 3283308, at *1-2 (D. Nev. Nov. 25, 2025), *appeal docketed*, No. 25-7831 (9th Cir. Dec. 12, 2025).

In Crypto.com's case, the court held that the CEA does not preempt state gaming laws because sports bets are not "swaps" or other derivatives subject to the CFTC's jurisdiction, and the preemption argument therefore fails at that threshold step. 2025 WL 2916151, at *6-11. State Defendants then moved to dissolve Kalshi's preliminary injunction. 1-ER-4.

The district court dissolved Kalshi's preliminary injunction. 1-ER-2-30. It held that Kalshi has no likelihood of success on the merits because its contracts are not "swaps" (or options or futures) under the CEA. 1-ER-12. It noted that Kalshi's expansive definitions of those terms "has no limiting principle" and would lead to "absurd" results. 1-ER-20. The court also explained that Kalshi's position would "require all sports betting across the country to come within the jurisdiction of the CFTC rather than the states and Indian tribes," which would "upset[] decades of federalism." 1-ER-2.

13

The district court determined that "the balance of hardships tips in favor of the Board, and the public interest favors dissolving the injunction." 1-ER-6. Kalshi's claimed harms "are largely monetary" ("essentially that it will not be able to profit from [its] trades"), and Kalshi "created or amplified" those harms by "greatly expand[ing]" its business instead of "proceed[ing] cautiously until this and other lawsuits played out." 1-ER-26-27.

State Defendants, in contrast, face "substantial" and "irreparable" harms that "weigh heavily" against Kalshi's asserted harms. 1-ER-27-29. Regulated gaming is vital to Nevada's economy and public welfare. 1-ER-27. Kalshi's continued operation deprives Nevada of needed revenue, gives Kalshi an unfair advantage over its licensed competitors, and harms the public by conducting gaming without Nevada's "rigorous" regulations. 1-ER-27-28.

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion in dissolving Kalshi's preliminary injunction.

I. To prevail on the merits, Kalshi must show both that its contracts are swaps (or other commodity derivatives) under the CEA, and that the CEA preempts all state gaming law as to those contracts. It cannot show a likelihood of success on either.

A. Kalshi's contracts are not "swaps" or other commodity derivatives, so its claim of preemption fails at the outset.

14

Kalshi attempts to avoid this question altogether by arguing that the CFTC has "exclusive jurisdiction" over *any* contract traded on a DCM. But that is not what the CEA says: It gives the CFTC jurisdiction over swaps, futures, options, and other listed derivatives that are traded on DCMs or on other markets. 7 U.S.C. § 2(a)(1)(A). Simply trading on a DCM is not enough.

Kalshi's contracts are not "swaps." Swaps are financial instruments used to hedge risk. The statutory definition reflects that understanding; it requires payment to be based on the "occurrence" of an "event" that is "associated with" potential economic consequences, meaning events that create risk against which a business could want to hedge. 7 U.S.C. § 1a(47)(A)(ii). Kalshi's contracts are based on the *outcomes* of sports events, not on whether the events occur. And as Kalshi has admitted, sports bets are not used to hedge existing economic risk; the bets *create* the risk. Kalshi's expansive definition of "swaps" is limitless; it would encompass a "contract on anything that happens or could happen." 1-ER-13-14.

Kalshi's contracts also are not "option[s]" or "contracts of sale of a commodity for future delivery." Notably, Kalshi *told* the CFTC that its contracts are "swaps," and the definition of swaps expressly excludes options and futures. Anyway, its contracts do not qualify as options or futures under the settled meanings of those terms.

15

The implications of Kalshi's position are extreme. Under Kalshi's view, all sports bets would qualify as swaps, futures, or options. The CEA expressly requires that all consumer swaps, futures, and options be traded *only* on CFTC-registered DCMs. So all sports betting would have to be done on CFTC-registered DCMs, and nowhere else. The CFTC would be the Nation's sole sports-betting regulator, to the complete exclusion of States and Tribes. Kalshi attempts to avoid that absurd result, but ultimately has no way around it.

As a fallback, Kalshi argues that this Court cannot even decide the threshold question whether its contracts are commodity derivatives. But Kalshi brought this lawsuit and invoked the CEA to enjoin State Defendants; of course this Court can decide whether the CEA applies. State Defendants are not required to sue the CFTC, because they are not seeking to enforce the CEA; they want to enforce Nevada law. Besides, the CFTC has not taken any action to approve Kalshi's contracts, so there would be no basis for such a lawsuit.

B. Even if Kalshi's products were within the CFTC's jurisdiction, the CEA would not preempt all state gaming law. The regulation of gaming is at the heart of the States' police power, and taking away that power would have vast economic and political consequences. Congress would need to speak exceptionally clearly if it intended that result. Nothing in the CEA shows that clear intent.

16

Kalshi primarily argues field preemption. It relies on the CEA's "exclusive jurisdiction" provision, but that provision says nothing about preempting all state gaming law. The CEA's narrow express-preemption provisions confirm that "exclusive jurisdiction" does not preempt state gaming law generally. The CEA also lacks a comprehensive regulatory scheme for gaming. It is implausible to think that Congress made the CFTC the Nation's sports-betting regulator, without giving it any tools to regulate gaming or guidance on how to do so.

Kalshi also argues conflict preemption. But Kalshi could comply with both Nevada law and the CEA—it just chooses not to. Kalshi identifies only one Nevada regulation that supposedly conflicts with federal law, and there is no conflict. Nevada gaming law also does not pose an obstacle to fulfilling the purposes of the CEA. Congress enacted the CEA to "bring[] risky financial products out of the shadows," not to "enabl[e] nationwide gambling on CFTC-designated exchanges." 1-ER-20.

II. As the district court found, the balance of equities weighs against Kalshi. Kalshi identifies no clear error in that finding.

A. Kalshi's claimed harms are speculative and self-inflicted. It aggressively expanded its business in the face of legal uncertainty and express warnings by the district court and the CFTC. Kalshi wishes to avoid the costs of geofencing, but its competitors pay those costs, and the costs are

minuscule in comparison to Kalshi's revenues. Kalshi cites possible criminal enforcement, but State Defendants simply seek to bring a state civil suit to stop Kalshi's unlawful activities. Kalshi cannot complain when it already is subject to such a suit in another State, and it could raise any defense in state court.

B. In contrast, State Defendants' harms are severe and irreparable. Nevada has a sovereign interest in enforcing its gaming laws. Kalshi's continued operation severely disrupts Nevada's regulated gaming industry by giving it an unfair advantage over licensed competitors. It harms Nevada's economy and public fisc by depriving the State of critical tax revenues. And it harms the public, because Kalshi does not comply with Nevada's consumer-protection requirements, and its platform is open to manipulation and abuse. Every day Kalshi operates in violation of Nevada law imposes "substantial irreparable harms to the Board, the State of Nevada, the gaming industry in this state, and the public interest." 1-ER-27.

This Court should affirm.

## STANDARD OF REVIEW

A preliminary injunction is a form of extraordinary relief. To obtain that relief, Kalshi must satisfy the four factors in *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008): (1) it is likely to succeed on the merits; (2) it likely will suffer irreparable harm without a preliminary injunction; (3) the balance of equities favors it; and (4) an injunction is in the public interest. *Karnoski v.*

*Trump*, 926 F.3d 1180, 1198 & n.14 (9th Cir. 2019). Where the defendant is a government entity, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The Court also has permitted injunctive relief using a sliding-scale approach, when the movant raises "serious questions" on the merits and the balance of hardships "tips sharply" in its favor. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (internal quotation marks omitted).[1]

This Court will reverse an order dissolving a preliminary injunction "only where the district court abused its discretion." *Latimore v. Cnty. of Contra Costa*, 77 F.3d 489 (9th Cir. 1996) (internal quotation marks omitted). The Court reviews the district court's legal determinations *de novo* and its factual findings for clear error. *Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 764 (9th Cir. 2018).

## ARGUMENT

## I. KALSHI IS NOT LIKELY TO SUCCEED ON THE MERITS

Kalshi argues that only the CFTC can regulate Kalshi's sports and election contracts because the CEA preempts all state regulation of them. To succeed on that argument, Kalshi must show both that (1) its contracts

---

[1] The sliding-scale approach appears inconsistent with *Winter*, which requires showing a likelihood of success on the merits. *See Flathead*, 98 F.4th at 1190 & n.12.

are "swaps," "option[s]," or "contracts of sale of a commodity for future delivery" so that the CEA applies, and (2) if the CEA applies, it preempts all state gaming law as to them. Kalshi cannot show either.

Kalshi's position has a fundamental problem: It is so sweeping that it would give the CFTC all authority over sports betting, to the exclusion of States and Tribes. 1-ER-2. That is why three of the four courts to address this issue have concluded that Kalshi's argument cannot possibly be correct. *See* 1-ER-3; *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025); Order, *Massachusetts v. KalshiEX LLC*, No. 2584CV02525 (Mass. Sup. Ct. Suffolk Cnty. Jan. 20, 2026) (Mass. PI Order) (available at Dkt. 32); *but see KalshiEX LLC v. Flaherty*, 2025 WL 1218313 (D.N.J. Apr. 28, 2025), *appeal argued*, No. 25-1922 (3d Cir. Sept. 10, 2025) (relying on the early, now-reversed decision in this case).

Courts presume that Congress did not preempt state law, "particularly" in cases involving "a field which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). Courts also require Congress to speak clearly when it gives an agency authority to regulate a field of "vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (internal quotation marks omitted).

20

This Court and the Supreme Court have held that the regulation of gaming "lie[s] at the heart of the state's police power." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 740 (9th Cir. 2003); *see Ah Sin*, 198 U.S. at 505-06; *Flynt v. Bonta*, 131 F.4th 918, 927 (9th Cir. 2025). Federal law "defer[s] to, and even promote[s], differing gambling policies in different States." *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999); *see* 15 U.S.C. § 3001(a)(1)-(2).

Kalshi thus would need to show exceptionally clear congressional intent to preempt state gaming law. *Bond v. United States*, 572 U.S. 844, 858-59 (2014). If the CEA "is susceptible of more than one plausible reading," this Court should "accept the reading that disfavors pre-emption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (internal quotation marks omitted). Nothing in the CEA shows the necessary intent.

Indeed, the CFTC itself has recognized that it has neither "the statutory mandate nor specialized experience appropriate to oversee" gaming. 89 Fed. Reg. at 48982-83. It has prohibited DCMs from listing contracts that involve "gaming," 17 C.F.R. § 40.11(a)—and Kalshi admits that sports bets are "gaming," 1-ER-15 n.3. So Kalshi has listed its contracts in direct violation of the CFTC's own rules. Kalshi cannot claim the protection of the CFTC when the CFTC has said it is *not* a gambling regulator and does *not* want gambling on DCMs.

21

A.    **Kalshi's Sports and Election Contracts Are Not "Swaps," "Option[s]," or "Contracts of Sale of a Commodity for Future Delivery" Under the CEA**

1.    **The CFTC Does Not Have "Exclusive Jurisdiction" Over Any Contract Traded on a DCM**

Kalshi's threshold argument—that any contract traded on a DCM is subject to the CFTC's exclusive jurisdiction—is wrong.  Kalshi repeatedly asserts that the CEA "grants the CFTC 'exclusive jurisdiction' over trading on DCMs"—meaning that if a contract is traded on a DCM, *only* the CFTC may regulate it.  Kalshi Br. 1, 4, 6-7, 22, 26-35.  According to Kalshi, "[t]he CEA preempts regulation of trading on DCMs—full stop."  *Id.* at 40; *see* Paradigm *Amicus* Br. 21 ("[I]f it's traded on a CFTC-exchange, it's exempt from state regulation.").

But that is not what the statute says.  Section 2(a)(1)(A) gives the CEA "exclusive jurisdiction" over "swap[s]," "option[s]," "contracts of sale of a commodity for future delivery," and other listed derivatives that are "traded or executed on [a DCM]," or "any other" market.  7 U.S.C. § 2(a)(1)(A).  To apply, a contract must *both* qualify as one of the listed derivatives *and* be traded on a DCM or other market.  If a contract is not one of those derivatives, Section 2(a)(1)(A) does not apply, and the claim of preemption fails at the outset.

22

Thus, the mere fact that a contract is traded on a DCM does not mean that the CFTC has "exclusive jurisdiction" over it. And the fact that a contract is traded on a DCM does not mean it is a "swap" or other derivative, because nothing in the CEA restricts DCMs to those financial instruments. Products are traded on DCMs that are not listed in Section 2(a)(1)(A), such as "spots" (contracts to directly buy the underlying commodity). *E.g.*, Chi. Mercantile Exch., *Rulebook* ch. 13, at 2, perma.cc/YW8G-D66W (spot contracts on foreign currencies); CFTC, *Acting Chairman Pham Announces First-Ever Listed Spot Crypto Trading on U.S. Regulated Exchanges* (Dec. 4, 2025), perma.cc/6XC8-EXY8 (spot contracts on cryptocurrencies).

In interpreting a statute, this Court cannot "ignore [its] plain text"; instead, the Court "appl[ies] the text" as written. *United States v. Lucero*, 989 F.3d 1088, 1094 (9th Cir. 2021). Thus, in order to invoke the CEA as a basis for preemption, Kalshi must show that its event contracts are "swaps" or other listed derivatives.

### 2. Kalshi's Contracts Are Not "Swaps"

A swap is a financial instrument by which two parties agree to exchange cash flows on financial obligations, as a means of hedging volatility and managing risk. *Thrifty Oil*, 322 F.3d at 1042. Because there are many different types of swaps in the market, the CEA sets out a detailed, six-part definition of "swap." 7 U.S.C. § 1a(47)(A). Kalshi relies on the second part, which covers a contract where "payment" is "dependent on" the "occurrence,

23

nonoccurrence, or the extent of the occurrence" of "an event or contingency" that is "associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii).

As the district court explained, Kalshi's interpretation of "swap" is contrary to the statutory text, makes no sense in context, "goes against congressional intent" and the CFTC's guidance, and ignores longstanding federalism principles. 1-ER-12-21.

### a. Kalshi's interpretation is contrary to the statutory text

Kalshi's contracts do not come within the plain text of the "swaps" definition for two reasons: they depend on the *outcomes* of events, not the "event[s]" themselves, and the outcomes of sports events are not "associated with" potential economic consequences, meaning consequences businesses would want to hedge against. These textual limitations ensure that "swaps" include only financial instruments that businesses use to hedge risk, and not "contract[s] on anything that happens or could happen." 1-ER-13-14.

***Events vs. outcomes.*** The "swap" definition requires that payment "depend[] on" whether "an event or contingency" occurs. 7 U.S.C. § 1a(47)(A)(ii).

The definition requires an "event or contingency" in order to capture "significan[t]" occurrences that create risk businesses could want to hedge. 1-ER-12 (internal quotation marks omitted). An "event" is different from

24

an "outcome." An "event" is "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time." 1-ER-12 (citation omitted); *see, e.g.*, *Webster's New World College Dictionary* 492 (4th ed. 2004) (a "happening or occurrence, esp. when important"); *Oxford English Dictionary* (2025), perma.cc/XER3-NGE7 (OED, *Event*) ("[s]omething that happens or takes place, esp. something significant or noteworthy"). An "outcome" is a "result" of the event. *Webster's New World College Dictionary* 1023.

Kalshi's sports and election contracts depend on the *outcomes* of events, not the "events" themselves. 1-ER-12. Indeed, in its self-certifications, Kalshi calls its sports and election contracts "outcome" contracts. 2-ER-110 (¶ 45). For example, a contract on the winner of an NFL game is not based on whether the game occurs, but which team wins. *Crypto.com*, 2025 WL 2916151, at *9. Props and parlays are not even based on the primary result of a sporting event (who wins), but instead on secondary results (such as the number of points scored), which Kalshi again labels "outcomes" in its self-certifications. 1-StateSER-58. Ordinary English speakers do not call the number of points scored in a football game an "event." *See Crypto.com*, 2025 WL 2916151, at *8.

Kalshi's contracts likewise are not based on "contingenc[ies]." 1-ER-12. "Contingency" means "contingent event"—a happening that may or may not occur—not the result of an event already scheduled to occur.

25

*Crypto.com*, 2025 WL 2916151, at \*8 n.9; *see, e.g.*, *Webster's New World College Dictionary* 314 (an "event" that "depends on" "another"). For example, a "deal-contingent swap" is based on a contingency, because it depends on whether the proposed deal is "consummated by a specified date." Deloitte, *Hedge Accounting* § 4.1.1.1.1 (2025), perma.cc/FX2W-LLPA. Kalshi's contracts are based on the outcomes of events, not on whether the events occur.

Kalshi has essentially four responses. First, it argues (Br. 48) that an "event" (or "contingency") includes an "outcome." They are different: The event (or contingent event) is the thing that happens, and the outcome is the result. *Crypto.com*, 2025 WL 2916151, at \*7. Kalshi notes (Br. 48) that some dictionaries define "event" to include "outcome," but more comprehensive dictionaries confirm that this usage is "archaic." *Id.* at \*7 & n.6; *see, e.g.*, OED, *Event* (labeling this usage "rare"). It would not make sense to adopt that archaic usage here, because then the definition of "swap" would be so broad as to be limitless; "everything a person can conceive of happening [would be] an event or contingency." 1-ER-20; *see Drapich v. Donovan*, 693 F.2d 1296, 1298 (9th Cir. 1982) (rejecting an "archaic" definition that is "more expansive than the ordinary understanding" of the term).

Kalshi cites (Br. 49-50) court decisions that use "event" and "outcome" interchangeably, but those decisions did not address the definition of "swap"

26

under Section 1a(47)(A)(ii).[2]  Kalshi also relies (Br. 49) on a proposed rule-making that would have strengthened the prohibition on gaming on DCMs —but that also did not interpret Section 1a(47)(A)(ii)'s definition of swap; instead, it involved the Special Rule, which applies to "agreements, contracts, transactions, or swaps," not just "swaps."  7 U.S.C. § 7a-2(c)(5)(C)(i); *see* 89 Fed. Reg. at 48969.

Second, Kalshi argues (Br. 50) that distinguishing "outcomes" from "events" could create "interpretive difficulties," because any "event" could be recharacterized as the "outcome" of a prior "event."  But the fact that an event (*e.g.*, a mortgage default) could be the outcome of an underlying event (*e.g.*, a recession) does not negate the fact that the first event is a significant independent event.  This argument, like Kalshi's other textual arguments, would make the definition of "swap" limitless.  *See* 1-ER-12.

Third, Kalshi argues (Br. 50-51) that defining "event" as distinct from "outcome" would be inconsistent with Nevada gaming law, which defines a "sports pool" as the business of "accepting wagers on sporting events."  NRS § 463.0193.  There is no inconsistency, because Nevada defines "wager" as "a sum of money" that is "risked on an occurrence for which the *outcome* is uncertain."  *Id.* § 463.01962 (emphasis added).  Thus, Nevada gaming law

---

[2]  *See Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*, 26 F.3d 1508 (10th Cir. 1994); *KalshiEX LLC v. CFTC*, 2024 WL 4164694 (D.D.C. Sept. 12, 2024); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29 (D.D.C. 2015).

27

applies to wagers on the *outcomes* of events, which reinforces that Kalshi's contracts are sports bets, not "swaps."

Finally, Kalshi argues (Br. 56-57) that the district court did not expressly address election contracts (a tiny percentage of Kalshi's business). But the court's distinction between outcomes and events applies to election contracts—indeed, Kalshi calls those contracts "political-outcome contracts." 2-ER-110 (¶ 45). And the court's holding is fully consistent with the holding of the district court in the District of Columbia, which addressed only the CFTC's authority under the Special Rule, not the definition of "swap" or the CEA's preemptive effect. *KalshiEX*, 2024 WL 4164694, at *7.

***Associated with potential economic consequences***. The swaps definition also requires that the event be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

This requirement limits qualifying events to those where there is an existing economic risk that companies seek to hedge. "Associate" means to "connect" or "join together" or to "connect in the mind." *Webster's New World Collegiate Dictionary* 86; *see Oxford English Dictionary* (2025), perma.cc/EW6F-NPP2 ("[t]o connect in idea"); 1-ER-12 n.1. Events that are "associated with" potential financial, economic, or commercial consequences are those that are "inherently joined or connected with a potential financial, economic, or commercial consequence." 1-ER-13-14 (footnote omitted).

28

They have potential economic consequences "without looking at externalities like potential downstream financial consequences." *Id.*

A sports bet does not hedge against existing risk; it creates the risk. Who wins a sports game generally does not have any direct economic consequence that someone would wish to hedge against (except, perhaps, for the participants, who cannot bet on their own games). Kalshi has admitted that sports are "staged purely for entertainment" and "their outcome[s] carry no economic risks," Mot. for Summ. J. at 30, *KalshiEX LLC v. CFTC*, No. 23-3257 (D.D.C. Jan. 25, 2024) (Dkt. 17-1), and that "a game doesn't have economic consequences outside of the game itself," 1-ER-15 n.3 (internal quotation marks omitted). Sports contracts thus "are unlikely to serve any commercial or hedging interest." Kalshi Br. at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024) (internal quotation marks omitted).

Kalshi now argues (Br. 46) that its sports contracts *do* have economic consequences. But it provides (*id.*) only one real-world example where its platform supposedly was used to hedge commercial risk—a sportsbook that uses Kalshi's contracts to hedge its *gaming* risk. That is just bootstrapping gaming risk onto itself, not hedging external economic risk.

Kalshi's bottom line (Br. 45-46, 51-54) is that because every event has some possible downstream economic consequence, every event contract qualifies as a "swap." Its view "knows no limiting principle." 1-ER-13.

29

Kalshi has argued, for example, that whether two people will hug has sufficient potential economic consequences. 3-StateSER-103; *see* 1-StateSER-46-55, 3-StateSER-83-91, 3-StateSER-111-323 (providing other examples). Indeed, Kalshi's counsel said he could not conceive of *any* happening that would not have sufficient potential economic consequences to be the basis of a "swap." 1-StateSER-70-71.[3]

As the district court explained, every event "might have some conceivable financial consequence if one is creative enough." 1-ER-13. For example, a bet on which team wins a youth softball game could qualify as a "swap" under Kalshi's view because the winning team might eat a celebratory dinner at its favorite restaurant. If those attenuated consequences were sufficient, then every event would be "associated with" potential economic consequences, and the potential-consequence requirement would "lose all meaning." 1-ER-19-20.

### b. Kalshi's interpretation of "swaps" makes no sense in context

The surrounding statutory text confirms that Kalshi's contracts are not "swaps." 1-ER-14-15.

---

[3] Kalshi argues (Br. 51) that weather swaps involve only downstream consequences. Even if true, Section 1a(47)(A)(iii) expressly includes "weather swap," 7 U.S.C. § 1a(47)(A)(iii)(XVII)—so Section 1a(47)(A)(ii) is not required to cover weather swaps.

Section 1a(47)(A)(ii) is part of a six-part definition of "swap." 7 U.S.C. § 1a(47)(A). When a definition contains multiple parts, a court should look to the other parts to inform the meaning of the part at issue. *Yates v. United States*, 574 U.S. 528, 543-44 (2015) (*noscitur a sociis* canon). If the other parts all share a common thread, the court should interpret the part at issue also to contain that thread. *E.g.*, *Beecham v. United States*, 511 U.S. 368, 371 (1994).

Here, all other parts of the definition refer to specific "financial measures, indices, or instruments" used to hedge risk. 1-ER-15. Parts (i) and (iii) cover specific financial instruments that involve "financial or economic interests" such as "interest or other rates, currencies, commodities, [or] securities or property of any kind." 7 U.S.C. § 1a(47)(A)(i), (iii). Part (iii) further lists 22 "commonly known" swaps. *Id.* § 1a(47)(A)(iii). Part (iv) covers any contract "that is or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). Part (v) covers certain "security-based swap agreement[s]" in which "a material term is based on the price, yield, value, or volatility of any security." *Id.* § 1a(47)(A)(v). And part (vi) covers any contract "that is any combination or permutation" of contracts in the five previous parts. *Id.* § 1a(47)(A)(vi). Part (ii) should be read in context to also cover financial instruments based on inherently economic events, not sports bets. 1-ER-15.

31

Under Kalshi's interpretation, part (ii) would lose the common thread and swallow the rest of the definition. If part (ii) reaches contracts "on anything that happens or could happen," 1-ER-13, then the remaining parts are left with nothing to do, 1-ER-20. This Court should not adopt a reading that makes most of the "swaps" definition "superfluous, void, or insignificant." *GCIU-Emp. Ret. Fund v. MNG Enters., Inc.*, 51 F.4th 1092, 1097 (9th Cir. 2022).

Kalshi responds (Br. 53) that its reading simply creates "overlap." But its interpretation of part (ii) does not merely overlap with the other parts— it makes them all superfluous. Kalshi does not identify *any* swap that would not come within its reading of part (ii). Kalshi argues (Br. 52) that part (ii) should be read broadly because part (iv) includes agreements that "become[] commonly known to the trade as swap," 7 U.S.C. § 1a(47)(A)(iv), and because Congress excluded certain contracts from the definition of swap, *see id.* § 1a(47)(B). Neither makes sense. If part (ii) is read broadly to cover any possible event contract, then part (iv) is meaningless, and Section 1a(47)(B) does not suggest or imply that broad construction of part (ii).

Kalshi asserts (Br. 51-52) that because the Special Rule allows the CFTC to prohibit contracts involving "gaming," those contracts must be "swaps" under the CEA. That is wrong, because the Special Rule is not limited to "swaps"; it applies to "agreements, contracts, transactions, or swaps." 7 U.S.C. § 7a-2(c)(5)(C)(i). Further, the Special Rule is a backstop

32

that allows the CFTC to prohibit trading in contracts that are "contrary to the public interest"; it does not define "swap." *Id.*

Importantly, the CFTC has exercised its Special-Rule authority to categorically *ban* contracts involving "gaming" on DCMs. 17 C.F.R. § 40.11(a). The CFTC did that specifically to "prevent gambling through the futures markets." Provisions Common to Registered Entities, 76 Fed. Reg. 44776-01, 44786 (July 27, 2011) (internal quotation marks omitted). Kalshi thus cannot rely on the Special Rule to *require* trading its sports bets on DCMs on the theory that they are "swaps." Citing 17 C.F.R. § 40.11(c), Kalshi argues (Br. 59 n.9) that the regulation does not categorically prohibit gaming contracts, but only subjects them to case-by-case review. But the terms of the regulation are clear and unequivocal: DCMs "shall not list" any contracts that "involve[], relate[] to, or reference[]" "gaming." 17 C.F.R. § 40.11(a). Section 40.11(c) merely confirms that if a DCM lists such a contract, the CFTC may review it and order it taken down. 1-ER-28 n.13. The Special Rule thus does not help Kalshi.

### c. Kalshi's interpretation is inconsistent with Congress's purposes and the CFTC's guidance

Interpreting "swap" to cover sports betting is not consistent with Congress's purposes in enacting the Dodd-Frank Act.

Congress added "swaps" to the CEA to strengthen regulation of financial markets following the 2008-2009 financial crisis, because unregulated

credit default swaps had exacerbated the crisis. 1-ER-16; *see Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 172-73 (D.D.C. 2012). Congress "aimed Dodd-Frank at systemic risks in the financial sector that undermined U.S. financial stability." 1-ER-16.

The Dodd-Frank Act was not about regulating sports or election betting. "Congress was bringing risky financial products out of the shadows," not "enabling nationwide gambling." 1-ER-20. Sports betting did not contribute to the financial crisis; indeed, at the time, it was illegal everywhere but Nevada. *See Murphy*, 584 U.S. at 462. Congress did not mention gaming in the definition of "swaps," and the legislative record nowhere evidences a discussion of regulating sports bets as swaps. And Congress added the Special Rule to ensure that gambling does *not* occur on CFTC-regulated DCMs. *See* 156 Cong. Rec. S5906-07 (July 15, 2010) (colloquy between Senators Feinstein and Lincoln explaining that sports bets should not be on DCMs because they "would not serve any real commercial purpose" and "would be used solely for gambling").

Notably, the CFTC has rejected a maximalist reading of "swap." In 2012, it promulgated a regulation defining "swap" to exclude "consumer and commercial arrangements that historically have not been considered swaps"—such as "traditional insurance products," "mortgages," "automobile loans," and "employment contracts"—even though these products could fall within an expansive interpretation of Section 1a(47)(ii). Further Definition

34

of "Swap," 77 Fed. Reg. 48208-01, 48212, 48246-50 (Aug. 13, 2012); *see* 17 C.F.R. § 1.3.  The CFTC explained that those contracts historically were regulated by States, and that there was no indication that Congress "intended" for those contracts "to be regulated as swaps."  77 Fed. Reg. at 48212 & n.29; *see id.* at 48246.

That reasoning applies equally to sports bets.  *See* 1-ER-14-17.  Sports bets do "not involve risk-shifting arrangements with financial entities"—the hallmark of a swap.  77 Fed. Reg. at 48248.  They are consumer transactions that people enter into "primarily for personal [entertainment] purposes" and that "historically have not been considered to involve swaps."  *Id.* at 48246-47.  Like insurance and mortgages, sports bets historically have been regulated by the States.  *Murphy*, 584 U.S. 484.  There is no indication that Congress intended for them to be regulated as "swaps."  1-ER-16.

### 3.   Kalshi's Contracts Are Not "Option[s]" or "Contracts of Sale of a Commodity for Future Delivery"

Kalshi contends (Br. 46-47) that even if its contracts are not "swaps," they are "option[s]" or "contracts . . . for future delivery" of a type of "commodity" (an "excluded commodity") under Section 2(a)(1)(A).  That made-for-litigation position, which Kalshi barely developed below, *see* 1-ER-21 n.8, is wrong.

As an initial matter, Kalshi should be estopped from making this argument, because it told the CFTC that all of its contracts are "swaps."  When

a DCM self-certifies a new contract for trading, it must identify whether the contract is a swap, option, or future. *See* 17 C.F.R. § 38.4(b). The statutory definition of "swap" expressly excludes futures and options, *see* 7 U.S.C. § 1a(47)(B)(i), and the CFTC has different certification requirements for each contract type, *see* 17 C.F.R. pt. 38, App'x C. Kalshi self-certified all of its contracts as "swaps"—not futures or options—in order to list them for trading. CFTC, *Designated Contract Market Products—KEX*, bit.ly/3YPbRoo (visited Jan. 22, 2026). Kalshi cannot now make a contrary argument to this Court. *See Rissetto v. Plumbers & Steamfitters Loc. 343*, 94 F.3d 597, 604 (9th Cir. 1996) (judicial estoppel applies to representations made to an agency).

In any event, Kalshi's argument is wrong for three reasons. First, its contracts do not involve excluded commodities. The relevant definition of "excluded commodity" requires "an occurrence, extent of an occurrence, or contingency" that is "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iii). This definition is more restrictive than that of "swap," because it requires actual (not merely potential) economic consequences. Because Kalshi's contracts are not swaps, they also are not contracts in excluded commodities, as is required for either a future or an option. 1-ER-21-22; *see* 7 U.S.C. § 2(a)(1)(A).

Second, Kalshi's contracts are not options. An "option" is a contract that "grants to the purchaser 'the right, for a specified period of time, to

either buy or sell the subject of the option at a predetermined price.'" *White Pine Tr.*, 574 F.3d at 1226 (internal quotation marks omitted) (citing 7 U.S.C. § 1a(36)); *see Saberi v. CFTC*, 488 F.3d 1207, 1210 n.2 (9th Cir. 2007). Kalshi does not explain how its contracts confer any such right, and they do not—the buyers of its contracts have no right to buy or sell the outcomes of the events that are the subject of those contracts.

Third, Kalshi's contracts are not "contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).  They are wagers on the outcomes of events, not promises to deliver those outcomes.  *See* 1-ER-24-25.  Kalshi argues (Br. 55-56) that a future does not require actual delivery and can instead be cash settled, but the contract still must involve something that can be delivered.  *Fisher v. Dean Witter Reynolds, Inc.*, 526 F. Supp. 558, 559-60 (E.D. Pa. 1981).  For example, an interest-rate future is based on interest-bearing Treasury notes that can be delivered.  *See id.*  Here, nothing is or could be delivered.

### 4. Kalshi's Position Would Require All Sports Betting to Be Regulated Only by the CFTC

The implications of Kalshi's position are extreme.  Under Kalshi's definitions, all sports wagers would qualify as "swaps" (or futures or options). 1-ER-18-19.  The CEA *requires* that all consumer swaps, options, and futures be traded on CFTC-regulated DCMs.  7 U.S.C. §§ 2(e), 6(a), 6c(c); 17 C.F.R. § 33.3(a).  And according to Kalshi, the CEA's "exclusive jurisdiction"

over swaps, options, and futures traded on DCMs means that no State can regulate them. So if Kalshi were correct, the CFTC would be the Nation's *sole* regulator for sports betting.

That would mean that when Congress added "swaps" (or futures or options) to the CEA, it took away the longstanding police power of the States and Tribes to regulate sports betting, *see Artichoke Joe's*, 353 F.3d at 737, and gave it all to the CFTC. And Congress supposedly wanted the CFTC to decide company-by-company how much sports betting to allow, based on which DCMs it certifies and which contracts it chooses to review.

And then apparently no one noticed this sea change until 2025—not even the Supreme Court, which recognized and reinforced the States' power to regulate sports betting in *Murphy*. 584 U.S. at 484. The result would be that that all sports betting now must be conducted on DCMs, and the licensed sportsbooks operating without DCM registrations (which is to say, all of them) are violating federal law—as are their millions of customers. 1-ER-18-19; *Crypto.com*, 2025 WL 2916151, at *9 & n.12. This Court should not interpret the CEA to produce that absurd result. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

Kalshi admits (Br. 61) that it would be "implausible" for Congress to have made the CFTC the Nation's sports-betting regulator. Yet that is the necessary consequence of its position. Kalshi argues that States still would be able to regulate off-exchange sports wagers. Kalshi Br. 61; *see* Paradigm

38

*Amicus* Br. 31. But under Kalshi's position, there would be no off-exchange sports wagers, because the CEA requires all consumer swaps, options, and futures to be traded on DCMs.

The CEA's language is clear on this point. Section 2(e) makes it "unlawful" for "any person" to "enter into a swap" unless that swap "is entered into on, or subject to the rules of, a [DCM]," except when both parties are regulated financial institutions, major corporations, or similar entities. 7 U.S.C. § 2(e); *see id.* § 1a(18). Section 6(a) makes it "unlawful" for "any person" to "enter into" any transaction involving a future unless the transaction is "conducted on or subject to the rules of a [DCM]." *Id.* § 6(a); *see CFTC v. Frankwell Bullion Ltd.*, 99 F.3d 299, 301 (9th Cir. 1996). And Section 6c(c) directs the CFTC to issue regulations requiring all options be traded on DCMs, 7 U.S.C. § 6c(c), which it has done, *see* 17 C.F.R. § 33.3(a). Thus, there could be no "off-exchange" sports betting under Kalshi's view.

Attempting to escape from the consequences of its position, Kalshi argues (Dkt. 28.1, at 3) that Section 2(a)(1)(A)'s savings clause nullifies Section 2(e). The savings clause provides that nothing in the CEA's "exclusive jurisdiction" provision "supersede[s] or limit[s]" the jurisdiction of state regulatory authorities or "restrict[s]" those authorities from carrying out their duties. 7 U.S.C. § 2(a)(1)(A). According to Kalshi, Section 2(e) cannot require sports bets (as swaps) to be traded on DCMs, because that would "restrict" the authority of state regulators over those bets. But Section 2(e)

39

does not restrict the authority of state officials; it acts on individuals and companies, and instructs them that trading in swaps must occur on DCMs. *Id.* § 2(e). Nothing in Section 2(a)(1)(A) contradicts that command.

Kalshi also argues (Br. 61-62) that "run-of-the-mill" sports wagers are not commodity derivatives subject to the CFTC's jurisdiction because they are not traded on exchanges. But the CEA's definition of "swap" does not require trading, *see* 7 U.S.C. § 1a(47)(A), and nothing in the CEA requires options or futures to be traded, either. If only contracts traded on DCMs could be swaps, options, or futures, then Sections 2(e), 6(a), and 6c(c) would be nullities; the whole point of those provisions is to require consumer contracts to be traded.

Kalshi cites the CFTC's rulemaking defining "swap," but the CFTC did not set a "bright-line" rule that only traded contracts can be swaps; it explained that one "factor" to consider in determining whether a contract is a swap is whether that type of contract historically has been traded, because that would suggest "risk-shifting arrangements with financial entities." 77 Fed. Reg. at 48247-50. The CFTC emphasized that contracts entered into for "personal" purposes are *not* swaps. *Id.* Sports bets historically have not been traded, do not involve risk-shifting, and are entered into for personal entertainment purposes. 1-ER-16-17.

40

Further, even if there were some reason to believe that the CEA would not *require* all sports wagers to be traded on DCMs, that would be the practical effect if Kalshi prevails. If sportsbooks could escape all state regulation by listing their bets on DCMs, they would have significant financial motivation to do so. *See* 1-ER-26. Indeed, DraftKings and FanDuel recently decided to forgo licensing in Nevada to offer sports betting on DCMs in other States. 1-ER-29. Thus, in practice, the CFTC still would become the Nation's sole sports-betting regulator.

### 5. This Court Can Decide the Threshold Issue of Whether the CEA Applies

Kalshi argues (Br. 40-45) that federal courts cannot decide in this case whether its contracts are swaps, futures, or options. Instead, it says, State Defendants must sue the CFTC under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* But Kalshi brought this lawsuit and invoked the CEA to enjoin State Defendants; of course the courts can decide whether the CEA applies. 1-ER-6-12.

Nothing in the CEA gives the CFTC the sole authority to determine whether a particular contract is a commodity derivative. 1-ER-9; *Crypto.com*, 2025 WL 2916151, at *6. Federal courts have the "duty" to "say what the law is"—here, by determining whether a particular contract is a swap, option, or future within the meaning of the CEA. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *see Loper Bright Enters. v. Raimondo*,

603 U.S. 369, 402 (2024). Indeed, the CEA provides that nothing in Section 2 "supersede[s] or limit[s] the jurisdiction conferred on courts of the United States." 7 U.S.C. § 2(a)(1)(A). Kalshi asserts (Br. 42-43) that allowing a State to challenge whether a particular contract is a commodity derivative outside of an APA action could lead to non-uniform results, but if a court finally determined that a Kalshi contract is not a swap, that determination would bind Kalshi nationwide. *See In re Palmer*, 207 F.3d 566, 568 (9th Cir. 2000).

Further, there is no agency action that could underlie an APA suit. The APA provides a cause of action to "set aside" an agency's action or to "compel agency action." 5 U.S.C. § 706; *see Plaskett v. Wormuth*, 18 F.4th 1072, 1082 (9th Cir. 2021). Here, Kalshi self-certified the contracts and immediately started trading them, and the CFTC took no action. 1-ER-8. The CFTC confirmed that it has not "taken any official action to approve the listing for trading of sports-related event contracts." 1-StateSER-41 n.4.

State Defendants also could not seek to compel the CFTC to take action. Nothing in the CEA requires the CFTC to formally approve a contract for trading, or to order a contract delisted from a DCM solely because it is not a commodity derivative. At most, the Special Rule says that the CFTC "may" delist contracts that involve gaming. 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC is under no "specific, unequivocal command" that it has not obeyed. *Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1075 (9th Cir. 2016).

42

Kalshi cites (Br. 44) *Big Lagoon Rancheria v. California*, 789 F.3d 947, 953-54 (9th Cir. 2015) (en banc), but that case is distinguishable. There, California refused to negotiate with an Indian Tribe about its plans to build a casino on lands that the Bureau of Indian Affairs (BIA) had taken into trust for the Tribe. *Id.* at 951. California argued that the BIA lacked authority to take the land into trust and had incorrectly designated the Tribe. *Id.* at 952. But Congress authorizes only the BIA to designate Tribes and to take land into trust for Tribes. 25 U.S.C. §§ 5108, 5131; *see Haaland v. Brackeen*, 599 U.S. 255, 273 (2023). California thus was challenging decisions that only the BIA could make. Here, the CEA does not grant the CFTC sole authority to determine whether a contract is a swap, future, or option, and the CEA has not made that determination with respect to Kalshi's contracts.

More fundamentally, Kalshi's argument (Br. 44) misunderstands State Defendants' interest in this litigation. State Defendants are not seeking to enforce the CEA or police what products are listed on DCMs—they seek only to enforce Nevada gaming law. Kalshi's argument (Br. 42) that the CEA does not allow state authorities to sue DCMs for violations of the CEA, *see* 7 U.S.C. § 13a-2(1), thus misses the mark. Kalshi put at issue whether its contracts are swaps by claiming preemption on that basis, *see* 2-ER-108 (¶ 35); it cannot turn around and require State Defendants to sue the CFTC to prove that its contracts are not swaps.

43

Kalshi's position is that once it self-certifies a contract, that contract is a commodity derivative under the CEA, and if the CFTC fails to act on it, then Kalshi's determination is binding on *everyone*—including this Court. That approach runs roughshod over the authority of the federal courts, *see Marbury*, 5 U.S. at 177, and runs afoul of the private non-delegation doctrine, which prevents private parties from exercising federal authority "without an agency's say-so," *FCC v. Consumers' Rsch.*, 606 U.S. 656, 695 (2025); *see Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

## B.    The CEA Does Not Preempt State Gaming Law

Even if Kalshi's contracts qualify as commodity derivatives within the CFTC's jurisdiction, the CEA does not preempt all state regulation of them.

Courts "start with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485 (internal quotation marks omitted). Because gaming is a traditional area of state regulation—and delegating responsibility for sports betting to a federal agency would raise a major question—Congress would need to clearly state that intent. *See id.*; *West Virginia*, 597 U.S. at 716.

Kalshi does not argue that the CEA expressly preempts Nevada gaming law. And nothing in the CEA provides the necessary clear intent to establish field or conflict preemption.

44

### 1. Field Preemption Does Not Apply

Field preemption applies where federal law "so thoroughly occupies a legislative field" that it leaves "no room" for state regulation. *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 733 (9th Cir. 2016). Even if a statute suggests some preemptive intent, courts should "avoid interpreting the scope of the preempted field too broadly." *Martin*, 793 F. Supp. 3d at 680 (quoting *Sikkelee v. Precision Airmotive Corp.*, 882 F.3d 680, 689 (3d Cir. 2016)); *see Medtronic*, 518 U.S. at 484. Nothing shows that Congress intended to preempt state *gaming* law in particular. *Martin*, 793 F. Supp. 3d at 680; *see* Mass. PI Order 10-13.

### a. The CEA's text does not show a clear intent to preempt state gaming law

Kalshi's argument (Br. 27-28) rests almost entirely on Section 2(a)(1)(A), the CEA's "exclusive jurisdiction" provision, taking the most expansive view of that provision as possible. But courts do not read statutory provisions in isolation, *Sackett v. EPA*, 598 U.S. 651, 674 (2023), or read preemptive provisions expansively, *Altria*, 555 U.S. at 77, especially in areas of traditional state regulation, *Medtronic*, 518 U.S. at 485. When read in context, it is clear that this provision has a more modest scope.

Section 2(a)(1)(A) says nothing about state gaming law. As the Supreme Court explained, Congress enacted this provision "only to consolidate

45

federal regulation of commodity futures trading in the [CFTC]"—to "separate the functions of the [CFTC] from those of the [SEC]" and other federal agencies. *Merrill Lynch*, 456 U.S. at 386-87. Further, the CEA contains narrow express-preemption provisions—which confirm that Section 2(a)(1)(A) is not a broad preemption provision. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995) (express-preemption provision supports an inference that Congress did not impliedly preempt state laws outside of that provision).

The CEA's express-preemption provisions make clear that preemption does not extend to all state gaming law. One provision states that the CEA "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming" in limited circumstances not applicable here. 7 U.S.C. § 16(e)(2). That provision would be superfluous if the exclusive-jurisdiction provision already preempted state gaming law. More fundamentally, it shows that Congress specified exactly what it wanted to preempt when it comes to gaming—and it was *not* all gaming law.

The other express-preemption provision preempts state insurance law: It says that a swap "may not be regulated as an insurance contract under the law of any State." 7 U.S.C. § 16(h)(2). Kalshi essentially wants the Court to read into the CEA an equivalent provision for gaming, but the CEA conspicuously does not contain that provision.

46

Kalshi has essentially two responses. First, it cites (Br. 28) decisions where "exclusive jurisdiction" supposedly means preemption. But none of those decisions involved a federal statute that conferred "exclusive jurisdiction" on a federal agency. Two were about statutes that conferred "original and exclusive jurisdiction" on courts over particular causes of action,[4] and the other three involved statutes that the courts interpreted to have field-preemptive effect because they contained comprehensive regulatory schemes; the statutes themselves did not contain "exclusive jurisdiction" language.[5] Statutes that *do* use "exclusive jurisdiction" confirm that the term does not broadly preempt state law, particularly when there is a separate express-preemption provision. *E.g.*, 30 U.S.C. § 1254(a)(3) (providing that the Secretary of the Interior has "exclusive jurisdiction" over surface coal mining when he or she adopts a federal plan for a State); *id.* § 1254(g) (separately providing that the federal plan "shall preempt[] and super-sede[]" state regulation).

---

[4]  *See Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992) (citing 28 U.S.C. § 1251(a)); *Transcon. Gas Pipe Line Co. v. Pa. Envy Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024) (citing 15 U.S.C. § 717r(d)(1)).

[5]  *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (Federal Power Act); *Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1057 (9th Cir. 2001) (same); *Richardson v. Kruchko & Fries*, 966 F.2d 153, 158 (4th Cir. 1992) (National Labor Relations Act).

Second, Kalshi cites (Br. 29) the savings clause in Section 2(a)(1)(A). That clause states that, "[e]xcept as hereinabove provided" (in the "exclusive jurisdiction clause"), "nothing contained in this section shall [] supersede or limit" the "jurisdiction conferred" on "regulatory authorities under the laws" of "any State." 7 U.S.C. § 2(a)(1)(A). According to Kalshi (Br. 29), this clause shows that the exclusive-jurisdiction provision has preemptive effect. But the clause equally suggests the opposite, because "[a] savings clause generally 'negates the inference that Congress left no room for state causes of action.'" *Martin*, 793 F. Supp. 3d at 682 (quoting *Int'l Paper Co. v. Oullette*, 479 U.S. 481, 492 (1987)). And even if the savings clause suggests that the CEA has some preemptive effect, it does not support the view that the preempted field includes *gaming*.

> **b.** **The CEA contains no comprehensive regulatory scheme for gaming**

The CEA does not contain a comprehensive regulatory scheme for gaming. Indeed, it lacks the most basic features of such a scheme. The CEA does not require licensing or background checks, indicate what bets are allowed, contain protections against insider betting or unfair bets, or provide for basic consumer protections (such as age restrictions or measures to address problem gaming and organized crime). The CEA requires DCMs to be certified, but then allows trading based on self-certifications. 7 U.S.C. §§ 6a(a), 13.

The CFTC has recognized that it does not "ha[ve] the statutory mandate nor specialized experience appropriate to oversee" gaming. 89 Fed. Reg. at 48976. It is not plausible to think that Congress intended for the CFTC to act as a gaming regulator—much less as the Nation's exclusive sports-betting regulator—without giving the CFTC the basic tools of gaming regulation. Such a delegation also would run afoul of the nondelegation doctrine because Congress provided no "intelligible principle" to guide the regulation of gaming. *Consumers' Rsch.*, 606 U.S. at 673.

Kalshi contends (Br. 47) that the Special Rule shows an intent to bring gambling under the jurisdiction of the CFTC. That is incorrect. The Special Rule is a safety-valve provision that allows the CFTC to require DCMs to delist contracts that are contrary to the "public interest," not a broad authorization to regulate gaming. 7 U.S.C. § 7a-2(c)(5)(C)(i). Notably, the Special Rule is not limited to gaming, but also applies to contracts involving "war," "assassination," and "terrorism." *Id.* It does not show that Congress intended for the CFTC to regulate gaming generally, any more than war, assassinations, or terrorism. Further, the Special Rule allows the CFTC to bar contracts involving conduct that is "unlawful" under "State law." *Id.* That "reflects an affirmative intent to *preserve* state laws," rather than supplant them. *Martin*, 793 F. Supp. 3d at 680.

Kalshi cannot rely on the Special Rule to *authorize* sports betting on DCMs when the CFTC has exercised its authority under the Rule to categorically *ban* "gaming" on DCMs. 17 C.F.R. § 40.11(a). Kalshi also cannot rely on the Special Rule to support CFTC jurisdiction over its election contracts, because its position (Br. 38) is that the CFTC cannot regulate election contracts at all under the Special Rule.

Kalshi's remaining arguments miss the mark because they do not address whether the CEA preempts *gaming* regulation. Kalshi argues that the CEA's history and case law show that Congress intended for the CEA to preempt state regulation of commodity-futures markets, and that the CEA contains a comprehensive scheme for regulating commodity-futures trading. Kalshi Br. 29-35; *see* Paradigm *Amicus* Br. 5-21. But the decisions Kalshi cites address *bona fide* commodity derivatives; none addresses sports wagers "guised" as commodity derivatives. *Crypto.com*, 2025 WL 2916151, at *11. Further, the decisions that "carefully focused on the scope of Congress's preemptive intent" recognized "that intent had limits." *Martin*, 793 F. Supp. 3d at 682; *see, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (concluding that the CEA preempts only state laws that "directly affect trading on or the operation of a futures market"—which Nevada's licensing requirements do not). Kalshi's cited materials simply do not show that Congress intended to

50

preempt the field of gaming. *Martin*, 793 F. Supp. 3d at 684 n.5; Mass. PI Order 10-11.

Commodity-futures regulation and gaming regulation are different fields with different regulatory needs and policy goals. *See* 89 Fed. Reg. at 48982-83. Commodity-futures markets serve an important function in our Nation's economy—they allow commercial sellers and buyers of commodities to manage financial risk by trading with investors. *See* 7 U.S.C. § 5(a). Although some people previously characterized commodity-futures trading as speculation akin to gambling (and indeed, some States attempted to regulate it under state gaming laws), this trading is permitted so that commodity-futures markets may efficiently function. *See Merrill Lynch*, 456 U.S. at 358-59. The CFTC regulates trading to curb excess speculation and ensure that prices reflect economic reality. *See* 7 U.S.C. § 6(a).

In contrast, sports betting is a form of entertainment. The millions of people who gamble on sports do not seek to hedge existing financial risks; they *create* the risk by betting. *See* p. 29, *supra.* Gaming is regulated as a form of entertainment to ensure that it is fair and free of criminal elements, and to protect the public (especially young people and problem gamers). *Greater New Orleans Broad. Ass'n*, 527 U.S. at 185. The CEA simply does not contemplate that type of regulation.

### c. There is no evidence that Congress intended to federalize all sports betting

There is no indication that Congress sought to preempt all state gaming law and make the CFTC the Nation's sole sports-betting regulator. "Had Congress intended such a sea change in the regulatory landscape, it surely would have said so," because Congress does not "hide elephants in mouseholes." *Whitman*, 531 U.S. at 468; *see* 1-ER-18; *Martin*, 793 F. Supp. 3d at 684; Mass. PI Order 12.

Federalizing sports betting would massively upset the federal-state balance. Gaming is a longstanding area of state regulation, *see Flynt*, 131 F.4th at 932, and federal law historically has respected state authority in this field, *Greater New Orleans Broad. Ass'n*, 527 U.S. at 185. Yet the "necessary implication" of Kalshi's position is that all sports wagers can be regulated only by the CFTC. *Crypto.com*, 2025 WL 2916151, at *9. Congress does not make major changes to the "usual constitutional balance of federal and state powers" without clearly saying so. *Bond*, 572 U.S. at 858-59 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

Further, federalizing sports betting would have "vast economic and political" consequences. *West Virginia*, 597 U.S. at 716 (internal quotation marks omitted). Sports betting is a $14-billion-a-year industry that is both "controversial" and "immensely popular." *Murphy*, 584 U.S. at 460, 484; *see* AGA, *States* 10. Thus, under the major-questions doctrine, there would

52

need to be "clear congressional authorization" for the CFTC to take exclusive regulation of sports betting. *West Virginia*, 597 U.S. at 732 (internal quotation marks omitted). Kalshi points to no such authorization.

Kalshi's only response (Br. 60-61) is that ruling for State Defendants would allow States to regulate commodity-futures markets. But Nevada is not seeking to regulate interest-rate swaps or pork futures. State Defendants forthrightly acknowledged that state attempts to regulate *bona fide* commodity derivatives would be preempted. 1-StateSER-26; *see Martin*, 793 F. Supp. 3d at 681. This case involves only Kalshi's sports and election contracts—classic forms of gambling that have long been regulated by the States.

### d. Kalshi's view would require impliedly repealing other important federal laws

Kalshi's view of the CEA would require finding that Congress impliedly repealed other federal laws, including the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*, and the Wire Act, 18 U.S.C. § 1084. *Martin*, 793 F. Supp. 3d at 683. There is a strong presumption against such repeals by implication. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

The IGRA gives Tribes the "exclusive right" to determine whether and to what extent to allow gaming that is permitted under federal and state law on tribal land, 25 U.S.C. § 2701(5), and it contains a comprehensive

53

scheme to regulate that gaming, *see id.* § 2710. Kalshi's view would completely override the Tribes' authority and disrupt that scheme, because under Kalshi's view, Congress gave the CFTC the exclusive authority to determine how much sports betting to allow nationwide, including on tribal land. *Martin*, 793 F. Supp. 3d at 683.

The Wire Act makes it a federal crime to use interstate wire communication facilities, including the internet, to place bets or wagers on "any sporting event," except where such wagers are legal in both the sending and receiving State. 18 U.S.C. § 1084(a). Companies that offer online betting geofence their customers to comply with this provision. 1-StateSER-36. Yet under Kalshi's view, customers could engage in sports betting wherever they are, with no regard for state law—thus nullifying the Wire Act. *Martin*, 793 F. Supp. 3d at 683.

Kalshi invokes (Br. 63) the Unlawful Internet Gambling Enforcement Act (UIGEA), 31 U.S.C. § 5361 *et seq.*, which supplements the Wire Act by making it a crime to *fund* illegal online betting. *Id.* § 5363. As Kalshi notes (Br. 63), the UIGEA defines "bet" and "wager" to exclude transactions on DCMs. *See id.* § 5362(1)(E)(ii). But those definitions do not apply outside the UIGEA; the UIGEA expressly states it does not "alter[]" or "limit[]" other laws. *Id.* § 5361(b). Thus, the Wire Act continues to prohibit internet betting that is illegal under state law, and IGRA continues to prohibit internet betting on tribal lands unless permitted by the Tribe.

54

The IGRA and Wire Act confirm both that Congress knows how to regulate gambling, and that it generally has deferred to state judgments in doing so.

### 2. Conflict Preemption Does Not Apply

Neither form of conflict preemption (impossibility or obstacle) applies.

#### a. It is not impossible for Kalshi to comply with Nevada law and the CEA

Impossibility preemption applies when it would be "impossible to comply with both federal and state law." *Am. Apparel & Footwear Ass'n v. Baden*, 107 F.4th 934, 943 (9th Cir. 2024). That is not true here. Kalshi could become licensed and comply with Nevada law, as other online betting companies have; it just refuses to do so. *See Martin*, 793 F. Supp. 3d at 686. Although Nevada law has some differences from the CEA—for example, Nevada bans gaming under age 21, and Kalshi allows 18-year-olds to gamble, 1-ER-28—state law can be more protective than federal law; that does not show a conflict. *See Wyeth v. Levine*, 555 U.S. 555, 573 (2009).

Kalshi identifies (Br. 37-38) only one Nevada regulation that it says it cannot follow—a requirement that sports bettors be located in Nevada or other States where sports betting is legal. *See* Nev. Gaming Reg. 22.140(1). Even if accepted, that only would excuse compliance with that regulation, not all Nevada gaming law. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983) (preemption operates

55

only "to the extent" of an actual conflict).  Further, Kalshi does not show why compliance with that regulation is impossible.  Kalshi vaguely references (Br. 37) its operations' structure, but its licensed competitors have no difficulty following this requirement—they employ geofencing technology to limit their products to States where sports betting is legal.  1-StateSER-36.

Kalshi also suggests (Br. 37) that complying with the Nevada regulation would violate a CFTC "core principle" that requires DCMs to provide "impartial access" to their markets.  17 C.F.R. § 38.151(b).  The district court correctly rejected this argument, finding "no evidence" that the CFTC would "take adverse action" if a DCM geofences to comply with state law.  1-ER-26.  The impartial-access requirement prevents DCMs from discriminating based on wealth or exclusivity, *see* Core Principles and Other Requirements for DCMs, 75 Fed. Reg. 80572, 80579 & n.51 (Dec. 22, 2010); it does not require DCMs to offer identical products in every State, *see* Dan Bernstein, *A Frequent Kalshi Claim Is Being Undermined by Nevada, CFTC*, Sportico (Nov. 12, 2025), perma.cc/DE6H-B4PF.  Indeed, Kalshi's competitor Crypto.com has restricted access to its platforms by location, and the CFTC has taken no action.  1-ER-26.  Other competitors similarly have launched or are planning to launch location-restricted prediction markets.[6]

---

[6]  *See* Dan Bernstein & Eben Novy-Williams, *Fanatics Launches a Prediction Market—Without the G-Word*, Sportico (Dec. 3, 2025), perma.cc/6YQW-

Kalshi also briefly asserts (Br. 37-38) that limiting its Nevada operations would violate other CFTC core principles by causing "market disruptions" or increasing the risk of "manipulation," but fails to substantiate those assertions. Further, Kalshi is only in this position because it chose to operate in Nevada despite the legal risks, apparently without any plan for stopping its operations. 1-ER-26-27. Kalshi cannot manufacture preemption by violating state law and then claiming it would be impossible to stop.

> **b. Enforcing Nevada gaming law does not pose an obstacle to the CEA's objectives**

Obstacle preemption applies when enforcing state law "stands as an obstacle" to Congress's objectives. *Am. Apparel*, 107 F.4th at 943. It likewise does not apply here. There is no evidence of a congressional purpose to allow sports gambling on DCMs. *See* pp. 48-53, *supra.* And even if Congress intended to allow sports betting on DCMs, Kalshi could obtain a Nevada license (as other sportsbooks have) and then continue to offer its wagers.

Kalshi argues (Br. 36-37) that requiring it to comply with Nevada gaming law would frustrate the CEA's supposed goal of "uniform" regulation of derivatives markets. But uniformity is a field-preemption argument,

---

QS9R; Sean Treppedi, *FanDuel Launching Prediction Markets App to Target Non-Sports Betting States*, N.Y. Post (Nov. 13, 2025), perma.cc/T9MM-F7RG; Daniel O'Boyle, *DraftKings Enters Prediction Markets With Quite A Few Questions Unanswered*, InGame (Dec. 22, 2025), perma.cc/FYE2-PKE2.

not a conflict-preemption argument. *See, e.g.*, *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007); *Martin*, 793 F. Supp. 3d at 685; Mass. PI Order 13-14. Conflict preemption assumes that States may regulate, and may regulate nonuniformly. *See Wyeth*, 555 U.S. at 575.

Kalshi cites (Br. 38-40) *Arizona v. United States*, 567 U.S. 387 (2012), to argue that allowing State Defendants to enforce Nevada law would interfere with Congress's "chosen method of enforcement." *Id.* at 406. That is incorrect. This form of obstacle preemption occurs when a State seeks to supplement federal enforcement of conduct that violates federal law—for example, when Arizona sought to penalize violations of federal immigration law. *Id.* at 403. The Supreme Court invalidated that scheme because it would interfere with the discretion Congress gave to the Executive Branch to enforce federal law. *Id.* at 406. Nothing like that is happening here. State Defendants seek only to enforce Nevada gaming law, not the CEA.

## II. THE BALANCE OF HARDSHIPS WEIGHS HEAVILY AGAINST KALSHI

Aside from the merits, a preliminary injunction is not warranted because the balance of hardships weighs heavily against Kalshi. The most Kalshi can say is that it may have to pay a relatively small amount of money to stop operating in Nevada while this case proceeds—which pales in comparison to the severe and ongoing harms Kalshi is causing Nevada, its gaming industry, and the public.

## A.      Kalshi Identifies No Irreparable Harm

Kalshi claims basically four harms.  The district court carefully considered and rejected each, *see* 1-ER-26-27, and Kalshi identifies no clear error in the court's decision.

***Geofencing costs.***  To comply with state gaming laws and the Wire Act, other internet-betting companies implement geofencing technology. *See* 1-ER-26.  Kalshi argues (Br. 64) that it should not have to incur that cost.  But that is just a cost of doing business both for state-regulated sportsbooks, *see* 1-ER-26, and for federally regulated financial institutions, *see* U.S. Treas., Fin. Crimes Enf't Network, *FinCEN Assesses $3.5 Million Penalty Against Paxful for Facilitating Suspicious Activity Involving Illicit Actors* (Dec. 9, 2025), perma.cc/95AW-ZH2T.  Indeed, Kalshi already prevents users from certain countries from accessing its platform.  Kalshi, *Member Agreement* § VI (Oct. 12, 2025), perma.cc/PAF8-8WLD.  Geofencing costs would be minuscule in comparison to Kalshi's revenues.  *See* 1-StateSER-37.

***Harms from closing contracts.***  Kalshi asserts (Br. 64-65) that it would face financial and reputational harm from closing existing contracts with Nevada users.  But Kalshi has never explained what proportion of its contracts involve Nevada users or how much it would cost to refund those contracts—it offers only speculation about what the costs "could" be, 1-ER-

59

62-63, which is insufficient to support injunctive relief, *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

Anyway, this harm is self-inflicted: Kalshi started trading sports contracts despite the CFTC's express prohibition on them, 17 C.F.R. § 40.11(a), and then chose to forge ahead even though the district court warned it was "proceeding at its own risk and creating its own harms," 2-ER-80. Kalshi's "self-inflicted" harms are not irreparable as a matter of law. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020).

Months ago, the CFTC expressly directed DCMs offering sports-related contracts to have "liquidation or close-out policies and procedures" if they cannot operate in a given State. 1-StateSER-41. Kalshi apparently chose to ignore that command, but that is a problem of its own making. And if Kalshi's customers continue to use Kalshi despite the CFTC's warnings, "they, like Kalshi, are proceeding at their own risk." 1-ER-27.

Notably, both Kalshi's competitor Crypto.com and its partner Robinhood have agreed to temporarily restrict operations in Nevada, including closing existing contracts. *See* 2-StateSER-78; Notice, *Robinhood Derivatives, LLC v. Dreitzer*, No. 25-cv-1541 (D. Nev. Nov. 26, 2025) (Dkt. 91). Kalshi has not explained why it could not follow suit.

***Risk of losing its DCM status.*** Kalshi asserts (Br. 65) that limiting its operations in Nevada would jeopardize its status as a DCM by violating certain CFTC regulations. But it presented "no evidence" that "the CFTC

60

would take adverse action against" it for complying with state law "while the various lawsuits play out." 1-ER-26-27. Indeed, the CFTC has recognized that DCMs may need to restrict activity in particular States in light of ongoing litigation. 1-StateSER-41. Further, Crypto.com and other competitors have restricted operations in particular States, without the CFTC revoking their DCM registrations. 1-ER-26.

***State enforcement action.*** Kalshi asserts (Br. 63-64) that it would be harmed if Nevada filed a state enforcement action against it. But a state enforcement proceeding "typically does not constitute irreparable harm," because Kalshi could raise any potential defense. *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203 (D.D.C. 2017). Notably, Kalshi already is subject to a state-court enforcement action in Massachusetts, and at least nine other States have threatened enforcement actions. *See* Mick Bransfield, *Summary of Legal Actions Involving Sports Event Contracts* (Jan. 21, 2026), perma.cc/Y3CM-SGWS. The Massachusetts court has ruled against Kalshi in the enforcement action—yet Kalshi's business has not collapsed. *See* Mass. PI Order.

Kalshi could avoid enforcement by reasonably limiting its operations in Nevada pending appeal. That is what Crypto.com and Robinhood have done, apparently without incurring any meaningful harm. 1-ER-26. But

61

Kalshi flatly refused every option State Defendants suggested to avoid enforcement, instead demanding that it be allowed to continue its operations, unrestricted.

Kalshi repeatedly raises (Br. 38, 45, 63-64) the possibility of criminal enforcement. But at this point, State Defendants simply seek to stop Kalshi's unlawful operations by filing a state civil suit seeking a declaration and injunction. That is the procedure specified in state law, NRS § 463.343, and it is the exact process Nevada just began to stop the illegal operations of Polymarket, a Kalshi competitor, *see* Compl., *Nevada v. Blockratize, Inc.*, No. 260C 000121B (Nev. 1st Jud. Dist. filed Jan. 16, 2026).

Notably, Kalshi recently told the district court that it will not stop operating in Nevada—no matter what this Court says—until State Defendants bring a state-court enforcement action. 1-StateSER-5. State Defendants can hardly be faulted for taking the necessary steps under state law to stop Kalshi's unlawful operations.

Kalshi cites (Br. 63-64) *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013), but there, the Court found a likelihood of irreparable harm from "the threat of state prosecution for crimes that conflict with federal law." *Id.* at 1029 (internal quotation marks omitted). Here, Kalshi is *not* likely to succeed in showing that Nevada gaming law is preempted. 1-ER-25. Besides, Kalshi has the burden to show that a prosecution is "imminent." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019); *see*

62

*Black Unity League of Ky. v. Miller*, 394 U.S. 100, 100 (1969) (per curiam). For a criminal prosecution, a prosecutor would have to investigate and independently decide to seek criminal charges, then secure an indictment from a grand jury or file an information following a preliminary examination. NRS §§ 172.015, 173.035. Kalshi has not shown any of that is imminent.

## B. The Balance of Equities and Public Interest Favor State Defendants

The district court found that every day Kalshi operates in violation of Nevada law imposes "substantial irreparable harms to the Board, the State of Nevada, the gaming industry in this state, and the public interest." 1-ER-27. There is no clear error in that finding.

***Enforcement of state law.*** A State "suffers a form of irreparable injury" "[a]ny time" it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 860-61 (2025)). State Defendants are statutorily charged with enforcing Nevada's gaming laws. 1-ER-27. Preventing them from doing so poses an affront to Nevada's sovereignty and intrudes on the democratic will of the people.

63

***Harm to Nevada's gaming industry.*** Nevada has a sovereign interest in ensuring a fair and competitive gaming industry. 1-ER-27-29 (citing NRS § 463.0129(b)-(c)); *see Sports Form, Inc. v. Leroy's Horse & Sports Place*, 108 Nev. 37, 41 (1992). Allowing Kalshi to continue operating without complying with Nevada gaming law causes irreparable injury to Nevada's gaming industry. It gives Kalshi a massive and unfair competitive advantage over its competitors: Kalshi does not need to spend the money its competitors need to spend on licensing fees, taxes, and compliance, and its products are not subject to the same requirements as its competitors. *See* 1-ER-28-29.

The harm increases significantly the longer Kalshi operates. Kalshi's profit from unlicensed gaming incentivizes others to shift sports betting to DCMs rather than becoming (or remaining) licensed by the State. That already has started to happen: DraftKings and FanDuel decided to forgo licensing in Nevada so that they can enter the prediction-markets business in other States. 1-ER-29. Other sportsbooks could follow suit, "unleashing even more unregulated gambling and devastating the Nevada economy and related tax revenues." 1-ER-28-29.

***Harm to the integrity of gaming.*** Nevada law permits wagers only when there are sufficient safeguards to ensure that wagering is fair. For example, licensed sportsbooks must follow strict protocols to ensure that insiders do not bet on games. Nev. Gaming Reg. 22.1205. To offer wagers

64

on events other than organized sports contests, the sportsbook must prove that the event is "effectively supervised" and has "integrity safeguards." *Id.* at 22.1201(2)(c). Recent scandals in professional baseball and basketball show the importance of those safeguards. 1-ER-21 n.7. Kalshi offers sports betting without those safeguards—for which it has drawn criticism from sports leagues. *See* Kendall Baker, *NCAA President Charlie Baker on Sports Betting*, Yahoo! Sports (Dec. 11, 2025), perma.cc/DDS6-XDDF; *CFTC Reauthorization: Stakeholder Perspectives Before the H. Comm. on Agric.*, 119th Cong. (2025) (statement of Jeff Miller, NFL), perma.cc/Z5X3-L9WR.

Kalshi notes (Br. 67) that the CFTC has regulations that protect against market manipulation. But the CFTC is not a gaming regulator, and the CFTC generally leaves DCMs to self-regulate. The CEO of Coinbase exposed these vulnerabilities when, at the end of a recent earnings call, he deliberately spoke five seemingly random words specifically to change the result of a Kalshi event contract on what he would say during the call. Emily Nicolle & Justina Lee, *Coinbase CEO Stunt Exposes Prediction Market Vulnerability*, Bloomberg (Oct. 31, 2025), perma.cc/9S4K-Q2K8. Nevada law does not allow wagers on these types of unregulated "events" precisely because of the risk of manipulation and the threat to public confidence.

***Harm to the public.*** Allowing Kalshi to continue operating would harm some of Nevada's most vulnerable residents. Nevada law prohibits

people under 21 from gaming, NRS § 463.350(1)(a); Kalshi, by contrast, allows anyone over 18 to bet on its platform, Kalshi Help Center, *Signing Up as an Individual* (2025), perma.cc/2F8Y-REBP.

Nevada law also protects those suffering from problem gaming. It requires licensees to offer deposit-limit tools and to prominently display the State's responsible-gaming resources. Nev. Gaming Regs. 5.225(18)(a)-(b). "[N]either DCMs nor the CFTC is equipped to address those issues the same way state gaming regulators and licensed entities are." 1-ER-28.

Indeed, Kalshi gleefully describes its platform as "kind of addicting." Dustin Gouker, *Kalshi Says It's 'Kind of Addicting' In Instagram Post*, Event Horizon (Oct. 21, 2025), perma.cc/5DWW-4LKE. Although Kalshi says (Br. 67) that it offers consumer-protection tools, its efforts are entirely voluntary and nowhere near as stringent as Nevada law. 1-ER-28. Indeed, Kalshi's counsel has disclaimed a desire for any limits: "People are adults," and "they're allowed to spend their money however they want it, and if they lose their shirt, that's on them." Danny Funt, *America's Betting Craze Has Spread to Its News Networks*, New Yorker (Dec. 12, 2025), perma.cc/77H2-RH96.

***Harm to the State's economy and finances.*** Licensed gaming is "vitally important to the economy of the State and the general welfare of the inhabitants." NRS § 463.0129(1)(a). In 2024, Nevada collected $2 billion in

66

gaming taxes, which fund core public services. NRA, *Fact Book* 65. Unlicensed gaming threatens that revenue, by evading taxes and diverting business from licensed sportsbooks that pay taxes. *See Sacco v. State*, 105 Nev. 844, 847 (1989).

Kalshi suggests (Br. 66-67) that State Defendants ultimately could recoup unpaid taxes. But only licensed entities pay taxes, and licensing is not retroactive. NRS § 463.370. Although a new law permits disgorgement of "profits, gain, gross receipts, or other benefit" from a state-law violation, it requires a criminal conviction. *Id.* § 463.360(3), as amended by S.B. 256 (2025). So unless Kalshi is willing to admit that it should be held criminally liable, it cannot say Nevada will be made whole.

Kalshi asserts (Br. 66) that State Defendants are not harmed because they did not immediately appeal the initial preliminary-injunction decision and agreed to not enforce against Crypto.com pending appeal. But State Defendants consistently have sought to resolve this litigation as quickly as possible because of the harms from Kalshi's operations. When Kalshi "greatly expanded" its operations, State Defendants sought dissolution of the preliminary injunction. 1-ER-27. A delay in seeking "judicial protection" does not negate an irreparable injury, especially "in the context of ongoing, worsening injuries." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990-91 (9th Cir. 2014). Further, State Defendants only agreed not to enforce against Crypto.com (a much smaller competitor) pending appeal because it ceased

67

offering sports-related contracts to Nevada residents. 2-StateSER-78. Kalshi has refused to take *any* steps to avoid enforcement. This Court should reject its full-speed-ahead approach.

## CONCLUSION

The Court should affirm.

Dated: January 23, 2026

Respectfully submitted,

/s/ *Nicole A. Saharsky*

Aaron D. Ford
  Attorney General of Nevada

Nicole A. Saharsky
Minh Nguyen-Dang
Matthew Bisanz
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000

Heidi Parry Stern
  Solicitor General
Jessica E. Whelan
  Chief Deputy Solicitor General—
  Litigation
Sabrena K. Clinton
Abigail L. Pace
State of Nevada,

Rory K. Schneider
Alexander S. Mendelson
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

  Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420

Preston R. Michelson
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7516

I am the attorney or self-represented party.

**This brief contains** 15,397 **words,** including 115 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☒ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Nicole A. Saharsky  **Date** 1/23/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 23, 2026. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: February 5, 2026        /s/ *Nicole A. Saharsky*
                                              Nicole A. Saharsky

**ADDENDUM**

# TABLE OF CONTENTS

**Page**

7 U.S.C. § 1a ........................................................................................ 1a

7 U.S.C. § 2 ......................................................................................... 4a

7 U.S.C. § 6 ......................................................................................... 5a

7 U.S.C. § 6c ....................................................................................... 6a

7 U.S.C. § 7a-2 ................................................................................... 7a

7 U.S.C. § 16 ...................................................................................... 9a

15 U.S.C. § 3001 .............................................................................. 10a

18 U.S.C. § 1084 .............................................................................. 11a

25 U.S.C. § 2701 .............................................................................. 12a

17 C.F.R. § 33.3 ............................................................................... 12a

17 C.F.R. § 40.11 ............................................................................. 13a

NRS § 463.0129 ............................................................................... 14a

NRS § 463.0193 ............................................................................... 15a

NRS § 463.01962 ............................................................................. 15a

NRS § 463.170 ................................................................................. 16a

NRS § 463.350 ................................................................................. 17a

Nev. Gaming Reg. 5.225 .................................................................. 19a

Nev. Gaming Reg. 22.1205 .............................................................. 20a

## STATUTORY AND REGULATORY AUTHORITIES

**1.    7 U.S.C. § 1a provides, in relevant part:**

**Definitions**

As used in this chapter:

* * * * *

### (19) Excluded Commodity

The term "excluded commodity" means—

(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

(I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

(II) based solely on one or more commodities that have no cash market;

(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or (iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and

(II) associated with a financial, commercial, or economic consequence.

* * * * *

1a

**(36) Option**

The term "option" means an agreement, contract, or transaction that is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty".

\* \* \* \* \*

**(47) Swap**

**(A) In general**

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction—

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—

(I) an interest rate swap;

2a

(II) a rate floor;

(III) a rate cap;

(IV) a rate collar;

(V) a cross-currency rate swap;

(VI) a basis swap;

(VII) a currency swap;

(VIII) a foreign exchange swap;

(IX) a total return swap;

(X) an equity index swap;

(XI) an equity swap;

(XII) a debt index swap;

(XIII) a debt swap;

(XIV) a credit spread;

(XV) a credit default swap;

(XVI) a credit swap;

(XVII) a weather swap;

(XVIII) an energy swap;

(XIX) a metal swap;

(XX) an agricultural swap;

(XXI) an emissions swap; and

(XXII) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

**(B) Exclusions**

The term "swap" does not include—

(i) any contract of sale of a commodity for future delivery (or option on such a contract), leverage contract authorized under section 23 of this title, security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

\* \* \* \* \*

**2.      7 U.S.C. § 2 provides, in relevant part:**

**Jurisdiction of Commission; liability of principal for act of agent; Commodity Futures Trading Commission; transaction in interstate commerce**

**(a) Jurisdiction of Commission; Commodity Futures Trading Commission**

**(1) Jurisdiction of Commission**

**(A) In general**

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an

4a

"option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

\* \* \* \* \*

## (e) Limitation on participation

It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.

\* \* \* \* \*

## 3.   7 U.S.C. § 6 provides, in relevant part:

## Regulation of futures trading and foreign transactions

## (a) Restriction on futures trading

Unless exempted by the Commission pursuant to subsection (c) or by subsection (e), it shall be unlawful for any person to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States, its territories or possessions, for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of

5a

a commodity for future delivery (other than a contract which is made on or subject to the rules of a board of trade, exchange, or market located outside the United States, its territories or possessions) unless—

(1) such transaction is conducted on or subject to the rules of a board of trade which has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity;

(2) such contract is executed or consummated by or through a contract market; and

(3) such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery: *Provided*, That each contract market or derivatives transaction execution facility member shall keep such record for a period of three years from the date thereof, or for a longer period if the Commission shall so direct, which record shall at all times be open to the inspection of any representative of the Commission or the Department of Justice.

\* \* \* \* \*

**4.      7 U.S.C. § 6c provides, in relevant part:**

**Prohibited transactions**

\* \* \* \* \*

**(b) Regulated option trading**

No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

6a

Any such order, rule, or regulation may be made only after notice and opportunity for hearing, and the Commission may set different terms and conditions for different markets.

(c) Regulations for elimination of pilot status of commodity option transactions; terms and conditions of options trading

Not later than 90 days after November 10, 1986, the Commission shall issue regulations—

(1) to eliminate the pilot status of its program for commodity option transactions involving the trading of options on contract markets, including any numerical restrictions on the number of commodities or option contracts for which a contract market may be designated; and

(2) otherwise to continue to permit the trading of such commodity options under such terms and conditions that the Commission from time to time may prescribe.

\* \* \* \* \*

**5.    7 U.S.C. § 7a-2 provides, in relevant part:**

**Common provisions applicable to registered entities**

\* \* \* \* \*

**(c) New contracts, new rules, and rule amendments**

**(1) In general**

A registered entity may elect to list for trading or accept for clearing any new contract, or other instrument, or may elect to approve and implement any new rule or rule amendment, by providing to the Commission (and the Secretary of the Treasury, in the case of a contract of sale of a government security for future delivery (or option on such a contract) or a rule or rule amendment specifically related to such a contract) a written certification that the new contract or instrument or clearing of the new contract or instrument, new rule, or rule amendment complies with this chapter (including regulations under this chapter).

## (2) Rule review

The new rule or rule amendment described in paragraph (1) shall become effective, pursuant to the certification of the registered entity and notice of such certification to its members (in a manner to be determined by the Commission), on the date that is 10 business days after the date on which the Commission receives the certification (or such shorter period as determined by the Commission by rule or regulation) unless the Commission notifies the registered entity within such time that it is staying the certification because there exist novel or complex issues that require additional time to analyze, an inadequate explanation by the submitting registered entity, or a potential inconsistency with this chapter (including regulations under this chapter).

\* \* \* \* \*

## (5) Approval

\* \* \* \* \*

### (C) Special rule for review and approval of event contracts and swaps contracts

#### (i) Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

(I) activity that is unlawful under any Federal or State law;

(II) terrorism;

(III) assassination;

(IV) war;

(V) gaming; or

(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

### (ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

\* \* \* \* \*

**6.     7 U.S.C. § 16 provides, in relevant part:**

**Commission Operations**

\* \* \* \* \*

**(e) Relation to other law, departments, or agencies**

(1) Nothing in this chapter shall supersede or preempt—

(A) criminal prosecution under any Federal criminal statute;

(B) the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest—

(i) that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

(ii) (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

(iii) that is not subject to regulation by the Commission under section 6c or 23 of this title; or

(C) the application of any Federal or State statute, including any rule or regulation thereunder, to any person required to be registered or designated under this chapter who shall fail or refuse to obtain such registration or designation.

(2) This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of—

(A) an electronic trading facility excluded under section 2(e) of this title; and

(B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

\* \* \* \* \*

## (h) Regulation of swaps as insurance under State law

A swap—

(1) shall not be considered to be insurance; and

(2) may not be regulated as an insurance contract under the law of any State.

**7.   15 U.S.C. § 3001 provides, in relevant part:**

**Congressional findings and policy**

(a) The Congress finds that—

(1) the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders;

10a

(2) the Federal Government should prevent interference by one State with the gambling policies of another, and should act to protect identifiable national interests; and

(3) in the limited area of interstate off-track wagering on horseraces, there is a need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers.

* * * * *

**8.     18 U.S.C. § 1084 provides, in relevant part:**

**Transmission of wagering information; penalties**

(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both.

(b) Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into a State or foreign country in which such betting is legal.

* * * * *

11a

**9.    25 U.S.C. § 2701  provides:**

**Findings**

The Congress finds that—

(1) numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;

(2) Federal courts have held that section 81 of this title requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts;

(3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;

(4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and

(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.


**10.    17 C.F.R. § 33.3 provides, in relevant part:**

**Unlawful commodity options transactions.**

(a) It shall be unlawful for any person to offer to enter into, enter into, confirm the execution of, or maintain a position in, any commodity option transaction subject to the provisions of this part unless the commodity option involved is traded (1) on or subject to the rules of a contract market which has been designated to trade commodity options pursuant to this part and (2) by or through a member thereof in accordance with the provisions of this part.

\* \* \* \* \*

12a

**11.   17 C.F.R. § 40.11 provides:**

**Review of event contracts based upon certain excluded commodities.**

(a) *Prohibition.*  A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

(1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

(2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b) [Reserved]

(c) *90-day review and approval of certain event contracts.*  The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90-day review.  The 90-day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

(1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90-day review period.  The Commission shall post on the Web site a notification of the intent to carry out a 90-day review.

(2) *Final determination.*  The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90-day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at

13a

the conclusion of such extended period agreed to or requested by the registered entity.

**12.    NRS § 463.0129 provides, in relevant part:**

**Public policy of state concerning gaming; license or approval revocable privilege.**

1. The Legislature hereby finds, and declares to be the public policy of this state, that:

(a) The gaming industry is vitally important to the economy of the State and the general welfare of the inhabitants.

(b) The continued growth and success of gaming is dependent upon public confidence and trust that licensed gaming and the manufacture, sale and distribution of gaming devices and associated equipment are conducted honestly and competitively, that establishments which hold restricted and nonrestricted licenses where gaming is conducted and where gambling devices are operated do not unduly impact the quality of life enjoyed by residents of the surrounding neighborhoods, that the rights of the creditors of licensees are protected and that gaming is free from criminal and corruptive elements.

(c) Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments and the manufacture, sale or distribution of gaming devices and associated equipment.

(d)  All establishments where gaming is conducted and where gaming devices are operated, and manufacturers, sellers and distributors of certain gaming devices and equipment must therefore be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State, to foster the stability and success of gaming and to preserve the competitive economy and policies of free competition of the State of Nevada.

\* \* \* \* \*

14a

**13.  NRS § 463.0193 provides:**

**"Sports pool" defined.** "Sports pool" means the business of accepting wagers on sporting events or other events by any system or method of wagering.

**14.  NRS § 463.01962 provides:**

**"Wager" defined.** "Wager" means a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain.

**15.  NRS § 463.160 provides, in relevant part:**

**Licenses required; unlawful to permit certain gaming activities to be conducted without license; exceptions; separate license required for each location where operation of race book or sports pool conducted.**

1.  Except as otherwise provided in subsection 3 and NRS 462.155, 463.172 and 463.1725, it is unlawful for any person, either as owner, lessee or employee, whether for hire or not, either solely or in conjunction with others:

(a) To deal, operate, carry on, conduct, maintain or expose for play in the State of Nevada any gambling game, gaming device, slot machine, race book or sports pool;

(b) To provide or maintain any information service;

(c) To operate a gaming salon;

(d) To receive, directly or indirectly, any compensation or reward or any percentage or share of the money or property played, for keeping, running or carrying on any gambling game, slot machine, gaming device, race book or sports pool; or

(e) To operate, carry on, conduct, maintain or expose for play in or from the State of Nevada any interactive gaming system,

without having first procured, and thereafter maintaining in effect, all federal, state, county and municipal gaming licenses or registrations as required by statute, regulation or ordinance or by the governing board of any unincorporated town.

* * * * *

**16. NRS § 463.170 provides, in relevant part:**

**Qualifications for license, finding of suitability or approval; regulations.**

1. Any person who the Commission determines is qualified to receive a license, to be found suitable or to receive any approval required under the provisions of this chapter, or to be found suitable regarding the operation of a charitable lottery under the provisions of chapter 462 of NRS, having due consideration for the proper protection of the health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada and the declared policy of this State, may be issued a state gaming license, be found suitable or receive any approval required by this chapter, as appropriate. The burden of proving an applicant's qualification to receive any license, be found suitable or receive any approval required by this chapter is on the applicant.

2. An application to receive a license or be found suitable must not be granted unless the Commission is satisfied that the applicant is:

(a) A person of good character, honesty and integrity;

(b) A person whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest of this State or to the effective regulation and control of gaming or charitable lotteries, or create or enhance the dangers of unsuitable, unfair or illegal practices, methods and activities in the conduct of gaming or charitable lotteries or in the carrying on of the business and financial arrangements incidental thereto; and

(c) In all other respects qualified to be licensed or found suitable consistently with the declared policy of the State.

16a

3. A license to operate a gaming establishment must not be granted unless the applicant has satisfied the Commission that:

(a) The applicant has adequate business probity, competence and experience, in gaming or generally; and

(b) The proposed financing of the entire operation is:

(1) Adequate for the nature of the proposed operation; and

(2) From a suitable source.

Any lender or other source of money or credit which the Commission finds does not meet the standards set forth in subsection 2 may be deemed unsuitable.

* * * * *

**17.     NRS § 463.350 provides, in relevant part:**

**Gaming or employment in gaming prohibited for persons under 21; exception.**

1. A person under the age of 21 years shall not:

(a) Play, be allowed to play, place wagers at, or collect winnings from, whether personally or through an agent, any gambling game, slot machine, race book, sports pool or pari-mutuel operator.

* * * * *

17a

**18.   Nev. Gaming Reg. 5.170 provides, in relevant part:**

**Programs to address problem gambling.**

*  *  *  *  *

2.  Each licensee shall post or provide in conspicuous places in or near gaming and cage areas and cash dispensing machines located in gaming areas written materials concerning the nature and symptoms of problem gambling and the toll-free telephone number of the National Council on Problem Gambling or a similar entity approved by the Board Chair that provides information and referral services for problem gamblers.

3.  Each licensee shall implement procedures and training for all employees who directly interact with gaming patrons in gaming areas.  That training shall, at a minimum, consist of information concerning the nature and symptoms of problem gambling behavior and assisting patrons in obtaining information about problem gambling programs.  This subsection shall not be construed to require employees of licensees to identify problem gamblers. Each licensee shall designate personnel responsible for maintaining the program and addressing the types and frequency of such training and procedures.  Training programs conducted or certified by the Nevada Council on Problem Gambling are presumed to provide adequate training for the period certified by the Nevada Council on Problem Gambling.

4.   Each licensee that engages in the issuance of credit, check cashing, or the direct mail marketing of gaming opportunities, shall implement a program containing the elements described below, as appropriate, that allows patrons to self-limit their access to the issuance of credit, check cashing, or direct mail marketing by that licensee.  As appropriate, such program shall contain, at a minimum, the following:

(a) The development of written materials for dissemination to patrons explaining the program;

(b) The development of written forms allowing patrons to participate in the program;

(c) Standards and procedures that allow a patron to be prohibited from access to check cashing, the issuance of credit, and the participation in direct mail marketing of gaming opportunities;

18a

(d) Standards and procedures that allow a patron to be removed from the licensee's direct mailing and other direct marketing regarding gaming opportunities at that licensee's location; and

(e) Procedures and forms requiring the patron to notify a designated office of the licensee within 10 days of the patron's receipt of any financial gaming privilege, material or promotion covered by the program.

* * * * *

**19.   Nev. Gaming Reg. 5.225 provides, in relevant part:**

**Wagering accounts.**

* * * * *

18.  Responsible Gambling.

(a) Licensees shall ensure that its patrons have the ability to select responsible gambling options associated with their wagering account that include deposit limits establishing the amount of total deposits a patron can make to their wagering account within a specified period of time.

(b) Licensees shall conspicuously display and make available to patrons, upon access to their wagering account, the following responsible gambling message:

> [Licensee's name] encourages you to gamble responsibly. For problem gambling information and assistance, call the 24-hour confidential Problem Gamblers HelpLine at 1-800-522-4700, or visit www.WhenTheFunStops.org.

* * * * *

19a

**20.    Nev. Gaming Reg. 22.1205 provides, in relevant part:**

**Prohibited wagers.**  No wagers may be accepted or paid by any book on:

1.  Any amateur sport or athletic event other than Olympic sporting or athletic events and collegiate sporting or athletic events as set out in this Regulation;

2.  Any sporting event or other event which the licensee knows or reasonably should know is being placed by, or on behalf of, an official, owner, coach, or staff of a participant or team or participant in that event. Each licensee shall take reasonable steps to prevent the circumvention of this regulation;

3.  The outcome of any election for any public office both within and without the State of Nevada; and

4. Any athletic sports event sanctioned by a governing body where the Chair has made a finding that the governing body is not effectively supervising such event or is not ensuring the integrity of such event.

* * * * *