No. 25-7516

IN THE

# United States Court of Appeals
# for the Ninth Circuit

KALSHIEX, LLC,

*Plaintiff-Appellant,*

v.

KIRK D. HENDRICK, *et al.,*

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Nevada
No. 2:25-cv-575 (Gordon, C.J.)

## KALSHIEX LLC'S REPLY BRIEF

<table>
<tr><td>

GRANT R. MAINLAND
ANDREW L. PORTER
DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

DENNIS L. KENNEDY
PAUL C. WILLIAMS
BAILEY ❖ KENNEDY
8984 Spanish Ridge Ave.
Las Vegas, NV 89148

February 13, 2026

</td><td>

NEAL KUMAR KATYAL
JOSHUA B. STERLING
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellant
KalshiEX LLC*

</td></tr>
</table>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..............................................................................1

ARGUMENT .................................................................................. 3

I. THE COURT SHOULD REJECT DEFENDANTS' CONTENTION THAT KALSHI'S CONTRACTS ARE NOT SWAPS .................................... 3

    A. States Cannot Circumvent The CEA By Claiming Instruments On DCMs Are Not Derivatives................................... 3

    B. Kalshi's Contracts Are Swaps...........................................7

    C. Kalshi's Contracts Are Futures Or Options In Excluded Commodities ..............................................................16

    D. Defendants' Parade Of Horribles Fails...........................19

II. THE CEA PREEMPTS STATE GAMING LAW AS TO TRADING ON DCMs ..................................................................................21

    A. The CEA Expressly And Impliedly Preempts The Field Of Regulating Trading On DCMs....................................21

    B. Nevada's Gaming Laws Conflict With The CEA.......................... 29

    C. No Presumption Against Preemption Applies ............................ 32

III. THE REMAINING PRELIMINARY-INJUNCTION FACTORS FAVOR KALSHI............................................................................... 33

CONCLUSION ..............................................................................40

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ......................................... 1, 3, 23, 24, 30, 31

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ................................................... 36

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................................... 4, 31

*Assurance Wireless USA, L.P. v. Reynolds*,
100 F.4th 1024 (9th Cir. 2024) ............................................... 33

*Big Lagoon Rancheria v. California*,
789 F.3d 947 (9th Cir. 2015) ............................................... 5, 6, 7

*Blue Lake Rancheria v. Kalshi Inc.*,
No. 25-cv-06162, 2025 WL 3141202
(N.D. Cal. Nov. 10, 2025) ..................................................... 27

*Botsford v. Blue Cross & Blue Shield of Mont., Inc.*,
314 F.3d 390 (9th Cir. 2002) ............................................... 30, 31

*Cal. Rest. Ass'n v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ............................................... 32

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ................................................. 36

*CFTC v. Erskine*,
512 F.3d 309 (6th Cir. 2008) ................................................. 21

*Chi. Mercantile Exch. v. SEC*,
883 F.2d 537 (7th Cir. 1989) ................................................. 6

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) ............................................... 33

ii

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Cothran v. Ellis,*
16 N.E. 646 (Ill. 1888) ................................. 29

*Dickson v. Uhlmann Grain Co.,*
288 U.S. 188 (1933) ................................. 3, 28

*Effex Cap., LLC v. Nat'l Futures Ass'n,*
933 F.3d 882 (7th Cir. 2019) ...................... 4

*Fisher v. Dean Witter Reynolds, Inc.,*
526 F. Supp. 558 (E.D. Pa. 1981) .............. 17

*Freightliner Corp. v. Myrick,*
514 U.S. 280 (1995) .................................. 25

*FTC v. Ken Roberts Co.,*
276 F.3d 583 (D.C. Cir. 2001) ............... 23, 24

*Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.,*
123 F.3d 1098 (8th Cir. 1997) .................. 22

*Hughes v. Talen Energy Mktg., LLC,*
578 U.S. 150 (2016) .............................. 22, 23

*Index Newspapers LLC v. U.S. Marshals Serv.,*
977 F.3d 817 (9th Cir. 2020) .................... 38

*John Doe Co. v. CFPB,*
235 F. Supp. 3d 194 (D.D.C. 2017) ......... 34, 35

*KalshiEX LLC v. CFTC,*
No. 23-3257, 2024 WL 4164694
(D.D.C. Sep. 12, 2024) ........................... 16, 26

*Leist v. Simplot,*
638 F.2d 283 (2d Cir. 1980) ..................... 23

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ................................ 20

iii

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Loving v. IRS,*
742 F.3d 1013 (D.C. Cir. 2014) ..................................................10

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
456 U.S. 353 (1982) ...................................................... 11, 23

*Mississippi v. Louisiana,*
506 U.S. 73 (1992) ............................................................... 22

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992) ............................................................. 34

*N. Am. Derivatives Exch., Inc. v. Nev. Gaming Control Bd.,*
No. 2:25-cv-978, 2025 WL 2916151
(D. Nev. Oct. 14, 2025) ................................................ 17, 18

*Oklahoma v. Castro-Huerta,*
597 U.S. 629 (2022)...........................................................9, 13

*Omnipoint Commc'ns, Inc. v. City of Huntington Beach,*
738 F.3d 192 (9th Cir. 2013)............................................... 24

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway,*
515 F. Supp. 202 (N.D. Ala. 1981) ....................................... 5

*PPL EnergyPlus, LLC v. Nazarian,*
753 F.3d 467 (4th Cir. 2014)............................................... 26

*Puerto Rico v. Franklin Cal. Tax-free Tr.,*
579 U.S. 115 (2016) ............................................................. 32

*Slaney v. Int'l Amateur Athletic Fed'n,*
244 F.3d 580 (7th Cir. 2001)............................................... 22

*Transcon. Gas Pipe Line Co. v. Pa. Envtl. Hr'g Bd.,*
108 F.4th 144 (3d Cir. 2024) ............................................... 22

*United States v. Brien,*
617 F.2d 299 (1st Cir. 1980)................................................ 23

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*United States v. Locke,*
    529 U.S. 89 (2000) ............................................................... 33

*United States v. Monsanto,*
    491 U.S. 600 (1989) ............................................................... 9

*Valle del Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ...................................... 33, 34, 38

**STATUTES:**

5 U.S.C. § 702 ............................................................................... 5

5 U.S.C. § 706(2) .......................................................................... 5

7 U.S.C. §§

    1a(19)(iv) ........................................................................... 16, 17

    1a(19)(iv)(II) ........................................................................... 17

    1a(47)(A)(i) ............................................................................. 18

    1a(47)(A)(ii) ........................................................................ 9, 10

    1a(47)(A)(iii) ....................................................................... 9, 10

    1a(47)(A)(iv) ........................................................................... 10

    1a(47)(B) .............................................................................. 11, 12

    2(a)(1)(A) ............................................................................ 19, 24

    2(c)(2)(D) ................................................................................. 6

    2(c)(2)(D)(iii) ............................................................................ 6

    5(a) ........................................................................................ 30

    6(a) ......................................................................................... 6

# TABLE OF AUTHORITIES—Continued

**Page(s)**

7a-2(c)(5)(C)(i) ................................................................ 12, 26, 28, 31

7b-3(d)(1) ................................................................................ 24, 25

7b-3(d)(2) ............................................................................... 24, 25

13a-2(1) ....................................................................................... 5

13a-2(7) ...................................................................................... 5

16(e)(1)(B)(ii) .............................................................................19

16(e)(2) ..................................................................................... 24

16(h)(2) ................................................................................. 24, 25

15 U.S.C. § 8302(d)(1) ........................................................ 11, 12, 20

31 U.S.C. § 5361(b) .................................................................... 26

31 U.S.C. § 5362(1)(E)(ii) ........................................................... 27

Mont. Code Ann. § 23-7-110(3) .................................................... 39

Nev. Rev. Stat. § 463.0193 ............................................................ 9

Nev. Rev. Stat. § 463.01962 ........................................................... 9

**RULES & REGULATIONS:**

17 C.F.R. § 38.151(b) ................................................................. 30

17 C.F.R. § 38.250 ...................................................................... 39

17 C.F.R. § 40.11 .................................................................... 12, 13

17 C.F.R. § 40.11(a) .....................................................................13

17 C.F.R. § 40.11(c) .....................................................................13

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Concept Release*,
   73 Fed. Reg. 25,669 (May 7, 2008) ............................................... 11, 12, 16

*Event Contracts*,
   89 Fed. Reg. 48,968 (June 10, 2024) ...................................................... 8

*Further Definition of "Swap,"*
   77 Fed. Reg. 48,208 (Aug. 13, 2012) ................................................ 20, 21

*Provisions Common to Registered Entities*,
   76 Fed. Reg. 44,776 (July 27, 2011) ....................................................... 13

**LEGISLATIVE MATERIALS:**

156 Cong. Rec. S5906 (July 15, 2010) ...................................................... 13, 14

H.R. Rep. No. 93-1383 (1974) ................................................................ 23, 27

H.R. Rep. No. 97-565, pt. 1 (1982) ............................................................... 19

H.R. Rep. No. 106-711, pt. 2 (2000) ............................................................. 24

S. Rep. No. 93-1131 (1974) ............................................................................ 24

**OTHER AUTHORITIES:**

Andrew Ross Sorkin, et al., *New Epstein Details
   Rattle Washington, Hollywood and Beyond*,
   N.Y. Times DealBook (Feb. 10, 2026), https://www.ny-
   times.com/2026/02/10/business/dealbook/epstein-
   lutnick-wasserman-starmer.html ....................................................... 2, 11

Chris Altruda, *Football Keys October Surge in
   Nevada Sportsbook Revenue*,
   In Game (Nov. 25, 2025), https://perma.cc/8JFH-FGB4 ..................... 38

*CME Rulebook*, Ch. 13, https://perma.cc/YW8G-D66W............................. 6

*CME Rulebook*, Ch. 460, https://perma.cc/N9YE-UVSU ........................... 17

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Contingency*,
  Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ........................7

*Designated Contract Market Products—KEX*, CFTC, bit.ly/3YPbRoo .......18

Eric Ramsey, *US Sports Betting Revenue & Handle*, LSR (Feb. 5, 2026),
  https://perma.cc/JS4T-6CYW ................................................................21

*Event*,
  Oxford English Dictionary (2025) ......................................................... 8

*Event*,
  Webster's II New College Dictionary (3d ed. 2005) ...............................7

*Exclusive*,
  American Heritage Dictionary (2d ed. 1980) ........................................ 22

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*,
  58 Chi.-Kent L. Rev. 657 (1982) ............................................................ 29

*Remarks of Chairman Michael S. Selig at CFTC-SEC Event
  on Harmonization*,
  CFTC (Jan. 29, 2026), https://perma.cc/PJ2L-DHXG........ 1, 2, 15, 16, 17

## INTRODUCTION

Defendants' brief confirms that a preliminary injunction is warranted. Their principal argument—that Kalshi's contracts are not derivatives—rewrites the statutory text. Their theory that an "outcome" cannot be an "event" is flatly wrong as a matter of plain meaning. Their theory that swaps must involve events "inherently" connected to financial consequences is invented out of whole cloth—the CEA requires "potential" financial consequences, not "inherent" ones. And their theory that a futures contract must involve something "that can be delivered" would strip the CFTC of jurisdiction to regulate quintessential derivatives like interest-rate futures. More fundamentally, Defendants cannot justify a regime in which 50 states may subject DCMs to 50 different enforcement regimes based on their own narrow interpretation of the CFTC's jurisdiction—a recipe for the "total chaos" Congress sought to avoid. *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (citation omitted).

Defendants' claim that the CFTC has disclaimed jurisdiction over Kalshi's contracts has aged poorly. The CFTC Chairman recently directed the agency to initiate an event-contracts rulemaking to provide "a clear understanding that the CFTC supports lawful innovation in these markets." *Remarks of Chairman Michael S. Selig* (Jan. 29, 2026),

1

https://perma.cc/PJ2L-DHXG ("*Selig Remarks*"). And the CFTC recently requested permission to file an amicus brief in this Court supporting Kalshi's position. While Defendants insist that sports-event contracts cannot be used to hedge, the public record refutes that argument as well. One insurance company, for example, has announced it "expects to hedge about $30 million annually" through Kalshi to manage risks associated with sports events.[1]

Defendants' alternative argument—that the CEA does not preempt state law even if Kalshi's contracts are derivatives—can be readily rejected. Their contention that the exclusive-jurisdiction provision supersedes only federal authorities is irreconcilable with the CEA's text. And their contention that the CEA preempts some laws, but not *gaming* laws, is equally mistaken. The Special Rule is unequivocal textual proof that Congress understood contracts involving "gaming" would be regulated by the CFTC, not 50 different states.

Defendants' real argument is that finding preemption here would make the CFTC the nation's *only* sports-betting regulator, but this argument is a straw man. The CEA preempts state regulation of *on*-DCM trading but leaves states free to regulate *off*-DCM transactions, including sports bets. And a

---

[1] Andrew Ross Sorkin, et al., *New Epstein Details Rattle Washington, Hollywood and Beyond*, N.Y. Times DealBook (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/business/dealbook/epstein-lutnick-wasserman-starmer.html.

joint CFTC/SEC rule confirms that sports bets are not swaps because, unlike sports-event contracts, they are not *traded on an organized exchange.*

By contrast, Defendants cannot escape the startling implications of their position. Nevada law prohibits wagering not just on sports events, but all events, meaning that if state gaming laws are not preempted, Defendants could prohibit *all* event contracts, or even *all* futures contracts. Many states a century ago regulated all futures trading as "gambling in grain." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933). The 1974 CEA amendments were designed to end that practice. But Defendants' position would allow states to restore it, upending the system of uniform federal regulation that has prevailed in this Nation for 50 years. A preliminary injunction is warranted.

## ARGUMENT

### I. THE COURT SHOULD REJECT DEFENDANTS' CONTENTION THAT KALSHI'S CONTRACTS ARE NOT SWAPS.

#### A. States Cannot Circumvent The CEA By Claiming Instruments On DCMs Are Not Derivatives.

It has been settled for decades that states may not "directly affect trading on or the operation of a" DCM. *Am. Agric.*, 977 F.2d at 1156-57. Letting Defendants enforce state law against Kalshi on the theory (at 50) that its contracts are not "*bona fide*" derivatives would violate that precept and interfere with the CFTC's exclusive jurisdiction. Defendants respond (at 22-23) that

3

the CFTC's exclusive jurisdiction extends only to swaps, futures, and options, leaving states free to enforce state law against DCM-traded instruments by the simple expedient of claiming they are something else. Defendants are wrong, for three reasons.

*First*, "the existence of an express preemption provision does *not* bar the ordinary working of conflict preemption principles," *Arizona v. United States*, 567 U.S. 387, 406 (2012) (citation modified), and permitting Defendants' workaround would plainly conflict with the CEA. It would subject DCMs to multiple regulatory regimes concurrently, conflicting with Congress's goal of "uniform legal rules" for DCMs. *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (citation omitted). Worse, it would let state regulators scrutinize each of tens of thousands of DCM-traded contracts to determine whether any do not, in the state's view, qualify as a derivative, with the looming threat of criminal prosecution in state court for DCMs that offer contracts state regulators wish to prohibit, even if the CFTC has unquestionably exercised jurisdiction over the very same contracts.

Defendants' only response (at 42)—that Kalshi could rely on the preclusive effect of a final ruling—is wrong. A win for Kalshi against one state would not be preclusive against others, which means that, absent a final decision by the U.S. Supreme Court, Kalshi would have to run the table against

50 states to offer a contract without fear of liability. Defendants offer no defense of such a chaotic regime and identify no precedent permitting it.

*Second*, Defendants have no answer to Section 13a-2, which authorizes states to enforce the CEA against derivatives market participants "other than" DCMs. 7 U.S.C. § 13a-2(1). Section 13a-2 also authorizes states to enforce general antifraud laws. *Id.* § 13a-2(7). By "specifical[ly] allow[ing]" only "antifraud proceedings," Congress confirmed that "antigambling proceedings" were "preclude[d]." *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981). These specific limits on state authority would be incomprehensible if Congress intended to allow states to decide what contracts may properly be traded on DCMs.

*Third*, a claim against a DCM alleging that its instruments are not "*bona fide*" derivatives is, in substance, a complaint with the CFTC for permitting the instruments. Such a claim lies against the CFTC—not against a DCM for offering instruments that its exclusive federal regulator has permitted. A state aggrieved by the CFTC's decision-making may attempt to mount a challenge under the Administrative Procedure Act. *See* 5 U.S.C. §§ 702, 706(2). But, as this Court has held, parties cannot bring a "collateral attack" to circumvent agency regulation. *Big Lagoon Rancheria v. California*, 789 F.3d 947, 953 (9th Cir. 2015) (en banc) (citation omitted).

Defendants respond (at 23) that the CEA permits certain unspecified instruments to trade on DCMs while also being subject to state regulation. But the opposite is true: Where "the CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989). Defendants cite examples (at 23) of instruments supposedly traded on DCMs that are not under exclusive CFTC jurisdiction, but these examples fail. The foreign exchange spot transactions they cite are not executed on the Chicago Mercantile Exchange (CME), which is a DCM, but on an affiliated exchange called EBS, which is not. *See CME Rulebook*, Ch. 13, https://perma.cc/YW8G-D66W. As to (at 23) "spot contracts on cryptocurrencies," the CEA *requires* "[r]etail commodity transactions" that are "entered into, or offered … on a leveraged or margined basis, or financed by the offeror" to be executed on DCMs. 7 U.S.C. § 2(c)(2)(D). These transactions are regulated "as if" they are "contract[s] of sale of a commodity for future delivery"—*i.e.*, futures, *id.* § 2(c)(2)(D)(iii), which means that they can only be traded lawfully on DCMs, *id.* § 6(a).

Defendants attempt to distinguish *Big Lagoon* (at 41-43) on the ground that "Kalshi brought this lawsuit." But the same was true in *Big Lagoon*, where the plaintiff sued California, and California raised a federal issue as a *defense*. This Court deemed that defense precluded because it "necessarily"

challenged agency decision-making. *Big Lagoon*, 789 F.3d at 953. Defendants are wrong to suggest (at 43) that the agency decision in *Big Lagoon* was totally insulated from judicial review. It was "a garden-variety APA claim" subject to judicial review, *id.* (citation omitted), just not via a collateral attack. Nor does *Big Lagoon* turn on Defendants' ability to *prevail* in an APA suit, as Defendants suggest (at 42). In *Big Lagoon* itself, any APA claim was time-barred. *Id.* at 953.

### B. Kalshi's Contracts Are Swaps.

If this Court reaches the issue, Kalshi's contracts are swaps under exclusive CFTC jurisdiction. Defendants advance a gerrymandered definition of "swap" to exclude sports and election contracts, but their policy-driven arguments cannot be reconciled with the CEA's text.

*First*, Defendants maintain (at 24-25) that "[a]n 'event' is different from an 'outcome.'" But the ordinary meaning of "event" includes "outcome." *Event*, Webster's II New College Dictionary (3d ed. 2005). A "contingency" in turn includes "something liable to happen as an adjunct to *or result* of something else." *Contingency,* Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (emphasis added). These definitions easily encompass the outcomes of sports events and elections.

7

The CFTC itself has repeatedly explained that event contracts are "based on the outcome of an underlying occurrence or event." *Event Contracts*, 89 Fed. Reg. 48,968, 48,969 (June 10, 2024); *see Concept Release*, 73 Fed. Reg. 25,669, 25,669-71 (May 7, 2008) (event contracts may turn on "the outcome[s]" of entertainment events). Defendants' contrary argument would make CFTC jurisdiction rise and fall on semantics, as almost any event can simply be recharacterized as the outcome of a different event.

Defendants concede (at 27) that "the fact that an event" "could be the outcome of an underlying event" "does not negate the fact that the first event is a significant independent event." This concession—some outcomes are events after all—is fatal. Defendants' real argument (at 27) is that an event must be "significant," and that this requirement excludes sports and election outcomes, but not others. But the dictionaries Defendants cite (at 25) make clear that an "event" is "[s]omething that happens or takes place," synonymous with "occurrence." *Event*, Oxford English Dictionary (2025). Defendants offer no standard by which to assess the "significance" of events, nor any plausible basis to conclude that *all* sports and election outcomes—including the winner of the Super Bowl or a presidential election—are insignificant. Defendants' Rorschach-test formulation would put DCMs at the mercy of 50 different state regulators' understandings of what qualifies as "significant."

Defendants' definition of "event" also refutes Defendants' own argument. Nevada has accused Kalshi of operating a "[s]ports pool," defined as a business that "accept[s] wagers on sporting *events*." Nev. Rev. Stat. § 463.0193 (emphasis added). Unless a "sporting event" includes outcomes, offering wagers on sports outcomes would fall outside the state law Defendants themselves invoke against Kalshi. Defendants respond by noting (at 27) that a different Nevada statute defines "[w]ager" as money "risked on an occurrence for which the outcome is uncertain." Nev. Rev. Stat. § 463.01962. But that provision refers to money risked on an "occurrence"—just like the definition of swap—and underscores that occurrences encompass outcomes.

*Second*, Defendants argue (at 28) that an event underlying a swap must be "inherently" financial. The CEA, however, "says no such thing." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). Instead, the CEA requires that an event underlying a swap be associated with a "potential" financial consequence, 7 U.S.C. § 1a(47)(A)(ii)—the opposite of inherent.

Defendants cite interpretive canons, but "canons are not a license for the judiciary to rewrite language enacted by the legislature." *United States v. Monsanto*, 491 U.S. 600, 611 (1989) (citation modified). Nor do canons help. Defendants are wrong (at 31) that "all other parts" of the "swap" definition refer to "financial measures, indices, or instruments." Congress, for

9

example, included swaps on "weather," "energy," and "metal," in subsection (iii), none of which is a financial measure, index, or instrument. Subsection (iv) also makes no reference to "financial measures, indices, or instruments"—it encompasses transactions "known to the trade as" swaps.

Kalshi's interpretation creates no superfluity. Subsection (ii) encompasses swaps based on "an event or contingency," whereas subsection (iii) encompasses swaps "based on the value" of interest rates, commodities, and other instruments. Of course, Congress's six definitions of "swap" overlap—for example, subsection (iv)'s reference to contracts "commonly known to the trade as a swap" overlaps entirely with the swaps enumerated in subsection (iii). But that overlap is compelled by the text, and it is equally inevitable under Defendants' own interpretation, because, as they concede (at 31), the "inherently financial" limitation they press would make subsection (ii) coextensive with "all other parts of the definition." Far from justifying Defendants' artificial narrowing, the overlap makes clear that Congress sought to "remove any doubt and make doubly sure." *Loving v. IRS*, 742 F.3d 1013, 1019 (D.C. Cir. 2014) (Kavanaugh, J.). Artificially limiting the "swap" definition would flout Congress's decision to define it broadly.

Defendants claim (at 28) an event underlying a swap must entail "an existing economic risk that companies seek to hedge" and that Kalshi's

10

contracts do not qualify. That is wrong, both legally and factually. Legally, while the CEA *previously* imposed an "economic purpose" requirement, Congress removed it in 2000. 73 Fed. Reg. at 25,672. Factually, many entities use Kalshi's contracts to hedge. One insurance company "expects to hedge about $30 million annually through" Kalshi to help "college athletics departments, sports teams and sponsors to manage the financial risks of performance incentives in athletes' and coaches' contracts." Sorkin, *supra*. Nor do Defendants dispute (at 29) that sportsbooks use Kalshi's contracts to hedge their exposure to sports events. *See* 3-StateSER-146; 3-StateSER-170. Defendants suggest (at 29) it is illegitimate to hedge "*gaming* risk," but nothing in the CEA prohibits hedging risk from lawful business activity. Kalshi's contracts can be used for speculation, but so can all derivatives. "The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982).

Defendants are wrong (at 29) that Kalshi's definition lacks a "limiting principle." The definition of swap is broad, but not unlimited. It would exclude a contract on, for example, whether or not a player wears a hat, as well as Intervenor's hypothetical coin flip for the front seat. *See* Intervenors' Br. 47. Congress further enumerated ten exclusions from the swap definition, 7

11

U.S.C § 1a(47)(B), and authorized the CFTC and SEC to identify more, 15 U.S.C. § 8302(d)(1). These limits, unlike Defendants' manufactured ones, derive from the CEA's text, and none helps Defendants. While Defendants cherry-pick contracts they claim are unconnected to a financial consequence, Kalshi never listed some, *see* 3-StateSER-99-110, and handful of edge cases out of tens of thousands of contracts cannot justify Defendants' assertion that *no* sports or election contracts are swaps.

*Third*, Defendants rely on the Special Rule, but it is fatal to their position. Defendants claim (at 34) that "Congress did not mention gaming in the definition of 'swaps,'" but Congress in the Special Rule *did* identify contracts involving "gaming" as a type of "swap" subject to CFTC jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). Defendants respond (at 32) by noting that the Special Rule refers to "agreements, contracts, transactions, or swaps" in excluded commodities, rather than to "swaps" alone. But that simply reflects that event contracts may be structured as "options" or "futures contracts" as well as swaps. 73 Fed. Reg. at 25,670-71. It does nothing to undermine Congress's recognition that contracts involving "gaming" can be "swaps."

Defendants rely (at 33) on a CFTC regulation implementing the Special Rule, *see* 17 C.F.R. § 40.11, which undermines their position still further. It refers to "gaming" contracts as one type of "event contract[] based upon

12

certain excluded commodities"—further proof that gaming contracts are subject to CFTC jurisdiction. *Id.* Defendants claim (at 33) that Section 40.11 "categorically *ban[s]* contracts involving 'gaming' on DCMs," but that is wrong, and it would not help Defendants even if it were right. Section 40.11(c) preserves CFTC discretion to permit such contracts case-by-case. *See Provisions Common to Registered Entities*, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011) (rule adopting Section 40.11 explaining that DCMs "may always" self-certify contracts and that review is available "on a case-by-case basis" notwithstanding Section 40.11(a)). The CFTC has not treated Section 40.11 as a blanket ban. And even if Section 40.11 were a categorical ban, it would *confirm* the CFTC's exclusive jurisdiction over sports contracts, as the CFTC would have no authority to ban contracts over which it lacks jurisdiction.

Defendants support their view of the Special Rule (at 34) by resorting to statements by individual legislators. But "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Castro-Huerta*, 597 U.S. at 642. And these statements again support Kalshi. Senators Feinstein and Lincoln explained that the purpose of the Special Rule was to "restore *CFTC's* authority to prevent trading that is contrary to the public interest," 156 Cong. Rec. S5906 (July 15, 2010) (emphasis added)—*not* to

13

subject these contracts to concurrent state jurisdiction. While certain legislators had concerns with gaming contracts, Congress addressed those concerns *not* by categorically excluding the contracts from CFTC jurisdiction, but by granting the CFTC discretion to prohibit them if—and only if—it determines they are contrary to public interest. As Senator Lincoln herself recently noted, the Special Rule "intended event contracts on designated contract markets to be regulated by the CFTC, and the CFTC alone." Members of Congress Br. 5, Dkt. 66, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir.).

Defendants' citation (at 29) to Kalshi's statements in litigation over its election contracts fails for similar reasons. *See also* Intervenor's Br. 44-46. Kalshi's argument throughout that litigation was that its election contracts did not involve "gaming" and therefore could not be subject to public-interest review under the Special Rule. Kalshi maintained that "gaming" required an actual game such as a sporting event, and noted that Congress had particular concerns about gaming contracts. The upshot was *not* that Congress prohibited gaming contracts; instead, Kalshi explained, Congress addressed its concerns by "empower[ing] the CFTC to *at least review the category of game-based contracts*" under the Special Rule. Appellee Br., *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698, at *45 (D.C. Cir. Nov. 15, 2024) (emphasis added). Kalshi also made clear that "the CFTC's 'exclusive

14

jurisdiction' over the derivatives markets preempts any state law that purports to prohibit the trading of a contract on a regulated exchange." *Id.* at *31. That is likewise Kalshi's position here.

*Fourth*, Defendants' suggestion (at 8-9, 33-34) that the CFTC understands sports-event contracts to fall outside its jurisdiction is plainly incorrect. The CFTC chair recently noted that "event contracts" have been "within the CFTC's regulatory perimeter for more than two decades"; he emphasized the CFTC's "expertise and responsibility to defend its exclusive jurisdiction over commodity derivatives" with a specific reference to "sports-related event contracts"; and he noted that the CFTC is moving forward "with drafting an event contracts rulemaking" that will further regulate these contracts. *Selig Remarks*. Defendants strain to draw inferences (at 8-9) from a footnote to a staff advisory issued before the federal government shutdown, but the CFTC has withdrawn that advisory. *Id.* Defendants, like the district court, also cite a *proposed* CFTC rule that would have deemed sports-event contracts contrary to the public interest under the Special Rule, but this rule was never adopted, and thus never reflected the agency's public-interest determination. In any case, the CFTC has now formally withdrawn that proposal to provide "a clear understanding that the CFTC supports lawful innovation in these markets." *Id.* And the CFTC has sought to file an amicus brief

15

supporting Kalshi's position in these consolidated appeals. CFTC's Mot. for Leave to File an Amicus Curiae Br., Dkt. 30, *N. Am. Derivatives Exch. Inc. v. Nevada*, No. 25-7187 (Feb. 5, 2026).

*Finally*, Defendants do not deny that the district court failed to address Kalshi's election contracts—an independent basis for reversal. Defendants' argument (at 28) that "the court's distinction between outcomes and events applies to election contracts" is simply not credible. Defendants concede (at 27) that some outcomes—they suggest a "mortgage default"—are events because they are "significant." If so, outcomes of elections—far more significant than mortgage defaults—are events as well. Defendants do not address the myriad respects in which businesses have exposure to election outcomes, which they may seek to hedge. Nor do they attempt to explain how allowing states to *ban* elections contracts as gambling could be consistent with the CEA, which *requires* the CFTC to permit these contracts. *See KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *13 (D.D.C. Sep. 12, 2024).

### C. Kalshi's Contracts Are Futures Or Options In Excluded Commodities.

Event contracts like Kalshi's can be "structured as options" or "futures contracts." 73 Fed. Reg. at 25,670-71. Congress made this clear in 2000, ten years before Dodd-Frank, by defining "excluded commodity" to include "an occurrence" "associated with a financial ... consequence." 7 U.S.C.

§ 1a(19)(iv); *see Selig Remarks* ("event contracts" have been "within the CFTC's regulatory perimeter for more than two decades").

Defendants' principal argument to the contrary (at 37)—that a futures contract "must involve something that can be delivered"—is manifestly incorrect. Under the CEA's plain text, myriad futures are based on undeliverable intangibles, including "occurrence[s]" or "contingenc[ies]." 7 U.S.C. § 1a(19)(iv). Defendants observe (at 37) that some "interest-rate future[s]" may reference a deliverable such as a Treasury note, but others have no underlying deliverable and are based purely on a commercial benchmark. *See CME Rulebook*, Ch. 460, https://perma.cc/N9YE-UVSU. Defendants' position would mean some of the world's largest futures markets—like those involving rates and securities indices—would not be CFTC-regulated. Defendants' sole authority for their theory is a 45-year-old district court case addressing the Securities and Exchange Act of 1934, not the CEA. *See Fisher v. Dean Witter Reynolds, Inc.*, 526 F. Supp. 558, 559-560 (E.D. Pa. 1981).

Defendants contend (at 36) that sports and election outcomes are not "excluded commodities" because they are not "associated with [ ] financial … consequence[s]." 7 U.S.C. § 1a(19)(iv)(II). But Defendants' principal argument for why Kalshi's contracts are not swaps—that an outcome is not an "event"—does not apply here, because "excluded commodity" references an

17

"occurrence" and not an "event." *See N. Am. Derivatives Exch., Inc. v. Nev. Gaming Control Bd. ("Crypto.com")*, 2025 WL 2916151, at *7 (D. Nev. Oct. 14, 2025) (concluding that "occurrence" is broader than "event" (citations omitted)). Nor does the lack of the word "potential" in the excluded commodity definition help Defendants. The financial consequences associated with the occurrences underlying Kalshi's contracts are no less real than those associated with weather events underlying weather derivatives or carbon dioxide emissions underlying emissions swaps.

Defendants finally argue (at 35-36) that Kalshi "should be estopped from making this argument, because it told the CFTC that its contracts are 'swaps.'" But the CEA expressly defines "swap" to include various kinds of "option[s]." 7 U.S.C. § 1a(47)(A)(i). Indeed, the webpage Defendants cite (at 36) lists Kalshi's contracts as *both* "Swap[s]" and "Option[s]." *Designated Contract Market Products—KEX*, CFTC, bit.ly/3YPbRoo. In self-certifying its contracts to the CFTC, Kalshi did not represent that its contracts are not futures or options. Kalshi has consistently argued that its contracts are swaps, but it has also preserved an alternative argument that its contracts are futures or options. Arguing in the alternative is not grounds for estoppel.

## D. Defendants' Parade Of Horribles Fails.

Defendants' argument is driven by their contention (at 37-38) that Kalshi's position would make the CFTC "the Nation's *sole* regulator for sports betting." Defendants are wrong for multiple independent reasons.

To begin, Section 2(a)'s savings clause makes clear that, except for the CFTC's exclusive jurisdiction over on-DCM trading, "nothing" in Section 2 shall "restrict" state authorities "from carrying out their duties" under state law. 7 U.S.C. § 2(a)(1)(A); *see id.* § 16(e)(1)(B)(ii) (similar). This reflects the CEA's fundamental division of responsibility, giving "the CFTC exclusi[ve] jurisdiction to regulate futures trading" on DCMs, "thereby preempting any State regulatory laws," while confirming that "States should be extensively involved in … policing transactions outside those preserved exclusively" for the CFTC. H.R. Rep. No. 97-565, pt. 1, at 44-45 (1982). The savings clause confirms that the CEA does not preempt state licensure of sportsbooks, which operate off-DCM subject to state regulation. Defendants claim (at 39) that if Kalshi's contracts are swaps, Section 2(e) would prohibit sportsbooks from operating subject to state licensing regimes. But interpreting Section 2(e) to prevent sportsbook licensure would "restrict" states "from carrying out their duties" regarding off-DCM transactions under state law—exactly what the savings clause forbids. 7 U.S.C. § 2(a)(1)(A).

19

In any event, while sports-event contracts traded on-DCM are swaps, sports bets traded off-DCM are not. Acting pursuant to an express congressional delegation to define "swap," 15 U.S.C. § 8302(d)(1), the CFTC and SEC have explained that some "customary consumer … arrangements" may resemble swaps, but that consumers may engage in them "without concern that such arrangements would be considered swaps." *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,247 (Aug. 13, 2012). One of the factors the CFTC and SEC use to evaluate whether transactions are swaps is whether "[t]hey are not traded on an organized market." *Id*. at 48,247. Sports-event contracts are swaps under this framework because they are undisputedly traded on an organized market. Sports bets are not swaps under this framework because they are not traded on an organized market but through customer-to-company transactions.

Defendants claim (at 40) that "the CEA's definition of 'swap' does not require trading." But the regulation does. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (regulations adopted pursuant to statutes that "expressly delegate to an agency the authority to give meaning to a particular statutory term" carry the force of law (citation modified)). Tradability is critical not only to distinguishing sports-event contracts from sports bets, but also to distinguishing many other derivatives from state-regulated

20

analogues. For example, the CFTC and SEC follow the same framework to distinguish certain swaps from insurance products regulated by states, which are "not traded on an organized market or over the counter." 77 Fed. Reg. at 48,214-15; *accord CFTC v. Erskine*, 512 F.3d 309, 325 (6th Cir. 2008) (derivatives are "traded on an exchange" and "fungib[le]").

Defendants contend (at 41) that the "practical effect" of a ruling for Kalshi would be that all sportsbooks would eschew state licensure in favor of regulation by the CFTC. That argument is wildly unrealistic, as prediction markets represent a tiny fraction of the business of sportsbooks.[2] Defendants suggest (at 41) that DraftKings and FanDuel opted to forgo licensing in Nevada, but in fact, they simply sought to "launch[] prediction markets in other states," 1-ER-29, and Nevada punished them for that out-of-state conduct by disqualifying them from licensure in Nevada.

## II. THE CEA PREEMPTS STATE GAMING LAW AS TO TRADING ON DCMs.

### A. The CEA Expressly And Impliedly Preempts The Field Of Regulating Trading On DCMs.

The CEA preempts state regulation of trading on DCMs. Defendants' contrary arguments do not come close to calling this evidence into doubt.

---

[2] *See* Eric Ramsey, *US Sports Betting Revenue & Handle* (Feb. 5, 2026), https://perma.cc/JS4T-6CYW (reporting that U.S. sportsbook revenues exceeded $16.6 billion in 2025).

21

1. Defendants principally argue (at 47) that the CEA's exclusive-jurisdiction provision has no preemptive effect at all. That argument can be easily rejected. "Exclusive" means "[n]ot divided or shared with others." *Exclusive*, American Heritage Dictionary (2d ed. 1980). The Supreme Court has repeatedly instructed that state law is preempted where a federal agency's jurisdiction is "exclusive." *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). It has further held that a "description of ... jurisdiction as 'exclusive' necessarily denies jurisdiction" to others. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992). The Third Circuit has held that "[t]he explicit statutory conferral of exclusive jurisdiction" constitutes "a form of express preemption." *Transcon. Gas Pipe Line Co. v. Pa. Envtl. Hr'g Bd.*, 108 F.4th 144, 152-153 (3d Cir. 2024); *see also Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 595 (7th Cir. 2001) (statutory grant of "exclusive jurisdiction" to committee preempted state law); *Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.*, 123 F.3d 1098, 1103 (8th Cir. 1997) (similar).

Defendants distinguish (at 47) some of these cases on the ground that the grant of "exclusive jurisdiction" was to a federal court rather than a federal agency. But Defendants provide no reason why this distinction should have any legal significance. Defendants also note (at 47) that the statute in *Hughes* did not use the phrase "exclusive jurisdiction," but they do not

22

dispute that the Supreme Court understood the phrase to be synonymous with preemption. 578 U.S. at 153. Defendants cherry-pick (at 47) one statute with an exclusive-jurisdiction provision and a separate preemption provision, which they cite as evidence that exclusive jurisdiction does not result in preemption. But the preemption provision there specified that state laws were only *conflict*-preempted rather than *field*-preempted, which is why a separate provision narrowing the scope of preemption was necessary.

Defendants suggest (at 46) that the CFTC's exclusive jurisdiction prevents only "other federal agencies" from regulating DCMs. Defendants' sole support for that proposition is *Curran*, 456 U.S. 353, which had nothing to do with preemption. Defendants' position would mean states have been free for five decades to regulate DCM-traded derivatives, contrary to all precedent, contrary to Congress's declaration that it sought to "preempt the field," H.R. Rep. No. 93-1383, at 35-36 (1974), and contrary to the CFTC's position that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant's Br. 27, *KalshiEX v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024); *see Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) ("the CEA preempts the application of state law"); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("Congress intended the CFTC to occupy the entire field of commodities futures regulation."); *FTC v. Ken*

*Roberts Co.*, 276 F.3d 583, 590-591 (D.C. Cir. 2001) (similar); *Am. Agric.*, 977 F.2d at 1156-57 (similar).

Defendants fail to grapple with Section 2(a)'s savings clause, which provides that Section 2(a) does not "supersede or limit the jurisdiction" of other regulators "*[e]xcept as hereinabove provided*" by the CFTC's exclusive jurisdiction over on-exchange trading. 7 U.S.C. § 2(a)(1)(A) (emphasis added). This Court has held that a similar provision supports a "logical inference" of preemption. *Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 194-196 (9th Cir. 2013). Defendants ignore that authority. They also ignore that Congress added the proviso to reject the meaning Defendants ask this Court to accept. *See* S. Rep. No. 93-1131, at 6 (1974) (adding the proviso to confirm that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies").

Defendants rely (at 46) on Sections 16(e)(2) and 16(h)(2), but both provisions support Kalshi. Section 16(e)(2) "preempt[s]" state "gaming" and "bucket shop[ ]" laws as to "excluded"—off-DCM—transactions. Congress's enactment of this provision in 2000 turned critically on its recognition that "the current" CEA already "supersedes and preempts" those state laws "in the case of transactions conducted on a registered entity" but not as to excluded transactions. H.R. Rep. No. 106-711, pt. 2, at 71 (2000). Similarly,

24

Section 16(h)(2) prevents states from applying insurance law to swap trans-actions—including swaps traded over-the-counter rather than on a DCM. *See* 7 U.S.C. §§ 7b-3(d)(1), (2).

Kalshi's position does not, as Defendants claim (at 46), render these two express-preemption provisions "superfluous." They both ensure that ex-cluded off-DCM transactions are shielded from state laws, just as on-DCM transactions have been since 1974. Nor does *Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995), support using one express preemption clause to over-ride another. That case held that an express preemption provision supported an "inference," not even "a rule," that Congress did not otherwise intend "im-plied pre-emption." *Id*. at 289. It does not suggest that courts should ignore a broad express-preemption provision where Congress later complements it with a narrow one.

2. Defendants next suggest (at 45) that Section 2(a) preempts some state laws, but not state "gaming" laws. Defendants provide no basis for that "gaming" exception to the CEA, nor do they explain how this argument can be reconciled with their principal argument that the exclusive-jurisdiction provision is not a preemption provision at all. Defendants note (at 45) that the exclusive-jurisdiction provision "says nothing about state gaming law," but that is because it preempts *all* state regulation of trading on DCMs,

25

making it unnecessary to specify every type of state law that is preempted. Field preemption does not permit a "case-by-case analysis" of which state laws Congress may have silently wished to preserve. *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 475 (4th Cir. 2014) (citation omitted).

The Special Rule makes clear that contracts involving "gaming" fall within CFTC jurisdiction. As Defendants themselves acknowledge (at 49), the Special Rule "*allows* the CFTC to require DCMs to delist contracts" that involve gaming (emphasis added). It therefore also allows the CFTC to permit such contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). While Defendants claim (at 49) the Special Rule "reflects an affirmative intent to *preserve* state laws," it in fact authorizes only *the CFTC* to bar contracts where the underlier violates state law, only if *the CFTC* concludes they are contrary to the public interest. *See KalshiEX*, 2024 WL 4164694, at *12 (describing the interpretation espoused by Defendants as not "plausible" given that "the CEA specifically preempts the application of state law over derivative markets").

Defendants are wrong (at 53) that preemption of state gaming law would "impliedly repeal" IGRA and the Wire Act. These statutes do not apply to trading on DCMs, as UIGEA confirms. Defendants note (at 54) that UIGEA does not "alter[ ], limit[ ], or extend[ ]" other federal or state laws, 31 U.S.C. § 5361(b), but Kalshi does not contend otherwise. Instead, UIGEA

confirms Congress's judgment that on-DCM transactions are not bets or wagers to begin with. Defendants cannot explain why Congress would have exempted "any transaction conducted on" a DCM from UIGEA, 31 U.S.C. § 5362(1)(E)(ii), if Congress intended the very same transactions to be subject to criminal penalties under other federal laws. The Northern District of California recently rejected an IGRA challenge to Kalshi's contracts for this reason, explaining that it was not an implied repeal, but an exercise of the "duty of the courts" to "regard each [statute] as effective" rather than create unnecessary conflict. *Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162, 2025 WL 3141202, at *6 (N.D. Cal. Nov. 10, 2025) (citation omitted).

Defendants argue (at 48) the CEA does not provide a comprehensive regulatory scheme "for gaming." But that is not the question. As Defendants do not dispute, the CEA provides a comprehensive regulatory scheme *for trading on DCMs*. Given that comprehensive scheme, Congress did not "contemplate that there will be a need for *any* supplementary regulation by the States." H.R. Rep. No. 93-1383, at 36 (emphasis added). While Defendants believe (at 51) Kalshi's contracts *should* be regulated as gaming, that is not their decision to make. Defendants are free to submit comments to the CFTC when it initiates its event-contracts rulemaking, but they may not substitute their judgment for Congress's.

27

Defendants brush past the radical implications of their position. Dozens of states a century ago sought to regulate futures trading as "gambling in grain." *Dickson,* 288 U.S. at 197; *see* Opening Br. Addendum B. Even Defendants concede (at 51) that "some States attempted to regulate [futures trading] under state gaming laws." If the CEA does not preempt state gaming law, nothing would prevent state regulators from reprising that practice. Defendants assert (at 53) they are "not seeking to regulate interest-rate swaps or pork futures." But their theory would allow them to do precisely that, along with 49 other state regulators. And while Defendants claim to target only sports and election contracts, Defendants have obtained TROs against other companies in state court prohibiting them from offering *any* event contracts, on the asserted ground that *all* event contracts violate state gambling laws. *See* Dkt. 62.2 (Ex. C to Admin. Stay Mot.). Event contracts are quintessential derivatives spelled out in the CEA's text as subject to CFTC jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). Defendants' efforts to prohibit all event contracts illustrate their theory's limitlessness.

3. Late in their brief, Defendants concede (at 53) that "state attempts to regulate *bona fide* commodity derivatives" under gambling laws "would be preempted." This is a significant concession. It means that state gambling laws would be preempted if Kalshi's contracts qualify as swaps or other

derivatives. It thus demonstrates that Defendants' preemption argument is incorrect, and that their only theory is that Kalshi's contracts are not "*bona fide*" derivatives—a judgment the CEA does not entrust to states.

The term "*bona fide*" derivative is made up; it is simply a rearticulation of the district court's observation that "I know it when I see it." 1-ER-17. The grain futures Defendants now concede are *bona fide* derivatives were once considered a "species of gambling" as well. *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888). Defendants claim that sports and election betting is "a form of entertainment," but the same thing was said of bucket shops a century ago. Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 663 (1982) (bucket shops were considered "gambling den[s], and nothing else" (citation omitted)). Defendants offer no limiting principle to prevent them from deploying state gambling laws to bar all futures trading, even though they themselves agree that would be preempted.

## B. Nevada's Gaming Laws Conflict With The CEA.

1. Compliance with Nevada law is impossible for Kalshi. As a nation-wide exchange that facilitates trades between users across the country, Kalshi cannot limit trading geographically as Defendants demand. Comply-ing with such a geographical limitation—plus those of 49 other states—would create fragmented markets with separate liquidity pools, resulting in the

29

same contracts trading at different prices in different places. Fifty different siloed markets would be anathema to the "interstate and international commerce" that informs the "national public interest" served by derivatives. 7 U.S.C. § 5(a). And offering different prices in each state for the same contract would violate Kalshi's obligation to provide "impartial access" to its DCM. 17 C.F.R. § 38.151(b).

Defendants hardly dispute (at 55-56) that Nevada's geographical restrictions are conflict-preempted, but they claim that Nevada's other licensing requirements should survive. Defendants provide no basis to conclude Kalshi could obtain a license without complying with Nevada's geographical limitations, but even if it could, it would still be impossible for Kalshi to comply with 50 different sets of licensing standards, cash-reserve requirements, and more. Defendants cite the district court's belief that the CFTC is unlikely to "take *adverse action* against Kalshi for complying with court orders" to limit access to its exchange, 1-ER-26 (emphasis added), but the district court never explained how DCMs could comply with 50 state licensing regimes.

2. Letting each state regulate DCMs differently would frustrate Congress's aim of bringing futures markets "under a uniform set of regulations." *Am. Agric.*, 977 F.2d at 1156. Defendants dismiss (at 57-58) "uniformity" as "a field-preemption argument, not a conflict-preemption argument." But, as

30

Kalshi explained, Opening Br. 36-37, courts find "conflict preemption" where "[t]he application of different state standards would disrupt the nationally uniform administration" provided by a federal statute. *Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390, 395-396 (9th Cir. 2002). Defendants fail to respond. They argue without elaboration (at 50) that "Nevada's licensing requirements do not" "directly affect trading on or the operation of" a DCM (quoting *Am. Agric.*, 977 F.2d at 1156). But that cannot be taken seriously—Defendants seek to use state law to *outright ban* trading on DCMs, as their recent state-court TRO requests confirm.

3. State attempts to regulate Kalshi's contracts as "gaming" interfere with Congress's chosen "method of enforcement." *Arizona*, 567 U.S. at 406. Defendants are wrong (at 58) that this form of preemption occurs only "when a State seeks to supplement federal enforcement of conduct that violates federal law." In *Arizona*, Congress had struck a "careful balance" with respect to "unauthorized employment of aliens" by subjecting this conduct to civil but not criminal penalties, and allowing a state to impose criminal penalties for the same conduct "interfere[d]" with that balance. *Id.* Likewise here, Congress granted the CFTC discretion to determine whether event contracts that "involve" "gaming" should be allowed to trade subject to its public-interest determination. 7 U.S.C. § 7a-2(c)(5)(C)(i). If 50 states could

31

*criminally prosecute* DCMs for offering contracts that any state concludes are contrary to the public interest, the CFTC's exclusive jurisdiction to make a public-interest judgment would be meaningless.

### C.   No Presumption Against Preemption Applies.

Because evidence of Congress's preemptive intent would overcome a presumption even if it applied, this Court need not decide whether a presumption applies.  But if the Court reaches the issue, no presumption applies, for two reasons.

*First*, where a statute "'contains an express pre-emption clause,' [courts] do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'"  *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016); *accord Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024).  Defendants' only response is to assert (at 44) that "Kalshi does not argue that the CEA expressly preempts Nevada gaming law."  That is a mystifying assertion.  Kalshi explained that field preemption can be "express" or "implied," and argued that "the CEA preempts the field of regulating trading on DCMs—both through its express text and by setting out a comprehensive scheme that displaces state regulation." Opening Br. 27.

32

*Second*, a presumption applies only when "the field which Congress is said to have pre-empted has been traditionally occupied by the States." *United States v. Locke*, 529 U.S. 89, 108 (2000) (citation omitted). While Defendants assert (at 6) that "regulating gaming" is within states' traditional "police powers," the Sixth Circuit recently rejected a similar argument, noting that because "*interstate* gambling isn't a traditional area of state regulation, the presumption against preemption doesn't apply." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025).

## III. THE REMAINING PRELIMINARY-INJUNCTION FACTORS FAVOR KALSHI.

Kalshi will suffer irreparable harms absent an injunction, and those irreparable harms easily outweigh Defendants' alleged harms, most of which are not cognizable given that the laws Defendants seek to enforce against Kalshi are preempted. Kalshi has at minimum raised "serious questions" on the merits, 1-ER-25, which makes an injunction warranted because the "balance of hardship tips sharply" in Kalshi's favor. *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) (citation omitted).

1. Kalshi will suffer myriad irreparable harms absent an injunction. Most obviously, the "threat of prosecution" under a preempted statute constitutes irreparable harm. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015

(9th Cir. 2013). Defendants suggest (at 63) that Kalshi must demonstrate that "a prosecutor" is likely "imminent[ly]" to "seek criminal charges." But Defendants invent this obligation. This Court has found a "credible threat of prosecution" where a plaintiff established that its conduct "fall[s] within the plain language of" state law "prohibitions." *Id.* (citation modified). Here, Defendants themselves informed Kalshi that its conduct is a "felony." 2-ER-98. Nor does Defendants' conspicuously caveated representation (at 62) that they do not "at this point" wish to prosecute Kalshi provide a basis for with-holding relief.

Even if the State does not initiate a criminal prosecution, a state civil enforcement proceeding would subject Kalshi to irreparable harm. Defend-ants dispute this harm (at 61) on the ground that "Kalshi could raise any po-tential defense" in the state proceeding. That argument contravenes *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), which makes clear that an entity suffers irreparable harm where it faces a "Hobson's choice" between violating state law and exposing itself "to potentially huge liability," or suf-fering "the injury of obeying the law during the pendency of the proceedings." *Id.* at 381. Defendants' theory would mean a preliminary injunction is *never* available in preemption cases, because a party in such cases may *always* raise preemption as a defense in a state proceeding. Defendants' sole

34

support for their argument is an out-of-circuit district court case that did not involve preemption and instead involved an assertion that the plaintiff was "being harmed by the CFPB's allegedly unconstitutional structure even" absent any enforcement proceeding—an entirely different theory. *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203 (D.D.C. 2017).

Defendants' own actions underscore Kalshi's irreparable harm. In recent weeks, Defendants have obtained *ex parte* TROs against two other companies prohibiting them from offering not just sports and election contracts, but *all* event contracts in Nevada. Dkt. 57. Defendants have declared their intention to renege on a commitment to Kalshi not to initiate enforcement while its stay motion is pending. *See* Dkt. 60. If permitted, such immediate *ex parte* relief would clearly cause Kalshi irreparable harm. And while Defendants (at 62) falsely attribute to Kalshi the position that "it will not stop operating in Nevada—no matter what this Court says—until State Defendants bring a state-court enforcement action," the memorandum Defendants cite says nothing of the kind. *See* 1-StateSER-5.

As to the cost of geofencing, Defendants argue (at 59) that other companies—which are *not* DCMs—pay these costs and that they would not be financially ruinous. But Defendants do not dispute that geofencing would cost Kalshi tens of millions annually or that Kalshi could not recoup those costs

35

from Defendants were it to prevail. "The analysis focuses on irreparability, 'irrespective of the magnitude of the injury.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (citation omitted). Defendants' claim (at 2) that courts do not enjoin preempted state laws to protect businesses from financial harm is false. This Court, for example, has granted a preliminary injunction to prevent businesses from "incur[ring] large costs" and "chang[ing] the whole nature of [their] business[es]" to comply with likely-preempted state law. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058-59 (9th Cir. 2009).

Defendants dismiss (at 59-60) the significant harms Kalshi would suffer from terminating trading for Nevada users as "speculation." But Kalshi has offered detailed evidence explaining why abruptly forcing users out of positions would harm Kalshi, its users, and its business partners. 2-ER-62-63. Defendants offer no reason to doubt that evidence. Defendants claim that Kalshi's harms are self-inflicted because Kalshi is violating state law, but in *every* preemption case, a party violates state law on the ground that federal law governs. Defendants' assertions of a self-inflicted injury are especially untenable given that Kalshi acted in reliance on two preliminary injunctions—in Nevada and New Jersey—holding that the CEA likely preempts state regulation of its contracts.

36

Defendants point to (at 60) agreements by Crypto.com and Robinhood "to temporarily restrict operations in Nevada, including closing existing contracts." Neither agreement calls Kalshi's harm into question. Robinhood has asked this Court for an injunction pending appeal because this agreement subjects it to "irreparable harm." Mot. for Inj. Pending Appeal at 3, Dkt. 10, *Robinhood Derivatives, LLC v. Dreitzer*, No. 25-7831 (9th Cir. Dec. 24, 2025). And neither company is similarly situated to Kalshi. Robinhood is not a DCM and therefore is not subject to impartial-access obligations. And Crypto.com's principal business is cryptocurrency trading, not event contracts, giving it very different incentives to acquiesce to state regulatory demands. While Defendants reprise (at 60-61) the district court's speculation that the CFTC may not act against Kalshi if it ceases to operate in Nevada pursuant to a court order, Defendants cannot plausibly contend that being ejected from 50 different states would not be irreparably harmful.

2. By contrast, Defendants' claimed harms are either nonexistent or reparable. To begin, their assertion (at 63) that they suffer irreparable harm "every day" is simply not credible given their decision not to appeal the preliminary injunction. They explain (at 67) this "delay" by alleging that Kalshi "'greatly expanded' its operations" following the preliminary injunction. But

37

they claimed "irreparable harm" from Kalshi's conduct *before* Kalshi obtained a preliminary injunction, D. Ct. Dkt. 34 at 23, yet did not appeal.

Defendants emphasize (at 63) "Nevada's sovereignty" and "the democratic will of the people." But states have no legitimate interest in "violat[ing] the requirements of federal law." *Valle del Sol*, 732 F.3d at 1029 (citation omitted). To the contrary, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) (citation omitted). If Defendants were correct that Nevada's purported sovereign interests forbid an injunction here, preempted state laws could never be enjoined.

Defendants (at 67) point to lost tax revenues. But they concede (at 67) they can "disgorge[ ]" Kalshi's profits in a state-court proceeding if this Court finds no preemption, meaning their purported financial harm—unlike Kalshi's—is quintessentially reparable.

Defendants assert (at 64) harms to the gaming industry, but Nevada sportsbook revenue has been "surg[ing]." Chris Altruda, *Football Keys October Surge in Nevada Sportsbook Revenue*, In Game (Nov. 25, 2025), https://perma.cc/8JFH-FGB4. Intervenor, whose members include Nevada gaming businesses, likewise fails to identify any evidence that Kalshi's operations have disadvantaged its members in any way.

38

Defendants cite (at 64-65) a threat to the "integrity of gaming." They state (at 65) that the "CFTC generally leaves DCMs to self-regulate." But in fact, DCMs are subject to extensive CFTC regulation and oversight. *See* Opening Br. 15-17. Kalshi prohibits insider trading. 3-ER-159-161. And none of the "scandals" Defendants reference (at 65) had anything to do with Kalshi or prediction markets—they involved state-regulated sportsbooks. 1-ER-21. Defendants (at 65) point to an incident relating to a Kalshi contract that does not involve sports or elections, and thus has nothing to do with the integrity of any of the contracts Defendants seek to prohibit.

Defendants' claimed harm (at 65) to "the public" fares no better. Kalshi is bound by CFTC Core Principles to prevent "manipulation, price distortion, and disruptions" on its exchange to protect the integrity of trading. 17 C.F.R. § 38.250. Kalshi also lets users self-exclude from trading, take trading breaks, and set personal funding caps that limit deposits to Kalshi. 2-ER-59. Though Defendants attempt (at 66) to minimize these measures, the only concrete difference they identify is that 18-year-olds can trade on Kalshi. But many states (including in this Circuit) allow 18-year-olds to place sports bets. *See, e.g.*, Mont. Code Ann. § 23-7-110(3). Letting adults trade on Kalshi does not cause the public irreparable harm.

39

## CONCLUSION

The dissolution order should be reversed.

Date: February 13, 2026

GRANT R. MAINLAND
ANDREW L. PORTER
DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

DENNIS L. KENNEDY
PAUL C. WILLIAMS
BAILEY ❖ KENNEDY
8984 Spanish Ridge Ave.
Las Vegas, NV 89148

/s/ Neal Kumar Katyal

NEAL KUMAR KATYAL
JOSHUA B. STERLING
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellant
KalshiEX, LLC*

40

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-7516

I am the attorney or self-represented party.

**This brief contains** 8,376 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

● complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☒ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Neal Kumar Katyal     **Date** 2/13/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*