**Nos. 25-7187, 25-7516, 25-7831**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NORTH AMERICAN DERIVATIVES EXCHANGE, INC., d/b/a
Crypto.com | Derivatives North America,
*Plaintiff-Appellant*,

v.

STATE OF NEVADA, on Relation of the NEVADA GAMING
CONTROL BOARD; MIKE DREITZER, in his official capacity as
Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in
his official capacity as a member of the Nevada Gaming Control Board;
CHANDENI K. SENDALL, Deputy City Attorney, in her official
capacity as a member of the Nevada Gaming Control Board; AARON D.
FORD, in his official capacity as Attorney General of Nevada,
*Defendants-Appellees*,

NEVADA RESORT ASSOCIATION,
*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court for the
District of Nevada, No. 2:25-cv-978 (Hon. Andrew P. Gordon)

**STATE DEFENDANTS' ANSWERING BRIEF**

Nicole A. Saharsky
Minh Nguyen-Dang
Matthew Bisanz
Wajdi C. Mallat
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000

Rory K. Schneider
Alexander S. Mendelson
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

Aaron D. Ford
 Attorney General of Nevada
Heidi Parry Stern
 Solicitor General
Jessica E. Whelan
 Chief Deputy Solicitor General—
 Litigation
Sabrena K. Clinton
Abigail L. Pace
State of Nevada,
 Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 3

STATEMENT OF THE ISSUE .......................................................... 3

STATUTORY AND REGULATORY AUTHORITIES ....................... 3

STATEMENT OF THE CASE ........................................................... 3

    A.   Legal Background ............................................................... 3

        1.   Nevada Comprehensively Regulates Gaming ......................... 3

        2.   The CFTC Regulates Commodity Futures Trading ............... 6

    B.   Factual Background ............................................................ 9

    C.   Procedural History ........................................................... 11

SUMMARY OF THE ARGUMENT ................................................. 12

STANDARD OF REVIEW .............................................................. 17

ARGUMENT .................................................................................. 18

I.   CRYPTO.COM IS NOT LIKELY TO SUCCEED ON THE MERITS ..................................................................................... 18

    A.   Crypto.com's Sports Contracts Are Not "Swaps" or "Option[s]" Under the CEA ............................................... 20

        1.   The CFTC Does Not Have "Exclusive Jurisdiction" Over Any Contract Traded on a DCM ............................................. 20

        2.   Crypto.com's Contracts Are Not "Swaps" ............................ 21

            a.   Crypto.com's interpretation is contrary to the statutory text ............................................................. 22

            b.   Crypto.com's interpretation makes no sense in context .................................................................... 30

            c.   Crypto.com's interpretation is inconsistent with Congress's purposes and the CFTC's regulations ......... 32

        3.   Crypto.com's Contracts Are Not "Option[s]" ...................... 34

        4.   Crypto.com's Position Would Require All Sports Betting to Be Regulated Only by the CFTC ...................................... 35

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

5. The CFTC's Arguments About "Swaps" and "Options" Are Unpersuasive ......................................................................39

6. This Court Can Decide the Threshold Issue of Whether the CEA Applies .........................................................................43

B. The CEA Does Not Preempt State Gaming Law ...........................46

1. There Is No Evidence That Congress Intended To Federalize All Sports Betting ...................................................46

2. Express Preemption Does Not Apply ....................................48

3. Field Preemption Does Not Apply .........................................53

4. Conflict Preemption Does Not Apply ....................................55

    a. It is not impossible for Crypto.com to comply with Nevada law and the CEA ................................................55

    b. Enforcing Nevada gaming law does not pose an obstacle to the CEA's objectives .....................................57

5. Crypto.com's View Would Require Impliedly Repealing Other Important Federal Laws ...............................................58

6. The CFTC's Preemption Arguments Are Unpersuasive .......60

II. THE BALANCE OF HARDSHIPS WEIGHS HEAVILY AGAINST CRYPTO.COM........................................................................61

A. Crypto.com Identifies No Irreparable Harm...............................61

B. The Balance of Equities and Public Interest Favor State Defendants ......................................................................................63

III. THE COURT SHOULD NOT REVERSE THE DENIAL OF JUDGMENT ON THE PLEADINGS................................................66

CONCLUSION ..............................................................................................68

ADDENDUM

Statutory and Regulatory Authorities.................................................1a

State Court Orders................................................................................21a

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Aargon Agency, Inc. v. O'Laughlin,*
70 F.4th 1224 (9th Cir. 2023)................................................................48

*Adidas Am., Inc. v. Skechers USA, Inc.,*
890 F.3d 747 (9th Cir. 2018) ................................................................18

*Ah Sin v. Wittman,*
198 U.S. 500 (1905) ..............................................................................19

*Al Otro Lado v. Wolf,*
952 F.3d 999 (9th Cir. 2020) ................................................................62

*Altria Grp., Inc. v. Good,*
555 U.S. 70 (2008) ..........................................................................20, 48

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.,*
977 F.2d 1147 (7th Cir. 1992) ..............................................................54

*Am. Apparel & Footwear Assoc. v. Baden,*
107 F.4th 934 (9th Cir. 2024)....................................................49, 55, 57

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
148 F.4th 648 (9th Cir. 2025)...............................................................63

*Angelotti Chiropractic, Inc. v. Baker,*
791 F.3d 1075 (9th Cir. 2015) ..............................................................67

*Arizona v. United States,*
567 U.S. 387 (2012) ..............................................................................58

*Artichoke Joe's Cal. Grand Casino v. Norton,*
353 F.3d 712 (9th Cir. 2003) ..........................................................19, 36

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra,*
870 F.3d 1140 (9th Cir. 2017) ..............................................................48

*Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.,*
972 F.3d 83 (D.C. Cir. 2020) ...............................................................44

## TABLE OF AUTHORITIES
### (continued)

**Cases (continued)**                                                    **Page(s)**

*Big Lagoon Rancheria v. California,*
  789 F.3d 947 (9th Cir. 2015) ....................................................................45

*Bond v. United States,*
  572 U.S. 844 (2014) ...........................................................................20, 47

*Cal. Save Our Streams Council, Inc. v. Yeutter,*
  887 F.2d 908 (9th Cir. 1989) ....................................................................51

*Carter v. Carter Coal Co.,*
  298 U.S. 238 (1936) ...................................................................................46

*CFTC v. Noble Metals Int'l, Inc.,*
  67 F.3d 766 (9th Cir. 1995) ........................................................................6

*CFTC v. White Pine Tr. Corp.,*
  574 F.3d 1219 (9th Cir. 2009) ................................................................7, 35

*China Unicom (Americas) Operations Ltd. v. FCC,*
  124 F.4th 1128 (9th Cir. 2024)...................................................................39

*Chinaryan v. City of L.A.,*
  113 F.4th 888 (9th Cir. 2024)....................................................................67

*Does 1-5 v. Chandler,*
  83 F.3d 1150 (9th Cir. 1996) .....................................................................18

*Drapich v. Donovan,*
  693 F.2d 1296 (9th Cir. 1982) ...................................................................26

*Duke Energy Trading & Mktg., L.L.C. v. Davis,*
  267 F.3d 1042 (9th Cir. 2001) ...................................................................51

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ...................................................................................40

*Epic Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018) ...................................................................................58

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**            **Page(s)**

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) ...............................................................46, 54

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024)...................................................17

*Flynt v. Bonta*,
131 F.4th 918 (9th Cir. 2025).............................................19, 47

*Freightliner Corp. v. Myrick*,
514 U.S. 280 (1995) ...................................................................50

*Geneva Assur. Syndicate, Inc. v. Med. Emergency Servs. Assocs.*
*(MESA) S.C.*,
964 F.2d 599 (7th Cir. 1992) ...................................................43

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
527 U.S. 173 (1999) ......................................................20, 47, 55

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) ...................................................................36

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) .................................................62

*Hughes Props. v. State*,
100 Nev. 295 (1984) ...................................................................11

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) ...................................................................51

*Hunter v. FERC*,
711 F.3d 155 (D.C. Cir. 2013) ..................................................50

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987) ...................................................................52

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                    **Page(s)**

*Inv. Co. Inst. v. CFTC,*
  891 F. Supp. 2d 162 (D.D.C. 2012) ..........................................................32

*John Doe Co. v. CFPB,*
  235 F. Supp. 3d 194 (D.D.C. 2017) ..........................................................62

*KalshiEX LLC v. Flaherty,*
  2025 WL 1218313 (D.N.J. Apr. 28, 2025) ................................................19

*KalshiEX LLC v. Martin,*
  793 F. Supp. 3d 667 (D. Md. 2025) ...................................................*passim*

*KalshiEX LLC v. Orgel,*
  2026 WL 474869 (D. Tenn. Feb. 19, 2026)...............................................19

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ..........................................................................39, 44

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803).............................................................44, 46

*Massachusetts v. KalshiEX LLC,*
  2026 WL 188019 (Mass. Super. Ct.
  Suffolk Cnty. Jan. 20, 2026) ......................................... 19, 53, 54, 58, 62

*Medtronic, Inc. v. Lohr,*
  518 U.S. 470 (1996) ...................................................... 19, 46, 48, 53, 61

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
  456 U.S. 353 (1982) ...................................................................7, 49, 55

*Mississippi v. Louisiana,*
  506 U.S. 73 (1992) .............................................................................51

*Montalvo v. Spirit Airlines,*
  508 F.3d 464 (9th Cir. 2007) ...............................................................58

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                            **Page(s)**

*Murphy v. NCAA,*
584 U.S. 453 (2018) .................................................................*passim*

*Nat'l Fed'n of the Blind v. United Airlines Inc.,*
813 F.3d 718 (9th Cir. 2016) ...................................................53

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
461 U.S. 190 (1983) ...................................................................55

*In re Palmer,*
207 F.3d 566 (9th Cir. 2000) ...................................................44

*Rissetto v. Plumbers & Steamfitters Loc. 343,*
94 F.3d 597 (9th Cir. 1996) ..................................................... 34

*Roberts v. Sea-Land Servs., Inc.,*
566 U.S. 93 (2012) ....................................................................23

*Sacco v. State,*
105 Nev. 844 (1989).................................................................66

*Sackett v. EPA,*
598 U.S. 651 (2023) ..................................................................48

*Sikkelee v. Precision Airmotive Corp.,*
882 F.3d 680 (3d Cir. 2016).....................................................53

*Skidmore v. Swift & Co.,*
323 U.S. 134 (1944) ..................................................................39

*Smith v. Marsh,*
194 F.3d 1045 (9th Cir. 1999) .................................................34

*Sports Form, Inc. v. Leroy's Horse & Sports Place,*
108 Nev. 37 (1992) ...................................................................64

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
566 U.S. 560 (2012) ..................................................................25

vii

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                             **Page(s)**

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n,*
322 F.3d 1039 (9th Cir. 2003) ......................................................7, 21

*United States v. Lucero,*
989 F.3d 1088 (9th Cir. 2021) ........................................................ 21

*Vietnam Veterans of Am. v. CIA,*
811 F.3d 1068 (9th Cir. 2016) ..........................................................45

*West Virginia v. EPA,*
597 U.S. 697 (2022) ..........................................................19, 41, 47

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001) ..........................................................................47

*Winter v. NRDC, Inc.,*
555 U.S. 7 (2008) ..............................................................................17

*Wyeth v. Levine,*
555 U.S. 555 (2009) ..............................................................41, 56, 58

*Yates v. United States,*
574 U.S. 528 (2015) ..............................................................23, 24, 31

*Yellow Freight Sys., Inc. v. Donnelly,*
494 U.S. 820 (1990) ..........................................................................51

**Statutes, Rules, and Regulations**

Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ................................43

    5 U.S.C. § 706..............................................................................44

Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ...............................................3

    7 U.S.C. § 1a(19)(iv)....................................................................35

    7 U.S.C. § 1a(47)(A) ..........................................................7, 22, 37

# TABLE OF AUTHORITIES
## (continued)

**Statutes, Rules, and Regulations (continued)**        **Page(s)**

7 U.S.C. § 1a(47)(A)(i) ...................................................................... 22

7 U.S.C. § 1a(47)(A)(ii) .................................................. 13, 23, 24, 27, 30

7 U.S.C. § 1a(47)(A)(iii) ................................................................22, 23

7 U.S.C. § 1a(47)(A)(iii)(XVII)...................................................................29

7 U.S.C. § 1a(47)(A)(iv).........................................................................23, 30

7 U.S.C. § 1a(47)(A)(v)...........................................................................22, 23

7 U.S.C. § 1a(47)(B)(i) ...............................................................................34

7 U.S.C. § 2(a) (1974).................................................................................7

7 U.S.C. § 2(a)(1)(A)..........................................................................*passim*

7 U.S.C. § 2(e) ..................................................................................*passim*

7 U.S.C. § 5(a) ....................................................................................54

7 U.S.C. § 6(a) ................................................................................8, 55

7 U.S.C. § 6c(c)..............................................................................36, 37, 38

7 U.S.C. § 7 (1936) ..................................................................................6

7 U.S.C. § 7a-2(c)(1)................................................................................8

7 U.S.C. § 7a-2(c)(2) ...........................................................................8, 44

7 U.S.C. § 7a-2(c)(5)............................................................................8, 53

7 U.S.C. § 7a-2(c)(5)(C)(i) ..................................................................31, 52

7 U.S.C. § 13.........................................................................................30

7 U.S.C. § 13a-2(1).................................................................................45

# TABLE OF AUTHORITIES
## (continued)

**Statutes, Rules, and Regulations (continued)**      **Page(s)**

7 U.S.C. § 16(e)(2) ...................................................................................50, 53

7 U.S.C. § 16(h)(2) ........................................................................................50

15 U.S.C. § 3001(a)(1) ...................................................................................47

Wire Act, 18 U.S.C. § 1084.............................................................................58

18 U.S.C. § 1084(a) ........................................................................................59

Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ...........................58

25 U.S.C. § 2701(5) ........................................................................................59

25 U.S.C. § 5108 ............................................................................................45

25 U.S.C. § 5131 ............................................................................................45

28 U.S.C. § 1292(b).........................................................................................67

Professional and Amateur Sports Protection Act,
28 U.S.C. § 3701 *et seq.* .............................................................................5

30 U.S.C. § 1254(a)(3) ...................................................................................51

30 U.S.C. § 1254(g).........................................................................................51

Unlawful Internet Gambling Enforcement Act,
31 U.S.C. § 5361 *et seq.* ...........................................................................59

31 U.S.C. § 5361(b) ........................................................................................60

31 U.S.C. § 5362(1)(E)(ii) ...............................................................................60

31 U.S.C. § 5363 ............................................................................................59

Pub. L. No. 74-675, § 3, 40 Stat. 1491, 1491 (1936) ......................................6

Pub. L. No. 93-463, § 201(b), 88 Stat. 1389 (1974) ........................................6

# TABLE OF AUTHORITIES
### (continued)

**Statutes, Rules, and Regulations (continued)**        **Page(s)**

Pub. L. No. 111-203, pt. II, 124 Stat. 1376, 1658-754 (2010) ........................7

17 C.F.R. § 1.3.................................................................................................33

17 C.F.R. § 33.3(a) ...............................................................................8, 36, 37

17 C.F.R. § 38.4(b) .........................................................................................34

17 C.F.R. § 38.151(b) .....................................................................................56

17 C.F.R. § 40.2(a)(2) ................................................................................8, 44

17 C.F.R. § 40.2(c)............................................................................................8

17 C.F.R. § 40.11...................................................................................... 40, 43

17 C.F.R. § 40.11(a) ........................................................... 8, 31, 52, 62

17 C.F.R. pt. 38, App'x C ...............................................................................34

NRS § 293.830 ..................................................................................................5

NRS § 463.0129(1)(a) .................................................................................3, 66

NRS § 463.0129(1)(b) .................................................................................4, 63

NRS § 463.0129(1)(c) .................................................................................4, 63

NRS § 463.0193 ................................................................................................5

NRS § 463.01962 ..............................................................................................5

NRS § 463.160(1) ..............................................................................................4

NRS § 463.343 ................................................................................................63

NRS § 463.350(1)(a) ....................................................................................4, 65

1959 Nev. Stat. 427 ..........................................................................................4

# TABLE OF AUTHORITIES
## (continued)

**Statutes, Rules, and Regulations (continued)**       **Page(s)**

Nev. Gaming Reg. 5.170..............................................................................5, 42

Nev. Gaming Reg. 22.1201(2)(c) ....................................................................64

Nev. Gaming Reg. 22.1205...........................................................................5, 64

Nev. Gaming Reg. 22.121................................................................................5

**Other Authorities**

156 Cong. Rec. S5906 (July 15, 2010) ......................................... 8, 31, 33, 48

Am. Gaming Ass'n, *State of the States 2025* (May 13, 2025)...............5, 6, 47

Kendall Baker, *NCAA President Charlie Baker on Sports Betting*,
    Yahoo! Sports (Dec. 11, 2025) ...............................................................65

Dan Bernstein, *A Frequent Kalshi Claim Is Being Undermined by*
    *Nevada, CFTC*, Sportico (Nov. 12, 2025). ............................................56

Dan Bernstein & Eben Novy-Williams, *Fanatics Launches a*
    *Prediction Market-Without the G-Word*, Sportico (Dec. 3, 2025)............57

*Black's Law Dictionary* (12th ed. 2024) ........................................................7

Mick Bransfield, *Summary of Legal Actions Involving Sports Event*
    *Contracts* (Jan. 21, 2026) ........................................................................62

CFTC, *Acting Chairman Pham Announces First-Ever Listed Spot*
    *Crypto Trading on U.S. Regulated Exchanges* (Dec. 4, 2025) ................21

CFTC, *Designated Contract Market Products-CDNA* .................................34

*CFTC Reauthorization: Stakeholder Perspectives Before the H.*
    *Comm. on Agric.*, 119th Cong. (2025).......................................................65

Chi. Mercantile Exch., *Rulebook* ..................................................................21

# TABLE OF AUTHORITIES
### (continued)

**Other Authorities (continued)**        **Page(s)**

Concept Release on the Appropriate Regulatory Treatment of Event
Contracts, 73 Fed. Reg. 25669 (May 7, 2008) ...................................26, 35

Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and
Consumer Protection Act* (2017)................................................................7

Core Principles and Other Requirements for DCMs, 75 Fed. Reg.
80572 (Dec. 22, 2010) ...............................................................................56

Crypto.com, *Market Makers Program* ...........................................................11

Crypto.com, *Sports Combos* ..........................................................................28

Crypto.com, *Terms & Conditions* (Mar. 17, 2025)..................................56, 65

Deloitte, *Hedge Accounting* (2025) ...............................................................25

Event Contracts, 89 Fed. Reg. 48968
(proposed June 10, 2024) ................................................. 8, 40, 41, 43, 54

Further Definition of "Swap," 77 Fed. Reg. 48208-01
(Aug. 13, 2012) .........................................................................................33

Becky Harris & Husna Alikhan, *Nevada, Over 60 Years Regulating
Gambling-A Jurisdictional Overview*, 23 Gaming L. Rev. 645
(2019)......................................................................................................3, 4

Sam Learner, *Prediction Markets Barely Make Money; Sportsbooks
Make Money*, Fin. Times (Dec. 19, 2025) ...............................................11

Nev. Gaming Control Bd., *Monthly Revenue Report* (Nov. 2025) .................5

Nev. Resort Ass'n, *2025 Nevada Gaming Fact Book* (2025)...................5, 66

Emily Nicolle, *Crypto.com Hiring Sports Market Maker to Trade
Against Customers*, Bloomberg Law News (Dec. 23, 2025). ...................11

Emily Nicolle & Justina Lee, *Coinbase CEO Stunt Exposes
Prediction Market Vulnerability*, Bloomberg (Oct. 31, 2025) .................65

# TABLE OF AUTHORITIES
## (continued)

**Other Authorities (continued)**        **Page(s)**

*Oxford English Dictionary* (2025) ......................................................24, 27

Provisions Common to Registered Entities,
    76 Fed. Reg. 44776-01 (July 27, 2011) ...................................................31

Sean Treppedi, *FanDuel Launching Prediction Markets App to
    Target Non-Sports Betting States*, N.Y. Post (Nov. 13, 2025),
    perma.cc/T9MM-F7RG...............................................................................57

*Webster's New World College Dictionary* (4th ed. 2004) ................. 24, 25, 27

**INTRODUCTION**

On Crypto.com, a user can buy a contract on whether North Carolina State will beat Duke in an upcoming men's basketball game, on whether Arsenal will win the English Premier League this season, and on whether Shai Gilgeous-Alexander will be this year's NBA MVP. That is sports betting, and everyone who sees it knows it.

But Crypto.com does not comply with the gaming laws in Nevada, or any other State. Instead, it argues that it can only be regulated by the Commodity Futures Trading Commission (CFTC). That is wrong. The CFTC is responsible for regulating trading in commodity futures, not gambling. Nothing in the Commodity Exchange Act (CEA) shows that Congress intended to take away the States' and Indian Tribes' historic powers to regulate gambling and give them all to the CFTC. Indeed, Crypto.com's sports bets are not even within the CFTC's jurisdiction, so its preemption argument fails at the outset.

The implications of Crypto.com's position are truly staggering. Under Crypto.com's view of the CEA, *all* sports wagers are "swaps" that can be regulated *only* by the CFTC. According to Crypto.com, when Congress amended the CEA in response to the financial crisis, it both legalized sports betting nationwide and made the CFTC the Nation's sole gaming regulator. And then no one noticed for over a decade—not even the Supreme Court, which reaffirmed the States' historic power to regulate sports betting in

1

*Murphy v. NCAA*, 584 U.S. 453 (2018). Congress did not secretly preempt all state gaming regulation in a law about commodity-futures trading.

The CFTC has never regulated sports betting, and indeed it previously disclaimed that authority and promulgated a regulation banning gaming contracts on its markets. But now the CFTC has filed an *amicus* brief asserting that it *is* a gaming regulator. The CFTC offers no explanation for its abrupt about-face, and its brief fails to address even the most basic problems with its position, such as its inconsistency with the CFTC's own binding regulation, its extreme consequences, and its complete disregard of States' longstanding authority to regulate gambling.

Apart from the merits, a preliminary injunction is not warranted because the balance of equities tips heavily against Crypto.com. Crypto.com just wants to keep profiting from unlicensed sports betting. That claimed harm pales in comparison to the severe and ongoing harms Crypto.com is causing Nevada, its gaming industry, and the public. Nevada's gaming industry is at the core of its economy. Crypto.com's refusal to follow the same rules as its competitors threatens the integrity of that industry and deprives Nevada of critical revenue. Crypto.com's operation also harms the public by offering gambling without Nevada's restrictions on gambling by minors, problem gambling, insider betting, and criminal conduct.

2

Crypto.com cites no decision where a court enjoined a State from enforcing a presumptively valid law to allow a private business to continue profiting from violating that law. This Court should not be the first.

## JURISDICTIONAL STATEMENT

The jurisdictional statement in Crypto.com's brief is correct.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in denying Crypto.com's motion for preliminary injunction, when (1) Crypto.com is unlikely to succeed in showing that the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, preempts Nevada gaming law with respect to Crypto.com's sports contracts, and (2) the balance of equities tips heavily against Crypto.com.

## STATUTORY AND REGULATORY AUTHORITIES

Pertinent statutes and rules are set out in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Legal Background

#### 1. Nevada Comprehensively Regulates Gaming

Nevada is the "gaming capital of the world." Becky Harris & Husna Alikhan, *Nevada, Over 60 Years Regulating Gambling—A Jurisdictional Overview*, 23 Gaming L. Rev. 645, 647 (2019) (Harris & Alikhan). The Legislature has found that "[t]he gaming industry is vitally important to the economy of the State and the general welfare of the inhabitants." NRS § 463.0129(1)(a). The "continued growth and success" of the industry "is

3

dependent upon public confidence and trust" that gaming is "conducted honestly and competitively" and "free from criminal and corruptive elements." *Id.* § 463.0129(1)(b). That confidence and trust "can only be maintained by strict regulation" of all gaming activities in Nevada. *Id.* § 463.0129(1)(c).

Nevada's comprehensive regulatory regime is the "gold standard in gaming regulation." Harris & Alikhan 645. Starting in 1869, Nevada progressively legalized gaming, first by allowing local governments to authorize gaming. *Id.* at 648. Then, in the 1940s, Nevada began regulating gaming at the state level. *Id.* at 651-54. In 1959, the Legislature centralized gaming regulation in the Nevada Gaming Control Board (Board) and the Nevada Gaming Commission. *See* 1959 Nev. Stat. 427.

Nevada law imposes stringent licensing requirements on all gaming operators. NRS § 463.160(1). The Board investigates each applicant's background to ensure that it is competent to conduct gaming, is financially sound, and is not connected to criminal activity. *Id.* §§ 463.170, 463.1405(1). The Board strictly prescribes the "games and devices" that may be offered to ensure that the games are fair and consistent with the public interest. *Id.* § 463.150(2).

Many provisions of Nevada gaming law protect the public. Only people who are at least 21 years old may gamble. NRS § 463.350(1)(a). Licensees must allow patrons to set betting limits, conspicuously display information about responsible-gaming resources, train employees to identify

4

signs of problem gaming, and refrain from marketing to customers who have excluded themselves. Nev. Gaming Reg. 5.170.

Nevada specifically regulates sports and event betting. State law permits wagering on certain organized sports events (*i.e.*, operating "sports pools"), NRS §§ 463.0193, 463.01962, but not on elections, *id.* § 293.830, or events that lack effective supervision, Nev. Gaming Reg. 22.1205. Among other things, Nevada requires licensees to verify that insiders (such as players or coaches) do not wager on their own events, and to report suspicious activity that suggests point shaving or match fixing. *Id.* at 22.1205, 22.121.

The gaming industry is vital to Nevada's economy. Licensed sports pools report more than $548 million in revenue each year. *See* Nev. Gaming Control Bd., *Monthly Revenue Report* 1 (Nov. 2025), perma.cc/DFE3-V8J4. The gaming industry accounts for over one-third of Nevada's economy and supports over 436,000 jobs. Nev. Resort Ass'n, *2025 Nevada Gaming Fact Book* 2 (2025), perma.cc/NRH9-5NGV (NRA, *Fact Book*). The industry contributes over $2 billion in taxes—over one-third of Nevada's general fund. *Id.* at 65. Those taxes pay for essential services across the State, including schools, roads, and public utilities. Am. Gaming Ass'n, *State of the States 2025*, at 85 (May 13, 2025), perma.cc/J27S-WLSB (AGA, *States*).

Before 2018, Nevada was the only State that allowed casino-style sports betting because of the Professional and Amateur Sports Protection Act (PASPA), 28 U.S.C. § 3701 *et seq. Murphy*, 584 U.S. at 462. After the

5

Supreme Court invalidated PASPA, other States became free to choose whether and to what extent they would allow sports betting. Now, 38 other States and the District of Columbia allow some form of sports betting, either statewide or only on tribal lands. *See* AGA, *States* 12-13. Other States, including California, Hawaii, and Utah, completely prohibit sports betting. *See id.*

### 2. The CFTC Regulates Commodity Futures Trading

The CFTC regulates trading in commodity derivatives—financial instruments that companies use to manage risk. It has never regulated sports betting, and indeed has prohibited gaming on its markets.

In 1936, Congress enacted the CEA to regulate trading in futures in wheat, corn, and other agricultural commodities. Pub. L. No. 74-675, § 3, 40 Stat. 1491, 1491 (1936). A "future" is a contract to buy or sell a quantity of a commodity at a specified price on a future date. *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995). Businesses use futures to hedge against price volatility. *Id.* The CEA initially authorized the Secretary of Agriculture to register "designated contract markets" (DCMs) for futures trading. 7 U.S.C. § 7 (1936).

In 1974, Congress expanded the CEA to cover nearly all commodities, including non-agricultural commodities, and to cover other derivatives, including "options." Pub. L. No. 93-463, § 201(b), 88 Stat. 1389 (1974). A "derivative" is a contract whose value depends on the performance of an

underlying asset, such as a commodity. *Black's Law Dictionary* (12th ed. 2024). An "option" is a contract that "grants to the purchaser the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price." *CFTC v. White Pine Tr. Corp.*, 574 F.3d 1219, 1226 (9th Cir. 2009) (internal quotation marks omitted).

Also in 1974, Congress created the CFTC "to consolidate federal regulation of commodity futures trading" in one agency. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386-87 (1982). Congress gave the CFTC "exclusive jurisdiction" over futures and options that are traded on DCMs or other markets. *Id.*; *see* 7 U.S.C. § 2(a) (1974).

In 2010, Congress enacted the Dodd-Frank Act in response to the financial crisis. *See* Pub. L. No. 111-203, pt. II, 124 Stat. 1376, 1658-754 (2010). In it, Congress expanded the CEA to cover "swaps." *Id.* § 722, 124 Stat. at 1672. A "swap" is an agreement between two parties to exchange (or swap) cash flows on financial obligations (such as interest payments), to hedge risk on those obligations. *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042-43 (9th Cir. 2003). Congress added "swaps" to the CEA because certain swaps, known as "credit default swaps," had exacerbated the financial crisis. Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act* 3 (2017). To capture the various forms of swaps in the market, Congress provided a detailed, six-part definition of "swap." 7 U.S.C. § 1a(47)(A).

7

If a consumer contract qualifies as a swap, option, or future, it *only* can be traded on a CFTC-registered DCM, and nowhere else. *See* 7 U.S.C. § 2(e) (swaps); *id.* § 6(a) (futures); 17 C.F.R. § 33.3(a) (options).

To offer a contract for trading, a DCM can self-certify that the contract complies with the CEA and start trading the next day, without any action by the CFTC. 7 U.S.C. § 7a-2(c)(1)-(2); *see* 17 C.F.R. § 40.2(a)(2). The CFTC can review a self-certification and disallow a contract that fails to comply with the CEA's requirements. *See* 17 C.F.R. § 40.2(c).

Congress did not want sports betting to occur on DCMs. *See, e.g.*, 156 Cong. Rec. S5906-07 (July 15, 2010). To that end, it enacted the "Special Rule," which authorizes the CFTC to disallow contracts that involve "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or (as relevant here) "gaming." 7 U.S.C. § 7a-2(c)(5).

The CFTC has long recognized that it is not a gaming regulator and that gaming should not occur on DCMs. The CFTC previously explained that it "does not believe that it has the statutory mandate nor specialized experience appropriate to oversee" gaming. Event Contracts, 89 Fed. Reg. 48968, 48976 (proposed June 10, 2024), *withdrawn*, 91 Fed. Reg. 5386 (Feb. 6, 2026). Further, under the Special Rule, the CFTC promulgated a regulation that categorically prohibits trading on DCMs contracts "that involve[], relate[] to, or reference[]" "gaming." 17 C.F.R. § 40.11(a). Although the CFTC now claims the authority to regulate sports betting, CFTC Br. 14-

18, that is an abrupt about-face, and its regulation prohibiting gaming on DCMs remains on the books.

## B. Factual Background

Crypto.com operates a CFTC-registered DCM where users can buy "event contracts" on sports, elections, and other events. ER-160-161, 172 (¶¶ 8-9, 63). Those contracts are wagers under Nevada gaming law: The user buys a contract on whether a particular outcome will occur and receives a payout if it occurs. ER-173 (¶ 66).

In January 2025, Crypto.com began offering contracts on the outcomes of sports events. ER-173 (¶ 68). Crypto.com initially offered sports bets only on the winners or losers of games, but since has expanded to "prop" bets (bets on outcomes within a game, such as the number of touchdowns scored) and "parlays" (chained bets on two or more outcomes).[1] For example, on February 1, 2026, a Crypto.com user could buy a contract for $0.34 that would pay $1 if the New England Patriots won the Super Bowl.[2] The user also could wager on which team would win the coin toss,[3] which team

---

[1] *See* @Crypto.comsports, X (Jan. 17, 2026), perma.cc/3LHC-BREX (prop bets); @Crypto.comsports, X (Jan. 8, 2026), perma.cc/3558-XH75 (parlays).

[2] Crypto.com, *Seattle vs New England,* perma.cc/3DE4-8HTH (accessed Feb. 1, 2026).

[3] Crypto.com, *Team to Win Coin Toss,* perma.cc/D7AH-FSDW (accessed Feb. 1, 2026).

would score first,[4] and even what color Gatorade the winning team would use to shower its head coach.[5]

As the district court found, Crypto.com's sports contracts are indistinguishable from sports bets offered by licensed sportsbooks. ER-26. The following screenshot shows some of the wagers available on Crypto.com's platform on February 21, 2026:



Crypto.com, *Sports*, bit.ly/4ru8Bvz (accessed Feb. 21, 2026).

Crypto.com argues (Br. 23-24) that it functions differently from a traditional sportsbook because it connects users directly with each other and does not act as the "house" (*i.e.*, does not contract with users directly or set

---

[4]  Crypto.com, *First Team to Score*, perma.cc/MYK4-QEXY (accessed Feb. 1, 2026).

[5]  Crypto.com, *Gatorade Shower Color*, perma.cc/L6VW-VTQG (accessed Feb. 1, 2026).

the odds). But many forms of gambling involve players betting directly with each other, with the casino taking a cut. *See Hughes Props. v. State*, 100 Nev. 295, 297 (1984). Further, Crypto.com affiliates do act as "market makers" that serve as counterparties to bets on its platform. Crypto.com, *Market Makers Program*, perma.cc/LE5Q-UG2T (visited Feb. 27, 2026); *see* Emily Nicolle, *Crypto.com Hiring Sports Market Maker to Trade Against Customers*, Bloomberg Law News (Dec. 23, 2025), perma.cc/XNX5-LH35.

Crypto.com also offers a variety of wagers on elections and entertainment events. For example, users can bet on who will be the presidential candidates in 2028, Crypto.com, *Democratic Presidential Nominee 2028*, perma.cc/BD5G-FPY7, and what film will win the Oscar for Best Picture, Crypto.com, *Oscar: Best Picture Winner*, perma.cc/MY98-WGUB. That said, nearly all the trading and growth in prediction markets has been in sports. Sam Learner, *Prediction Markets Barely Make Money; Sportsbooks Make Money*, Fin. Times (Dec. 19, 2025), perma.cc/CB9N-SN6P.

## C. Procedural History

In March 2025, the Board sent Crypto.com a cease-and-desist letter, explaining that Crypto.com is violating Nevada law by offering unlicensed sports betting. ER-119-123. In response, Crypto.com filed this lawsuit, arguing that because it registered its DCM with the CFTC, the CFTC has "exclusive jurisdiction" over any product Crypto.com lists or will list for trading on its DCM. ER-176 (¶ 79).

Crypto.com moved for a preliminary injunction and for judgment on the pleadings. *See* ER-10. The district court denied the motions. ER-11. On the merits, the court explained that whether the CEA preempts Nevada gaming law depends on two issues: (1) whether Crypto.com's contracts are "swaps" or other commodity derivatives subject to the CEA and (2) if they are, whether the CEA preempts Nevada gaming law. ER-19. The court determined that the preemption argument fails at the first step because Crypto.com's sports bets are not "swaps." ER-19-29. The court further found that the balance of equities favors State Defendants. ER-30.

The district court then dissolved a preliminary injunction it had entered against Kalshi, one of Crypto.com's competitors, and denied a preliminary-injunction motion filed by Kalshi's partner Robinhood, explaining further why sports bets are not "swaps" within the CFTC's jurisdiction. *See* 25-7516 1-ER-2-30; 25-7831 1-ER-4-7.

Crypto.com appealed the district court's denial of a preliminary injunction but did not seek interlocutory review of the district court's denial of its motion for judgment on the pleadings. ER-189.

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion in denying Crypto.com's motion for a preliminary injunction.

I. Crypto.com is not likely to succeed on the merits. To prevail on its preemption argument, Crypto.com must show both that its sports contracts

12

are swaps (or other commodity derivatives) under the CEA, and that the CEA preempts application of state gaming law.  On both, it faces a heavy presumption against preemption.

A.  Crypto.com's contracts are not "swaps" or other commodity derivatives, so its preemption argument fails at the outset.  Crypto.com attempts to avoid this threshold issue by arguing that the CFTC has "exclusive jurisdiction" over *any* contract traded on a DCM.  That is not what the statute says:  The CFTC's "exclusive jurisdiction" applies only to specified commodity derivatives, including "swaps" and "option[s]."  7 U.S.C. § 2(a)(1)(A).

Crypto.com's contracts are not "swaps."  Swaps are financial instruments where parties trade obligations to hedge risk.  All six parts of the definition of "swap" reflect that.  Crypto.com relies on part (ii), which covers contracts where payment is based on the "occurrence" of an "event" that is "associated with" potential economic consequences, meaning an event that creates risk against which a business could want to hedge.  7 U.S.C. § 1a(47)(A)(ii).  But Crypto.com's sports bets are based on the outcomes of sports events, not on whether the events occur, and the outcomes of sports events are not associated with potential economic consequences that businesses would want to hedge against.  Sports bets are not financial instruments used to hedge economic risk; the bets *create* the risk.

Crypto.com's definition of "swaps" is limitless.  Under its view, two parents betting on the outcome of a Little League game would be a "swap"

that would have to be traded on a CFTC-registered market. Crypto.com has never identified *any* bet between *anyone* that would not be a "swap."

Crypto.com also asserts that its contracts are "option[s]." But it told the CFTC the opposite: It certified its event contracts as "swaps," not options. In any event, its contracts do not qualify as options under the settled definition of that term.

The implications of Crypto.com's position are extreme. Under Crypto.com's view, all sports bets would qualify as swaps or options. Yet the CEA requires that all consumer swaps and options be traded *only* on CFTC-registered DCMs. 7 U.S.C. § 2(e). The CFTC thus would be the Nation's sole sports-betting regulator, to the complete exclusion of States and Tribes. Further, all of the casinos that offer sports betting—and their customers—would be violating federal law. This Court should reject that absurd result.

After previously saying that it is not a gaming regulator and banning gaming contracts on DCMs, the CFTC has filed a brief asserting that sports bets are "swaps" and that it has the authority to regulate all sports betting nationwide. The CFTC gives no explanation for its abrupt change in position; does not address the extreme consequences of that position; and does not even mention its own binding regulation that prohibits "gaming" contracts on DCMs. The CFTC argues that ruling for State Defendants would allow them to regulate trading in *bona fide* commodity derivatives, but State

Defendants have expressly disclaimed that authority, and this case involves only sports bets.

Crypto.com argues, as a fallback, that this Court cannot even decide the threshold question whether its contracts are "swaps" or "options." But Crypto.com brought this lawsuit and invoked the CEA to enjoin State Defendants; of course this Court can decide whether the CEA applies. Conspicuously, the CFTC does not make this argument.

B. Even if Crypto.com's sports contracts were within the CFTC's jurisdiction, the CEA would not preempt all state gaming law. The regulation of gaming is at the heart of the States' police power, and giving all of that power to the CFTC would have vast economic and political consequences. Nothing in the CEA shows the exceptionally clear congressional intent that would be required for that result.

Crypto.com argues that the CEA's "exclusive jurisdiction" provision expressly preempts Nevada gaming law. But that provision says *nothing* about preempting state gaming law. When Congress wanted to expressly preempt state law in the CEA, it said so—as it did with state insurance law.

Crypto.com also argues field preemption. But nothing in the CEA shows that Congress intended the regulated field to include *sports betting* in particular. The CEA also provides no rules for regulating gaming, except to authorize the CFTC to prohibit gaming contracts on DCMs (which the CFTC did).

15

Finally, Crypto.com argues conflict preemption. But Crypto.com could comply with both Nevada law and the CEA—it just chooses not to. Crypto.com says complying with Nevada law would violate the CFTC's "impartial access" requirement, but there is no conflict. And even if there was, that would only excuse compliance with the conflicting provision of Nevada law—not all of Nevada gaming law. Further, Nevada gaming law does not pose any obstacle to fulfilling the CEA's purposes: Congress enacted the CEA to regulate commodity futures and other derivatives, not to federalize sports betting.

II. As the district court found, the balance of equities weighs against Crypto.com.

A. Crypto.com's claimed harms are speculative and self-inflicted. Crypto.com just wants to continue making money from unlicensed sports betting. It wishes to avoid the costs of geofencing, but its competitors pay those costs, and the costs are minuscule in comparison to its revenues. It also invokes the prospect of a state enforcement action, but that is not irreparable harm because Crypto.com can raise any defense. Notably, Crypto.com voluntarily agreed to stop operating for months, which undercuts its claim of irreparable harm.

B. In contrast, State Defendants' harms are severe and irreparable. Nevada has a sovereign interest in enforcing its gaming laws. Crypto.com's unlicensed operation severely disrupts Nevada's regulated gaming industry

16

by giving it an unfair advantage over licensed competitors. It harms Nevada's economy and public fisc by depriving the State of critical tax revenues. And it harms the public, because Crypto.com does not comply with Nevada's consumer-protection requirements, and its platform is open to match fixing, insider betting, and abuse.

III. Crypto.com asks the Court to reverse the denial of its motion for judgment on the pleadings. It does not develop this argument, so it is forfeited, and the argument lacks merit in any event.

This Court should affirm.

## STANDARD OF REVIEW

A preliminary injunction is a form of extraordinary relief. To obtain one, Crypto.com must establish the four factors set out in *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008): (1) it is likely to succeed on the merits; (2) it likely will suffer irreparable harm without a preliminary injunction; (3) the balance of equities favors it; and (4) an injunction is in the public interest. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024). The Court also has permitted injunctive relief using a slid-

ing-scale approach, when the movant raises "serious questions" on the merits and the balance of hardships "tips sharply" in its favor. *Id.* (internal quotation marks omitted).[6]

This Court reverses an order denying a motion for a preliminary injunction "only where the district court abused its discretion." *Does 1-5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir. 1996). The Court reviews the district court's legal determinations *de novo* and its factual findings for clear error. *Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 764 (9th Cir. 2018).

## ARGUMENT

## I. CRYPTO.COM IS NOT LIKELY TO SUCCEED ON THE MERITS

Crypto.com argues that only the CFTC can regulate its sports contracts because the CEA preempts all state regulation of them. To succeed on that argument, Crypto.com must show both that (1) its sports contracts are "swaps" or "option[s]" so that the CEA applies, and (2) if the CEA applies, Congress intended to preempt all state gaming law as to those contracts. Crypto.com cannot show either.

Crypto.com's position requires the Court to believe that Congress decided in the Dodd-Frank Act to give the CFTC all authority to regulate sports betting, to the complete exclusion of the States and Tribes, and that

---

6 The sliding-scale approach appears inconsistent with *Winter*, which requires showing a likelihood of success on the merits. *See id.* at 1190 & n.12.

no one recognized it for over a decade—not even the Supreme Court in *Murphy*. ER-26. That is completely implausible—as the majority of courts to address the issue have held.[7]

Courts presume that Congress did not preempt state law, "particularly" in cases involving "a field which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). Courts also require Congress to speak clearly when it gives an agency authority to regulate an issue of "vast economic and political significance," especially when the agency "claim[s] to discover" a new power in "a long-extant statute." *West Virginia v. EPA*, 597 U.S. 697, 716, 724 (2022) (internal quotation marks omitted).

The regulation of gaming "lie[s] at the heart of the state's police power." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 740 (9th Cir. 2003); *see Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905); *Flynt v. Bonta*, 131 F.4th 918, 927 (9th Cir. 2025). Federal law "defer[s] to, and even

---

7   *See id.*; 25-7516 1-ER-2-30; *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025); *Massachusetts v. KalshiEX LLC*, 2026 WL 188019 (Mass. Super. Ct. Suffolk Cnty. Jan. 20, 2026); Order, *Nevada v. Blockratize, Inc.*, No. 26-OC-00012-1B (Nev. 1st JD Jan. 29, 2026) (reproduced in addendum); Order, *Nevada v. Coinbase Fin. Mkts., Inc.*, No. 26-OC-00030-1B (Nev. 1st Jud. Dist. Feb 5, 2026) (reproduced in addendum); *but see KalshiEX LLC v. Flaherty*, 2025 WL 1218313 (D.N.J. Apr. 28, 2025), *appeal docketed*, No. 25-1922 (3d Cir. May 15, 2025) (relying on the early, now-reversed decision in *KalshiEX*); *KalshiEX LLC v. Orgel*, 2026 WL 474869 (D. Tenn. Feb. 19, 2026).

promote[s], differing gambling policies in different States." *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999).

Crypto.com thus would need to show exceptionally clear congressional intent to preempt state gaming law. *Bond v. United States*, 572 U.S. 844, 858-59 (2014). If the CEA "is susceptible of more than one plausible reading," this Court should "accept the reading that disfavors pre-emption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (internal quotation marks omitted). Nothing in the CEA shows the necessary intent.

### A. Crypto.com's Sports Contracts Are Not "Swaps" or "Option[s]" Under the CEA

#### 1. The CFTC Does Not Have "Exclusive Jurisdiction" Over Any Contract Traded on a DCM

Crypto.com's threshold argument—that any contract traded on a DCM is subject to the CFTC's exclusive jurisdiction—is wrong. Crypto.com repeatedly asserts (Br. 1-4, 13, 32, 62) that the CEA "gives the CFTC 'exclusive jurisdiction' over transactions on DCMs"—meaning that if a contract is traded on a DCM, only the CFTC may regulate it. *See also* Paradigm *Amicus* Br. 22. Notably, the CFTC does not make that argument.

Crypto.com's argument ignores key limiting language in the statute. Section 2(a)(1)(A) gives the CFTC "exclusive jurisdiction" over certain listed commodity derivatives, including "swap[s]," that are "traded or executed on [a DCM]" or "any other" market. 7 U.S.C. § 2(a)(1)(A). If a contract is not

one of the listed commodity derivatives, Section 2(a)(1)(A) simply does not apply, and the claim of preemption fails at the outset.

The mere fact that a contract is traded on a DCM does not mean that the CFTC has "exclusive jurisdiction" over it. And the fact that a contract is traded on a DCM does not mean it is a "swap" or other derivative, because nothing in the CEA restricts DCMs to those financial instruments. For example, "spots" (contracts to directly buy the underlying commodity) are traded on DCMs but are not listed in Section 2(a)(1)(A).[8]

Crypto.com's threshold argument should be rejected because it ignores the statute's plain text and makes key language superfluous. *United States v. Lucero*, 989 F.3d 1088, 1094 (9th Cir. 2021).

### 2. Crypto.com's Contracts Are Not "Swaps"

A swap is a financial instrument by which two parties agree to exchange cash flows on financial obligations, as a means of hedging volatility and managing risk. *Thrifty Oil*, 322 F.3d at 1042. Crypto.com recognizes that; it explains (Br. 1) how commodity derivatives such as grain futures are used to "transfer or manage specific risks." And it admits (Br. 55) that

---

[8] *E.g.*, Chi. Mercantile Exch., *Rulebook* ch. 13, at 2, perma.cc/YW8G-D66W (foreign-currency spots); CFTC, *Acting Chairman Pham Announces First-Ever Listed Spot Crypto Trading on U.S. Regulated Exchanges* (Dec. 4, 2025), perma.cc/6XC8-EXY8 (cryptocurrency spots).

"swaps are typically" traded by "financial and sophisticated institutions," not consumers.

Sports bets are fundamentally different from commodity derivatives. They are not recognized financial instruments used to manage existing risks, such as the risk that grain prices will go down in the future. Instead, they are a form of entertainment that creates risk where none previously existed.

Crypto.com advocates a definition of "swap" that is nearly limitless—it would cover essentially any person betting on anything. ER-25. As the district court explained, that definition is contrary to the statutory text, makes no sense in context, goes against congressional intent, and ignores longstanding federalism principles. ER-20-30.

### a. Crypto.com's interpretation is contrary to the statutory text

The CEA's definition of "swap" reflects that swaps are financial instruments used to hedge existing financial risk. 7 U.S.C. § 1a(47)(A). The definition contains six parts, all of which refer to specific "financial measures, indices, or instruments" used to hedge risk. 25-7516 1-ER-14. Parts (i), (iii), and (v) list specific financial instruments that involve "financial or economic interests" such as "interest or other rates, currencies, commodities, [or] securities . . . or property of any kind." 7 U.S.C. § 1a(47)(A)(i), (iii), (v). Part (iii) further lists 22 specific "commonly known" swaps, *id.*

22

§ 1a(47)(A)(iii), and part (v) covers certain "security-based swap agreement[s]" in which "a material term is based on the price, yield, value, or volatility of any security," *id.* § 1a(47)(A)(v). Part (iv) covers any contract "that is or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). And part (vi) covers any contract "that is any combination or permutation" of contracts in the five previous parts. *Id.* § 1a(47)(A)(vi). These all concern financial instruments that are used to hedge risk and are recognized as swaps.

Crypto.com relies on part (ii), which covers a contract where "payment" is "dependent on" the "occurrence, nonoccurrence, or the extent of the occurrence" of "an event or contingency" that is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Crypto.com seeks to give this definition its broadest possible reading, to reach contracts "on anything that happens or could happen." 25-7516 1-ER-13.

But courts do not interpret individual definition provisions in isolation and as expansively as possible. *See Yates v. United States*, 574 U.S. 528, 543-44 (2015). Instead, they read "the words of a statute . . . in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). Here, part (ii) should be read in context to also cover financial instruments based on economic events that

23

are used for hedging risk. 25-7516 1-ER-14-16; *see Yates*, 574 U.S. at 543-44 (*noscitur a sociis* canon).

Two key textual limitations in part (ii) make clear that sports bets are not "swaps." First, payment must "depend[] on" whether "an event or contingency" occurs. 7 U.S.C. § 1a(47)(A)(ii). Second, the event or contingency must be "associated with a potential financial, economic, or commercial consequence." *Id.* These limitations ensure that the definition captures contracts on occurrences that create risks against which businesses would want to hedge—such as whether a company's bond defaults. ER-23; 25-7516 1-ER-11-14.

***Event or contingency.*** Crypto.com's sports contracts depend on the *outcomes* of events, not the events themselves. ER-24. As the district court explained, an "event" is different from an "outcome." An "event" is "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time," whereas an "outcome" is the result of an event. ER-23.[9]

---

[9] *See, e.g.*, *Webster's New World College Dictionary* 492 (4th ed. 2004) ("event" is a "happening or occurrence, esp. when important"); *Oxford English Dictionary* (2025), perma.cc/XER3-NGE7 (OED, *Event*) ("event" is "[s]omething that happens or takes place, esp. something significant or noteworthy"); *Webster's New World College Dictionary* 1023 ("outcome" is the "result" of an event); *see also* ER-22 n.5, ER-24 n.7 (citing additional definitions).

24

In its self-certifications, Crypto.com called its sports contracts "outcome" contracts. ER-173 (¶ 66). And they are: A contract on the winner of an NFL game is not based on whether the game occurs, but which team wins. ER-25. Props and parlays are not even based on the primary result of a sporting event (who wins), but instead on secondary results (such as the number of points scored). Ordinary English speakers do not call the number of points scored in a football game an "event." ER-24; *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568-69 (2012) (the fact that "a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense").

Crypto.com also argues (Br. 47-48) that its contracts are based on "contingenc[ies]." Crypto.com did not preserve that argument below. ER-24 n.9. And it is wrong: "Contingency" means "contingent event"—a happening that may or may not occur—not the result of an event already scheduled to occur. *Id.*; *see, e.g.*, *Webster's New World College Dictionary* 314 (an "event" that "depends on" "another"). For example, a "deal-contingent swap" is based on a contingency, because it depends on whether the proposed deal is "consummated by a specified date." Deloitte, *Hedge Accounting* § 4.1.1.1.1 (2025), perma.cc/FX2W-LLPA. Crypto.com's contracts are based on the outcomes, not on whether the events occur.

Crypto.com has essentially two responses. First, it argues (Br. 46-48, 55-56) that an "event" (or "contingency") includes an "outcome." That is incorrect: The event (or contingent event) is the thing that happens, and the outcome is the result. ER-23-24. Crypto.com notes (Br. 46) that some dictionaries define "event" to include "outcome," but more comprehensive dictionaries confirm that is an "archaic" usage. ER-22 & n.6; *see, e.g.*, OED, *Event* (labeling this usage "rare"). It would not make sense to adopt that archaic usage here, because then the definition of "swap" would be so broad as to be limitless; "everything a person can conceive of happening [would be] an event or contingency." 25-7516 1-ER-20; *see Drapich v. Donovan*, 693 F.2d 1296, 1298 (9th Cir. 1982) (rejecting an "archaic" definition that is "more expansive than the ordinary understanding" of the term).[10]

Second, Crypto.com argues (Br. 57) that distinguishing "outcomes" from "events" could create "line-drawing problems," because some "events" could be recharacterized as "outcome[s]." But the fact that an event (*e.g.*, a

---

[10] Crypto.com also relies (Br. 47) on a CFTC statement that "event contracts" "typically" depend on whether "an outcome" occurs. *See* Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669, 25670-71 (May 7, 2008). But this was a passing statement from 2008, before Congress added swaps to the CEA—so it plainly does not address the definition of "swap."

26

mortgage default) could be the outcome of an underlying event (*e.g.*, a recession) does not negate the fact that the first event has independent economic significance.

Crypto.com's argument has a fundamental problem, which is that "everything c[ould] be defined as an event," which would mean that "the statutory words either have no meaning or have such a broad meaning that they would render superfluous other portions of the CEA's definition of a swap." ER-25. Crypto.com has no answer.

***Associated with potential economic consequences.*** Crypto.com's sports bets also are not "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

This requirement limits qualifying events to those where there is an existing economic risk that companies seek to hedge. "Potential" reflects that the consequences may or may not occur—they "can, but ha[ve] not yet," happened. *Webster's New World Collegiate Dictionary* 1126. "Associate" means to "connect" or "join together" or to "connect in the mind." *Id.* at 86; *see Oxford English Dictionary* (2025), perma.cc/EW6F-NPP2 ("[t]o connect in idea"); 25-7516 1-ER-13 n.1. Events that are "associated with" potential economic consequences are those that are "inherently joined or connected with" those consequences. 25-7516 1-ER-13-14. They have potential economic consequences "without looking at externalities like potential downstream financial consequences." *Id.*

27

A sports bet does not hedge against existing risk; it creates the risk. Who wins a sports game generally does not have any direct economic consequence that someone would wish to hedge against. The exception might be the players, coaches, and other similar insiders, but they cannot bet on their own games. *See* ER-130.

Crypto.com argues (Br. 48) that its sports contracts *do* have a risk-hedging purpose. But Crypto.com offers only hypothetical examples; it does not present any evidence that any person in the real world actually uses sports bets to hedge against risk, as opposed to gamble for entertainment. And the supposed economic consequences are either attenuated or nonexistent. For example, Crypto.com offered bets on the outcome of the coin toss at the Super Bowl, the color of the Gatorade shower after the game, and whether the first point scored would be a touchdown. *See* pp. 9-10, *supra*. It offers parlays, such as whether Arsenal wins its next game *and* the Dallas Cowboys beat the spread *and* the L.A. Lakers win their next game. Crypto.com, *Sports Combos*, perma.cc/NPD5-24AN. None of these has any direct economic consequence. Crypto.com suggests (Br. 48) that businesses in the city hosting the Super Bowl might expect more business, but that would happen regardless of the result on the field. And although

28

Crypto.com speculates (*id.*) that a sportsbook could use sports contracts to hedge its gaming risk, that is just bootstrapping gaming risk onto itself.[11]

Further, there is a mismatch in Crypto.com's hypotheticals between the people doing the betting and the supposed hedging purposes. Crypto.com speculates (Br. 48) that retailers might sell more of a team's merchandise, or that a municipality might benefit from more tourism, if a team wins a game. But Crypto.com's sports bettors are not retailers and municipalities—they are individuals betting on games for entertainment.

***No limiting principle.*** Crypto.com's position (Br. 48, 58-59) is that because every event has some possible downstream economic consequence, every event contract qualifies as a "swap." Its view "knows no limiting principle." 25-7516 1-ER-20. Throughout this litigation, Crypto.com has not identified a single example of a bet that would not qualify as a "swap" under its view.[12]

---

[11] Crypto.com argues (Br. 58-59) that weather swaps involve only downstream consequences. But Section 1a(47)(A)(iii) separately covers "weather swap[s]." 7 U.S.C. § 1a(47)(A)(iii)(XVII).

[12] In the district court, the most Crypto.com's counsel would say was that "a coin flip in my hotel room may not be of consequence to anyone" and that someone "would have a hard time" explaining "the economic, commercial, or financial consequences" of "what color the Gatorade is that's poured on the coach," although counsel would not "pre-judge" the issue. ER-53-55. Despite that, Crypto.com offers contracts on both coin flips and the color of the Gatorade shower after the Super Bowl. *See* pp. 9-10, *supra*.

As the district court explained, every event "might have some conceivable financial consequence if one is creative enough." 25-7516 1-ER-13. For example, two parents betting on which team wins a Little League game would qualify as a "swap" under Crypto.com's view, because the winning team might eat a celebratory dinner at its favorite restaurant. And because all consumer swaps must be traded on DCMs, the parents would be federal felons. 7 U.S.C. §§ 2(e), 13. Crypto.com's definition of "swap" cannot be correct.

### b. Crypto.com's interpretation makes no sense in context

The statutory context confirms that Crypto.com's contracts are not "swaps." 25-7516 1-ER-14.

Crypto.com's reading of part (ii) of the "swap" definition makes no sense in context. First, it ignores that every other part of the "swap" definition concerns financial instruments used to hedge economic risk. 25-7516 1-ER-14-15. Further, it makes the rest of the definition superfluous—if part (ii) reaches contracts "on anything that happens or could happen," 25-7516 1-ER-13, then the remaining parts are left with nothing to do, 25-7516 1-ER-20.[13] This case is just like *Yates*, where the Supreme Court refused to

---

[13] Crypto.com argues (Br. 59) that part (ii) should be read broadly because part (iv) includes an agreement "that is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv). But part (iv) just ensures that the definition keeps pace with developments in the industry

30

adopt a broad definition of "tangible object" because it was an "unbounded reading" that made no sense in context and would "render superfluous" other key statutory language. 574 U.S. at 546.

The Special Rule confirms that "swaps" should not be interpreted to allow sports betting and other gambling. Congress did not want sports betting on DCMs. *See* 156 Cong. Rec. S5906-07. So in the Special Rule, Congress gave the CFTC authority to ban contracts involving "gaming" from DCMs. 7 U.S.C. § 7a-2(c)(5)(C)(i). Crypto.com argues (Br. 59, 60-61) that the Special Rule assumes that "gaming" contracts are swaps. That is incorrect: The Special Rule is not limited to "swaps"; it applies to "agreements, contracts, transactions, or swaps." 7 U.S.C. § 7a-2(c)(5)(C)(i). Further, the Special Rule is a backstop that allows the CFTC to prohibit contracts that are "contrary to the public interest"; it does not define "swap." *Id.*

Importantly, the CFTC has exercised its Special-Rule authority to categorically *ban* contracts involving "gaming" on DCMs. 17 C.F.R. § 40.11(a). The CFTC did that specifically to "prevent gambling through the futures markets." Provisions Common to Registered Entities, 76 Fed. Reg. 44776-01, 44786 (July 27, 2011) (internal quotation marks omitted). The terms of

---

(which does not consider sports bets to be swaps). If part (ii) is interpreted as Crypto.com suggests, part (iv) would be left with nothing to do.

31

the regulation are clear and unequivocal: DCMs "shall not list" any contracts that "involve[], relate[] to, or reference[]" "gaming." 17 C.F.R. § 40.11(a). That severely undercuts Crypto.com's claim that its sports contracts are "swaps" that must be listed on DCMs. Crypto.com *never even mentions* this regulatory prohibition in its brief.

### c. Crypto.com's interpretation is inconsistent with Congress's purposes and the CFTC's regulations

Interpreting "swap" to cover sports betting is not consistent with Congress's purposes in enacting the Dodd-Frank Act.

Congress added "swaps" to the CEA to strengthen regulation of financial markets following the 2008-2009 financial crisis, because unregulated credit default swaps had exacerbated the crisis. *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 172-73 (D.D.C. 2012). Congress "aimed Dodd-Frank at systemic risks in the financial sector that undermined U.S. financial stability." 25-7516 1-ER-16.

The Dodd-Frank Act was not about regulating sports or election betting. "Congress was bringing risky financial products out of the shadows," not "enabling nationwide gambling." 25-7516 1-ER-20. Sports betting did not contribute to the financial crisis; indeed, at the time, it was illegal everywhere but Nevada. *See Murphy*, 584 U.S. at 462.

Notably, the only mention of sports betting in the legislative history makes clear that Congress did *not* want that gambling to occur on CFTC-

32

regulated DCMs. *See* 156 Cong. Rec. S5906-07 (colloquy between Senators Feinstein and Lincoln explaining that sports bets should not be on DCMs because they "would not serve any real commercial purpose" and "would be used solely for gambling"). Thus, Congress recognized that sports bets are not commodity derivatives and did not want sports betting on DCMs.

Further, the CFTC's own regulations reject a maximalist reading of "swap." In 2012, it promulgated a regulation defining "swap" to exclude "consumer and commercial arrangements that historically have not been considered swaps"—such as "traditional insurance products," "mortgages," "automobile loans," and "employment contracts." Further Definition of "Swap," 77 Fed. Reg. 48208-01, 48212, 48246-50 (Aug. 13, 2012); *see* 17 C.F.R. § 1.3. The CFTC explained that those contracts historically were regulated by States, and that there was no indication that Congress "intended" for those contracts "to be regulated as swaps." 77 Fed. Reg. at 48212 & n.29; *see id.* at 48246.

That reasoning applies equally to sports bets. Sports bets do "not involve risk-shifting arrangements with financial entities"—the hallmark of a swap. 77 Fed. Reg. at 48248. They are consumer transactions that people enter into "primarily for personal [entertainment] purposes" and that "historically have not been considered to involve swaps." *Id.* at 48246-47. Like insurance and mortgages, sports bets historically have been regulated by

33

the States.  *Murphy*, 584 U.S. 484.  There is no indication that Congress intended for them to be regulated as "swaps."

### 3.    Crypto.com's Contracts Are Not "Option[s]"

Crypto.com contends (Br. 57, 63-64) that even if its sports contracts are not "swaps," they are "option[s]" under Section 2(a)(1)(A).  Crypto.com never made this argument in the district court, so the Court should not consider it.  *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

Crypto.com also should be estopped from making this argument because it told the CFTC that all of its contracts are "swaps."  When a DCM self-certifies a new contract for trading, it must identify whether the contract is a swap, option, or future.  *See* 17 C.F.R. § 38.4(b).  The statutory definition of "swap" expressly excludes futures and certain options, *see* 7 U.S.C. § 1a(47)(B)(i), and the CFTC has different certification requirements for each, *see* 17 C.F.R. pt. 38, App'x C.

Crypto.com self-certified its sports event contracts as "swaps"—not options—in order to list them for trading.  CFTC, *Designated Contract Market Products—CDNA*, bit.ly/4rMmKUO (visited Mar. 3, 2026).  Crypto.com cannot now make a contrary argument to this Court.  *See Rissetto v. Plumbers & Steamfitters Loc. 343*, 94 F.3d 597, 604 (9th Cir. 1996).

In any event, Crypto.com's argument is incorrect.  Crypto.com argues (Br. 64) that its sports bets are "binary option[s]" because they pay out if a certain outcome occurs.  Crypto.com relies (*id.*) only on a passing statement

in a 2008 CFTC request for comment and ignores the statutory requirements for an "option." *See* 73 Fed. Reg. at 25670.

Crypto.com's contracts are not options. An "option" is a contract that "grants to the purchaser 'the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price.'" *White Pine Tr.*, 574 F.3d at 1226 (internal quotation marks omitted) (citing 7 U.S.C. § 1a(36)). Crypto.com's contracts do not confer any such right—the buyers have no right to buy or sell the outcomes of the events that are the subject of those contracts.

Further, the CEA's reference to an "option" requires the subject of the option to be a "commodity," 7 U.S.C. § 2(a)(1)(A), and Crypto.com's contracts do not involve commodities under the CEA. Crypto.com asserts (Br. 15-16) that its contracts involve "excluded commodities," but the relevant definition of "excluded commodity" requires "an occurrence, extent of an occurrence, or contingency" that is "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv). As just explained, Crypto.com's sports bets do not satisfy that requirement.

### 4. Crypto.com's Position Would Require All Sports Betting to Be Regulated Only by the CFTC

The implications of Crypto.com's position are extreme: All sports wagers would qualify as "swaps" (or options). ER-26. The CEA requires that all consumer swaps and options be traded on CFTC-regulated DCMs. 7

35

U.S.C. §§ 2(e), 6c(c); 17 C.F.R. § 33.3(a). So all sports betting would have to be done on DCMs. That would make the CFTC the Nation's sole regulator of sports betting. And the licensed sportsbooks operating without DCM registrations (which is to say, all of them), along with their millions of customers, would be felons under federal law. ER-26-27 & n.12; *see* 25-7516 1-ER-18.

To reach that outcome, the Court would have to believe that when Congress added "swaps" (or options) to the CEA, it intended to take away the longstanding police power of the States and Tribes to regulate sports betting, *see Artichoke Joe's*, 353 F.3d at 737, and give it all to the CFTC. And the way Congress supposedly did this was by allowing the CFTC to decide company-by-company how much sports betting to allow, based on which DCMs it certifies and which contracts it chooses to review. Then apparently no one noticed this sea change until 2025, when companies like Crypto.com decided to offer sports betting for the first time. And the Supreme Court's decision in *Murphy*, which recognized and reinforced the States' power to regulate sports betting, 584 U.S. at 484, would be meaningless. This Court should not interpret the CEA to produce those absurd results. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

Crypto.com makes two arguments in response. First, it argues (Br. 60) that States still would be able to regulate off-exchange sports wagers.

36

But under Crypto.com's position, there would be no off-exchange sports wagers, because the CEA requires all consumer swaps and options to be traded on DCMs. The text is clear: Section 2(e) makes it "unlawful" for "any person" to "enter into a swap" unless that swap "is entered into on, or subject to the rules of, a [DCM]," except when both parties are regulated financial institutions, major corporations, or similar entities. 7 U.S.C. § 2(e); *see id.* § 1a(18). Similarly, Section 6c(c) directs the CFTC to issue regulations requiring all options be traded on DCMs, 7 U.S.C. § 6c(c), which it has done, *see* 17 C.F.R. § 33.3(a). Thus, there could be no "off-exchange" sports betting under Crypto.com's view. Crypto.com never grapples with—or even mentions—this statutory language.

Second, Crypto.com argues (Br. 61) that its products are different from other sports bets, and that other sports bets do not qualify as "swaps." But Crypto.com's products are indistinguishable from sports wagers offered by licensed sportsbooks. ER-26; *see* pp. 9-10, *supra.* Crypto.com asserts (Br. 23-24) that it does not act as the "house" or set the odds, but that is incorrect, *see* pp. 10-11, *supra*, and besides, nothing in the definition of "swap" requires the parties taking the opposite side of a position to contract directly with each other, as opposed to both contracting with an intermediary, *see* 7 U.S.C. § 1a(47)(A). Notably, the CFTC does not contend that Crypto.com's sport contracts are different from other sports bets.

Crypto.com asserts (Br. 61) that "sports wagers are not swaps" because swaps are "typically" traded by sophisticated institutions, whereas individual consumers engage in sports betting. These arguments just show why Crypto.com is wrong to call its sports contracts "swaps" in the first place. Besides, Crypto.com offers and markets its sports contracts to individual consumers.

Crypto.com also argues (Br. 60-61) that sports bets are not "swaps" unless they are traded on exchanges. The CEA's definition of "swap" does not require trading, *see* 7 U.S.C. § 1a(47)(A), and nothing in the CEA requires options to be traded, either. If only contracts traded on DCMs could be swaps or options, then Sections 2(e) and 6c(c) would be nullities; the point of those provisions is to require consumer contracts to be traded on exchanges.

Further, even if there were some reason to believe that the CEA would not *require* all sports wagers to be traded on DCMs, that would be the practical effect if Crypto.com prevails. If sportsbooks could escape all state regulation by listing their bets on DCMs, they would have significant financial motivation to do so. *See* 25-7516 1-ER-28-29. Indeed, DraftKings and FanDuel recently decided to forgo licensing in Nevada to offer sports betting on DCMs in other States. *Id.* Thus, in practice, the CFTC still would become the Nation's sole sports-betting regulator.

### 5. The CFTC's Arguments About "Swaps" and "Options" Are Unpersuasive

Although it has never before regulated sports betting, the CFTC now argues that sports contracts are "swaps" within its jurisdiction. *See* CFTC Br. 14-18. The CFTC does not seek any deference to its views, and none would be due; it is the job of the courts to determine the "best reading" of the statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). "[A]gencies have no special competence in resolving statutory ambiguities," especially when it comes to "the scope of an agency's own power"—that is the circumstance in which following the agency's views is "*least* appropriate." *Id.* at 400-01; *see China Unicom (Americas) Operations Ltd. v. FCC*, 124 F.4th 1128, 1143 (9th Cir. 2024).

An agency's views may be considered for their "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). But their persuasive power depends on factors such as "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Id.* Here, there are many reasons why the CFTC's views lack persuasive force.

First, the CFTC's assertion that sports bets are swaps is an abrupt change in position, with no explanation. The CFTC has never regulated sports betting. As recently as 2024, the CFTC explained that commodity-

39

derivatives trading and gambling are different, and the CEA and its regulations "are focused on regulating financial instruments and markets, and do not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling." 89 Fed. Reg. at 48983. The CFTC concluded that it has neither "the statutory mandate nor specialized experience appropriate to oversee" gaming. *Id.*

The CFTC does not even acknowledge these prior statements, let alone explain its about-face. So right off the bat, the CFTC's views should be viewed with skepticism. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (an agency's interpretation is "arbitrary and capricious" when the agency changes its position without acknowledgment or explanation).

Second, and relatedly, the CFTC's brief does not even mention its own on-point regulation, 17 C.F.R. § 40.11. That regulation categorically prohibits "gaming" on CFTC-regulated DCMs. Crypto.com has listed its sports contracts in direct violation of this regulation. The inconsistency between the CFTC's new, made-for-litigation position and its longstanding regulation provides further reason to question the new position.

Third, the CFTC's new position is an unprecedented assertion of regulatory authority and a severe intrusion on state sovereignty. Although the CFTC previously recognized that it is not a gaming regulator and lacks the

capacity to regulate gaming, 89 Fed. Reg. at 48976, it now asserts (Br. 17) that it and it alone should regulate Crypto.com's sports contracts. And it does not dispute that, if Crypto.com's sports contracts are swaps, then so are all sports bets, and all sports bets would have to be traded on DCMs. *See* ER-25-27. So apparently, the CFTC now wants to be the Nation's sole gaming regulator. And the CFTC took this "sweeping position" on preemption "without offering States or other interested parties notice or opportunity for comment," which makes its position "inherently suspect." *Wyeth v. Levine*, 555 U.S. 555, 577 (2009).

The sheer breadth of the CFTC's claimed authority should give this Court pause. Under the major-questions doctrine, the Supreme Court has rejected an agency's claimed "discover[y] in a long-extant statute" of "an unheralded power" that "represent[s] a transformative expansion in [its] regulatory authority." *West Virginia*, 597 U.S. at 724 (internal quotation marks omitted). That doctrine applies with particular force here given that the CFTC's position would "upset[] decades of federalism." 25-7516 1-ER-2.

Fourth, the fact that the CFTC has never regulated sports betting calls into question its authority to do so. According to the CFTC (Br. 13), Congress gave it the power to regulate sports betting in the Dodd-Frank Act in 2010. Yet the CFTC has not taken any steps at all to regulate sports betting, such as adopting consumer-protection measures, rules to address problem gaming, or enforcement mechanisms for match-fixing and insider-

41

betting—all of which are present in state gaming law. *E.g.*, Nev. Gaming Reg. 5.170.

Finally, the CFTC's arguments that sports bets are "swaps" or "options" are unpersuasive. It simply repeats (Br. 14-16, 19-20) Crypto.com's arguments, while ignoring key limiting language in the statute and failing to grapple with the consequences of its position. The CFTC acknowledges (Br. 4) that "swaps" are financial instruments used for hedging purposes, and it tries to hypothesize (Br. 20) how sports bets could be used to manage risk. But it points to no actual examples of that, and it never explains how prop or parlay bets, or bets on the outcome of a coin toss or the color of a Gatorade shower, would have any risk-hedging function.

The CFTC argues (Br. 17) that "swap" must be defined broadly to prevent States from regulating traditional commodity derivatives. But this case involves sports contracts, *see* ER-112; the related cases involving Kalshi and Robinhood involve sports and election contracts. State Defendants are not asserting any authority to regulate *bona fide* commodity derivatives such as grain futures or interest-rate swaps; indeed, they have expressly disclaimed that authority. *See* 25-7516 1-StateSER-24. State Defendants seek only to regulate what they have always regulated—wagers that are entered into for personal entertainment, that do not hedge any external risk but instead create gambling risk. The CFTC previously recog-

nized that there is a clear line between commodity derivatives and gambling, 89 Fed. Reg. at 48983, and it has banned gambling contracts on its markets in a binding regulation, 17 C.F.R. § 40.11.

The Court need not decide the precise scope of the State's authority here, because this is not an enforcement action. Instead, Crypto.com sued seeking to prevent State Defendants from even beginning enforcement of Nevada gaming law. If this Court affirms the denial of the preliminary injunction, then State Defendants could bring an enforcement action, and the state court could address the applicable limits.[14]

### 6. This Court Can Decide the Threshold Issue of Whether the CEA Applies

Crypto.com briefly argues (Br. 62-63) that this Court cannot decide whether its contracts are swaps or options. Instead, it says, State Defendants must sue the CFTC under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* But Crypto.com brought this lawsuit and invoked the CEA to enjoin State Defendants; of course this Court can decide whether the CEA applies. ER-19-21. Notably, the CFTC agrees (Br. 20) that the Court can decide whether sports bets are swaps.

---

[14] The CFTC notes (Br. 2-3) that the temporary restraining order in *Coinbase* reached all event contracts, but TROs can be imprecise given their emergency nature and short duration. *See Geneva Assur. Syndicate, Inc. v. Med. Emergency Servs. Assocs. (MESA) S.C.*, 964 F.2d 599, 600 (7th Cir. 1992). When the state courts address preliminary-injunction motions, they can carefully tailor the scope of any injunction.

Federal courts have the "duty" to "say what the law is"—here, by determining whether a particular contract is a swap or option within the meaning of the CEA. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *see Loper Bright*, 603 U.S. at 402. The CEA itself provides that nothing in Section 2 "supersede[s] or limit[s] the jurisdiction conferred on courts of the United States." 7 U.S.C. § 2(a)(1)(A). Crypto.com asserts (Br. 62) that allowing a State to challenge whether a particular contract is a commodity derivative outside of an APA action could lead to non-uniform results, but if a court finally determined that a Crypto.com contract is not a swap, that determination would bind Crypto.com nationwide. *See In re Palmer*, 207 F.3d 566, 568 (9th Cir. 2000).

Further, there is no agency action that could underlie an APA suit. The APA provides a cause of action to "set aside" an agency's action or to "compel agency action." 5 U.S.C. § 706. Here, Crypto.com self-certified the contracts and started trading them, and the CFTC took no action. ER-15. Crypto.com argues (Br. 62) that there is agency action because the CFTC gave "passive approval" to its contracts. But in a passive-approval system, the agency deems a submission approved if it fails to act within a specified time. *E.g.*, *Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.*, 972 F.3d 83, 99 (D.C. Cir. 2020) (citing 49 C.F.R. § 240.103(c)). There is no such time limit here. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(a)(2).

44

State Defendants also could not seek to compel the CFTC to take action. Nothing in the CEA requires the CFTC to formally approve a contract for trading or to order a contract delisted from a DCM solely because it is not a commodity derivative. The CFTC thus is under no "specific, unequivocal command" that it has not obeyed. *Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1075 (9th Cir. 2016).

Crypto.com cites (Br. 63) *Big Lagoon Rancheria v. California*, 789 F.3d 947, 953-54 (9th Cir. 2015) (en banc). There, California refused to negotiate with an Indian Tribe about its plans to build a casino on lands that the Bureau of Indian Affairs (BIA) had taken into trust for the Tribe. *Id.* at 951. California argued that the BIA lacked authority to take the land into trust and had incorrectly designated the Tribe. *Id.* at 952. But Congress authorized only the BIA to designate Tribes and to take land into trust for Tribes. 25 U.S.C. §§ 5108, 5131. California thus was challenging decisions that only the BIA could make. Here, the CEA does not grant the CFTC sole authority to determine whether a contract is a swap or option.

More fundamentally, Crypto.com's argument (Br. 63) misunderstands State Defendants' interest in this litigation. State Defendants are not seeking to enforce the CEA or police what products are listed on DCMs—they seek only to enforce Nevada gaming law. Crypto.com's argument (Br. 53) that the CEA does not allow state authorities to sue DCMs for violations of the CEA, *see* 7 U.S.C. § 13a-2(1), thus misses the mark. Crypto.com put at

45

issue whether its contracts are swaps by claiming preemption on that basis, *see* ER-182 (¶ 104); it cannot turn around and require State Defendants to sue the CFTC to prove that its contracts are not swaps.

Crypto.com's position is that once it self-certifies a contract, that contract is a swap under the CEA, and if the CFTC fails to act on it, then Crypto.com's determination is binding on *everyone*—including this Court. That approach runs roughshod over the authority of the federal courts, *Marbury*, 5 U.S. at 177, and runs afoul of the private nondelegation doctrine, which prevents private parties from exercising federal authority "without an agency's say-so," *FCC v. Consumers' Rsch.*, 606 U.S. 656, 695 (2025); *see Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

## B.    The CEA Does Not Preempt State Gaming Law

Even if Crypto.com's sports contracts qualify as swaps or options, the CEA does not preempt application of state gaming law to them.

### 1.    There Is No Evidence that Congress Intended to Federalize All Sports Betting

Courts "start with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485 (internal quotation marks omitted). There is no indication that Congress sought to preempt all state gaming law and make the CFTC the Nation's sole sports-betting regulator. "Had Congress intended such a sea change in the

46

regulatory landscape, it surely would have said so," because Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see* 25-7516 1-ER-18; *Martin*, 793 F. Supp. 3d at 684.

Federalizing sports betting would massively upset the federal-state balance. Gaming is a longstanding area of state regulation, *see Flynt*, 131 F.4th at 932, and federal law historically has respected state authority in this field, *Greater New Orleans Broad. Ass'n*, 527 U.S. at 185. "[T]he States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). Yet the "necessary implication" of Crypto.com's position is that all sports wagers can be regulated only by the CFTC. ER-27. Congress does not make major changes to the "usual constitutional balance of federal and state powers" without clearly saying so. *Bond*, 572 U.S. at 858-59 (internal quotation marks omitted).

Further, federalizing sports betting would have "vast economic and political" consequences. *West Virginia*, 597 U.S. at 716 (internal quotation marks omitted). Sports betting is a $14-billion-a-year industry that is both "controversial" and "immensely popular." *Murphy*, 584 U.S. at 460, 484; *see* AGA, *States* 10. Thus, under the major-questions doctrine, there would need to be "clear congressional authorization" for the CFTC to take exclusive regulation of sports betting. *West Virginia*, 597 U.S. at 732 (internal quotation marks omitted). Crypto.com points to no such authorization.

47

Crypto.com cites (Br. 44-45) statutory and legislative history to show that Congress intended the CEA to preempt certain state regulation of trading in commodity derivatives. *See* CFTC Br. 5-9. But none of that history shows an intent to preempt state regulation of *sports betting*. *See Martin,* 793 F. Supp. 3d at 682. On the contrary, the only mention of sports betting in the legislative history confirms Congress did *not* want sports betting on DCMs. *See* 156 Cong. Rec. S5906-07. Crypto.com has the heavy burden to show that Congress specifically considered sports betting and chose to override all state gaming regulation. It simply cannot do so.

### 2. Express Preemption Does Not Apply

Crypto.com argues (Br. 39-44) that the CEA expressly preempts Nevada gaming law. It relies on Section 2(a)(1)(A), the CEA's "exclusive jurisdiction" provision, taking the most expansive view of that provision possible. But courts do not read statutory provisions in isolation, *Sackett v. EPA*, 598 U.S. 651, 674 (2023), or read supposedly preemptive provisions expansively, *Altria*, 555 U.S. at 77, especially in areas of traditional state regulation, *Medtronic*, 518 U.S. at 485. Notably, the CFTC does *not* argue that the CEA expressly preempts state gaming law. *See* CFTC Br. 21-27.[15]

---

[15] Crypto.com argues (Br. 40) that courts should not apply the presumption against preemption to express-preemption provisions. But both the Supreme Court and this Court have done so. *See, e.g., Altria*, 555 U.S. at 70; *Aargon Agency, Inc. v. O'Laughlin*, 70 F.4th 1224, 1236 (9th Cir. 2023); *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140,

Section 2(a)(1)(A) is not an express-preemption provision. Congress expressly preempts state law "by enacting a clear statement to that effect." *Am. Apparel & Footwear Assoc. v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024) (internal quotation marks omitted). That is, the provision must say, in so many words, that state law is preempted or that state authorities may not act. *See, e.g., id.* (citing 15 U.S.C. § 1261 note (b)(1)(B) and 15 U.S.C. § 2075(a), which provide that "no State or political subdivision of a State" may "establish" a product-safety standard different from a federal standard).

Section 2(a)(1)(A) simply does not do that. It describes the jurisdiction of the CFTC but does not take away jurisdiction from the States. As the Supreme Court explained, Congress enacted this provision "only to consolidate federal regulation of commodity futures trading in the [CFTC]"—that is, to "separate the functions of the [CFTC] from those of the [SEC]" and other federal agencies. *Merrill Lynch*, 456 U.S. at 386-87.

Notably, the CEA contains other provisions that *do* expressly preempt state law. Those provisions confirm that Congress knew how to enact ex-

---

1146 (9th Cir. 2017). Besides, the question here is whether Section 2(a)(1)(A) even is an express-preemption provision at all, not what its scope is.

press-preemption provisions in the CEA, and that it did not do so with respect to state gaming law generally. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995).

One such provision states that the CEA "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming" with respect to contracts that are exempted from the CEA's requirements (which is not the situation here). 7 U.S.C. § 16(e)(2). That provision would be superfluous if the exclusive-jurisdiction provision already preempted state gaming law. Further, it shows that Congress specified exactly what it wanted to preempt when it comes to gaming—and it was *not* all gaming law.

The other express-preemption provision preempts state insurance law: It says that a swap "may not be regulated as an insurance contract under the law of any State." 7 U.S.C. § 16(h)(2). Crypto.com essentially wants the Court to read into the CEA an equivalent provision for gaming, but the CEA conspicuously does not contain that provision.

Crypto.com has three responses. First, it cites (Br. 41-42) decisions where "exclusive jurisdiction" supposedly means preemption. But only one decision involved Section 2(a)(1)(A), and that decision did not address preemption—the issue was whether the CFTC or the Federal Energy Regulatory Commission could regulate a gas-futures contract. *See Hunter v. FERC*, 711 F.3d 155, 157 (D.C. Cir. 2013). None of the remaining decisions involved a federal statute that conferred "exclusive jurisdiction" on a federal

50

agency. Two decisions involved statutes that conferred "exclusive jurisdiction" on courts over particular causes of action,[16] and three others involved the Federal Power Act (FPA), which does not contain "exclusive jurisdiction" language.[17] Statutes that *do* use "exclusive jurisdiction" to confer authority on a federal agency confirm that the term is not one of express preemption. *E.g.*, 30 U.S.C. § 1254(a)(3) (providing that the Secretary of the Interior has "exclusive jurisdiction" over surface coal mining when he or she adopts a federal plan for a State); *id.* § 1254(g) (separately providing that the federal plan "shall preempt[] and supersede[]" state regulation).

Second, Crypto.com cites (Br. 42-43) Section 2(a)(1)(A)'s savings clause, which provides that "[e]xcept as hereinabove provided" (in the "exclusive jurisdiction" provision), "nothing contained in this section shall [] supersede or limit" the "jurisdiction conferred" on "regulatory authorities under the laws" of "any State." 7 U.S.C. § 2(a)(1)(A). According to Crypto.com (Br. 43), this clause shows that the exclusive-jurisdiction provision has preemptive effect. But the clause equally suggests the opposite,

---

[16] *See Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992) (citing 28 U.S.C. § 1251(a)); *Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 823 n.3 (1990) (citing 29 U.S.C. § 1132(e)(1)).

[17] *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1057 (9th Cir. 2001); *Cal. Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 911 (9th Cir. 1989).

51

because "[a] savings clause generally 'negates the inference that Congress left no room for state causes of action.'" *Martin*, 793 F. Supp. 3d at 682 (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987)). And even if the savings clause suggests some preemption, it does not support the view that Section 2(a)(1)(A) expressly preempts state *gaming* law.

Third, Crypto.com contends (Br. 45) that the Special Rule shows an intent to bring gambling under the jurisdiction of the CFTC. That is incorrect. The Special Rule is a safety-valve provision that allows the CFTC to ban contracts that are contrary to the "public interest," not a broad authorization to regulate gaming. 7 U.S.C. § 7a-2(c)(5)(C)(i). Notably, the Special Rule is not limited to gaming, but also applies to contracts involving "war," "assassination," and "terrorism." *Id.* It does not show that Congress intended for the CFTC to regulate gaming generally, any more than war, assassinations, or terrorism. Further, the Special Rule allows the CFTC to bar contracts involving conduct that is "unlawful" under "State law." *Id.* That "reflects an affirmative intent to *preserve* state laws," rather than supplant them. *Martin*, 793 F. Supp. 3d at 680. In any event, Crypto.com cannot rely on the Special Rule to *authorize* sports betting on DCMs when the CFTC has exercised its authority under it to categorically *ban* "gaming" on DCMs. 17 C.F.R. § 40.11(a).

52

### 3. Field Preemption Does Not Apply

Crypto.com (Br. 43-44) and the CFTC (Br. 21-27) argue that the CEA field preempts state gaming law.

Field preemption applies where federal law "so thoroughly occupies a legislative field" that it leaves "no room" for state regulation. *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 733 (9th Cir. 2016). Even if a statute suggests some preemptive intent, courts should "avoid 'interpreting the scope of the preempted field too broadly.'" *Martin*, 793 F. Supp. 3d at 680 (quoting *Sikkelee v. Precision Airmotive Corp.*, 882 F.3d 680, 689 (3d Cir. 2016)); *see Medtronic*, 518 U.S. at 484.

Here, nothing shows that Congress intended to preempt state *gaming* law in particular. *Martin*, 793 F. Supp. 3d at 680; *see Mass.*, 2026 WL 188019, at *5-7. The CEA does not expressly refer to gaming, except in limited circumstances that do not help Crypto.com. *See* 7 U.S.C. §§ 7a-2(c)(5), 16(e)(2). The CEA also does not contain a comprehensive regulatory scheme for gaming. Indeed, it lacks the most basic features of such a scheme. The CEA does not require licensing or background checks, indicate what bets are allowed, contain protections against insider betting or unfair bets, or provide for basic consumer protections (such as age restrictions or measures to address problem gaming).

It is implausible to think that Congress intended for the CFTC to act as a gaming regulator—much less as the Nation's exclusive sports-betting

regulator—without giving the CFTC the basic tools of gaming regulation. Such a delegation also would run afoul of the nondelegation doctrine because Congress provided no "intelligible principle" to guide the regulation of gaming. *Consumers' Rsch.*, 606 U.S. at 673.

Crypto.com and the CFTC argue that the CEA contains a comprehensive scheme for regulating commodity-futures trading. Crypto.com Br. 51-54; CFTC Br. 21-24. But the decisions they cite address *bona fide* commodity derivatives; none addresses sports wagers "guised" as commodity derivatives. ER-30. Further, the decisions that "carefully focused on the scope of Congress's preemptive intent" recognized "that intent had limits." *Martin*, 793 F. Supp. 3d at 682; *see, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (the CEA preempts only state laws that "directly affect trading on or the operation of a futures market"—which Nevada's licensing requirements do not). The cited materials simply do not show that Congress intended to preempt the field of gaming. *Martin*, 793 F. Supp. 3d at 684 n.5; *Mass.*, 2026 WL 188019, at *6-7.

Commodity-futures regulation and gaming regulation are different fields with different regulatory needs and policy goals. *See* 89 Fed. Reg. at 48982-83. Commodity-futures markets serve an important function in our Nation's economy—they allow commercial sellers and buyers of commodities to manage financial risk by trading with investors. *See* 7 U.S.C. § 5(a). Although some people previously characterized commodity-futures trading

54

as speculation akin to gambling (and indeed, some States attempted to regulate it under state gaming laws), this trading is permitted so that commodity-futures markets may efficiently function. *See Merrill Lynch*, 456 U.S. at 358-59. The CFTC regulates trading to curb excess speculation and ensure that prices reflect economic reality. *See* 7 U.S.C. § 6(a).

In contrast, sports betting is a form of entertainment. The millions of people who gamble on sports do not seek to hedge existing financial risks; they create the risk by betting. Gaming is regulated as a form of entertainment to ensure that it is fair and free of criminal elements, and to protect the public (especially young people and problem gamers). *Greater New Orleans Broad. Ass'n*, 527 U.S. at 185. The CEA simply does not contemplate that type of regulation.

### 4. Conflict Preemption Does Not Apply

Neither form of conflict preemption (impossibility or obstacle) applies.

#### a. It is not impossible for Crypto.com to comply with Nevada law and the CEA

Impossibility preemption applies when it would be "impossible to comply with both federal and state law." *Am. Apparel*, 107 F.4th at 943. It applies only "to the extent" of an actual conflict. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983). Notably, Crypto.com does not identify (Br. 51) any specific Nevada regulation that it cannot follow.

55

To the contrary, Crypto.com could become licensed and comply with Nevada law, as other online betting companies have. *See Martin*, 793 F. Supp. 3d at 686. Although Nevada law has some differences from the CEA—for example, Nevada bans gaming under age 21, and Crypto.com allows 18-year-olds to gamble, Crypto.com, *Terms & Conditions* (Mar. 17, 2025), perma.cc/P8NZ-TPGS—state law can be more protective than federal law; that does not show a conflict. *See Wyeth*, 555 U.S. at 573.

Crypto.com (Br. 51) and the CFTC (Br. 26-27) assert that complying with Nevada gaming law would violate a CFTC "core principle" that requires DCMs to provide "impartial access" to their markets. 17 C.F.R. § 38.151(b). The district court correctly rejected this argument, finding "no evidence" that the CFTC would "take adverse action" if a DCM restricts its operations to particular States to comply with state law. 25-7516 1-ER-26. The impartial-access requirement prevents DCMs from discriminating based on wealth or exclusivity, *see* Core Principles and Other Requirements for DCMs, 75 Fed. Reg. 80572, 80579 & n.51 (Dec. 22, 2010); it does not require DCMs to offer identical products in every State, *see* Dan Bernstein, *A Frequent Kalshi Claim Is Being Undermined by Nevada, CFTC*, Sportico (Nov. 12, 2025), perma.cc/DE6H-B4PF. Indeed, Crypto.com has restricted Nevada residents from accessing its platform pending appeal, and the CFTC

56

has taken no action. Other competitors similarly have launched or are planning to launch location-restricted prediction markets.[18]

In any event, this argument is based on the mistaken premise that State Defendants seek to ban Crypto.com's sports contracts. That is incorrect: If Crypto.com obtained a license and complied with Nevada's gaming laws, it could offer its sports contracts within Nevada, and there would be no impartial-access issue, even under its (mistaken) view of that requirement. *Martin*, 793 F. Supp. 3d at 686.

### b. Enforcing Nevada gaming law does not pose an obstacle to the CEA's objectives

Obstacle preemption applies when enforcing state law "stands as an obstacle" to Congress's objectives. *Am. Apparel*, 107 F.4th at 943. It likewise does not apply here. There is no evidence of a congressional purpose to allow sports gambling on DCMs. *See* pp. 46-48, *supra*. And even if Congress intended to allow sports betting on DCMs, Crypto.com could obtain a Nevada license (as other sportsbooks have) and offer its wagers.

---

[18] *See* Dan Bernstein & Eben Novy-Williams, *Fanatics Launches a Prediction Market—Without the G-Word*, Sportico (Dec. 3, 2025), perma.cc/6YQW-QS9R; Sean Treppedi, *FanDuel Launching Prediction Markets App to Target Non-Sports Betting States*, N.Y. Post (Nov. 13, 2025), perma.cc/T9MM-F7RG.

Crypto.com argues (Br. 50-51) that requiring it to comply with Nevada gaming law would frustrate the CEA's goal of "uniform" regulation of derivatives markets. But uniformity is a field-preemption argument, not a conflict-preemption argument. *See, e.g.*, *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007); *Martin*, 793 F. Supp. 3d at 685; *Mass.*, 2026 WL 188019, at \*7. Conflict preemption assumes that States may regulate, and may regulate nonuniformly. *See Wyeth*, 555 U.S. at 575. Notably, the CFTC does not make an obstacle-preemption argument.

Crypto.com cites (Br. 38-40) *Arizona v. United States*, 567 U.S. 387 (2012), but that case is very different. There, Arizona sought to penalize violations of federal immigration law, and the Supreme Court invalidated that scheme because it would interfere with the discretion Congress gave to the Executive Branch to enforce federal law. *Id.* at 403, 406. Nothing like that is happening here. State Defendants seek only to enforce Nevada gaming law, not the CEA.

### 5. Crypto.com's View Would Require Impliedly Repealing Other Important Federal Laws

Crypto.com's view of the CEA would require finding that Congress impliedly repealed other federal laws, including the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*, and the Wire Act, 18 U.S.C. § 1084. *Martin*, 793 F. Supp. 3d at 683. There is a strong presumption against repeals by implication. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

58

The IGRA gives Tribes the "exclusive right" to determine whether and to what extent to allow gaming that is permitted under federal and state law on tribal land, 25 U.S.C. § 2701(5), and it contains a comprehensive scheme to regulate that gaming, *see id.* § 2710. Crypto.com's view would completely override the Tribes' authority and disrupt that scheme, because under Crypto.com's view, Congress gave the CFTC the exclusive authority to determine how much sports betting to allow nationwide, including on tribal land. *Martin*, 793 F. Supp. 3d at 683.

The Wire Act makes it a federal crime to use interstate wire communication facilities, including the internet, to place bets or wagers on "any sporting event," except where such wagers are legal in both the sending and receiving State. 18 U.S.C. § 1084(a). Yet under Crypto.com's view, customers could engage in sports betting wherever they are, with no regard for state law—thus nullifying the Wire Act. *Martin*, 793 F. Supp. 3d at 683.

Crypto.com's only response (Br. 66-67) is that the IGRA's definition of "gaming," and the Wire Act's definition of "bets" or "wagers," do not expressly include swaps on DCMs. But Crypto.com's sports contracts are sports wagers "and everyone who sees them knows it." 25-7516 1-ER-17. They thus fall under the ordinary meaning of gaming, bets, and wagers.[19]

---

[19] In the Unlawful Internet Gambling Enforcement Act (UIGEA), 31 U.S.C. § 5361 *et seq.*—which supplements the Wire Act by making it a crime to *fund* illegal online betting, *id.* § 5363—Congress defined "bet" and "wager"

59

The IGRA and Wire Act confirm both that Congress knows how to regulate gambling, and that it generally has deferred to state judgments in doing so.

### 6. The CFTC's Preemption Arguments Are Unpersuasive

The Court should view the CFTC's field- and conflict-preemption arguments (Br. 21-27) with great skepticism because of the agency's unexplained change in position, complete failure to address its own regulations, and lack of any experience regulating gaming. *See* pp. 39-43, *supra*.

Its preemption arguments have two particularly serious flaws. First, they ignore the States' strong and longstanding interest in regulating gaming. The regulation of gaming is at the core of the States' police power, so Congress must speak very clearly before displacing state gaming law. *Medtronic*, 518 U.S. at 484-85. Yet the CFTC identifies nothing in the CEA that shows the necessary clear intent to preempt state *gaming* law in particular. Second, the CFTC's position would require impliedly repealing other important federal laws such as the IGRA and the Wire Act—yet the CFTC does not even mention them. The CFTC's failure to address the serious consequences of its position is yet another reason to reject that position.

---

for purposes of the UIGEA to exclude transactions on DCMs, *see id.* § 5362(1)(E)(ii). But those definitions do not apply outside the UIGEA; the UIGEA expressly states it does not "alter[]" or "limit[]" other laws. *Id.* § 5361(b).

60

## II. THE BALANCE OF HARDSHIPS WEIGHS HEAVILY AGAINST CRYPTO.COM

As the district court found—and Crypto.com barely challenges—a preliminary injunction is not warranted because the balance of hardships weighs heavily against Crypto.com.

### A. Crypto.com Identifies No Irreparable Harm

Crypto.com claims basically three harms. The district court rejected them, *see* ER-21, and Crypto.com identifies no clear error in the court's decision. Further, the fact that Crypto.com agreed to stop offering its event contracts to Nevada residents pending appeal (ER-4) undercuts its claim of irreparable harm.

*Geofencing costs.* To comply with state gaming laws and the Wire Act, internet-betting companies implement geofencing technology. *See* 25-7516 1-ER-26. Crypto.com argues (Br. 69) that it should not have to incur that cost. But this is just the cost of doing business for state-regulated sportsbooks. *See* 25-7516 1-ER-26. In any event, these geofencing costs would be minuscule in comparison to Crypto.com's revenues. *See* 25-7516 1-StateSER-36-37.

*Harms from closing contracts.* Crypto.com asserts (Br. 69-70) that it would face harm from closing existing contracts with non-Nevada residents who travel to and from Nevada. But Crypto.com has not explained what proportion of its contracts that is or how much it would cost to refund

61

those contracts—it offers only speculation, which is insufficient to support injunctive relief. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). Further, this claimed harm is self-inflicted: Crypto.com started trading sports contracts despite the CFTC's express prohibition on them. 17 C.F.R. § 40.11(a). "[S]elf-inflicted" harms are not irreparable as a matter of law. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020).

*State enforcement action.* Crypto.com asserts (Br. 42, 69) that it would be harmed if Nevada filed a state enforcement action against it. But a state enforcement proceeding "typically does not constitute irreparable harm," because Crypto.com could raise any potential defense. *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203 (D.D.C. 2017). Notably, Crypto.com's competitors Kalshi, Polymarket, and Coinbase already are subject to enforcement actions in state court in Nevada (and Kalshi also is subject to an enforcement action in Massachusetts). *See* Mick Bransfield, *Summary of Legal Actions Involving Sports Event Contracts* (Jan. 21, 2026), perma.cc/ Y3CM-SGWS. The Nevada courts have restrained Polymarket and Coinbase, and the Massachusetts court has ruled against Kalshi, yet those businesses have not collapsed. *E.g.*, *Mass.*, 2026 WL 188019.

Crypto.com also raises (Br. 69) the possibility of criminal enforcement. But at this point, State Defendants simply seek to stop Crypto.com's unlaw-

ful operations by filing a state civil suit seeking a declaration and injunction. *See* NRS § 463.343. That is the exact process Nevada began against Polymarket, Coinbase, and Kalshi. *E.g.*, Compl., *Nevada v. Blockratize, Inc.*, No. 260C 000121B (Nev. 1st Jud. Dist. filed Jan. 16, 2026).

## B. The Balance of Equities and Public Interest Favor State Defendants

The district court found that every day Crypto.com operates in violation of Nevada law "imposes substantial hardships on the defendants" and on the public, which "has an interest in ensuring that unlicensed sports wagering does not occur on CFTC-designated exchanges." ER-30. There is no clear error in that finding.

***Enforcement of state law.*** A State "suffers a form of irreparable injury" "[a]ny time" it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 860-61 (2025)). State Defendants are statutorily charged with enforcing Nevada's gaming laws. ER-21. Preventing them from doing so poses an affront to Nevada's sovereignty and intrudes on the democratic will of the people.

***Harm to Nevada's gaming industry.*** Nevada has a sovereign interest in ensuring a fair and competitive gaming industry. NRS § 463.0129(1)(b)-(c); *see Sports Form, Inc. v. Leroy's Horse & Sports Place*,

63

108 Nev. 37, 41 (1992). Allowing Crypto.com to continue operating without complying with Nevada gaming law causes irreparable injury to Nevada's gaming industry. It gives Crypto.com a massive and unfair competitive advantage over its competitors: Crypto.com does not need to spend the money its competitors need to spend on licensing fees, taxes, and compliance, and its products are not subject to the same requirements as its competitors. *See* 25-7516 1-ER-28-29.

The harm increases significantly the longer Crypto.com operates. Crypto.com's profit from unlicensed gaming incentivizes others to shift sports betting to DCMs rather than becoming (or remaining) licensed by the State. That already has started to happen: DraftKings and FanDuel decided to forgo licensing in Nevada so that they can enter the prediction-markets business in other States. 25-7516 1-ER-28-29. Others could follow suit, "unleashing even more unregulated gambling and devastating the Nevada economy and related tax revenues." *Id.*

***Harm to the integrity of gaming.*** Nevada law permits wagers only when there are sufficient safeguards to ensure that wagering is fair. For example, licensed sportsbooks must follow strict protocols to ensure that insiders do not bet on games. Nev. Gaming Reg. 22.1205. To offer wagers on events other than organized sports contests, the sportsbook must prove that the event is "effectively supervised" and has "integrity safeguards." *Id.* at 22.1201(2)(c). Recent scandals in professional baseball and basketball

64

show the importance of those safeguards. 25-7516 1-ER-21 n.7. Yet Crypto.com offers sports betting without those safeguards—for which it and its competitors have drawn criticism from sports leagues. *See* Kendall Baker, *NCAA President Charlie Baker on Sports Betting*, Yahoo! Sports (Dec. 11, 2025), perma.cc/DDS6-XDDF; *CFTC Reauthorization: Stakeholder Perspectives Before the H. Comm. on Agric.*, 119th Cong. (2025) (statement of Jeff Miller, NFL), perma.cc/Z5X3-L9WR.

Crypto.com notes (Br. 43-44) that CFTC regulations protect against market manipulation. But the CFTC is not a gaming regulator, and the CFTC generally leaves DCMs to self-regulate. The CEO of Coinbase exposed these vulnerabilities when, at the end of a recent earnings call, he deliberately spoke five seemingly random words specifically to change the result of a Kalshi event contract on what he would say during the call. Emily Nicolle & Justina Lee, *Coinbase CEO Stunt Exposes Prediction Market Vulnerability*, Bloomberg (Oct. 31, 2025), perma.cc/9S4K-Q2K8. Nevada law does not allow wagers on these types of unregulated "events" precisely because of the risk of manipulation and the threat to public confidence.

***Harm to the public.*** Allowing Crypto.com to continue operating would harm some of Nevada's most vulnerable residents. Nevada law prohibits people under 21 from gaming, NRS § 463.350(1)(a); Crypto.com, by contrast, allows anyone over 18 to bet on its platform, Crypto.com, *Terms & Conditions* (Mar. 17, 2025), perma.cc/P8NZ-TPGS.

Nevada law also protects those suffering from problem gaming. It requires licensees to offer deposit-limit tools and to prominently display the State's responsible-gaming resources. Nev. Gaming Regs. 5.225(18)(a)-(b). "[N]either DCMs nor the CFTC is equipped to address those issues the same way state gaming regulators and licensed entities are." 25-7516 1-ER-28.

***Harm to the State's economy and finances.*** Licensed gaming is "vitally important to the economy of the State and the general welfare of the inhabitants." NRS § 463.0129(1)(a). In 2024, Nevada collected $2 billion in gaming taxes, which fund core public services. NRA, *Fact Book* 65. Unlicensed gaming threatens that revenue by evading taxes and diverting business from licensed sportsbooks that pay taxes. *See Sacco v. State*, 105 Nev. 844, 847 (1989).

Crypto.com has no response to any of this. It merely asserts (Br. 70) that because it is correct on the merits, none of the State's harms matter. But it is wrong on the merits. And if the merits were debatable, Crypto.com still would not succeed, because it has not shown that the balance of harms tips sharply in its favor.

## III. THE COURT SHOULD NOT REVERSE THE DENIAL OF JUDGMENT ON THE PLEADINGS

Crypto.com briefly argues (Br. 71) that the Court should not only reverse the denial of a *preliminary* injunction, but also should reverse the denial of its motion for judgment on the pleadings and direct the district court

66

to enter a *permanent* injunction. It devotes just a single sentence to this argument, which is not sufficient to preserve the argument for appeal. *See Chinaryan v. City of L.A.*, 113 F.4th 888, 903 (9th Cir. 2024).

In any event, reversal of the preliminary-injunction denial would not warrant reversal of the denial of the motion for judgment on the pleadings. Because Crypto.com did not separately seek interlocutory review of the denial of the motion for judgment on the pleadings under 28 U.S.C. § 1292(b), this Court may address that issue only if the Court determines that Crypto.com *will* (and not merely *is likely to*) succeed on the merits. *See Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1087-88 (9th Cir. 2015). Here, the district court's decision was necessarily preliminary—the court evaluated only the allegations in the complaint and did not even have any of Crypto.com's actual contracts before it. ER-11. There thus is no basis for granting Crypto.com judgment on the pleadings.

## CONCLUSION

The Court should affirm.

Dated:  March 3, 2026

Respectfully submitted,

/s/ *Nicole A. Saharsky*

Nicole A. Saharsky
Minh Nguyen-Dang
Matthew Bisanz
Wajdi C. Mallat
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000

Rory K. Schneider
Alexander S. Mendelson
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

Aaron D. Ford
 Attorney General of Nevada
Heidi Parry Stern
 Solicitor General
Jessica E. Whelan
 Chief Deputy Solicitor General—
 Litigation
Sabrena K. Clinton
Abigail L. Pace
State of Nevada,
 Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7187

I am the attorney or self-represented party.

**This brief contains** 15,302 **words,** including 79 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- ☐ it is a joint brief submitted by separately represented parties.
- ☑ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Nicole A. Saharsky **Date** 3/3/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 3, 2026. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 3, 2026

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky

**ADDENDUM**

# TABLE OF CONTENTS

**Page**

7 U.S.C. § 1a ...............................................................................1a

7 U.S.C. § 2 ................................................................................4a

7 U.S.C. § 6 ................................................................................5a

7 U.S.C. § 6c ...............................................................................6a

7 U.S.C. § 7a-2 ...........................................................................7a

7 U.S.C. § 16 ..............................................................................9a

15 U.S.C. § 3001 .......................................................................10a

18 U.S.C. § 1084 .......................................................................11a

25 U.S.C. § 2701 .......................................................................12a

17 C.F.R. § 33.3.........................................................................12a

17 C.F.R. § 40.11.......................................................................13a

NRS § 463.0129 .........................................................................14a

NRS § 463.0193 .........................................................................15a

NRS § 463.01962 .......................................................................15a

NRS § 463.170 ...........................................................................16a

NRS § 463.350 ...........................................................................17a

Nev. Gaming Reg. 5.225.............................................................19a

Nev. Gaming Reg. 22.1205..........................................................20a

Order, *Nevada v. Blockratize, Inc.*,
    No. 26-OC-00012-1B (Nev. 1st JD Jan. 29, 2026) ..........................21a

Order, *Nevada v. Coinbase Fin. Mkts., Inc.*,
    No. 26-OC-00030-1B (Nev. 1st Jud. Dist. Feb 5, 2026)....................31a

## STATUTORY AND REGULATORY AUTHORITIES

**1.    7 U.S.C. § 1a provides, in relevant part:**

**Definitions**

As used in this chapter:

\* \* \* \* \*

**(19) Excluded Commodity**

The term "excluded commodity" means—

(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

(I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

(II) based solely on one or more commodities that have no cash market;

(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or (iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and

(II) associated with a financial, commercial, or economic consequence.

\* \* \* \* \*

1a

**(36) Option**

The term "option" means an agreement, contract, or transaction that is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty".

\* \* \* \* \*

**(47) Swap**

**(A) In general**

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction—

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—

(I) an interest rate swap;

2a

(II) a rate floor;

(III) a rate cap;

(IV) a rate collar;

(V) a cross-currency rate swap;

(VI) a basis swap;

(VII) a currency swap;

(VIII) a foreign exchange swap;

(IX) a total return swap;

(X) an equity index swap;

(XI) an equity swap;

(XII) a debt index swap;

(XIII) a debt swap;

(XIV) a credit spread;

(XV) a credit default swap;

(XVI) a credit swap;

(XVII) a weather swap;

(XVIII) an energy swap;

(XIX) a metal swap;

(XX) an agricultural swap;

(XXI) an emissions swap; and

(XXII) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

## (B) Exclusions

The term "swap" does not include—

(i) any contract of sale of a commodity for future delivery (or option on such a contract), leverage contract authorized under section 23 of this title, security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

\* \* \* \* \*

## 2.    7 U.S.C. § 2 provides, in relevant part:

**Jurisdiction of Commission; liability of principal for act of agent; Commodity Futures Trading Commission; transaction in interstate commerce**

**(a) Jurisdiction of Commission; Commodity Futures Trading Commission**

### (1) Jurisdiction of Commission

#### (A) In general

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an

4a

"option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

* * * * *

## (e) Limitation on participation

It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.

* * * * *

**3.    7 U.S.C. § 6 provides, in relevant part:**

**Regulation of futures trading and foreign transactions**

## (a) Restriction on futures trading

Unless exempted by the Commission pursuant to subsection (c) or by subsection (e), it shall be unlawful for any person to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States, its territories or possessions, for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of

5a

a commodity for future delivery (other than a contract which is made on or subject to the rules of a board of trade, exchange, or market located outside the United States, its territories or possessions) unless—

(1) such transaction is conducted on or subject to the rules of a board of trade which has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity;

(2) such contract is executed or consummated by or through a contract market; and

(3) such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery: *Provided*, That each contract market or derivatives transaction execution facility member shall keep such record for a period of three years from the date thereof, or for a longer period if the Commission shall so direct, which record shall at all times be open to the inspection of any representative of the Commission or the Department of Justice.

\* \* \* \* \*

**4.    7 U.S.C. § 6c provides, in relevant part:**

**Prohibited transactions**

\* \* \* \* \*

**(b) Regulated option trading**

No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

Any such order, rule, or regulation may be made only after notice and opportunity for hearing, and the Commission may set different terms and conditions for different markets.

(c) Regulations for elimination of pilot status of commodity option transactions; terms and conditions of options trading

Not later than 90 days after November 10, 1986, the Commission shall issue regulations—

(1) to eliminate the pilot status of its program for commodity option transactions involving the trading of options on contract markets, including any numerical restrictions on the number of commodities or option contracts for which a contract market may be designated; and

(2) otherwise to continue to permit the trading of such commodity options under such terms and conditions that the Commission from time to time may prescribe.

\* \* \* \* \*

5.    7 U.S.C. § 7a-2 provides, in relevant part:

**Common provisions applicable to registered entities**

\* \* \* \* \*

**(c) New contracts, new rules, and rule amendments**

**(1) In general**

A registered entity may elect to list for trading or accept for clearing any new contract, or other instrument, or may elect to approve and implement any new rule or rule amendment, by providing to the Commission (and the Secretary of the Treasury, in the case of a contract of sale of a government security for future delivery (or option on such a contract) or a rule or rule amendment specifically related to such a contract) a written certification that the new contract or instrument or clearing of the new contract or instrument, new rule, or rule amendment complies with this chapter (including regulations under this chapter).

7a

**(2) Rule review**

The new rule or rule amendment described in paragraph (1) shall become effective, pursuant to the certification of the registered entity and notice of such certification to its members (in a manner to be determined by the Commission), on the date that is 10 business days after the date on which the Commission receives the certification (or such shorter period as determined by the Commission by rule or regulation) unless the Commission notifies the registered entity within such time that it is staying the certification because there exist novel or complex issues that require additional time to analyze, an inadequate explanation by the submitting registered entity, or a potential inconsistency with this chapter (including regulations under this chapter).

\* \* \* \* \*

**(5) Approval**

\* \* \* \* \*

**(C) Special rule for review and approval of event contracts and swaps contracts**

**(i) Event contracts**

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

(I) activity that is unlawful under any Federal or State law;

(II) terrorism;

(III) assassination;

(IV) war;

(V) gaming; or

8a

(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

### (ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

\* \* \* \* \*

**6.     7 U.S.C. § 16 provides, in relevant part:**

**Commission Operations**

\* \* \* \* \*

**(e) Relation to other law, departments, or agencies**

(1) Nothing in this chapter shall supersede or preempt—

(A) criminal prosecution under any Federal criminal statute;

(B) the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest—

(i) that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

(ii) (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

(iii) that is not subject to regulation by the Commission under section 6c or 23 of this title; or

(C) the application of any Federal or State statute, including any rule or regulation thereunder, to any person required to be registered or designated under this chapter who shall fail or refuse to obtain such registration or designation.

(2) This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of—

(A) an electronic trading facility excluded under section 2(e) of this title; and

(B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

\* \* \* \* \*

**(h) Regulation of swaps as insurance under State law**

A swap—

(1) shall not be considered to be insurance; and

(2) may not be regulated as an insurance contract under the law of any State.

**7.    15 U.S.C. § 3001 provides, in relevant part:**

**Congressional findings and policy**

(a) The Congress finds that—

(1) the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders;

10a

(2) the Federal Government should prevent interference by one State with the gambling policies of another, and should act to protect identifiable national interests; and

(3) in the limited area of interstate off-track wagering on horseraces, there is a need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers.

* * * * *

**8.    18 U.S.C. § 1084 provides, in relevant part:**

**Transmission of wagering information; penalties**

(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both.

(b) Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into a State or foreign country in which such betting is legal.

* * * * *

11a

**9.    25 U.S.C. § 2701 provides:**

**Findings**

The Congress finds that—

(1) numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;

(2) Federal courts have held that section 81 of this title requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts;

(3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;

(4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and

(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.

**10.    17 C.F.R. § 33.3 provides, in relevant part:**

**Unlawful commodity options transactions.**

(a) It shall be unlawful for any person to offer to enter into, enter into, confirm the execution of, or maintain a position in, any commodity option transaction subject to the provisions of this part unless the commodity option involved is traded (1) on or subject to the rules of a contract market which has been designated to trade commodity options pursuant to this part and (2) by or through a member thereof in accordance with the provisions of this part.

\* \* \* \* \*

12a

**11.    17 C.F.R. § 40.11 provides:**

**Review of event contracts based upon certain excluded commodities.**

(a) *Prohibition.*  A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

   (1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

   (2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b) [Reserved]

(c) *90-day review and approval of certain event contracts.*  The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90-day review.  The 90-day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

   (1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90-day review period.  The Commission shall post on the Web site a notification of the intent to carry out a 90-day review.

   (2) *Final determination.*  The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90-day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at

13a

the conclusion of such extended period agreed to or requested by the registered entity.

**12.   NRS § 463.0129 provides, in relevant part:**

**Public policy of state concerning gaming; license or approval revocable privilege.**

1. The Legislature hereby finds, and declares to be the public policy of this state, that:

(a) The gaming industry is vitally important to the economy of the State and the general welfare of the inhabitants.

(b) The continued growth and success of gaming is dependent upon public confidence and trust that licensed gaming and the manufacture, sale and distribution of gaming devices and associated equipment are conducted honestly and competitively, that establishments which hold restricted and nonrestricted licenses where gaming is conducted and where gambling devices are operated do not unduly impact the quality of life enjoyed by residents of the surrounding neighborhoods, that the rights of the creditors of licensees are protected and that gaming is free from criminal and corruptive elements.

(c) Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments and the manufacture, sale or distribution of gaming devices and associated equipment.

(d)  All establishments where gaming is conducted and where gaming devices are operated, and manufacturers, sellers and distributors of certain gaming devices and equipment must therefore be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State, to foster the stability and success of gaming and to preserve the competitive economy and policies of free competition of the State of Nevada.

* * * * *

14a

**13.    NRS § 463.0193 provides:**

**"Sports pool" defined.**  "Sports pool" means the business of accepting wagers on sporting events or other events by any system or method of wagering.

**14.    NRS § 463.01962 provides:**

**"Wager" defined.**  "Wager" means a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain.

**15.    NRS § 463.160 provides, in relevant part:**

**Licenses required; unlawful to permit certain gaming activities to be conducted without license; exceptions; separate license required for each location where operation of race book or sports pool conducted.**

1.  Except as otherwise provided in subsection 3 and NRS 462.155, 463.172 and 463.1725, it is unlawful for any person, either as owner, lessee or employee, whether for hire or not, either solely or in conjunction with others:

(a) To deal, operate, carry on, conduct, maintain or expose for play in the State of Nevada any gambling game, gaming device, slot machine, race book or sports pool;

(b) To provide or maintain any information service;

(c) To operate a gaming salon;

(d) To receive, directly or indirectly, any compensation or reward or any percentage or share of the money or property played, for keeping, running or carrying on any gambling game, slot machine, gaming device, race book or sports pool; or

(e) To operate, carry on, conduct, maintain or expose for play in or from the State of Nevada any interactive gaming system,

15a

without having first procured, and thereafter maintaining in effect, all federal, state, county and municipal gaming licenses or registrations as required by statute, regulation or ordinance or by the governing board of any unincorporated town.

* * * * *

**16.  NRS § 463.170 provides, in relevant part:**

**Qualifications for license, finding of suitability or approval; regulations.**

1.  Any person who the Commission determines is qualified to receive a license, to be found suitable or to receive any approval required under the provisions of this chapter, or to be found suitable regarding the operation of a charitable lottery under the provisions of chapter 462 of NRS, having due consideration for the proper protection of the health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada and the declared policy of this State, may be issued a state gaming license, be found suitable or receive any approval required by this chapter, as appropriate. The burden of proving an applicant's qualification to receive any license, be found suitable or receive any approval required by this chapter is on the applicant.

2.  An application to receive a license or be found suitable must not be granted unless the Commission is satisfied that the applicant is:

   (a) A person of good character, honesty and integrity;

   (b) A person whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest of this State or to the effective regulation and control of gaming or charitable lotteries, or create or enhance the dangers of unsuitable, unfair or illegal practices, methods and activities in the conduct of gaming or charitable lotteries or in the carrying on of the business and financial arrangements incidental thereto; and

   (c) In all other respects qualified to be licensed or found suitable consistently with the declared policy of the State.

16a

3. A license to operate a gaming establishment must not be granted unless the applicant has satisfied the Commission that:

(a) The applicant has adequate business probity, competence and experience, in gaming or generally; and

(b) The proposed financing of the entire operation is:

(1) Adequate for the nature of the proposed operation; and

(2) From a suitable source.

Any lender or other source of money or credit which the Commission finds does not meet the standards set forth in subsection 2 may be deemed unsuitable.

\* \* \* \* \*

**17.    NRS § 463.350 provides, in relevant part:**

**Gaming or employment in gaming prohibited for persons under 21; exception.**

1. A person under the age of 21 years shall not:

(a) Play, be allowed to play, place wagers at, or collect winnings from, whether personally or through an agent, any gambling game, slot machine, race book, sports pool or pari-mutuel operator.

\* \* \* \* \*

17a

**18.    Nev. Gaming Reg. 5.170 provides, in relevant part:**

**Programs to address problem gambling.**

* * * * *

2.  Each licensee shall post or provide in conspicuous places in or near gaming and cage areas and cash dispensing machines located in gaming areas written materials concerning the nature and symptoms of problem gambling and the toll-free telephone number of the National Council on Problem Gambling or a similar entity approved by the Board Chair that provides information and referral services for problem gamblers.

3.  Each licensee shall implement procedures and training for all employees who directly interact with gaming patrons in gaming areas. That training shall, at a minimum, consist of information concerning the nature and symptoms of problem gambling behavior and assisting patrons in obtaining information about problem gambling programs. This subsection shall not be construed to require employees of licensees to identify problem gamblers. Each licensee shall designate personnel responsible for maintaining the program and addressing the types and frequency of such training and procedures. Training programs conducted or certified by the Nevada Council on Problem Gambling are presumed to provide adequate training for the period certified by the Nevada Council on Problem Gambling.

4.  Each licensee that engages in the issuance of credit, check cashing, or the direct mail marketing of gaming opportunities, shall implement a program containing the elements described below, as appropriate, that allows patrons to self-limit their access to the issuance of credit, check cashing, or direct mail marketing by that licensee. As appropriate, such program shall contain, at a minimum, the following:

(a) The development of written materials for dissemination to patrons explaining the program;

(b) The development of written forms allowing patrons to participate in the program;

(c) Standards and procedures that allow a patron to be prohibited from access to check cashing, the issuance of credit, and the participation in direct mail marketing of gaming opportunities;

18a

(d) Standards and procedures that allow a patron to be removed from the licensee's direct mailing and other direct marketing regarding gaming opportunities at that licensee's location; and

(e) Procedures and forms requiring the patron to notify a designated office of the licensee within 10 days of the patron's receipt of any financial gaming privilege, material or promotion covered by the program.

\* \* \* \* \*

**19.   Nev. Gaming Reg. 5.225 provides, in relevant part:**

**Wagering accounts.**

\* \* \* \* \*

18.  Responsible Gambling.

(a) Licensees shall ensure that its patrons have the ability to select responsible gambling options associated with their wagering account that include deposit limits establishing the amount of total deposits a patron can make to their wagering account within a specified period of time.

(b) Licensees shall conspicuously display and make available to patrons, upon access to their wagering account, the following responsible gambling message:

[Licensee's name] encourages you to gamble responsibly. For problem gambling information and assistance, call the 24-hour confidential Problem Gamblers HelpLine at 1-800-522-4700, or visit www.WhenTheFunStops.org.

\* \* \* \* \*

19a

**20.   Nev. Gaming Reg. 22.1205 provides, in relevant part:**

**Prohibited wagers.**  No wagers may be accepted or paid by any book on:

1.  Any amateur sport or athletic event other than Olympic sporting or athletic events and collegiate sporting or athletic events as set out in this Regulation;

2.  Any sporting event or other event which the licensee knows or reasonably should know is being placed by, or on behalf of, an official, owner, coach, or staff of a participant or team or participant in that event. Each licensee shall take reasonable steps to prevent the circumvention of this regulation;

3.  The outcome of any election for any public office both within and without the State of Nevada; and

4. Any athletic sports event sanctioned by a governing body where the Chair has made a finding that the governing body is not effectively supervising such event or is not ensuring the integrity of such event.

* * * * *

20a

REC'D & FILED

2026 JAN 29 AM 9: 09

WILLIAM SCOTT HOEN
CLERK

BY_____

DEPUTY

IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR CARSON CITY

STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD,

Plaintiff,

vs.

BLOCKRATIZE, INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS, INC. d/b/a POLYMARKET,

Defendants.

Case No.: 26 OC 00012 1B

Dept. No.: 1

## ORDER GRANTING PLAINTIFF'S RENEWED *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

THIS MATTER is before the Court on a *Complaint for Permanent Injunction and Declaratory Relief* ("*Complaint*") filed January 16, 2026 by the NEVADA GAMING CONTROL BOARD ("BOARD") and *Plaintiff's Renewed Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Renewed Application*") filed by the BOARD on January 26, 2026. With the *Renewed Application*, the BOARD included the *Declaration of Jessica E. Whelan in Support of Plaintiff's Renewed Application for Ex Parte Temporary Restraining Order* ("*Declaration*"). Previously, in response to *Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Original Application*") filed January 16, 2026 and *Errata to Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Errata*") filed January 21, 2026, the

21a

*Defendants' Preliminary Response and Request for Opportunity to File Full Opposition to Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction and to Attend Hearing and Be Heard Thereon* was filed January 22, 2026 ("*Original Opposition*"). And in response to the *Renewed Application, Defendants' Preliminary Response and Renewed Request for Opportunity to File Full Opposition to Plaintiff's Renewed Application for Ex Parte Temporary Restraining Order* was filed January 27, 2026 ("*Renewed Opposition*"). The *Original Opposition* and *Renewed Opposition* are collectively referred to as the "*Opposition*" hereinafter. The *Original Application* and *Errata* were previously denied on procedural grounds without prejudice to the BOARD to resubmit the *Application*, and the BOARD's request for a preliminary injunction was scheduled for a hearing on February 19, 2026. The Court has reviewed the *Complaint, Renewed Application*, and *Opposition* and familiarized itself with the legal authorities cited therein.

### A. LEGAL STANDARD

As pertinent to the *Renewed Application,* NRCP 65 provides:

**(b) Temporary Restraining Order.**

> (1) **Issuing Without Notice.** The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

....

**22a**

**(d) Contents and Scope of Every Injunction and Restraining Order.**

**(1) Contents.** Every order granting an injunction and every restraining order must:
(A) state the reasons why it issued;
(B) state its terms specifically; and
(C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.

**(2) Persons Bound.** The order binds only the following who receive actual notice of it by personal service or otherwise:
(A) the parties;
(B) the parties' officers, agents, servants, employees, and attorneys; and
(C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Nevada law further explains that the injunctive relief of a temporary restraining order is authorized when it "appear[s] by the complaint that the plaintiff is entitled to the relief demanded"; the relief involves "restraining the commission or continuance of the act complained of"; and when continuance of the act "would produce great or irreparable injury to the plaintiff." NRS 33.010; *Posner v. U.S. Bank N.A.*, 140 Nev. Adv. Op. 22, 545 P.3d 1150, 1152 (Nev. 2024) (holding injunctive relief is "'proper where the moving party can demonstrate that it has a reasonable likelihood of success on the merits and that, absent [such relief], it will suffer irreparable harm for which compensatory damages would not suffice.'" (*quoting Excellence Cmty. Mgmt., LLC v. Gilmore*, 131 Nev. 347, 351, 351 P.3d 720, 722 (Nev. 2015))).

In addition, the balance of hardships and public interest may be considered in determining whether injunctive relief is warranted and, if so, the scope and nature of that relief. *University & Cmty. College Sys. of Nev. v. Nevadans for Sound Gov't*, 120 Nev. 712, 721, 100 P.3d 179, 187 (2004).

\\\
\\\
\\\
\\\
\\\

**23a**

## B. ANALYSIS

**1. Based on the information that has been presented at this early stage in the proceedings, the BOARD appears to be reasonably likely to prevail on the merits of the underlying case.**

Here, the *Complaint, Application,* and *Declaration* satisfy the requirements of NRCP 65(b)(1) for issuance of the requested temporary restraining order without notice. As a threshold matter, the BOARD has a "reasonable likelihood of success on the merits." First, the *Complaint* establishes that gaming in Nevada is expansively and strictly regulated. The BOARD, in conjunction with the Nevada Gaming Commission, has virtually comprehensive statutory authority over gaming in Nevada. *See generally* Nev. Rev. Stat. ch. 463. The strict regulation of gaming promotes the public interest in several respects, including the prevention of underage gambling, preservation of the integrity of the events which are the subject of gaming wagers, and exclusion of unsuitable individuals from gaming activities. NRS 463.166, .350, *Nev. Gam'g Comm. Reg.* 22.1205(2). Gaming in Nevada may only be conducted by an entity licensed under the authority of the Nevada Gaming Control Act. NRS 463.160

Second, "gaming" as used in Nevada law includes a "percentage game," and a "wager" in a "sports pool." NRS 493.0152, .0193, .01962. "Percentage games are … games where patrons wager against each other and the house takes a percentage of each wager as a 'rake-off.'" *Hughes Properties v. State*, 100 Nev. 295, 297, 680 P.2d 970, 971 (1984). A "wager" is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." NRS 463.01962. And a "sports pool" is "the business of accepting wagers on sporting events or other events by any system or method of wagering." NRS 463.0193.

Third, the record at this early stage in the proceedings indicates BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC d/b/a POLYMARKET US, and ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively, "POLYMARKET") are not licensed under the Nevada Gaming Control Act.

\\\\

**24a**

Fourth, the record at this early stage in the proceedings indicates POLYMARKET offers "event-based contracts" that relate to sporting and other events, including college basketball games, college and professional football games and elections. Under Nevada law, this conduct constitutes the operation of a "sports pool" as it involves the acceptance of "wagers" concerning "sporting events or other events" "for which the outcome is uncertain." Further, the record indicates POLYMARKET takes a commission on contracts purchased through its system, meaning it is operating a "percentage game" as defined in Nevada law.

And, finally, the Court has considered POLYMARKET's contention that it "operates a federally designated contract market subject to the 'exclusive jurisdiction' of the Commodity Futures Trading Commission." As such, POLYMARKET asserts federal law, specifically 7 U.S.C. §2(a)(1)(A), preempts the BOARD's effort to subject its "event-based contracts" to Nevada law. The question of federal preemption in this regard is nuanced and rapidly evolving. At the moment, the balance of convincing legal authority weighs against federal preemption in this context. *See KalshiEx, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 U.S. Dist. LEXIS 234246 at *11-38 (D. Nev. Nov. 24, 2025) [hereinafter referred to as "*KalshiEx*"]; *see also North American Derivatives Ex., Inc. v. Nev. Gaming Control Bd.*, No. 2:25-cv-00978-APG-BNW, 2025 U.S. Dist. LEXIS 466366 (D. Nev. Oct. 14, 2025) (holding contracts based on outcome of sporting events are not "swaps" under the Commodity Exchange Act and are not subject to exclusive jurisdiction of CFTC), *KalshiEx, LLC v. Martin*, No. 25-cv-1283-ABA, 793 F. Supp. 3d 667, 2025 U.S. Dist. LEXIS 147815 (D. Maryland Aug. 1, 2025) (holding state law not preempted by Commodity Exchange Act as applied to sports-related event contracts). *But see KalshiEx, LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 U.S. Dist. LEXIS 79893 (D.N.J. April 28, 2025) (holding state law preempted by Commodity Exchange Act as applied to sports-related event contracts). The reasoning in *KalshiEx* is persuasive. Therefore, this Court concludes that based on the current state of the law, the Commodities Exchange Act, more specifically 7 U.S.C. §2(a)(1)(A), fairly interpreted, does not vest exclusive jurisdiction over POLYMARKET's contracts with the Commodity Futures Trading Commission. As such, \\\\

**25a**

Nevada law is not preempted and the BOARD has authority to prosecute the enforcement action presented by the *Complaint* and *Renewed Application.*

### 2. The BOARD's injuries are irreparable and non-compensable.

If POLYMARKET's acts are wrongful, the resulting harm in evasion of Nevada's "comprehensive regulatory structure" and "strict licensing standards" is immediate, irreparable and not sufficiently remediable by compensatory damages. The BOARD has a statutory duty to protect the public and advance Nevada's interest in administering a reputable gaming industry with integrity. In furtherance of that duty, the BOARD is obliged to consistently and equitably monitor and enforce regulatory and statutory compliance among all industry participants and protect the health, safety, morals, good order, and general welfare of gaming consumers. An unlicensed participant beyond the BOARD's control, such as POLYMARKET, obstructs the BOARD's ability to fulfill its statutory functions. For example, the BOARD lacks authority to ensure that wagers are not being accepted by POLYMARKET from owners, coaches, players or officials who are in a position to influence the outcome of a sporting event. The BOARD also has no means to ensure that underage individuals are not allowed to purchase POLYMARKET's contracts and no ability to enforce any sanction against POLYMARKET even it determined this to be the case. Additionally, the BOARD has no way to know, much less prevent, if unsuitable individuals are involved with POLYMARKET's activities in Nevada. By their nature, the nature of these injuries cannot be mitigated, much less restored, by compensatory damages after the injury is incurred.

These potential consequences must be characterized as irreparable under Nevada law. As such, they support issuance of a temporary restraining order.

### 3. The *Declaration* establishes immediate and irreparable injury will result if POLYMARKET is allowed a full opportunity to respond before the temporary restraining order is issued.

As the *Declaration* and the record establish, POLYMARKET has been provided notice of the BOARD's filings as well as the actual filings themselves. Further, POLYMARKET has been given some opportunity to respond and, in fact, responded, albeit to a limited extent. POLYMARKET requests that this Court defer issuance of any injunctive relief until it is able to

**26a**

"file a comprehensive opposition" which it anticipates filing "February 2, 2026 or by any shortened deadline the Court deems appropriate." POLYMARKET's request is clearly in good faith and not for the purposes of delay, as it unilaterally proposes a significantly expedited schedule. Issuance of the temporary restraining order in advance of POLYMARKET's comprehensive response may necessitate conversion of the response to a motion to dissolve under NRCP 65(b)(4), but there is nothing to otherwise prevent POLYMARKET from being fully and fairly heard on the issues in dispute and on an expedited basis. However, the nature of the BOARD's injuries which are alleged and, at least preliminarily, substantiated are imminent. They are also the types of injuries that exacerbate with each day that POLYMARKET operates in Nevada outside the authority of the BOARD. A day means more consumers. More consumers mean more transactions. More transactions means more potential harm to the BOARD. As such, every day matters in this case in a literal sense. For these reasons, this Court deems immediate action to be necessary and issues the temporary restraining order in advance of POLYMARKET providing the comprehensive response it contemplates.

**4. The balance of hardships and public interest weigh in favor of issuing the temporary restraining order.**

Largely for the reasons that have already been explained above, the balance of hardships and public interest in maintaining meaningful control over Nevada's gaming industry for the purpose of ensuring its integrity strongly supports issuance of the temporary restraining order. Beyond the factors previously addressed, if it is later determined that the temporary restraining order was issued wrongfully, POLYMARKET would have been denied a brief period in the market which damaged them in an amount that should be relatively straightforward to quantify and, if legally redressable, compensate. There is no reciprocal remedy for the BOARD if the temporary restraining order is wrongfully denied.

**5. No security is required.**

A party who is the beneficiary of a temporary restraining order is typically required to post security for damages resulting from wrongful issuance of the temporary restraining order.

\\\\

**27a**

NRCP 65(c). However, the BOARD, as an agency of the State of Nevada, is exempted from that typical requirement. *Id.* Therefore, no security will be required.

**6. The duration of the temporary restraining order is limited to 14 days.**

NRCP 65(b)(2) limits the duration of a temporary restraining order without notice to a maximum of 14 days unless it is extended for good cause or the adverse party consents to a longer period. The *Renewed Application* urges this Court to extend the temporary restraining order until February 19, 2026 when the hearing on the preliminary injunction was set. This is insufficient to establish good cause for an extended duration. First, the February 19, 2026 hearing was set at a time when no temporary restraining order had been issued. As such, no effort was made to expedite the hearing further and schedule it within a 14-day period. Second, the *Renewed Opposition* indicates POLYMARKET's counsel is not available on February 19, 2026, so the hearing must be re-scheduled anyway. For these reasons, there is insufficient cause to extend the order beyond the normal 14-day time period at this time. Therefore, the BOARD's request to do so is denied, but denied without prejudice to request an extension in a subsequent filing if it believes circumstances develop to support good cause for a renewed request.

**C. ORDER**

Therefore, good cause appearing,

**IT IS HEREBY ORDERED** that *Plaintiff's Renewed Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction* filed on January 26, 2026 is **GRANTED** insofar as it requests issuance of a temporary restraining order.

**IT IS HEREBY FURTHER ORDERED** that a hearing on *Plaintiff's Renewed Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction* filed January 26, 2026 will be held in the First Judicial District Court, located at 885 East Musser Street, Carson City, Nevada, Department I, on **February 11, 2026, at 9:00 a.m.**

**IT IS HEREBY FURTHER ORDERED** that the hearing on the *Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* filed January 16, 2026 set by the January 23, 2026 *Order Denying Application for Temporary Restraining Order*

**28a**

29a

*Without Prejudice and Setting Hearing on Motion for Preliminary Injunction* on **February 19, 2026 at 1:30 p.m.** is **VACATED**.

Dated this 29ᵗʰ day of January, 2026.

Jason D. Woodbury
DISTRICT JUDGE

29a

## CERTIFICATE OF MAILING

The undersigned, an employee of the First Judicial District Court, hereby certifies that on the _24_ day of January, 2026, I served the foregoing Order by placing a copy in the United States Mail, postage prepaid, addressed as follows:

Aaron D. Ford, Attorney General
Jessica E. Whelan, Chief Deputy Solicitor General – Litigation
Sabrena K. Clinton, Senior Deputy Attorney General
John S. Michela, Senior Deputy Attorney General
State of Nevada
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

Jacob T. Spencer, Esq.
Gibson, Dunn & Crutcher, LLP
1700 M. Street, N.W.
Washington, D.C. 20036-4504

Orin Snyder, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

Robert A. Dotson, Esq.
Daniel T. Hayward, Esq.
Justin C. Vance, Esq.
Dotson, Hayward & Vance, PC
5355 Reno Corporate Drive, Suite 100
Reno, NV 89511

_____
Julie Harkleroad
Judicial Assistant, Dept. 1

**30a**

AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General - Litigation
John S. Michela (Bar No. 8189)
  Senior Deputy Attorney General
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
jmichela@ag.nv.gov
sclinton@ag.nv.gov

*Attorneys for Plaintiff*

REC'D & FILED

2026 FEB -5 AM 9: 23

WILLIAM SCOT~~~~
CLERK

BY_____
DEPUTY

## IN THE FIRST JUDICIAL DISTRICT COURT OF
## THE STATE OF NEVADA IN AND FOR CARSON CITY

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD, | Case No. 26 OC 00030 1B |
| Plaintiff, | Dept. No. II |
| vs. | |
| COINBASE FINANCIAL MARKETS, INC., | |
| Defendant. | |

[PROPOSED] ORDER GRANTING PLAINTIFF'S APPLICATION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER

This matter having come before the Court on Plaintiff, STATE OF NEVADA, ex rel. NEVADA GAMING CONTROL BOARD's ("BOARD") Complaint for Permanent Injunction and Declaratory Relief and its Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction filed by the BOARD on February 2, 2026. On February 3, 2026, Defendant COINBASE FINANCIAL MARKETS, INC.("COINBASE") filed a Preliminary Opposition to Plaintiff's Application for Ex Parte Temporary Restraining

Page 1 of 9

**31a**

Order and Motion for Preliminary Injunction, and Request for Opportunity to File a Full Opposition and to be Heard Thereon.

The Court having reviewed the Complaint, the Application, and Opposition, hereby CONCLUDES as follows:

The BOARD seeks to restrain and enjoin COINBASE and any of its agents, employees, officers, or affiliates from operating a derivatives exchange and prediction market that offers event-based contracts relating to sporting and other events to people within Nevada without obtaining all required Nevada gaming licenses, and from allowing its market to accept wagers from persons under the age of 21.

A temporary restraining order or a preliminary injunction may be issued pursuant to NRCP 65. Under Nevada law a temporary restraining order is authorized when it "appear[s] by the complaint that the plaintiff is entitled to the relief demanded"; the relief involves "restraining the commission or continuance of the act complained of"; and when continuance of the act "would produce great or irreparable injury to the plaintiff." NRS 33.010; *Posner v. U.S. Bank N.A.,* 140 Nev. Adv. Op. 22, 545 p.3d 1150, 1152 (Nev. 2024) (holding injunctive relief is "proper where the moving party can demonstrate that it has a reasonable likelihood of success on the merits and that, absent [such relief], it will suffer irreparable harm for which compensatory damages would not suffice." (internal citation omitted)).

In addition, the balance of hardships and public interest may be considered in determining whether injunctive relief is warranted and, if so, the scope and nature of that relief. *University & Cmty. College Sys. of Nev. v. Nevadans for Sound Gov 't,* 120 Nev. 712, 721, 100 P.3d 179, 187 (2004).

Although the doctrine of horizontal *stare decisis* does not strictly apply in Nevada, *see* NRS 3.220 (district courts of state have equal and coextensive jurisdiction), the Court is persuaded by the reasoning of Judge Woodbury in *State ex rel. Nevada Gaming Control Board v. Blockratize, Inc.,* No. 26 OC 00012 1B (Order Granting Plaintiff's Renewed Ex

Page 2 of 9

32a

Parte Application for Temporary Restraining Order, January 29, 2026). The Court therefore adopts that reasoning in large part below.

## I.     The BOARD is reasonably likely to prevail on the merits.

The Complaint, Application, and Declaration in support of Application satisfy the requirements of NRCP 65(b)(l) for issuance of the requested temporary restraining order without notice. As a threshold matter, the BOARD has a "reasonable likelihood of success on the merits."

**First,** the Complaint establishes that gaming in Nevada is expansively and strictly regulated. The BOARD, in conjunction with the Nevada Gaming Commission, has virtually comprehensive statutory authority over gaming in Nevada. *See generally* NRS Chapter 463 et seq. The strict regulation of gaming promotes the public interest in several respects, including the prevention of underage gambling, preservation of the integrity of the events which are the subject of gaming wagers, and exclusion of unsuitable individuals from gaming activities. NRS 463.166, .350, *Nev. Gam 'g Comm. Reg.* 22.1205(2). Gaming in Nevada may only be conducted by an entity licensed under the authority of the Nevada Gaming Control Act. NRS 463.160.

**Second,** "gaming" as used in Nevada law includes a "percentage game," and a "wager" in a "sports pool." NRS 493.0152, .0193, .01962. "Percentage games are ... games where patrons wager against each other and the house takes a percentage of each wager as a 'rake-off.'" *Hughes Properties v. State,* 100 Nev. 295,297,680 P.2d 970,971 (1984). A "wager" is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." NRS 463.01962. And a "sports pool" is "the business of accepting wagers on sporting events or other events by any system or method of wagering." NRS 463.0193.

**Third,** the record at this early stage in the proceedings indicates COINBASE is not licensed under the Nevada Gaming Control Act.

**Fourth,** the record at this early stage in the proceedings indicates COINBASE offers "event-based contracts" that relate to sporting and other events, including college

Page 3 of 9

33a

basketball games, college and professional football games and elections. Under Nevada law, this conduct constitutes the operation of a "sports pool" as it involves the acceptance of "wagers" concerning "sporting events or other events" "for which the outcome is uncertain." Further, the record indicates COINBASE takes a commission on contracts purchased through its system, meaning it is operating a "percentage game" as defined in Nevada law.

**Finally**, the Court has considered COINBASE's assertions that it offers Nevada users the ability to trade event contracts on its platform through a partnership with KalshiEX, LLC ("KALSHI"), a CFTC-registered exchange that lists event contracts for trading; that COINBASE is a CFTC-registered intermediary between COINBASE customers and KALSHI's exchange acting as execution and clearing agents that facilitate access to markets; that Nevada gaming laws are preempted with respect to the event contracts offered on a federally regulated exchange; and that the CEA grants the CFTC exclusive jurisdiction to regulate "transactions involving swaps traded or executed on a [federally designated] contract market." 7 U.S.C. §2(a)(1)(A).

The question of federal preemption in this regard is nuanced and rapidly evolving. At the moment, the balance of convincing legal authority weighs against federal preemption in this context. *See KalshiEx, LLC v. Hendrick,* No. 2:25-cv-00575-APG-BNW, 2025 U.S. Dist. LEXIS 234246 at *11-38 (D. Nev. Nov. 24, 2025) [hereinafter referred to as *"KalshiEx"]; see also North American Derivatives Ex., Inc. v. Nev. Gaming Control Bd.,* No. 2:25-cv-00978-APG-BNW, 2025 U.S. Dist. LEXIS 466366 (D. Nev. Oct. 14, 2025) (holding contracts based on outcome of sporting events are not "swaps" under the Commodity Exchange Act and are not subject to exclusive jurisdiction of CFTC), *KalshiEx, LLC v. Martin,* No. 25-cv-1283-ABA, 793 F. Supp. 3d 667, 2025 U.S. Dist. LEXIS 147815 (D. Maryland Aug. 1, 2025) (holding state law not preempted by Commodity Exchange Act as applied to sports-related event contracts). *But see KalshiEx, LLC v. Flaherty,* No. 25-cv-

Page 4 of 9

**34a**

02152-ESK-MJS, 2025 U.S. Dist. LEXIS 79893 (D.N.J. April 28, 2025) (holding state law preempted by Commodity Exchange Act as applied to sports-related event contracts).[1] The reasoning in *KalshiEx* is persuasive. Therefore, this Court concludes that based on the current state of the law, the Commodities Exchange Act, more specifically 7 U.S.C. §2(a)(l)(A), fairly interpreted, does not vest exclusive jurisdiction over COINBASE event contracts with the Commodity Futures Trading Commission. As such, Nevada law is not preempted and the BOARD has authority to prosecute the enforcement action presented by the Complaint and the Application.

## II.      The BOARD's injuries are irreparable and non-compensable.

If COINBASE's acts are wrongful, the resulting harm to Nevada's "comprehensive regulatory structure" and "strict licensing standards" is immediate, irreparable and not sufficiently remediable by compensatory damages. The BOARD has a statutory duty to protect the public and advance Nevada's interest in administering a reputable gaming industry with integrity. In furtherance of that duty, the BOARD is obliged to consistently and equitably monitor and enforce regulatory and statutory compliance among all industry participants and protect the health, safety, morals, good order, and general welfare of gaming consumers. An unlicensed participant beyond the BOARD's control, such as COINBASE, obstructs the BOARD's ability to fulfill its statutory functions. For example, the BOARD lacks authority to ensure that wagers are not being accepted by COINBASE from owners, coaches, players or officials who are in a position to influence the outcome of a sporting event. The BOARD also has no means to ensure that underage individuals are not allowed to purchase COINBASE's contracts and no ability to enforce any sanction against COINBASE if it determined this to be the case. Additionally, the BOARD has no way to know, much less prevent, if unsuitable individuals are involved with COINBASE's activities in Nevada. By their nature, the nature of these injuries cannot be mitigated,

---

[1] Notably, the New Jersey federal district court relied primarily on the reasoning of the Nevada federal district court in *KalshiEx* in that court's initial grant of KALSHI's motion for preliminary injunction—an injunction that was later dissolved. *See generally Flaherty*, 2025 U.S. Dist. LEXIS 79893

Page 5 of 9

35a

much less restored, by compensatory damages after the injury is incurred. The fact that KALSHI is not currently enjoined from offering event contracts in Nevada does not negate the harm caused by COINBASE's facilitation of event contracts absent a temporary restraining order.[2]

These potential consequences must be characterized as irreparable under Nevada law. As such, they support issuance of a temporary restraining order.

**III.  The *Declaration* establishes that immediate and irreparable injury will result if COINBASE is allowed a full opportunity to respond before the temporary restraining order is issued.**

As the *Declaration* and the record establish, COINBASE has been provided notice of the BOARD's filings as well as the actual filings themselves. Further, COINBASE has been given some opportunity to respond and, in fact, responded with its Preliminary Opposition. COINBASE requests an opportunity to file a full opposition and be heard thereon, or that the Court deny the BOARD's request for a TRO and set an expedited briefing schedule and hearing on the BOARD's motion for preliminary injunction. Issuance of the temporary restraining order in advance of COINBASE's comprehensive response may necessitate conversion of the response to a motion to dissolve under NRCP 65(b)(4), but there is nothing to otherwise prevent COINBASE from being fully and fairly heard on the issues in dispute and on an expedited basis. The nature of the BOARD's injuries which are alleged and, at least preliminarily, substantiated are imminent. They are also the types of injuries that exacerbate with each day that COINBASE operates in Nevada outside the authority of the BOARD. A day means more consumers. More consumers mean more transactions. More transactions means more potential harm to the BOARD. As such, every day matters in this case in a literal sense. For these reasons, this Court deems immediate action to be necessary and issues the temporary restraining order in advance of COINBASE providing the comprehensive response it contemplates.

---

[2] KALSHI is currently involved in litigation with the BOARD in *KalshiEx*, and its unique circumstances are not before this Court.

Page 6 of 9

**IV. The balance of hardships and public interest weigh in favor of issuing the temporary restraining order.**

Largely for the reasons that have already been explained above, the balance of hardships and public interest in maintaining meaningful control over Nevada's gaming industry for the purpose of ensuring its integrity strongly supports issuance of the temporary restraining order. Beyond the factors previously addressed, if it is later determined that the temporary restraining order was issued wrongfully, COINBASE would have been denied a brief period in the market which damaged them in an amount that should be relatively straightforward to quantify and, if legally redressable, compensate. There is no reciprocal remedy for the BOARD if the temporary restraining order is wrongfully denied.

**V. No security is required.**

A party who is the beneficiary of a temporary restraining order is typically required to post security for damages resulting from wrongful issuance of the temporary restraining order. NRCP 65(c). However, the BOARD, as an agency of the State of Nevada, is exempted from that typical requirement. *Id.* Therefore, no security will be required.

**VI. The duration of the temporary restraining order is limited to 14 days.**

NRCP 65(b )(2) limits the duration of a temporary restraining order without notice to a maximum of 14 days unless it is extended for good cause or the adverse party consents to a longer period. There is no request to extend the deadline nor has COINBASE consented to a longer period, so the duration of the TRO is 14 days from the date of this Order.

Therefore, good cause appearing,

**IT IS HEREBY ORDERED** that Plaintiff's Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction filed on February 2, 2026 is **GRANTED** insofar as it requests issuance of a temporary restraining order to prohibit COINBASE from offering or facilitating the offering of event contract in Nevada.

**IT IS HEREBY FURTHER ORDERED** that a hearing on Plaintiff's Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction filed February 2, 2026 will be held in the First Judicial District Court, located at 885 East Musser Street, Carson City, Nevada, Department II, on **February *17*, 2026, at *2:00 p.m.***

**IT IS HEREBY FURHTER ORDERED** that the BOARD will serve a notice of entry of the order on COINBASE and file proof of such service within 7 days after the date the court sent the order to the attorney.

2/5/2026

*Kristin Luis*

KRISTIN LUIS
DISTRICT COURT JUDGE

*Respectfully submitted:*
AARON D. FORD
Attorney General
By: /s/ *Jessica E. Whelan*
Jessica E. Whelan (Bar No. 14781)
Chief Deputy Solicitor General – Litigation
John S. Michela (Bar No. 8189)
 Senior Deputy Attorney General
Sabrena K. Clinton (Bar No. 6499)
Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
jwhelan@ag.nv.gov, jmichela@ag.nv.gov,
sclinton@ag.nv.gov