Nos. 25-7187, 25-7516, 25-7831 (Consolidated)

In the
# United States Court of Appeals
## for the Ninth Circuit

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D/B/A CRYPTO.COM | DERIVATIVES NORTH AMERICA,

*Plaintiff-Appellant*,

v.

THE STATE OF NEVADA, ET AL.,

*Defendants-Appellees*,

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant-Appellee*.

On Appeal from the United States District Court for the
District of Nevada, Case No. 2:25-cv-00978-APG-BNW
Hon. Andrew P. Gordon, *Chief United States District Judge*

**PLAINTIFF-APPELLANT NORTH AMERICAN DERIVATIVES
EXCHANGE, INC. D/B/A CRYPTO.COM | DERIVATIVES NORTH
AMERICA'S REPLY BRIEF**

David Meister
Robert A. Fumerton
Chad E. Silverman
Judith A. Flumenbaum
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

Shay Dvoretzky
 *Counsel of Record*
Parker Rider-Longmaid
Sylvia O. Tsakos
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1440 New York Ave. NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Plaintiff-Appellant North American Derivatives Exchange, Inc. d/b/a
Crypto.com | Derivatives North America
(additional counsel information on inside cover)*

*Counsel information continued from front cover*

Bradley Austin
SNELL & WILMER
1700 South Pavilion Center Dr.
 Ste. 700
Las Vegas, NV 89135

Nowell D. Bamberger
Matthew C. Solomon
CLEARY GOTTLIEB STEEN &
 HAMILTON LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037

*Counsel for Plaintiff-Appellant North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................. 1

ARGUMENT .................................................................................................... 4

I.    CDNA will likely succeed on the merits because the CEA preempts the application of Nevada's gaming laws to trading on DCMs, including the trading of CDNA's sports-event contracts. ................................................................................................... 4

    A.    Section 2(a)(1)(A) expressly preempts state law as applied to swap-trading on DCMs by placing regulatory authority within the CFTC's "exclusive jurisdiction." ................................... 4

        1.    Section 2(a)(1)(A)'s text and context make clear, and statutory and legislative history confirm, that the CEA expressly preempts state law as applied to swap-trading on DCMs. ....................................................... 5

        2.    Nevada's counterarguments lack merit. .............................. 7

    B.    Section 2(a)(1)(A) expressly preempts Nevada's gaming laws as applied to CDNA's sports-event contracts, as conflict preemption confirms. ........................................................ 9

        1.    CDNA's sports-event contracts are swaps traded on a DCM. ................................................................................. 9

            a.    Nevada's supposed textual arguments fail because, unlike a textual argument, they read words into § 1a(47) that are not there. ...................... 11

            b.    The CEA's Special Rule confirms that "swaps" include sports-event contracts. ............................... 17

**TABLE OF CONTENTS**
(continued)

**Page**

        c.      Interpreting "swap" to include sports-event contracts is consistent with the purpose of the Dodd-Frank Act. ........................................................20

        d.      Nevada's fear-mongering argument that sports-event contracts can't be swaps, because that would mean sports wagers are swaps, lacks merit.................................................................22

        e.      Sports-event contracts are also options. ..................26

    2.      Section 2(a)(1)(A) expressly preempts Nevada's gaming laws as applied to the trading of CDNA's sports-event contracts..........................................................28

    3.      Obstacle and impossibility preemption illustrate why Congress enacted § 2(a)(1)(A) and confirm that the CEA leaves no room for Nevada's gaming laws........28

  C.    The CEA also preempts the field of *all* trading on DCMs—no matter whether the derivatives are swaps or something else—including Nevada gaming laws as applied to CDNA's sports-event contracts..................................30

II.    The balance of harms and the public interest favor a preliminary injunction............................................................................33

CONCLUSION..............................................................................................37

CERTIFICATE OF COMPLIANCE................................................................38

CERTIFICATE OF SERVICE.........................................................................39

- ii -

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Agriculture Movement, Inc. v.
Board of Trade of Chicago,*
977 F.2d 1147 (7th Cir. 1992)............................................................1, 6, 29, 30

*Arizona v. United States,*
567 U.S. 387 (2012)................................................................................................31

*Barton v. Barr,*
590 U.S. 222 (2020)................................................................................................16

*Big Lagoon Rancheria v. California,*
789 F.3d 947 (9th Cir. 2015) .......................................................................31, 32

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) ............................................................................34

*CFTC v. Trade Exchange Network Ltd.,*
117 F. Supp. 3d 29 (D.D.C. 2015)....................................................................27

*Department of Agriculture Rural Development
Rural Housing Service v. Kirtz,*
601 U.S. 42 (2024)..................................................................................................11

*Drapich v. Donovan,*
693 F.2d 1296 (9th Cir. 1983)............................................................................14

*KalshiEX LLC v. CFTC,*
119 F.4th 58 (D.C. Cir. 2024) ..........................................................................32

*Leist v. Simplot,*
638 F.2d 283 (2d Cir. 1980).................................................................................. 7

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024)................................................................................................22

*Marx v. General Revenue Corp.,*
568 U.S. 371 (2013)................................................................................................15

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
456 U.S. 353 (1982)...................................................................................6, 17, 30

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Mississippi v. Louisiana*,
    506 U.S. 73 (1992) ............................................................................... 5

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) .......................................................................33, 35

*Murphy v. National Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018) .......................................................................25, 30

*NIH v. American Public Health Ass'n*,
    145 S. Ct. 2658 (2025) .........................................................................33

*Oklahoma v. Castro-Huerta*,
    597 U.S. 629 (2022) .............................................................................16

*Puerto Rico v. Franklin California Tax-Free Trust*,
    579 U.S. 115 (2016) ............................................................................. 7

*Stanley v. City of Sanford*,
    606 U.S. 46 (2025) .........................................................................20, 21

*Thrifty Oil Co. v. Bank of America
    National Trust & Savings Ass'n*,
    322 F.3d 1039 (9th Cir. 2003) .............................................................11

*United States v. Atlantic Research Corp.*,
    551 U.S. 128 (2007) .............................................................................16

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ..........................................................33, 34

*Velázquez v. Bondi*,
    604 U.S. 712 (2025) .............................................................................14

*Yates v. United States*,
    574 U.S. 528 (2015) .............................................................................23

**STATUTES**

Administrative Procedure Act (APA)
    5 U.S.C. § 551 *et seq.*..........................................................................31

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

5 U.S.C. § 551(13) ................................................................31

Commodity Exchange Act (CEA)
7 U.S.C. § 1 *et seq.*.................................................1, 2, 3, 4, 5,
.......................................................................6, 8, 17, 20, 21,
................................................................. 25, 27, 28, 29, 30, 31

7 U.S.C. § 1a(19)(iv) ...........................................................27

7 U.S.C. § 1a(36) ............................................................26, 27

7 U.S.C. § 1a(47) ................................................................11

7 U.S.C. § 1a(47)(A) .....................................................11, 12, 16

7 U.S.C. § 1a(47)(A)(ii) .........................................................1, 9, 10,
.......................................................................12, 14, 15,
.........................................................................16, 17, 20, 26

7 U.S.C. § 1a(47)(A)(iii) ....................................................16, 17

7 U.S.C. § 1a(47)(A)(iii)(XVII)...............................................12

7 U.S.C. § 1a(47)(A)(iii)(XVIII) ..............................................12

7 U.S.C. § 1a(47)(A)(iii)(XIX) ...............................................12

7 U.S.C. § 1a(47)(A)(iii)(XX) ................................................12

7 U.S.C. § 1a(47)(A)(iv) ...................................................12, 15

7 U.S.C. § 1a(47)(A)(vi) ....................................................15, 16

7 U.S.C. § 2(a)(1) ................................................................ 7

7 U.S.C. § 2(a)(1)(A).............................................................1, 4, 5, 6,
.......................................................................7, 8, 9, 18, 26,
.........................................................................27, 28, 29, 31, 32

7 U.S.C. § 7a-1 ...................................................................21

7 U.S.C. § 7a-2(c)(4)(A)........................................................32

7 U.S.C. § 7a-2(c)(5)(C) ........................................................ 6

7 U.S.C. § 7a-2(c)(5)(C)(i) ...........................17, 18, 19, 21, 22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

7 U.S.C. § 13a-2(1) ....................................................................31

Dodd-Frank Act,
Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......................................11, 20, 23

15 U.S.C. §§ 8301-8325 ...............................................................23

15 U.S.C. § 8302(d)(1) ...........................................................2, 15, 22

Professional and Amateur Sports Protection Act (PASPA)
28 U.S.C. § 3701 *et seq.*................................................................25

Commodity Futures Trading Commission Act of 1974,
Pub. L. No. 93-463, 88 Stat. 1389 ..................................................... 6

**REGULATIONS**

17 C.F.R. § 38.150.....................................................................29

17 C.F.R. § 38.151(b)..................................................................29

17 C.F.R. § 38.601.....................................................................21

17 C.F.R. § 40.2(a)(2) .................................................................32

17 C.F.R. § 40.11.....................................................................18, 19

17 C.F.R. § 40.11(a) ...................................................................19

17 C.F.R. § 40.11(c) ...................................................................19

17 C.F.R. § 140.99.....................................................................25

*Concept Release on the Appropriate Regulatory Treatment
of Event Contracts,*
73 Fed. Reg. 25,669 (May 7, 2008) .............................................13, 14, 26, 27

*Further Definition* of *"Swap,"*
77 Fed. Reg. 48,208 (Aug. 13, 2012)....................................................2, 3, 22,
.......................................................................................23, 24, 25

*Prediction Markets,*
91 Fed. Reg. 12,516 (Mar. 16, 2026) ...................................................3, 24

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

OTHER AUTHORITIES

156 Cong. Rec. 13173 (2010) ..........................................................................22

CFTC Letter No. 26-08,
   CFTC Staff Advisory, Division
   of Market Oversight (Mar. 12, 2026) ...............................................14, 18, 19

Thomas Harrigan,
   *Marte steals a taco for America in 2023 World Series*, MLB,
   https://www.mlb.com/news/taco-bell-world-series-steal-
   a-base-steal-a-taco (Oct. 27, 2023) ................................................................17

*In re Self-Certification by North American
   Derivatives Exchange, Inc.*, Order,
   https://www.cftc.gov/sites/default/files/stellent/
   groups/public/@rulesandproducts/documents/ifdocs/
   nadexorder040212.pdf (April 2, 2012) ..........................................................19

*Nevada Gaming Win 2024*,
   University of Nevada, Las Vegas, Center for Gaming Research,
   https://gaming.library.unlv.edu/
   reports/2024NevadaGamingWin.pdf..........................................................26

*Nevada Gaming Win 2025*,
   University of Nevada, Las Vegas, Center for Gaming Research,
   https://gaming.library.unlv.edu/
   reports/2025NevadaGamingWin.pdf..........................................................26

S. Rep. No. 93-1131 (1974) ............................................................................... 6

Brett Smiley,
   *Underdog Sports Preparing To Use Kalshi*, InGame,
   https://www.ingame.com/underdog-kalshi-pm-
   risk-management (Oct. 22, 2025) ...................................................................12

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Commissioner Jill E. Sommers,
*Clearinghouses as Mitigators of Systemic Risk*,
https://www.cftc.gov/PressRoom/
SpeechesTestimony/opasommers-10 (Sept. 30, 2020)...............................21

## INTRODUCTION

Nevada's and the Nevada Resort Association's (NRA) briefs confirm that the Commodity Exchange Act (CEA) preempts Nevada's gaming laws as applied to CDNA's sports-event contracts. The CEA comprehensively regulates derivatives, like swaps, traded on designated contract markets (DCMs), and gives the Commodity Futures Trading Commission (CFTC) "exclusive jurisdiction" over DCMs. 7 U.S.C. § 2(a)(1)(A). The law thus ensures that DCMs are subject to "a uniform set of regulations" rather than a patchwork of state laws. *American Agriculture Movement, Inc. v. Board of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992). And CDNA's sports-event contracts are "swap[s]," 7 U.S.C. § 1a(47)(A)(ii), that are traded on a DCM. The CFTC thus has "exclusive jurisdiction" over those contracts, and state law can play no role in regulating that activity.

Nevada disagrees. It insists that the CEA doesn't preempt its gaming laws because DCM-traded sports-event contracts aren't swaps, and because even if they are, states can regulate gambling. Nevada's reasoning goes like this: Sports-event contracts are sports wagers, just like those made through casino sportsbooks, so if sports-event contracts are swaps, then sports wagers are too. And if sports wagers are swaps, the CFTC would be the

nationwide gambling regulator—and that can't be, because Nevada regulates sports wagers. Thus, Nevada concludes, the CEA can't preempt state law as applied to sports-event contracts traded on DCMs.

The argument is a nice try at reverse-engineering, but it doesn't work. Sports-event contracts aren't the same as sports wagers, and sports wagers aren't swaps. Unlike sports wagers, which aren't traded on DCMs, sports-event contracts are traded on markets backed by financial entities and serve as tools for hedging risk. Indeed, sportsbooks can use sports-event contracts to hedge against the financial exposure they face from sports wagers.

Those differences matter. Congress tasked the CFTC with "further defin[ing] the term[] 'swap.'" 15 U.S.C. § 8302(d)(1). As Nevada recognizes, the CFTC has done just that. The Commission has clarified that "customary consumer" transactions aren't swaps because, among other things, they "are not traded on … organized market[s]" or "over the counter" with "financial entities." *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,217, 48,246-48 (Aug. 13, 2012). Organized markets use financial entities called clearinghouses to manage the financial risks between the parties to swap transactions. Swaps traded on DCMs and over-the-counter thus "involve

- 2 -

risk-shifting arrangements with financial entities." *Id.* at 48,247-48. Customary consumer transactions, by definition, do not.

Sports-event contracts are swaps. They are traded on DCMs and thus involve risk-shifting arrangements with clearinghouses. Sports wagers, in contrast, are customary consumer transactions, and thus not swaps. They're not traded on DCMs or over-the-counter with financial institutions. Nevada *agrees*: "Sports bets do 'not involve risk-shifting arrangements with financial entities,'" and instead "are consumer transactions" that "'historically have not been considered to involve swaps.'" Br. 33 (quoting 77 Fed. Reg. at 48,246-48). If that weren't clear enough, the CFTC will undoubtedly soon clarify its understanding of the line that separates sports wagers from swaps. *See Prediction Markets*, 91 Fed. Reg. 12,516, 12,516 (Mar. 16, 2026).

Without the faulty premise that wagers are swaps, Nevada's arguments fall apart. Nevada's theory—that it can regulate trading on DCMs because sports-event contracts don't belong on DCMs—contravenes the CEA's text, context, history, and purpose. The CFTC agrees: Nevada's position seeks to "reintroduce precisely the regulatory fragmentation Congress deliberately displaced" and would create "a seismic shift in the longstanding status quo between CFTC and state authority." Br. 2.

The district court's preemption ruling is flawed for the same reasons, which were the primary bases for denying a preliminary injunction. This Court should reverse.

## ARGUMENT

I. **CDNA will likely succeed on the merits because the CEA preempts the application of Nevada's gaming laws to trading on DCMs, including the trading of CDNA's sports-event contracts.**

    A. **Section 2(a)(1)(A) expressly preempts state law as applied to swap-trading on DCMs by placing regulatory authority within the CFTC's "exclusive jurisdiction."**

Section 2(a)(1)(A) expressly preempts state law as applied to on-DCM swap-trading by placing regulatory authority within the CFTC's "exclusive jurisdiction." Nevada's primary response is that § 2(a)(1)(A) speaks only to the CFTC's jurisdiction vis-à-vis the Securities and Exchange Commission (SEC). But that makes no sense in light of § 2(a)(1)(A)'s text and context, not to mention statutory and legislative history making clear that Congress enacted and amended the CEA to prevent states from interfering with the regulation of federally regulated exchanges.

- 4 -

**1.    Section 2(a)(1)(A)'s text and context make clear, and statutory and legislative history confirm, that the CEA expressly preempts state law as applied to swap-trading on DCMs.**

Section 2(a)(1)(A)'s text and context, and statutory and legislative history, all show that the CEA expressly preempts state law as applied to swap-trading on DCMs.

Section 2(a)(1)(A)'s text and statutory context make clear that the CEA expressly preempts state law as applied to swap-trading on DCMs by granting the CFTC "exclusive jurisdiction" to regulate all "transactions involving swaps … traded or executed on a contract market designated pursuant to section 7 of the [CEA]." 7 U.S.C. § 2(a)(1)(A); CDNA Br. 39-44. The plain meaning of "exclusive" makes clear that the CFTC alone can regulate all "transactions" on a DCM "involving swaps," because the CFTC's "exclusive jurisdiction" "necessarily denies jurisdiction" to other entities, *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992). Section 2(a)(1)(A)'s savings clause allows states to regulate conduct falling *outside* the CFTC's exclusive jurisdiction, confirming preemption for conduct *within* that exclusive jurisdiction. And it makes sense that Congress chose to expressly preempt state law as applied to swap-trading on DCMs under § 2(a)(1)(A), because the CEA preempts the

- 5 -

field of swap-trading on DCMs. The CEA creates "a comprehensive regulatory structure" to oversee swap-trading on DCMs, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982), from the certification and listing process through enforcement and any delisting decisions. The regime leaves no room for state law.

Statutory and legislative history confirm that conclusion. CDNA Br. 11-14, 44-45. When Congress overhauled the CEA in 1974, it gave the CFTC "exclusive jurisdiction" over DCMs, "bring[ing] the markets under a uniform set of regulations." *American Agriculture*, 977 F.2d at 1156. It also struck statutory language that had preserved state law, instead providing that state law could apply only "except as hereinabove provided." Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, 1395. Congress's choice confirmed that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6 (1974). And in 2010, Congress brought "swaps" transactions on DCMs under the CFTC's exclusive jurisdiction and crafted a "Special rule" allowing the CFTC alone to determine whether certain swaps are contrary to the public interest and thus cannot be traded on DCMs. 7 U.S.C. § 7a-2(c)(5)(C). Those changes likewise confirm that the CFTC alone

- 6 -

regulates swap-trading on DCMs, and that § 2(a)(1)(A) preempts state law as applied to that activity. Indeed, Congress made those changes against the backdrop of judicial decisions recognizing that § 2(a)(1) "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980).

### 2. Nevada's counterarguments lack merit.

Nevada seems to accept that "[i]f a contract is … one of the listed commodity derivatives" in § 2(a)(1)(A)—like a swap traded on a DCM—then § 2(a)(1)(A) grants the CFTC "exclusive jurisdiction" to regulate it. Nevada Br. 20-21. But Nevada insists that a "presumption against preemption" applies because states typically regulate sports betting. Br. 48 n.15. Nevada also claims (Br. 49-52) that all § 2(a)(1)(A)'s grant of "exclusive jurisdiction" does is make clear what conduct the CFTC, as compared to the SEC, can regulate. Those arguments are wrong.

*First*, as CDNA explained (Br. 40), the Supreme Court has rejected the notion of a presumption against preemption. For an express preemption provision, the analysis focuses simply on "the language of the statute." *Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115, 125 (2016). In any event, § 2(a)(1)(A) preempts only state law as applied to *trading on DCMs*, leaving off-DCM conduct to the states. Preempting state law as applied to trading

on DCMs doesn't interfere with traditional police powers, which don't include regulating on-DCM trading to begin with. *Supra* pp. 5-7.

Nevada's assertion (Br. 53-54) that there is no field preemption because the CEA doesn't preempt the field of state gaming law fails for the same reason. Section 2(a)(1)(A) preempts the field of derivatives-trading on DCMs, like the on-DCM trading of CDNA's sports-event contracts.

*Second*, the statute's plain text and the ordinary meaning of "exclusive"—plus caselaw explaining what "exclusive" means, CDNA Br. 41-42—make clear that the CFTC *alone* has jurisdiction to regulate all "transactions involving swaps … traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). That means neither states nor other federal agencies have jurisdiction over that activity. Other provisions of the CEA expressly preempting state law with different words don't suggest otherwise. *Contra* Nevada Br. 50-51. Congress doesn't have to take a cookie-cutter approach to every preemption provision in the U.S. Code. Section 2(a)(1)(A)'s grant of "exclusive jurisdiction" to the CFTC has one plausible meaning: state law is preempted. Congress didn't need to use magic words. CDNA Br. 64-65.

*Third*, it would have made no sense for Congress *not* to have preempted state law as applied to on-DCM trading, given that it has sought

- 8 -

for decades to avoid a patchwork of state legislation relating to that trading. *Supra* pp. 6-7. Nevada fails to square statutory and legislative history with its contention that states can regulate on-DCM swap-trading.

*Finally*, § 2(a)(1)(A)'s savings clause allows states to regulate conduct falling *outside* the CFTC's exclusive jurisdiction, confirming that the provision preempts state law as applied to conduct *within* the agency's exclusive jurisdiction. Nevada's claim that "the clause equally suggests the opposite" makes no sense, and Nevada doesn't even try to explain its theory. Br. 51-52.

### B. Section 2(a)(1)(A) expressly preempts Nevada's gaming laws as applied to CDNA's sports-event contracts, as conflict preemption confirms.

Section 2(a)(1)(A) expressly preempts the application of Nevada's gaming laws to CDNA's sports-event contracts. Nevada's responses—that sports-event contracts aren't swaps and that federal law cannot preempt state gaming laws—fail.

#### 1. CDNA's sports-event contracts are swaps traded on a DCM.

CDNA's sports-event contracts are swaps traded on a DCM, and thus fall within the CFTC's exclusive jurisdiction. CDNA's sports-event contracts "provide[] for … payment … that is dependent on the occurrence,

nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii); CDNA Br. 45-48. An "event" includes an outcome. And a "contingency" includes something that may happen as a result of something else. To be "associated with a potential financial, economic, or commercial consequence," the event must simply be "connected" to such a potential consequence. Here, payment under CDNA's sports-event contracts "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event"—like whether Country X wins the World Cup. The occurrence (or nonoccurrence) of such an event is "associated with a potential financial, economic, or commercial consequence," because it's connected to the possibility that stakeholders will benefit financially, commercially, or economically. For instance, licensed sportsbooks might stand to lose revenues if a large volume of one particular bet cashes out for the bettors, and they can use sports-event contracts to hedge against that risk. CDNA's sports-event contracts are thus swaps, and there's no dispute that they are traded on a DCM.

Nevada responds that text, context, purpose, and CFTC regulations show that sports-event contracts aren't swaps. *See* Doc. 91.1. And, Nevada

- 10 -

claims, sports-event contracts cannot be swaps, because then all off-DCM sports wagers would be swaps. Those arguments lack merit.

### a. Nevada's supposed textual arguments fail because, unlike a textual argument, they read words into § 1a(47) that are not there.

Nevada's arguments purportedly based on § 1a(47)'s text lack merit.

***i.*** **Nevada's claim that a "swap" is an agreement to exchange cash flows to hedge volatility is wrong.** Nevada claims that sports-event contracts aren't swaps because a swap is "a financial instrument by which two parties agree to exchange cash flows on financial obligations, as a means of hedging volatility and managing risk." Br. 21. That argument fails.

For starters, Nevada's definition doesn't appear in § 1a(47)'s definition of "swap." Instead, Nevada relies on a decision from before Congress defined "swap" in the Dodd-Frank Act. *See Thrifty Oil Co. v. Bank of America National Trust & Savings Ass'n*, 322 F.3d 1039, 1042 (9th Cir. 2003). Congress "[took] the trouble to define the term[]" swap, and that definition governs here. *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42, 59 (2024).

The six-part definition of "swap" in § 1a(47)(A) doesn't support Nevada's assertion that swaps must "refer to specific 'financial measures,

- 11 -

indices, or instruments' used to hedge risk." Br. 22, 30. For instance, swaps on "weather," "energy," "metal," and "agricultur[e]" aren't financial measures, indices, or instruments. *See* 7 U.S.C. § 1a(47)(A)(iii)(XVII)–(XX). Nor is "an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). Nevada thus offers no sound reason to insert its limitation into § 1a(47)(A)(ii)'s definition of "swap."

Regardless, Nevada's argument fails on its own terms because sports-event contracts are instruments used to hedge and manage risk. As CDNA explained (Br. 23-24), sportsbooks can use sports-event contracts to manage financial exposure from a large volume of wagers on a particular side of a bet. Sportsbooks can use sports-event contracts to "hedge against volatility, particularly during major events that are drawing huge amounts of sports fan interest." Brett Smiley, *Underdog Sports Preparing To Use Kalshi*, InGame, https://www.ingame.com/underdog-kalshi-pm-risk-management (Oct. 22, 2025); *see* CFTC Br. 20 & n.13. Amici supporting Nevada prove the point by noting that a sports-event contract could generate "roughly the same payout" as a sports wager. American Gaming Association Amicus Br. 7, Doc.

- 12 -

81.1. That just shows that sportsbooks and other stakeholders can use sports-event contracts to hedge against sports-wager-related exposure.

> ***ii.*** **Nevada's assertion that "event" and "contingency" do not mean "outcome" fails.** Echoing the district court's flawed reasoning, Nevada asserts that swaps must depend on events or contingencies, which are "happening[s] of some significance that took place or will take place." Br. 24. Nevada asserts (Br. 24-25) that sports-event contracts depend on the *result* or *outcome* of an event, and are thus not swaps. In Nevada's view, "event" cannot mean "outcome," because that is an "archaic" use of the term, and because the definition of event would be limitless. Those contentions fail. CDNA Br. 55-58.

*First*, the ordinary meanings of "event" and "contingency" plainly include an outcome. CDNA Br. 46-47. For instance, a rainstorm is an event. But businesses using weather swaps to hedge against rainstorm-related risks are concerned with the *outcome* of the rainstorm—like *how much* rain will fall and *how quickly*—not just with whether a rainstorm happened.

In 2008, the CFTC recognized that "event" also means "outcome," explaining that "event contracts typically pay out a fixed amount when an outcome either occurs or does not occur." *Concept Release on the Appropriate*

*Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008) [hereinafter *Concept Release*]. Nevada declares that the CFTC made that statement in "passing." Br. 26 n.10. But Nevada doesn't dispute that the CFTC understood that event contracts are based on outcomes. And a recent staff advisory confirms that interpretation. CFTC Letter No. 26-08 at 2, CFTC Staff Advisory, Division of Market Oversight (Mar. 12, 2026) [hereinafter CFTC Staff Advisory].

Nor can Nevada deny that Congress defined "swap" in 2010 "against the backdrop" of the CFTC's interpretation, which "should be understood to work in harmony" with Congress' use of the term "event" in § 1a(47)(A)(ii). *Velázquez v. Bondi,* 604 U.S. 712, 725 (2025). It's irrelevant that a nearly-45-year-old decision rejected an "archaic" definition of a different term in an unrelated statute. *Contra* Nevada Br. 26 (citing *Drapich v. Donovan*, 693 F.2d 1296, 1298 (9th Cir. 1983)).

*Second*, Nevada accepts (Br. 26-27) that its definition would lead to difficult line-drawing problems, because many events can be characterized as outcomes. That would mean that whether a contract is a swap would turn on wordplay. Nevada's only response is that even if "an event (*e.g.*, a mortgage default) could be the outcome of an underlying event (*e.g.*, a

recession)," "the first event [still] has independent economic significance." Br. 26-27. That position reveals that Nevada's definition of an "event" lacks any measurable standard: Whether an event is "significant" is subjective, and Nevada offers no way for courts to determine whether a particular event is significant enough to satisfy § 1a(47)(A)(ii). But if someone must make that judgment call, it would be the CFTC, which, as expert regulator with the statutory authority to further define "swap," 15 U.S.C. § 8302(d)(1); *see infra* pp. 22-24, has explained that sports-event contracts are swaps. *See* CFTC Br. 15-20.

*Finally*, defining "event" to include outcomes means there is some redundancy in the definition of "swap," but "[t]he canon against surplusage is not an absolute rule," *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013), and it doesn't favor Nevada's interpretation of "event" here. *Contra* Nevada Br. 30-31. A swap includes contracts where payment "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency," 7 U.S.C. § 1a(47)(A)(ii), and that may very well overlap with an agreement "that is, or in the future becomes, commonly known to the trade as a swap," *id.* § 1a(47)(A)(iv). Indeed, sports-event contracts are both. Other parts of the definition also make clear that Congress was aware of and

- 15 -

intended any overlap in its pursuit of breadth, as when it stated that a swap includes "any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)." *Id.* § 1a(47)(A)(vi). And other parts of § 1a(47)(A) still operate independently: a contract where payment depends on the occurrence of an event isn't necessarily an agreement "based on the value" of interest rates. *Id.* § 1a(47)(A)(iii). Thus, § 1a(47)(A)(ii) still "performs a significant function." *United States v. Atlantic Research Corp.*, 551 U.S. 128, 137 (2007). And given that Congress broadly defined "swap," "the better overall reading" of § 1a(47)(A)(ii) "contains some redundancy." *Barton v. Barr*, 590 U.S. 222, 239 (2020).

*iii.* **Events need not be "inherently" associated with financial consequences, as Nevada incorrectly claims.** Nevada maintains that swaps must be "inherently joined" with a financial consequence, and that sports-event contracts don't have inherent financial consequences because they aren't used to hedge against risk. Br. 27-29; *see* Todd Phillips Amicus Br. 8-22, Doc. 70.1. That's wrong.

*First*, as CDNA explained (Br. 58-60), § 1a(47)(A)(ii) "says no such thing." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). Section 1a(47)(A)(ii) says the event must be "associated with a potential financial,

economic, or commercial consequence." *Second*, context—like § 1a(47)(A)(iii)'s inclusion of "weather swaps"—likewise makes clear that there is no "inherently financial" requirement in the definition of a swap. *Finally*, sports-event contracts *can* be used to hedge risk—by sportsbooks, *supra* pp. 12-13; retailers offering promotions tied to sports games, *see* Thomas Harrigan, *Marte steals a taco for America in 2023 World Series*, MLB, https://www.mlb.com/news/taco-bell-world-series-steal-a-base-steal-a-taco (Oct. 27, 2023); and other stakeholders. It doesn't matter that individuals also use sports-event contracts. *Contra* Nevada Br. 38. Individual "'speculators' or 'investors,'" "who seek financial gain by taking positions in the futures market," are essential participants in those markets because they provide liquidity to the market. *Curran*, 456 U.S. at 359–60, 359 n.11.

### b. The CEA's Special Rule confirms that "swaps" include sports-event contracts.

*i.* Nevada asserts (Br. 31-32) that the CEA's Special Rule, 7 U.S.C. § 7a-2(c)(5)(C)(i), shows that sports-event contracts aren't swaps. Nevada claims that Congress authorized the CFTC to ban contracts involving "gaming" from DCMs, making clear that "Congress did not want sports betting on DCMs." Br. 31. That argument is incorrect.

On Nevada's own logic, § 7a-2(c)(5)(C)(i) confirms that sports-event contracts are swaps—not the other way around. *See* CDNA Br. 61-62. The provision says the CFTC "may determine" that "swap[s]" involving "gaming" shouldn't be listed because they are "contrary to the public interest." The provision thus makes clear that Congress contemplated that "swaps" could cover gaming-related contracts, and that those contracts can be listed unless and until the CFTC prohibits them. Thus, Nevada's position that CDNA's sports-event contracts "involve" "gaming" under § 7a-2(c)(5)(C)(i) only confirms that those contracts are swaps that can be listed on a DCM.

*ii.* Nevada says (Br. 31-32) the CFTC has banned contracts involving "gaming" on DCMs, *see* 17 C.F.R. § 40.11(a), meaning that sports-event contracts aren't "swaps." Not so.

*First*, whether § 40.11(a) bans sports-event contracts isn't at issue here. The question here is whether the CFTC's "exclusive jurisdiction" over trading on DCMs preempts state regulation. The answer to that question is yes, as Nevada's own argument makes clear. 7 U.S.C. § 2(a)(1)(A).

*Second*, the CFTC doesn't think § 40.11 categorically bars sports-event contracts, as its amicus participation makes clear. Indeed, further Commission guidance confirms that § 40.11 doesn't bar all sports-event contracts. *See*

CFTC Staff Advisory 5-6. Rather, § 40.11(c) allows DCMs to self-certify event contracts and allows the Commission to "determine, based upon a review of the terms or conditions of a submission," that a swap is banned. Consistent with that language, the CFTC hasn't treated § 40.11(a) as a blanket ban on event contracts. To the contrary, for instance, the Commission would consider whether a political-event contract fell within § 40.11(a)'s prohibition only after public-interest review under § 40.11(c). *See In re Self-Certification by North American Derivatives Exchange, Inc.*, Order, https://www.cftc.gov/sites/default/files/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf (April 2, 2012). CDNA is unaware of any CFTC enforcement action under § 40.11(a).

That makes sense, because treating § 40.11 as a blanket ban would exceed the CFTC's statutory authority. Under 7 U.S.C. § 7a-2(c)(5)(C)(i), the CFTC can ban contracts involving "gaming" (among other things) only if it first "determine[s] that such … contracts … are contrary to the public interest." But § 40.11(a) includes no public-interest determination, so the CFTC cannot use it to ban sports-event contracts without conducting a case-specific public-interest inquiry.

*Finally*, Nevada's incorrect view that § 40.11(a) is a lawful ban on sports-event contracts only proves that sports-event contracts traded on DCMs are swaps subject to the CFTC's exclusive jurisdiction, and that the CEA preempts Nevada gaming laws as applied to such contracts. Nevada's jurisdiction wouldn't be implicated unless the activity is off-DCM sports wagering, rather than swap-trading on a DCM. *See supra* pp. 5-9.

### c. Interpreting "swap" to include sports-event contracts is consistent with the purpose of the Dodd-Frank Act.

Nevada claims (Br. 32-33) that interpreting "swap" to include sports-event contracts contravenes the Dodd-Frank Act's purpose. Nevada claims that (i) the Dodd-Frank Act added "swaps" to the CEA so the CFTC could regulate instruments involving "systemic risks in the financial sector," and sports-event contracts aren't such instruments; and (ii) legislative history shows that Congress didn't want sports betting on DCMs. *Id.* Nevada's claims are meritless.

*First*, Nevada's purposivist argument cannot defeat § 1a(47)(A)(ii)'s text. "[I]t is 'quite mistaken to assume … that any interpretation of a law that does more to advance a statute's putative goal must be the law.'" *Stanley v. City of Sanford*, 606 U.S. 46, 58 (2025). And "no statute … pursues its stated

purpose at all costs." *Id.* Statutory text makes clear that sports-event contracts are swaps, so Nevada's appeals to purpose fail.

*Second*, Nevada's purposivist arguments are meritless on their own terms. Sports-event contracts do implicate risks in the financial sector. DCMs must use a CFTC-registered (and federally regulated) clearinghouse to list swaps. *See* 17 C.F.R. § 38.601; 7 U.S.C. § 7a-1. Clearinghouses "guarantee the performance of each trade that is submitted for clearing," and if they don't properly manage the risks associated with making those guarantees, "large segments of the markets and market participants could be put at unnecessary risk as well." Commissioner Jill E. Sommers, *Clearinghouses as Mitigators of Systemic Risk*, https://www.cftc.gov/PressRoom/SpeechesTestimony/opasommers-10 (Sept. 30, 2020). Given clearinghouses' involvement in trading sports-event contracts as swaps on DCMs, it makes sense that the CFTC would regulate that activity to monitor any associated financial risks.

*Finally*, whatever legislative history says about individual legislators' views of sports betting, it confirms that when Congress added "swaps" to the CEA, it thought that sports-event contracts could be traded on DCMs, but that the CFTC should have authority to prohibit them if the agency determined that they weren't in the public interest. *See* 7 U.S.C. § 7a-

- 21 -

2(c)(5)(C)(i). Senators recognized, for example, that it would be possible "to construct an 'event contract' around sporting events," and that the CFTC would "need[] the power to, and should, prevent derivatives contracts that are contrary to the public interest." 156 Cong. Rec. 13173 (2010) (Sen. Lincoln). In passing the Dodd-Frank Act, legislators thus contemplated that sports-event contracts *could* be traded on DCMs.

### d.   Nevada's fear-mongering argument that sports-event contracts can't be swaps, because that would mean sports wagers are swaps, lacks merit.

Nevada's arguments rest on its mistaken assertion that sports-event contracts can't be swaps because that would mean sports wagers are swaps. *See* Nevada Br. 35-38; Doc. 90.1. That is incorrect.

*i.*   As CDNA explained (Br. 60-62), sports wagers aren't swaps. Congress authorized the CFTC to "further define the term[] 'swap,'" 15 U.S.C. § 8302(d)(1), consistent with Congress's power to grant agencies "the authority to give meaning to a particular statutory term," *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 395 (2024). The CFTC did just that—as Nevada recognizes (Br. 33)—when it clarified that "customary consumer" transactions aren't swaps. *Further Definition*, 77 Fed. Reg. at 48,217, 48,246-48. As the Commission explained, customary consumer transactions are not

swaps because, among other things, they "are not traded on an organized market"—trading that involves clearinghouses—or "over the counter" with "financial entities." *Id.* Swaps traded on DCMs and over-the-counter thus "involve risk-shifting arrangements with financial entities," *id.* at 48,247-48; customary consumer transactions do not. *See supra* p. 21.

That makes sense, given the Dodd-Frank Act's stated goal of "improving accountability and transparency in the financial system." Pub. L. No. 111-203, 124 Stat. 1376, 1376; *see supra* pp. 20-21. Indeed, the CFTC's authority to further define "swap" appears in a subchapter titled "Regulation of Over-the-Counter Swaps Markets," 15 U.S.C. §§ 8301-8325, which itself is part of the "Wall Street Transparency and Accountability Act of 2010," 124 Stat. at 1641. Those "signals" support the CFTC's view that swaps are instruments traded over-the-counter with financial institutions or on organized markets, like DCMs. *See Yates v. United States*, 574 U.S. 528, 540 (2015) (position or a provision in particular chapters can "signal[]" meaning).

Unlike sports-event contracts, sports wagers aren't traded on DCMs or over-the-counter with financial institutions, so they aren't swaps. In fact, Nevada *agrees* that sports wagers aren't swaps: "Sports bets do 'not involve risk-shifting arrangements with financial entities,'" and instead "are

- 23 -

consumer transactions that people enter into" for entertainment and "that 'historically have not been considered to involve swaps.'" Br. 33 (quoting 77 Fed. Reg. at 48,246-48). Sports-event contracts, in contrast, are traded on DCMs and thus involve risk-shifting arrangements with clearinghouses. *Supra* p. 24. And the CFTC is poised to soon clarify its understanding of the line between sports bets and swaps. *See Prediction Markets*, 91 Fed. Reg. at 12,516 (advance notice of proposed rulemaking and request for comments "regarding event contract derivatives traded on markets commonly referred to as 'prediction markets'").

*ii.* Nevada nonetheless claims that if sports-event contracts are swaps, sports bets are swaps, too, with "extreme" consequences. Br. 35-38. According to Nevada, (1) casinos and licensed sportsbooks are thus violating federal law by not offering sports bets on DCMs; and (2) the CFTC would be the nation's sports-gambling regulator. Even if sports wagers aren't swaps, Nevada says, sportsbooks would choose to offer sports-event contracts on DCMs rather than offer betting on state-licensed sportsbooks.

*First*, as explained, sports bets *aren't* swaps, as Nevada elsewhere agrees. Nor can Nevada identify any instance where the CFTC has initiated an enforcement action against a casino or licensed sportsbook for offering

sports bets outside of a DCM. The CFTC's brief doesn't suggest that it views sports bets as swaps, either. Instead, the CFTC's brief makes clear that the agency seeks to regulate only "futures, options, and swaps traded on federally regulated exchanges." Br. 1; *see* Br. 1-3, 8-13, 21-27. If Nevada was truly concerned that the CFTC would consider sports bets to be swaps, it could have asked the CFTC for interpretive guidance or "no-action" relief. *See* 17 C.F.R. § 140.99; *Further Definition*, 77 Fed. Reg. at 48,250.

*Second*, when Congress added the definition of "swap" to the CEA in 2010, the Professional and Amateur Sports Protection Act (PASPA), 28 U.S.C. § 3701 *et seq.*, which dealt only with off-DCM sports betting, was still the law. The Supreme Court had not yet held PASPA unconstitutional, and sports betting was thus still unlawful in most of the country. *See Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018). Congress thus could not have understood that, in defining "swap," it was making the CFTC the nation's sports-betting regulator, or equating off-DCM sports betting with swaps. Congress would have instead understood that sports-event contracts traded on DCMs are different from traditional sports wagers. For those reasons, there is no implied repeal problem with respect to PASPA or other federal statutes. *Contra* Nevada Br. 58-60; *see* CDNA Br. 65-66. And,

- 25 -

relatedly, the CFTC's authority over sports-event contracts traded on DCMs—but not over state-licensed sportsbooks—doesn't implicate the major-questions doctrine, either. *Contra* Nevada Br. 41.

*Finally*, whatever motivated licensed sportsbooks to "forgo licensing in Nevada to offer sports betting on DCMs in other States," Nevada Br. 38, has nothing to do with how to interpret the term "swap" in § 1a(47)(A)(ii). Nor do Nevada's anecdotes about some sportsbooks' business decisions suggest that all licensed sportsbooks will stop their usual—and growing—sports wagering operations. *Compare Nevada Gaming Win 2025*, University of Nevada, Las Vegas, Center for Gaming Research, 2, https://gaming.library.unlv.edu/reports/2025NevadaGamingWin.pdf ($8,072,658,000 in statewide sportsbook bets), *with Nevada Gaming Win 2024*, University of Nevada, Las Vegas, Center for Gaming Research, 2, https://gaming.library.unlv.edu/reports/2024NevadaGamingWin.pdf ($7,890,147,000 in statewide sportsbooks bets).

### e. Sports-event contracts are also options.

As CDNA explained (Br. 63-64), even if sports-event contracts aren't swaps, they are "options" subject to the CFTC's exclusive jurisdiction. *See* 7 U.S.C. §§ 1a(36), 2(a)(1)(A). Binary options pay a fixed amount depending

- 26 -

on whether an outcome occurs, *Concept Release*, 73 Fed. Reg. at 25,669-71, and that's what CDNA's sports-event contracts do, too. *See* CFTC Br. 16. Nevada's counterarguments fail.

*i.* Nevada asserts that CDNA shouldn't be able to argue that its sports-event contracts are options, because it didn't make the argument below and it self-certified its contracts as swaps. But CDNA and its predecessor have long offered binary options. *See CFTC v. Trade Exchange Network Ltd.*, 117 F. Supp. 3d 29, 36 (D.D.C. 2015). So it's no surprise that CDNA argues that its sports-event contracts are options even if they aren't swaps.

*ii.* Nevada also claims (Br. 34-35), that sports-event contracts aren't options because they don't give the purchaser the right to buy or sell a commodity at a set price. That argument lacks merit. Many derivatives under the CEA are based on intangibles—like "occurrence[s]" or "contingenc[ies]," 7 U.S.C. § 1a(19)(iv)—rather than tangible commodities. And as the CFTC has explained (Br. 16), the agency has long understood event contracts as binary contracts, too. *See generally Trade Exchange Network*, 117 F. Supp. 3d at 29 (CFTC assertion that event contracts are options).

**2. Section 2(a)(1)(A) expressly preempts Nevada's gaming laws as applied to the trading of CDNA's sports-event contracts.**

Section 2(a)(1)(A) preempts Nevada's gaming laws as applied to CDNA's sports-event contracts. CDNA Br. 49. The CFTC has "exclusive jurisdiction" over the trading of CDNA's sports-event contracts. 7 U.S.C. § 2(a)(1)(A). Nevada seeks to regulate the trading of sports-event contracts on CDNA's DCM, asserting that its gaming laws prohibit CDNA from offering sports-event contracts unless CDNA obtains a state sports-pool license. ER-121-22. But the CFTC alone regulates the trading of sports-event contracts on CDNA's DCM. Nevada law cannot.

Nevada says § 2(a)(1)(A) cannot preempt its gaming laws, because Congress couldn't have intended to "federalize all sports betting," an area traditionally regulated by the states. Br. 46-48. That argument fails. As explained (*supra* pp. 5-7), § 2(a)(1)(A) preempts state law only as applied to *trading on DCMs*. That isn't an area of traditional state regulation.

**3. Obstacle and impossibility preemption illustrate why Congress enacted § 2(a)(1)(A) and confirm that the CEA leaves no room for Nevada's gaming laws.**

**a.** Obstacle and impossibility preemption confirm that the CEA leaves no room for applying Nevada's gaming laws to CDNA's sports-event

contracts. CDNA Br. 49-50. *First*, applying Nevada's gaming laws would pose an obstacle to the CEA's purpose of bringing derivatives "markets under a uniform set of regulations." *American Agriculture*, 977 F.2d at 1156. *Second*, CDNA cannot comply with both Nevada's gaming laws and the CEA with respect to its sports-event contracts. For instance, CDNA's obligation to "provide its members" "with impartial access to its markets and services," 17 C.F.R. §§ 38.150, 38.151(b), is at odds with barring users in certain states from trading sports-event contracts. It makes sense that Congress added an express preemption provision to § 2(a)(1)(A) to address just this kind of conflict over regulating trading on DCMs.

**b.** Nevada's counterarguments fail.

*i.* Nevada claims it isn't impossible for CDNA to comply with state regulations, because CDNA could simply "become licensed and comply with Nevada law." Br. 55. But that isn't so simple, given the risk that restricting access to certain residents risks violating CDNA's obligation to provide "impartial access." It's not clear why Nevada thinks *its* assurances (Br. 56-57) that CDNA wouldn't violate CFTC regulations are worth anything.

*ii.* Nevada claims that applying state law to on-DCM swap-trading poses no obstacle to the CEA's goal of uniformly regulating derivatives

- 29 -

markets, because "uniformity is a field-preemption argument," and Nevada "seek[s] only to enforce Nevada gaming law." Br. 57-58. That non-responsive labeling game fails. Although the Supreme Court has "identified three different types of preemption, … all of them work in the same way." *Murphy*, 584 U.S. at 477. Applying Nevada gaming laws to swap-trading on DCMs—which, in turn, would open the door for *any* state gaming laws to apply—would eviscerate the CEA's central purpose of bringing derivatives "markets under a uniform set of regulations." *American Agriculture*, 977 F.2d at 1156. Nevada offers no meaningful response. And, as explained below, Nevada's arguments also run headlong into field preemption.

C. **The CEA also preempts the field of *all* trading on DCMs—no matter whether the derivatives are swaps or something else—including Nevada gaming laws as applied to CDNA's sports-event contracts.**

a. Whether or not CDNA's sports-event contracts are swaps, the CEA preempts the field of *all* trading on DCMs, so it preempts Nevada gaming laws as applied to that activity. CDNA Br. 51-53. The CEA establishes "a comprehensive" scheme for regulating every aspect of a DCM's activities and makes clear that federal law governs on-DCM transactions. *Curran*, 456 U.S. at 356. At the same time, the CEA makes clear that states can regulate

and seek enforcement with respect to off-DCM transactions. For instance, states may bring *parens patriae* actions seeking relief for CEA violations—but they can't sue "a contract market." 7 U.S.C. § 13a-2(1).

Put simply, when it comes to on-DCM trading, the statutory and regulatory framework governing that conduct is extensive. It leaves "no room for [Nevada] to supplement it." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Yet that's what Nevada seeks to do here in claiming that it can regulate CDNA's on-DCM sports-event contracts. The CEA preempts Nevada's attempt to revise the federal scheme.

Given the CFTC's exclusive jurisdiction over on-DCM trading, Nevada cannot second-guess whether CDNA's sports-event contracts are swaps or options. CDNA Br. 62-63. If Nevada thinks CDNA's sports-event contracts aren't swaps, it can file an Administrative Procedure Act (APA) suit against the CFTC. *See* 5 U.S.C. § 551(13). But it cannot attack CDNA's self-certification through "collateral proceeding[s]." *Big Lagoon Rancheria v. California*, 789 F.3d 947, 953 (9th Cir. 2015) (en banc).

**b.** Nevada's counterarguments fail.

*i.* Nevada claims (Br. 20-21) that the CFTC has exclusive jurisdiction not over all trading on DCMs, but over on-DCM trading of one of the

- 31 -

commodities listed in § 2(a)(1)(a). But if Nevada could challenge self-certifications, so could *every* state. The likely result would be countless lawsuits and differing CFTC jurisdiction in different states, rather than the exclusive and uniform CFTC jurisdiction Congress prescribed. Congress specifically sought to avoid such a disjointed regulatory scheme. CDNA Br. 62-63.

*ii.*     Nevada claims (Br. 44), that it couldn't have challenged any decision by the CFTC, because self-certifications aren't deemed approved if the CFTC fails to act within a specified time. Not so. Although DCMs can seek prior CFTC approval to offer a new contract, *see* 7 U.S.C. § 7a-2(c)(4)(A), the self-certification process is an alternate approval system. After filing a self-certification, the DCM can begin offering a new contract the next business day. *See* 17 C.F.R. § 40.2(a)(2); *KalshiEX LLC v. CFTC*, 119 F.4th 58, 61 (D.C. Cir. 2024). That means the CFTC has passively approved the contract unless and until the agency takes steps to *disapprove* the listing.

*iii.*     Nevada tries to distinguish *Big Lagoon* on the ground that California "was challenging decisions that only the [agency] could make." Br. 45. But that's precisely what Nevada seeks to do here. The CFTC alone—not the states—can decide whether a contract is a swap or option. *Supra* pp. 6-7, 30-31. Nevada's claim that it doesn't seek to "police what products are listed on

DCMs" thus rings hollow, because its insistence that CDNA's sports-event contracts aren't swaps or options makes clear that Nevada thinks those contracts should *not* be listed on DCMs. Br. 45.

## II. The balance of harms and the public interest favor a preliminary injunction.

**A.** The balance of harms and the public interest favor a preliminary injunction. CDNA Br. 68-69. CDNA faces irreparable harm because Nevada has threatened it with civil and criminal consequences for failure to comply with state law. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Complying would cost CDNA business and reputational harm in Nevada, plus money to develop technology to prevent Nevada users from trading in sports-event contracts. CDNA has already experienced those harms, having agreed not to offer sports-event contracts in Nevada pending appeal. CDNA won't be able to later recoup those expenses given Nevada's sovereign immunity, so its financial harms are irreparable. *See NIH v. American Public Health Ass'n*, 145 S. Ct. 2658, 2660 (2025). The public interest likewise favors a preliminary injunction, because "preventing a violation of the Supremacy Clause serves the public interest." *United States v. California*,

921 F.3d 865, 893 (9th Cir. 2019). Neither Nevada nor the public suffers any harm from Nevada's inability to enforce preempted state laws. *See id.*

**B.** Nevada's counterarguments fail.

**1.** Nevada argues (Br. 61-63) that CDNA has identified no irreparable harm because the costs associated with geofencing are minor and routine business costs; CDNA has caused its own financial injuries by offering prohibited contracts; and CDNA won't be irreparably harmed if Nevada files an enforcement action, because CDNA can defend itself. Those arguments lack merit.

*First*, whether other companies routinely pay for geofencing doesn't detract from the irreparable harm to CDNA. Neither does "the magnitude of [CDNA's] injury." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). What matters is "irreparability," *id.*, and Nevada doesn't dispute that CDNA's financial harm is irreparable given the state's sovereign immunity.

*Second*, CDNA hasn't brought its irreparable injuries upon itself. CDNA listed and offered sports-event contracts in compliance with federal law — the law that applies to sports-event contracts on CDNA's DCM.

*Finally*, Nevada's argument that CDNA suffers no harm from the threat of civil and criminal enforcement because CDNA can defend itself

makes no sense, and it contravenes Supreme Court precedent. On Nevada's view, no party threatened with enforcement proceedings could establish the threat of irreparable harm. But as the Supreme Court has made clear, a party suffers irreparable harm when it faces the "Hobson's choice" of violating state law and exposing itself to liability, or "suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review." *Morales*, 504 U.S. at 381. That harm is all too real for CDNA, which has agreed to cease offering its sports-event contracts pending appeal.

**2.** Nevada claims that the balance of equities and the public interest weigh against a preliminary injunction because the state has an interest in enforcing its gaming laws and collecting taxes and licensing fees; because there are no safeguards ensuring that sports-event-contracts trading is fair; and because some Nevada residents "suffer[] from problem gaming." Br. 66; *see* Br. 63-66. Those arguments lack merit.

For one thing, given federal preemption, the state has no basis to collect taxes and licensing fees from CDNA for offering sports-event contracts on a federally regulated exchange. For another, Nevada is wrong that there are no safeguards for sports-event-contracts trading: As CDNA explained (Br. 19-21), CDNA is subject to extensive federal regulation. And the

- 35 -

scandals Nevada points to (Br. 64-65) involve sports wagering—that is, conduct that *the states* are responsible for regulating.

**C.** The correct result on preemption requires judgment on the pleadings for CDNA, and thus a permanent injunction, because it would resolve the outcome-determinative legal issues in this case.

## CONCLUSION

The Court should reverse the order denying CDNA's preliminary injunction motion.

Dated: March 24, 2026

David Meister
Robert A. Fumerton
Chad E. Silverman
Judith A. Flumenbaum
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

Bradley Austin
SNELL & WILMER
1700 South Pavilion Center Dr.
  Ste. 700
Las Vegas, NV 89135

Respectfully submitted,

*/s/ Shay Dvoretzky*

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Sylvia O. Tsakos
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

Nowell D. Bamberger
Matthew C. Solomon
CLEARY GOTTLIEB STEEN &
  HAMILTON LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037

*Counsel for Plaintiff-Appellant North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 25-7187, 25-7516, 25-7831

I am the attorney or self-represented party.

**This brief contains** | 6,979 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Shay Dvoretzky | **Date** | 3/24/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2026, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: March 24, 2026                    Respectfully submitted,

*/s/ Shay Dvoretzky*
Shay Dvoretzky

*Counsel for Plaintiff-Appellant North
  American Derivatives Exchange, Inc.
  d/b/a Crypto.com | Derivatives North
  America*

- 39 -