No. 25-7516
(consolidated with Nos. 25-7187, 25-7831)

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

KALSHIEX, LLC,
*Plaintiff-Appellant,*

v.

GEORGE ASSAD, et al.,
*Defendants-Appellees,*

NEVADA RESORT ASSOCIATION,
*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court for the District of Nevada
No. 2:25-cv-00575-APG-BNW (Gordon, C.J.)

Decided August 28, 2026
Before: R. Nelson, Bade, and Lee, Circuit Judges

# BRIEF OF AMICUS CURIAE COLIN SKOW IN SUPPORT OF APPELLANT'S PETITION FOR PANEL REHEARING AND REHEARING EN BANC, SUPPORTING REVERSAL

Colin Skow
*Pro Se*
2629 Gallarate Dr.
Henderson, NV 89044
(909) 265-4681
colinskow@gmail.com

# TABLE OF CONTENTS

**Page**


Table of Authorities ..... ii

INTEREST OF AMICUS CURIAE ..... 1

SUMMARY OF ARGUMENT ..... 2

ARGUMENT ..... 3

I. The panel construed only two words of a five-term clause ..... 3

II. Section 40.11 is a listing rule, not a definition, and cannot decide a question that turns on § 1a(47) ..... 7

III. The limiting principle is the Act's venue line, and Nevada's law has none ..... 11

IV. The major questions doctrine was applied with no agency action in the case, and it readmitted the presumption the panel had excluded ..... 15

V. Whom the holding reaches ..... 20

CONCLUSION ..... 21

CERTIFICATE OF SERVICE ..... 22

CERTIFICATE OF COMPLIANCE (Form 8) ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bostock v. Clayton County*, 590 U.S. 644 (2020)....................................19

*California Restaurant Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024)............................................................................15, 17

*Connecticut National Bank v. Germain*, 503 U.S. 249 (1992)................20

*KalshiEX, LLC v. Assad*, No. 25-7516 (9th Cir. Aug. 28, 2026)......passim

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998)..........19

*Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115 (2016)......................................................................15, 16, 18

*Thrifty Oil Co. v. Bank of America National Trust & Savings Ass'n*, 322 F.3d 1039 (9th Cir. 2003).......................................6, 7, 14

*West Virginia v. EPA*, 597 U.S. 697 (2022)........................................15, 16

*Yates v. United States*, 574 U.S. 528 (2015)............................................5

## Statutes

7 U.S.C. § 1a(19)(iv)...................................................................6, 8

7 U.S.C. § 1a(47)(A)..................................................3, 7, 8, 10, 11, 14, 17

7 U.S.C. § 2(a)(1)(A)...................................................1, 8, 10, 15, 20

7 U.S.C. § 2(e)...........................................................................11, 12

7 U.S.C. § 5(a)...................................................................................7

7 U.S.C. § 6(a).................................................................................12

7 U.S.C. § 7a-2(c)(5)(C)..............................................9, 10, 13, 18

7 U.S.C. § 13a-2...............................................................................9

7 U.S.C. § 16(e)(1)(B)(i), (e)(2)............................................12, 13, 14, 18

15 U.S.C. § 8302(d)(1).......................................................................8

Nev. Rev. Stat. § 463.0193 .......... 14

Nev. Rev. Stat. § 463.01962 .......... 14

**Rules**

Fed. R. App. P. 29(b), 40(b)(2) .......... 1, 17

Ninth Circuit Rule 29-2 .......... 1

**Regulations and Administrative Materials**

17 C.F.R. § 40.11 .......... 2, 7, 8, 9, 10, 16, 18

Further Definition of "Swap," 77 Fed. Reg. 48,208 (Aug. 13, 2012) .......... 8, 9

Prediction Markets, 91 Fed. Reg. 12,516 (Mar. 2026) .......... 6

Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026) .......... 6

**Legislative Materials**

156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) .......... 18

S. Rep. No. 93-1131 (1974) .......... 13

**Other Authorities**

Merriam-Webster's Collegiate Dictionary (11th ed. 2003) .......... 4

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .......... 6

## INTEREST OF AMICUS CURIAE

Amicus Colin Skow is a Nevada citizen and professional quantitative trader. Since September 2025 he has devoted more than 1,600 hours to developing, refining, and backtesting algorithmic trading systems built exclusively for sports event contracts on Appellant's designated contract market. Since March 20, 2026, a Nevada state-court order that Appellees obtained in a proceeding to which he is not a party has excluded everyone located or resident in Nevada from those contracts. The order has completely prevented him from deploying his systems; he has never placed a trade. He holds no financial interest in Appellant and is not represented by any party.

Amicus files as a member of the class 7 U.S.C. § 2(a)(1)(A) names first, the holder of an "account" on a designated contract market.

Amicus files by leave of court, sought by the accompanying motion under Fed. R. App. P. 29(b)(2) and Circuit Rule 29-2(a). No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than amicus contributed money intended to fund preparing or submitting it.

## SUMMARY OF ARGUMENT

The panel stated its grounds in one sentence: the swap reading "is not the best textual reading in context, does not square with the statutory scheme, does not have a limiting principle, and would raise concerns under the major-questions doctrine." *KalshiEX, LLC v. Assad*, No. 25-7516, slip op. 47 (9th Cir. Aug. 28, 2026) ("Op."). This brief answers those four grounds in order, with arguments the petition does not develop, and does not repeat the petition's showing on the circuit split, the Commission's practice, hedging, or tradability. Petition ("Pet.") 10–17.

First, the panel construed "event" and "occurrence" and stopped; the clause has three more operative terms, and the panel's own examples instantiate each. Second, § 40.11, by which Judge Lee avoided the Special Rule question and the majority answered it, is a listing rule: it does not define "swap," it reaches only contracts already inside the Act, and an unlawful listing is the Commission's to remedy, not a State's to regulate. Third, the "no limiting principle" objection condemns the weather swaps the panel concedes are preempted; the limit it demands is the Act's venue line; and Nevada's statute is the law

without a limit. Fourth, the major questions doctrine was applied with no agency action before the court, to Congress's own express command, readmitting the presumption the panel had excluded. Fifth, the holding reaches a class the panel never saw.

## ARGUMENT

### I. The panel construed only two words of a five-term clause.

Section 1a(47)(A)(ii) reaches a payment "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." The panel announced that it would consider "the words occurrence, event, and contingency," Op. 23, construed the first two, and never returned to the third. It never says what work "nonoccurrence" or "the extent of the occurrence" would do. Read whole, the clause describes a sports event contract term by term.

Take the panel's own hypothetical, a contract on the Raiders winning by more than 7.5 points. Op. 27–28. The **event** is the postulated outcome: the Raiders win. Its **occurrence or nonoccurrence** is whether that outcome comes to pass; the contract has a "yes" side that pays on occurrence and a "no" side that pays on

nonoccurrence. Pet. 8. The **extent of the occurrence** is the margin. Every word has a referent, and every word does different work.

**1. "Contingency."** The panel quoted the definition and never applied it: "something liable to happen as an adjunct to or result of something else." Op. 24 (quoting Merriam-Webster's Collegiate Dictionary (11th ed. 2003)). The Raiders winning by more than 7.5 is exactly that. The clause is disjunctive, "an event *or* contingency," so whatever "event" means, a payment dependent on the occurrence of a contingency is inside the definition. The holding that "we do not refer to whether the Dodgers win the World Series . . . as an 'event,'" Op. 24–25, answers a question the statute does not ask.

**2. "Nonoccurrence."** Congress wrote for something that may or may not happen. For the contracts at issue, the uncertain thing is not whether the game is played; it is who wins and by how much. The panel's "event," the scheduled game, is the one thing in the contract whose occurrence is not in doubt. The statute's subject is the thing whose occurrence is.

**3. "The extent of the occurrence."** The panel's own examples, "how many touchdowns Fernando Mendoza might throw in a game, or

how many points BYU Football will win by," Op. 25, are the extent of an occurrence. Offered to show that these are not "events," they show that Congress wrote a term for payment keyed to how much of something happened.

**4. The grammar answers *Yates*.** The panel reasoned that "event" and "occurrence" should each have "independent meaning to avoid rendering one term superfluous." Op. 25 (citing *Yates v. United States*, 574 U.S. 528, 546 (2015)). But the statute does not list them as parallel nouns. It speaks of "the occurrence . . . *of* an event or contingency." The occurrence is what happens to the event: it comes to pass, does not, or does to some extent. A predicate is not surplusage of its subject. On the reading above each term is independent; on the panel's, "nonoccurrence" and "extent" describe only whether a scheduled game is played, and how much of it. The canon cuts against the panel.

**5. Congress used the same words and carved out price changes.** An "excluded commodity" is "an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is . . . beyond the control of the parties . . . and associated with a financial, commercial, or

economic consequence." 7 U.S.C. § 1a(19)(iv). Congress had to carve *price changes* out of that phrase. A change in a price, rate, value, or level is a measure, not a scheduled happening, and the carve-out is intelligible only if the phrase, unqualified, reaches measures and outcomes.

**6. "Event" as a postulated outcome is current English.** It is the drafting sense of every financial contract, an "event of default" or a "credit event," and event contracts on "corporate credit events" traded on Commission-regulated exchanges between 1992 and 2008. 91 Fed. Reg. 12,516, 12,518 n.29 (Mar. 2026). In the vocabulary of every instrument whose price is a probability, an "event" is a set of outcomes, the technical sense Judge Lee's own canon preserves. Op. 48 (quoting Scalia & Garner, *Reading Law* 69). The Commission uses the words the same way: "The outcome of a game is an occurrence in a game." 91 Fed. Reg. 35,806, 35,826 (June 12, 2026).

**7. The company it keeps writes no hedging requirement.** The panel read (A)(ii) narrowly because its neighbors in (A)(iii) hedge risk, while sports contracts "create risk . . . where none previously existed." Op. 28–29 (citing *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. &*

*Sav. Ass'n*, 322 F.3d 1039, 1042 (9th Cir. 2003)). Three answers. (a) The panel's own authority, one page later, lists speculation among the uses of an interest-rate swap: "altering the character of assets and liabilities, fine tuning risk exposure, lowering the cost of financing or speculating on interest rate fluctuations." *Thrifty Oil*, 322 F.3d at 1043. (b) *Noscitur a sociis* is a canon for words in a list. Subparagraphs (A)(i)–(vi) are independent, disjunctive definitions, and reading a hedging function into (A)(ii) reads it out of the statute: Congress wrote (A)(ii) for payments triggered by an event rather than by a change in a value. (c) The purpose Congress enacted names both sides of the market: the transactions subject to the Act "are affected with a national public interest by providing a means for managing *and assuming* price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a) (emphasis added). Assuming risk is speculation, and every hedger requires a counterparty who assumes what the hedger sheds. The panel narrowed a definition on half of Congress's stated purpose.

## II. Section 40.11 is a listing rule, not a definition, and cannot decide a question that turns on § 1a(47).

The panel held that "there is no dispute Kalshi's sports event contracts are traded on a DCM" and that "the dispositive issue is

whether the sports event contracts are 'swaps'" under § 1a(47)(A)(ii). Op. 23. Judge Lee left the Special Rule question unresolved because "17 C.F.R. § 40.11 bars gaming contracts" and "controls the outcome of this appeal," Op. 49–50, and the majority answered the Special Rule argument, an argument about coverage, the same way. Op. 33. A rule about listing cannot govern coverage, for reasons the petition does not give.

**1. A listing rule does not define "swap."** Section 40.11 tells a registered entity what it "shall not list" and gives the Commission a review procedure. § 40.11(a), (c). It does not define "swap," and could not: Congress assigned the power to "further define" that term to the CFTC and SEC jointly, 15 U.S.C. § 8302(d)(1), and they exercised it in 2012. 77 Fed. Reg. 48,208. What § 40.11 does say places every contract it reaches inside the Act: it applies only to a contract "based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act." Op. 34. A rule that presupposes coverage cannot decide it.

**2. An unlawful listing confers nothing on a State.** Exclusive jurisdiction attaches to swaps "traded or executed on" a designated market, § 2(a)(1)(A), not to swaps *lawfully listed* on one. A listing that

violates a Commission rule violates federal law, and Congress said who acts on that: the Commission, by determination under § 7a-2(c)(5)(C)(i) or review under § 40.11(c); and a State suing in federal court, on immediate written notice to the Commission, to enforce the Act against "any person (other than a contract market . . .)." 7 U.S.C. § 13a-2(1)–(3). The one defendant Congress placed beyond even a supervised federal-law suit is the contract market. No provision converts a market's rule violation into state regulatory jurisdiction over the contract, and Nevada claims none: Nevada "is not attacking the CFTC's action or inaction but pursuing enforcement of its own state law about what qualifies as a bet or wager, not what the CFTC considers a swap." Op. 19. A rule Nevada does not enforce, about a violation Nevada does not allege, cannot control Nevada's preemption defense.

**3. The panel's own hypothetical rests the question on the definition.** If Kalshi listed a life-insurance contract and the Commission let it stand, the panel reasoned, the States could still regulate it. Op. 36. The hypothetical works only because insurance lies outside the swap definition, 77 Fed. Reg. at 48,246; the answer would be the same had the Commission acted the next day. A contract outside

§ 1a(47) is outside § 2(a)(1)(A) however it is listed, and a contract inside is inside however the Commission handles it. Section 40.11(a) reaches only the second kind.

**4. State law is an input, not a veto.** The panel read the Special Rule's state-law factor as proof that "state law and the CEA can coexist." Op. 43. It does: Congress made "activity that is unlawful under . . . State law" one factor the Commission "may" weigh in a federal determination, § 7a-2(c)(5)(C)(i)(I). The factor reaches the activity the contract references, not the trading of the contract; otherwise any State could delist any federally listed contract by declaring its purchase unlawful. State law enters a federal determination; it does not displace one.

If § 40.11 cannot control the outcome, the question Judge Lee left open must be answered: whether the Special Rule, by giving the Commission discretion over gaming contracts, presupposes that they are within the Act. His own reading answers it. The Commission "may determine" that such contracts are contrary to the public interest, § 7a-2(c)(5)(C)(i), so the Special Rule "does not seem to categorically bar all gaming contracts." Op. 49.

## III. The limiting principle is the Act's venue line, and Nevada's law has none.

The panel's recurring objection was that if these contracts are swaps, "every person placing a sports bet at Caesar's Sportsbook . . . is violating the CEA" under § 2(e). Op. 30–31; *see* Op. 41, 47. Kalshi answers that off-exchange bets are not swaps. Pet. 17. Amicus answers that the Act already draws the line the panel sought, whereas Nevada's law draws none.

**1. The panel's objection proves too much.** The panel concedes that "a state would be both field and expressly preempted from regulating weather or interest rate swaps." Op. 44. Congress named "a weather swap" in § 1a(47)(A)(iii), and the panel acknowledges that weather and emissions swaps "do not refer to a financial instrument or measure." Op. 33. Rainfall has no inherent financial character; its consequences are entirely downstream; and a bar bet on tomorrow's rain is the same contingency. If "every Caesars bettor violates the CEA" refutes the swap reading of sports contracts, "every rain bettor violates the CEA" refutes the weather holding the panel accepts. A test that condemns both settles nothing. The panel's only answer, that weather and emissions "are unlike" sports, Op. 33, is asserted, not explained.

**2. Venue has always been the line.** For futures, § 6(a) makes it "unlawful for any person . . . to enter into . . . any transaction in . . . a contract for the purchase or sale of a commodity for future delivery" unless it "is conducted on or subject to the rules of a board of trade which has been designated . . . by the Commission as a contract market." 7 U.S.C. § 6(a). For swaps, § 2(e) does the same for retail participants, as the panel quoted. Both make the identical instrument a regulated federal contract on-exchange and a federal violation off it.

**3. The elephant never enters.** Congress preserved state law off-exchange in terms: nothing in the chapter supersedes "the application of any Federal or State statute . . . to any transaction . . . that is not conducted on or subject to the rules of a registered entity or exempt board of trade." § 16(e)(1)(B)(i). Every casino, sportsbook, and tribal facility stays under state and tribal law. Whether § 2(e) reaches a sportsbook wager is a question of *federal* enforcement, not before this Court and irrelevant to whether Nevada may regulate a designated contract market. The only thing the swap reading makes exclusively federal is the designated market, which has been exclusively federal since 1974: the Commission's "jurisdiction, where applicable,

supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6 (1974). The "wrecking ball," Op. 40, swings at nothing: no gambling statute is displaced anywhere but on a designated contract market.

**4. The Special Rule's list refutes "inherently."** The panel grafted "inherently" onto "associated with" to exclude downstream consequences. Op. 32. Congress's own list of event-contract subjects, "terrorism, assassination, war, gaming," § 7a-2(c)(5)(C)(i), consists of occurrences whose economic consequences are *only* downstream. Congress named them as things event contracts may be "based upon" and gave the Commission discretion whether to bar them. "Inherently" cannot survive the list. The word it deletes from the statute is "potential."

**5. Congress spoke to gaming laws in this Act, and Nevada's law is the one without a limit.** The panel cited § 16(e)(2) only to show that Congress "can choose more explicit language for preemption." Op. 22. Read it: "This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops" as to specified transactions exempt from full regulation. 7 U.S.C. § 16(e)(2). Gaming laws yield, Congress

said, for transactions regulated *less* than a DCM-traded swap, and this Court applied it that way: "Congress preempted state bucket shop laws to the full extent the CFTC exempts transactions from coverage under the CEA." *Thrifty Oil*, 322 F.3d at 1058. Section 16(e)(2) needed its own words because those transactions are excluded or exempted from the Act, and so lie outside the grant; the core needs none, because "exclusive" already covers it. It cannot be that the periphery is shielded from gaming law by name while the core, the designated market, is exposed.

The panel also held that Nevada's statutes target "gaming," not swaps. Op. 44–45. "'Wager' means a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." Nev. Rev. Stat. § 463.01962. "'Sports pool' means the business of accepting wagers on sporting events or other events by any system or method of wagering." *Id.* § 463.0193. Nevada's "wager" is § 1a(47)(A)(ii) in a State's words, and its sports-pool statute reaches "other events." On its own text, Nevada's law targets every event contract on every designated market: the weather swap the panel says is preempted is a "wager" under § 463.01962, and Nevada has already

applied its law to election contracts. Op. 14, 41 n.7. So the reductio runs the other way: the *state* law has no limiting principle, and only federal exclusivity supplies one. And the overlap the panel treated as a reason to shrink the federal definition is what an express preemption clause exists to resolve: the Supremacy Clause chooses; it does not ask a court to narrow the federal words until the overlap disappears.

## IV. The major questions doctrine was applied with no agency action in the case, and it readmitted the presumption the panel had excluded.

The panel held that § 2(a)(1)(A) is express preemption, read on its "plain wording" with no presumption against preemption. Op. 20–22 (citing *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016); *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024)). It then resolved "competing, legitimate interpretations" of the definition against preemption under the major questions doctrine. Op. 37–41. The petition calls this "intuitions," Pet. 5, 20; it is a rule of decision with reach beyond this case.

**1. No agency exercised any power.** The doctrine addresses "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*,

597 U.S. 697, 724 (2022) (quoted at Op. 38). By the panel's own findings, the Commission exercised none: "Kalshi self-certified its sports event contracts," Op. 19; "[t]he CFTC never invoked the 90-day review," Op. 35; the CFTC "failed or declined to enforce § 40.11," Op. 36. The panel converted a doctrine about delegated authority into a rule for reading a preemption clause between a private party and a State.

**2. Preemption is Congress's act, not the agency's.** An express preemption clause is not "an ambiguous grant of statutory authority" to an agency, Op. 38; it is Congress's own command, and *Franklin* says it is read on its wording.

**3. The presumption, readmitted.** "If we were to simply apply the presumption against preemption, as Nevada suggests, this would become a much easier case." Op. 20. The panel declined the presumption, then made the case easy anyway: "competing, legitimate interpretations," Op. 41, were resolved for the State because gambling is "an area that has long been regulated by the States and Tribes." Op. 38–39. A clear-statement rule applied to the definition on which an express clause operates is the historic-police-powers presumption under another name, the presumption *Franklin* forbids and this Court's

precedent excludes. *Cal. Rest. Ass'n*, 89 F.4th at 1101 (no "presumptive thumb on the scale") (quoted at Op. 21). That is a conflict with the Supreme Court, Fed. R. App. P. 40(b)(2)(B), and within this Circuit, Rule 40(b)(2)(A), grounds the petition does not invoke. And its reach is not confined to prediction markets: every express-preemption case in a field of historic state concern can now be met with a demand for a clear statement, so long as the field can be called "major."

**4. No mousehole and no unheralded power.** Section 1a(47) is not an "ancillary provision[]," Op. 27; it is the definition on which Title VII of Dodd-Frank operates. Nor was anything discovered in an old statute. The panel says the CFTC "is not a national gambling regulator" and that "[n]o one suggested it was until over a decade after the law was passed." Op. 38. The Special Rule's sponsor suggested it in the Act's own debate. Section 745, she said, gives the Commission "the power to . . . prevent gambling through futures markets," because "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament," contracts that "would be used solely for gambling," and "[t]he Commission needs the power to, and should, prevent" them as

"contrary to the public interest." 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) (Sen. Lincoln). The colloquy is offered not for the meaning of "swap," which the text supplies, but against the panel's premise. Congress saw the sports event contract, assumed it could be listed, and assigned the judgment about it to the Commission's public-interest discretion, § 7a-2(c)(5)(C), which the Commission exercised by writing § 40.11 about gaming in 2011, Op. 34. The only new thing is that a State objected.

**5. Consequences are for Congress; the panel's own authority says so.** Puerto Rico was barred from authorizing its municipalities to file under Chapter 9 and preempted from enacting its own restructuring law. The dissent urged that it "should not have to wait for possible congressional action to avert the consequences." The Court answered that "our constitutional structure does not permit this Court to 'rewrite the statute that Congress has enacted.'" 579 U.S. at 130. That was express preemption in a field of the deepest sovereign concern, with consequences far harsher than Nevada's: Nevada keeps every casino and sportsbook under § 16(e)(1)(B)(i); Puerto Rico kept nothing. The consequences objection has an addressee, and it is not a

court. "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest." *Bostock v. Clayton County*, 590 U.S. 644, 653 (2020).

*Bostock* answers the panel's mousehole in its own terms. The Court conceded that its holding was "an elephant" and asked, "where's the mousehole?" A "major piece of federal . . . legislation" "written in starkly broad terms" is not one. *Id.* at 680. "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). That "a Wall Street reform bill," Op. 39, was aimed at Wall Street says nothing about the reach of the definition it enacted.

**6. Judge Lee's "contextual clues."** The concurrence uses the doctrine as "contextual clues" to ordinary meaning. Op. 49. A clue resolves ambiguity; it cannot create it. Once "contingency," "nonoccurrence," "extent," and "potential" are read, Part I, there is nothing left to narrow. Where the words are unambiguous, "judicial

inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

## V. Whom the holding reaches.

Section 2(a)(1)(A)'s grant runs "with respect to accounts, agreements . . . , and transactions." Its first object is the account, the market participant's. The panel decided the equities entirely on the exchange's choices: Kalshi "greatly expanded its offerings" and listed "in the face of" the regulation, Op. 45–46 (quoting the district court); its harms are "self-inflicted," Op. 45. Not one sentence concerns the person on the other side of the account.

Amicus is that person. He began building a profession on a federally designated market in September 2025, while a federal injunction against Nevada's enforcement was in force, Op. 14–16. He made none of the choices the panel weighed. Since March 20, 2026, Appellees' enforcement has completely prevented him from earning a living from his specialized profession in his home state. The "geofencing" the panel endorsed, Op. 43, is not only a cost to Kalshi. It is the exclusion of a class of persons, by location and residence, from a national federal market, while the Commission directs the exchange "to

continue to operate its exchange in accordance with its normal practices." Pet. 13 n.1. The participant is the person on whom those two commands collide. The equities, the panel said, "turn[] on our resolution of the likelihood of success." Op. 46. If Parts I through IV are right, they turn the other way, and for a class the panel never saw.

## CONCLUSION

The petition for panel rehearing or rehearing en banc should be granted.

Dated: September 17, 2026

Respectfully submitted,

s/ Colin Skow
Colin Skow
*Amicus Curiae, Pro Se*
2629 Gallarate Dr.
Henderson, NV 89044
(909) 265-4681
colinskow@gmail.com

## CERTIFICATE OF SERVICE

I certify that on September 17, 2026, I served the foregoing Brief of Amicus Curiae, together with the Motion for Leave to File it and the Form 34 Disclosure Statement, on counsel of record for every party in Nos. 25-7516, 25-7187, and 25-7831, as follows:

**Plaintiff-Appellant KalshiEX, LLC** — by email, with written consent (Fed. R. App. P. 25(c)(2)(B); email of William E. Havemann, Milbank LLP, September 17, 2026), to: Neal Kumar Katyal, nkatyal@milbank.com; William E. Havemann, whavemann@milbank.com; Joshua B. Sterling, jsterling@milbank.com; Samantha K. Ilagan, silagan@milbank.com; Colleen E. Roh Sinzdak, crohsinzdak@milbank.com; Natasha R. Khan, nkhan@milbank.com; Grant R. Mainland, gmainland@milbank.com; Andrew L. Porter, aporter@milbank.com; Davis B. Campbell, dcampbell@milbank.com, Milbank LLP; Dennis L. Kennedy, dkennedy@baileykennedy.com; Paul C. Williams, pwilliams@baileykennedy.com, Bailey Kennedy, LLP.

**Defendants-Appellees George Assad, et al. (the State Defendants)** (Nos. 25-7516, 25-7187, 25-7831) — by email, with written consent (Fed. R. App. P. 25(c)(2)(B); email of Minh Nguyen-

Dang, Mayer Brown LLP, September 15, 2026), to: Nicole A. Saharsky, nsaharsky@mayerbrown.com; Minh Nguyen-Dang, mnguyen-dang@mayerbrown.com; Rory K. Schneider, rschneider@mayerbrown.com, Mayer Brown LLP; Abigail L. Pace, apace@ag.nv.gov; Jessica E. Whelan, jwhelan@ag.nv.gov, Office of the Nevada Attorney General.

**Intervenor-Defendant-Appellee Nevada Resort Association** — by email, with written consent (Fed. R. App. P. 25(c)(2)(B); email of Adam Hosmer-Henner, McDonald Carano LLP, September 16, 2026), to: Adam Hosmer-Henner, ahosmerhenner@mcdonaldcarano.com; Jane Susskind, jsusskind@mcdonaldcarano.com, McDonald Carano LLP.

**Plaintiff-Appellant North American Derivatives Exchange, Inc. (No. 25-7187)** — by first-class United States mail, postage prepaid, to: Shay Dvoretzky, Skadden, Arps, Slate, Meagher & Flom LLP, 1440 New York Avenue, N.W., Washington, DC 20005-2111, with a courtesy copy the same day by email to shay.dvoretzky@skadden.com.

**Plaintiff-Appellant Robinhood Derivatives, LLC (No. 25-7831)** — by first-class United States mail, postage prepaid, to: Kevin J. Orsini, Cravath, Swaine & Moore LLP, 375 Ninth Avenue, New York,

NY 10001, with a courtesy copy the same day by email to korsini@cravath.com.

s/ Colin Skow
Colin Skow

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7516, 25-7187, 25-7831

I am the attorney or self-represented party.

**This brief contains** 4,130 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ______.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Colin Skow **Date** September 17, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*