**Nos. 25-7516, 25-7187, 25-7831**

# In the United States Court of Appeals for the Ninth Circuit

KALSHIEX LLC,

*Plaintiff-Appellant,*

v.

GEORGE ASSAD, ET AL.,

*Defendants-Appellees.*

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA, NO. 2:25-CV-575
HON. ANDREW P. GORDON

# BRIEF OF *AMICUS CURIAE* THE COALITION FOR PREDICTION MARKETS IN SUPPORT OF PLAINTIFF-APPELLANT'S PETITION FOR REHEARING & REHEARING EN BANC

ELIZABETH B. PRELOGAR
*Counsel of Record*
EPHRAIM A. MCDOWELL
ELIAS S. KIM
DEV P. RANJAN
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel for Amicus Curiae The Coalition for Prediction Markets*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record states that, as a nonprofit entity organized under § 501(c)(6) of the Internal Revenue Code, *amicus curiae* The Coalition for Prediction Markets has issued no stock. Consequently, no parent corporation nor any publicly held corporation could or does own 10% or more of its stock.

Dated: September 21, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

*Counsel for Amicus Curiae The Coalition for Prediction Markets*

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .......... i

IDENTITY AND INTEREST OF AMICUS CURIAE .......... 1

INTRODUCTION .......... 2

ARGUMENT .......... 3

I. Prediction Markets Serve Critical Economic Functions .......... 3

A. Mechanics of Prediction Markets .......... 3

B. Prediction Markets Have Significant Economic Benefits .......... 5

1. Prediction markets help forecast events by aggregating knowledge from diverse sources .......... 6

2. Prediction markets allow market participants to mitigate risks .......... 9

II. Prediction Markets Are Not Sportsbooks .......... 11

A. Sportsbooks Operate Differently from Prediction Markets .......... 12

B. Any Functional Similarities Between Prediction Markets and Sportsbooks Have No Legal Significance .......... 13

III. Exclusive Federal Regulation Of Prediction Markets Is The Only Sensible Approach .......... 15

A. The CFTC Correctly Treats Prediction Markets as Productive Mechanisms for Aggregating Information .......... 15

B. State Gambling Regulations Are a Mismatch For Prediction Markets .......... 19

C. Applying State Laws to Prediction Markets Would Have Detrimental Consequences .......... 21

CONCLUSION .......... 23

CERTIFICATE OF COMPLIANCE .......... 25

CERTIFICATE OF SERVICE .......... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905) .......... 16

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) .......... 14

**Statutes**

7 U.S.C.
§ 1a(27) .......... 14
§ 1a(47) .......... 14
§ 2(a)(1)(A) .......... 14
§ 5(a) .......... 16
§ 5(b) .......... 16
§ 7(d)(3) .......... 18
§ 7(d)(4) .......... 18
§ 7(d)(8) .......... 18
§ 7(d)(9)(A) .......... 18

15 U.S.C.
§ 78bb(a)(3) .......... 14
§ 78c(a)(68) .......... 14

Act of March 19, 1931,
1931 Nev. Stat. 165 .......... 20

CFTC Act of 1974,
Pub. L. No. 93-463, 88 Stat. 1389 .......... 17

Dodd-Frank Wall Street Reform and Consumer Protection
Act, Pub. L. No. 111-203, 124 Stat. 1376 .......... 17

Grain Futures Act,
Pub. L. No. 67-331, 42 Stat. 998 .......... 16

Minn. S.F. 4760, 94th Leg. (2026) .......... 21

## TABLE OF AUTHORITIES (continued)


**Page**

Nev. Rev. Stat.
§ 463.745(1) .................................................................................... 20
§ 463.745(2) .................................................................................... 20
§ 463.765(1)(a) ................................................................................. 20
§ 463.765(1)(d) ................................................................................. 20

**Rules & Regulations**

17 C.F.R. § 38.151(b) ........................................................................ 18

Nev. Gaming Comm'n Technical Standard § 6.130(3) .......................... 20

Nev. Gaming Comm'n Reg. 5A.120(4) ................................................. 20

**Other Authorities**

Anthony M. Diercks et al., *Kalshi and the Rise of Macro Markets*, Fin. & Econ. Discussion No. 2026-010 (Bd. of Governors of Fed. Rsrv. Sys. 2026) ........................... 7, 8, 9, 13

Caleb Tallman, *Kalshi's Next Bet: Institutional Hedging for Professional Sports Teams*, Gaming Today (Feb. 23, 2026) ............. 10

Catherine McGrath, *Trump Leads Harris on Robinhood's New Prediction Market with 100 Million Contracts Traded*, Fortune (Nov. 4, 2024) .......................................................................... 8

Cathrine Gioino, *This NYC Bar Just Covered Everyone's Tabs Because the Knicks Won, and Used Kalshi to Hedge Their Bets*, Fortune (June 3, 2026) .......................................................................... 11

Celso Brunetti et al., *Is Speculation Destabilizing?* (Apr. 22, 2009) .......................................................................... 19

CFTC, *Understanding Prediction Markets and Event Contracts* .......................................................................... 4

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Daniel Defoe, *The Gamester: A Benefit-Ticket for All That Are Concern'd in the Lotteries* (London, J. Roberts 1719) .................. 14

*Decision Markets*, 14 IEEE Intelligent Sys. 16 (1999) .............................. 6

Emily Giambalvo, *Americans Can't Stop Betting. Sportsbooks are Cashing In*, Washington Post (Oct. 9, 2025) .................................................................................. 12

Erik Snowberg et al., *Prediction Markets for Economic Forecasting*, Brookings (June 13, 2012) ............................................................................ 6, 7

F.A. Hayek, *The Use of Knowledge in Society*, 35 Am. Econ. Rev. 519 (1945) ...................................................................... 7

FINRA, *Insurance Agents* .................................................................... 14

Fox Corp., *FOX to Integrate Kalshi Forecasts Across FOX News Media and FOX One Platforms*, Reuters (Apr. 7, 2026) ...................................................................................... 9

Ian Frisch, *Prediction Markets and Casinos Go to War Over Sports Betting*, N.Y. Times (Feb. 7, 2026) .......................................... 13

John L. Smith, *A Nevada Leader Who Warned Us About Our Excesses*, L.V. Rev.-J. (Mar. 19, 2011) ................................................ 19

Joyce E. Berg et al., *Prediction Market Accuracy in the Long Run*, 24 Int'l J. Forecasting 285 (2008) ........................................... 6, 8

Justin Wolfers et al., *Interpreting Prediction Market Prices as Probabilities* (Nat'l Bureau of Econ. Rsch., Working Paper No. 12200, 2006) .......................................................................... 5

Justin Wolfers et al., *Prediction Markets*, 18 J. Econ. Persp. 107 (2004) ....................... 3, 6, 8

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


Karl Whelan, *On Prices and Returns in Commercial Prediction Markets* .................... 4, 5

Kenneth J. Arrow et al., *Economics: The Promise of Prediction Markets*, 320 Science 877 (2008) .................... 5, 6

Liz Hoffman, *A Soccer Team Bet Against Itself. This is the (Good) Future of Prediction Markets*, Semafor (June 4, 2026) .................... 10

Mahdieh Shamsi et al., *A Prediction Market Trading Strategy to Hedge Financial Risks of Wind Power Producers in Electricity Markets*, 36 IEEE Trans. Power Sys. 4513 (2021) .................... 10

Martin Spann et al., *Sports Forecasting: A Comparison of the Forecast Accuracy of Prediction Markets, Betting Odds, and Tipsters*, 28 J. Forecast 55 (2009) .................... 12

Max Rego, *Kalshi Puts Paxton Odds in Texas GOP Primary at 95 Percent*, The Hill (May 24, 2026) .................... 8, 9

Ole Jakob Bergfjord, *Prediction Markets as a Tool for Management of Political Risk*, 2 J. Prediction Mkts. 1 (2008) .................... 10

*Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35806 (June 12, 2026) .................... 9

Scott Duke Kominers, *What Prediction Markets Actually Know*, a16z Crypto (May 30, 2026) .................... 7

Steven D. Levitt, *Why Are Gambling Markets Organised So Differently from Financial Markets?*, 114 Econ. J. 223 (2004) .................... 12

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

Amicus is a national trade association dedicated to preserving safe, transparent, and federally supervised access to prediction markets. Amicus believes that prediction markets offer key insights into shifting economic, cultural, and political trends and has worked closely with policymakers and regulators to establish a consistent federal regulatory framework for prediction markets.

Amicus has an interest in ensuring that the Commodity Exchange Act (CEA) is correctly interpreted as granting the Commodity Futures Trading Commission (CFTC) exclusive jurisdiction over prediction markets. Congress has entrusted the CFTC with creating clear regulatory frameworks that balance market accessibility and integrity. States have no similar experience and might remove access to prediction markets entirely. It is thus critical that courts correctly recognize that the CEA preempts state regulation of prediction markets.

[1] Amicus states that no party or counsel for a party authored this brief in whole or in part, and no one other than amicus and their counsel have made a monetary contribution to fund the preparation or submission of this brief. Although Plaintiff-Appellant Kalshi is a CPM member, Kalshi did not contribute money that was intended to fund the preparation or submission of this brief.

## INTRODUCTION

The best decisions incorporate the wisdom of the crowd—not just the opinions of siloed constituencies. Prediction markets enable decisionmakers to gather that wisdom on an unprecedented scale. They allow anyone with an account to provide their view on the likely outcome of an event—rewarding those who predict the correct outcome—and they offer anyone with an internet connection the opportunity to see the consensus view.

Over the past year, States across the country have tried to impede the progress of prediction markets by subjecting them to inapposite gambling regulations. Those efforts are misguided because they jeopardize valuable economic activity. Like other financial markets, prediction markets facilitate transactions that lead to price discovery and allow participants to hedge against economic risks. Accordingly, Congress crafted a federal regulatory system for prediction markets that simultaneously maximizes their economic benefits and promotes market integrity. State gambling regulations—which focus on raising revenue for local development—do not serve these functions. And subjecting

prediction markets to 50 different state regulatory regimes would have destabilizing consequences.

Exclusive federal regulation of prediction markets is thus the only sensible approach. This Court should grant rehearing en banc.

## ARGUMENT

## I. PREDICTION MARKETS SERVE CRITICAL ECONOMIC FUNCTIONS

Prediction markets implement an age-old idea: the public can efficiently gather information about events of public interest by enabling individuals to obtain a monetary interest in the outcomes of those events. Although commercial prediction markets have achieved widespread use only within the last few years, the overwhelming consensus among expert economists has long been that properly regulated prediction markets provide significant economic benefits.

### A. Mechanics of Prediction Markets

Prediction markets are platforms where users trade with other users for contracts that provide payment upon the occurrence (or non-occurrence) of specified events. Justin Wolfers et al., *Prediction Markets*, 18 J. Econ. Persp. 107, 108 (2004). To facilitate the formation of a contract, platforms list a contract on an event (*e.g.*, it will rain tomorrow)

for trading. Each contract includes an amount (*e.g.*, $1) to be paid when the contract resolves. Market participants then offer to "buy" or "sell" a position based on how likely they believe the event is. The platform matches buyers and sellers at a given price—for instance, if a buyer believes that there is more than a 60% chance of rain (and therefore offers to buy a contract for $.60) the platform will match a seller who believes there is less than a 60% chance of rain. Once the platform matches two corresponding orders, a total of $1 per contract is held by the platform: the buyer pays $0.60 and the seller puts up the remaining $0.40. Whoever is correct receives the $1. After the contract is executed, both parties can sell their positions to third parties at any time. CFTC, *Understanding Prediction Markets and Event Contracts*, https://tinyurl.com/5n7e6nn2 (last visited Sept. 17, 2026).

Accordingly, as in other futures and derivatives markets, prediction market operators play a facilitating role. Karl Whelan, *On Prices and Returns in Commercial Prediction Markets*, 23 Quantitative Fin. 1699, 1699 (2023). The platform decides what contracts will be listed, matches corresponding buyers and sellers, and collects transaction fees. *Id.* Regardless of whether the buyer or the seller is correct, the financial

result for the platform (a transaction fee) is the same. *Id.*

Platforms also publicly disseminate information. By posting the price of the most recent transaction as a headline, platforms convey the market's current view of the event's probability. Justin Wolfers et al., *Interpreting Prediction Market Prices as Probabilities* 7 (Nat'l Bureau of Econ. Rsch., Working Paper No. 12200, 2006), https://perma.cc/73PM-F9X8. For instance, if the most recent rain contract sold for $.80, that reflects the market's view that the probability of rain is 80%.

### B. Prediction Markets Have Significant Economic Benefits

Economists have long touted the benefits of prediction markets. Almost fifteen years before the first commercial prediction market was licensed, a group of economists—including four Nobel Laureates—called on the CFTC to eliminate legal impediments to prediction markets. Kenneth J. Arrow et al., *Economics: The Promise of Prediction Markets*, 320 Science 877, 877 (2008). They explained that, with proper regulation, "[t]he range of applications is virtually limitless—from helping

businesses make better investment decisions to helping governments make better fiscal and monetary policy decisions." *Id.*

The benefits of prediction markets are twofold. First, they allow information in diverse locations to be aggregated and distributed. Robin D. Hanson, *Decision Markets*, 14 IEEE Intelligent Sys. 16, 16 (1999). Second, they solve a risk-management problem by allowing economic actors to hedge against the risk of adverse events. Arrow, *supra*, at 877.

**1.** *Prediction markets help forecast events by aggregating knowledge from diverse sources*

Prediction markets allow individuals with information relevant to future events to coordinate and communicate their knowledge through price signals. Joyce E. Berg et al., *Prediction Market Accuracy in the Long Run*, 24 Int'l J. Forecasting 285, 287 (2008). As already explained, the market price for any given event represents the market's collective belief about its probability. For several reasons, economists have long agreed that prediction markets can provide the best available information about the likelihood of an event. Wolfers, *Prediction Markets, supra*, at 108.

*First*, the market mechanism provides a simple way for diverse users from across the nation to share their views. Erik Snowberg et al.,

*Prediction Markets for Economic Forecasting*, Brookings 6 (June 13, 2012). Different participants might base predictions on different specialized information—*e.g.,* macroeconomic factors or weather patterns. The market mechanism allows them to translate that knowledge into a simple numerical form, which can be aggregated with information from other market participants. F.A. Hayek, *The Use of Knowledge in Society*, 35 Am. Econ. Rev. 519, 526 (1945).

*Second*, prediction markets create a financial incentive for ordinary individuals to share (and obtain) specialized knowledge. Snowberg, *supra*, at 6. Without prediction markets, there are few opportunities for most individuals to profit from accurate predictions about, *e.g.*, weather occurrences or political elections. A prediction market can also incentivize individuals to gain expertise in making predictions. For example, before the 2024 presidential election, one market participant conducted novel surveys that were more accurate than standard polling. Scott Duke Kominers, *What Prediction Markets Actually Know*, a16z Crypto (May 30, 2026), https://perma.cc/HB6Y-6TTU.

*Finally*, prediction markets aggregate and distribute information continuously and without delay. Anthony M. Diercks et al., *Kalshi and*

*the Rise of Macro Markets*, Fin. & Econ. Discussion No. 2026-010, at 8 (Bd. of Governors of Fed. Rsrv. Sys. 2026), https://doi.org/10.17016/FEDS.2026.010. As a result, prediction markets sometimes break news and provide updates on important economic events well before traditional media channels. Wolfers, *Prediction Markets*, *supra* at 108.

The results prove what the theory suggests. A study conducted between 1988 and 2004 concluded that the first modern prediction market beat election polling 74% of the time. Berg, *supra*, at 285. Today, prediction markets continue to beat polling in both nationwide and statewide elections. Catherine McGrath, *Trump Leads Harris on Robinhood's New Prediction Market with 100 Million Contracts Traded*, Fortune (Nov. 4, 2024), https://perma.cc/N3DC-H65Y; Max Rego, *Kalshi Puts Paxton Odds in Texas GOP Primary at 95 Percent*, The Hill (May 24, 2026), https://tinyurl.com/y2pznf4v. Prediction markets have also anticipated federal funds rate changes more accurately than any other metric. Diercks, *supra*, at 3.

The public is already incorporating prediction markets into decisionmaking. For instance, 70% of visitors to Kalshi's website use it

only to obtain information about future events—not to trade. Fox Corp., *FOX to Integrate Kalshi Forecasts Across FOX News Media and FOX One Platforms*, Reuters (Apr. 7, 2026), https://bit.ly/4eCXACL. And multiple news agencies are integrating Kalshi data into their news, business, and weather reporting. *See id.*; Rego, *supra*.

Policymakers also recognize the informational benefits of prediction markets. Economists at the Federal Reserve explain that prediction market platforms can be a "source of real-time . . . data" for "informing monetary policy decisions" and "can serve as a valuable complement to existing forecast tools" because they "open new avenues for studying monetary policy transmission, market sentiment, and macroeconomic uncertainty." Diercks, *supra*, at 2, 34. And the CFTC recognizes "a variety of ways . . . event contracts that involve sporting events can be used for price discovery." *Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35806, 35830 (June 12, 2026).

**2.** *Prediction markets allow market participants to mitigate risks*

Traditionally, few people have had the tools to hedge against risks from events that might disrupt their businesses and lives. Hedging was limited to specific sectors, and to individuals with the resources and

ability to trade futures contracts or construct financial insurance products. Prediction markets allow users to hedge a variety of risks—from imbalances in power generation to regulatory shifts to macroeconomic factors. *See* Mahdieh Shamsi et al., *A Prediction Market Trading Strategy to Hedge Financial Risks of Wind Power Producers in Electricity Markets*, 36 IEEE Trans. Power Sys. 4513 (2021), https://doi.org/10.1109/TPWRS.2021.3064277; Ole Jakob Bergfjord, *Prediction Markets as a Tool for Management of Political Risk*, 2 J. Prediction Mkts. 1 (2008).

The ability to hedge risks is likewise critical in professional sports, where wins, losses, and players' performances can have significant economic effects. For example, a Spanish soccer club used a prediction market to hedge against the risk that it would be relegated from the top division of Spanish soccer. Liz Hoffman, *A Soccer Team Bet Against Itself. This is the (Good) Future of Prediction Markets*, Semafor (June 4, 2026), https://perma.cc/YQV8-T88B. Other teams have used prediction markets to hedge against the risk of paying performance-based bonuses. Caleb Tallman, *Kalshi's Next Bet: Institutional Hedging for Professional Sports Teams*, Gaming Today (Feb. 23, 2026),

https://tinyurl.com/bdd4pnem. Prediction markets allow these risks to be hedged at a fraction of the price of traditional insurance contracts. *Id.*

Other businesses affected by professional sports have also started using prediction markets to hedge risk. For instance, a bar in New York City promised customers free tabs if the New York Knicks won Game 1 of the NBA Finals. Cathrine Gioino, *This NYC Bar Just Covered Everyone's Tabs Because the Knicks Won, and Used Kalshi to Hedge Their Bets*, Fortune (June 3, 2026), https://perma.cc/J5LF-GXEZ. The bar used Kalshi to offset the risk of loss in the event of a Knicks victory. *Id.* The last time the bar had run a similar promotion, it lost $4,000—but Kalshi allowed it to run the promotion without risking that loss. *Id.*

## II. PREDICTION MARKETS ARE NOT SPORTSBOOKS

Despite the clear benefits and distinct historical pedigree of prediction markets, some States have sought to regulate their use to predict sports-related events (and in some cases elections) as gambling. That approach is misconceived. Prediction markets offer a broad array of contracts, many of which do not relate to sports (or elections). And prediction markets do not function like sportsbooks because market operators do not play the same role as bookmakers. Moreover, any

superficial similarity between prediction markets and sportsbooks would not justify subjecting prediction markets to gambling regulations.

### A. Sportsbooks Operate Differently from Prediction Markets

Bookmakers and prediction market operators play fundamentally different roles. Unlike prediction markets, bookmakers exclusively make wagers with users themselves. Steven D. Levitt, *Why Are Gambling Markets Organised So Differently from Financial Markets?*, 114 Econ. J. 223, 223 (2004). As a result, users must accept the prices that bookmakers offer. *Id.*

The mechanics of sports gambling illustrate how bookmakers generate profits in a materially different way than prediction markets. Bookmakers employ in-house experts who calculate the probability of game outcomes and set theoretically favorable prices. *See* Martin Spann et al., *Sports Forecasting: A Comparison of the Forecast Accuracy of Prediction Markets, Betting Odds, and Tipsters*, 28 J. Forecast 55, 58 (2009), https://perma.cc/6BHF-FCHL. For instance, if a sportsbook calculates that the outcome of the game is 50-50, it will often offer "odds of roughly -110 on both sides." Emily Giambalvo, *Americans Can't Stop Betting. Sportsbooks are Cashing In*, Washington Post (Oct. 9, 2025),

http://bit.ly/4uoJuuK. This means users "must wager $110 to earn $100" on either team. *Id.* So even if users believe the odds are 50-50, they will be unable to place a bet at those odds.

Prediction market operators do not share the incentives or pursue the same business strategies as sportsbooks. Platforms lack control over contract prices, and they allow users to enter contracts at whatever odds other market participants are willing to accept. A losing prediction also makes a prediction market no more money than a winning one. Indeed, platforms *rely* on informed users with sound information to bolster the accuracy of their markets' predictions. *See* Diercks, *supra*, at 2.

### B. Any Functional Similarities Between Prediction Markets and Sportsbooks Have No Legal Significance

Opponents of prediction markets often contend that prediction markets should be regulated like sportsbooks based on similarities in the user experience. *See* Ian Frisch, *Prediction Markets and Casinos Go to War Over Sports Betting*, N.Y. Times (Feb. 7, 2026), https://bit.ly/4vyK7Td. As already explained, prediction markets and sportsbooks are in fact fundamentally distinct. But even if they were outwardly functional equivalents, that would not provide States regulatory authority over both.

On the contrary, *all* federally regulated financial markets have similarities to gambling but nevertheless are immune from state gambling regulations. Indeed, "[t]he short history of financial market regulation is that everything was once illegal." Hanson, *supra*, at 18. That includes the stock market, Daniel Defoe, *The Gamester: A Benefit-Ticket for All That Are Concern'd in the Lotteries* 12 (London, J. Roberts 1719), and futures trading, *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888). But federal law now preempts state regulation as to both. *See* 15 U.S.C. § 78bb(a)(3); 7 U.S.C. § 2(a)(1)(A).

Prediction markets should be no different. Indeed, the CFTC exercises jurisdiction over numerous financial instruments with functional equivalents outside its authority. For instance, a credit default swap is the functional equivalent of an insurance contract. But the former are federally regulated, 15 U.S.C. § 78c(a)(68); 7 U.S.C. § 1a(47), and the latter are regulated by state insurance commissions, FINRA, *Insurance Agents*, https://perma.cc/YYY8-D3EK (last visited Sept. 17, 2026). Likewise, the CFTC has jurisdiction over commodity futures contracts but not over forward delivery contracts. *See* 7 U.S.C. § 1a(27). Thus, even if prediction markets were functionally similar to

sportsbooks, that would not resolve whether prediction markets could be subject to state gambling regulations.

## III. EXCLUSIVE FEDERAL REGULATION OF PREDICTION MARKETS IS THE ONLY SENSIBLE APPROACH

Kalshi's petition comprehensively explains why the panel's interpretation of the statutory text and structure is incorrect. *See* Kalshi Pet. 14-21, Dkt. 206. An analysis of the CEA's broader objectives confirms Kalshi's position. Congress carefully designed the CFTC to regulate national financial markets that provide significant information to the public but are vulnerable to manipulation. Prediction markets present those benefits and risks, and Congress therefore entrusted their regulation to the CFTC. State gambling regulations seek to prevent immoral behavior and generate revenue for the state and county government, but are not concerned with fostering safe, liquid national markets. Applying those regulations to prediction markets would wreak havoc on markets and their users.

### A. The CFTC Correctly Treats Prediction Markets as Productive Mechanisms for Aggregating Information

The many financial instruments that fall within the CFTC's exclusive jurisdiction share one feature: they "are affected with a national public interest" because, when they are "trad[ed] in liquid, fair[,]

and financially secure trading facilities," they "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). Congress has thus directed the CFTC to promote markets for such instruments and encourage "self-regulation." *Id.* § 5(b). When the CFTC does regulate, its goal is to promote "market integrity." *Id.*

This calibrated regulatory system has existed since 1922, when Congress enacted the Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998, to address the risks from speculation at "boards of trade," which were venues for buying and selling contracts for the "future delivery" of grain. *See Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 245 (1905). By the turn of the century, at least 75 percent of transactions at the largest boards of trade did not involve "physical handing over of any grain." *Id.* at 246-47. Instead, most traders speculated on future grain prices by entering contracts and then attempting to settle them when prices moved in their favor. *See id.*

The public quickly realized that speculation regarding grain futures had both benefits and risks. As the Supreme Court explained, "[s]peculation of this kind" had "value . . . as a means of avoiding or

mitigating catastrophes, equalizing prices, and providing for periods of want." *Id.* at 247. The Senate Agriculture Committee likewise observed that "[p]ublic speculation helps to carry the risk for the producers, dealers, and millers who wish to hedge their cash grain transactions." S. Rep. No. 67-871, at 3 (1922). Public speculation also led to price discovery, benefiting "the producer and consumer alike." *Id.* at 4. At the same time, the grain-futures markets were susceptible to manipulation, which could cause "fluctuations . . . detrimental to the producer and the consumer." *Id.*

Accordingly, Congress crafted a regulatory framework to allow speculation while preventing manipulation. Most importantly, Congress provided that grain-futures contracts could only be traded in approved "contract market[s]." 42 Stat. at 1000. Congress subsequently established the CFTC, gave it exclusive jurisdiction to regulate futures contracts, and eventually expanded the system to cover "swaps," which Congress defined to include event contracts. CFTC Act of 1974, Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395; Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 721, 124 Stat. 1376, 1666, 1672.

Congress has thus charged the CFTC with regulating the national markets where traders buy and sell contracts to hedge against future risks—including from the occurrence of future events—and enable price discovery, with statutory safeguards in place. For example, contracts must not be "readily susceptible to manipulation," 7 U.S.C. § 7(d)(3), and platforms must "have the capacity and responsibility to prevent manipulation," *id.* § 7(d)(4). In turn, to facilitate price discovery, markets must "make public daily information on settlement prices, volume, open interest, and opening and closing ranges for actively traded contracts," *id.* § 7(d)(8), and must "provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process," *id.* § 7(d)(9)(A). Markets must also provide qualified traders with "impartial access." 17 C.F.R. § 38.151(b).

That framework fits seamlessly with prediction markets, demonstrating why Congress entrusted these markets to CFTC oversight. Prediction markets function like other markets subject to CFTC jurisdiction and thus present the same benefits and risks. By allowing traders to speculate on future events, prediction markets disseminate information about those events and enable users to hedge

against risks. As with other derivatives markets, prediction markets are used for both hedging and speculation. *See* Celso Brunetti et al., *Is Speculation Destabilizing?* 2 (Apr. 22, 2009), https://perma.cc/UX4A-JLR5. And like other contract markets, prediction markets may be subject to manipulation. The CFTC's regulatory framework is designed to maximize those exact benefits and minimize those exact risks.

### B. State Gambling Regulations Are a Mismatch For Prediction Markets

State gambling laws, by contrast, do not concern themselves with fostering safe, fair markets at all. They do not address price discovery, information aggregation, risk hedging, or market manipulation. Instead, state gambling laws largely seek to balance two countervailing goals: (1) restricting supposedly immoral behavior, and (2) promoting local economic development.

Nevada's gambling laws are illustrative. In 1861, Governor James W. Nye used his first speech in office to call for a prohibition on gambling, characterizing it as the "worst" of "all the seductive vices." John L. Smith, *A Nevada Leader Who Warned Us About Our Excesses*, L.V. Rev.-J. (Mar. 19, 2011), https://perma.cc/7NH5-7ADS. When Nevada later legalized most gambling in 1931, it created a licensing scheme that

sought to raise revenue while simultaneously protecting consumers from the worst harms. *See* Act of March 19, 1931, Ch. 99, 1931 Nev. Stat. 165.

Modern gambling laws—including those regulating online sports gambling—continue to follow that model. In Nevada, statutes regulating sports betting aim to "ensure the protection of consumers" and "vulnerable persons" while simultaneously raising revenue for the State. Nev. Rev. Stat. § 463.745(1)-(2). Any entity wishing to obtain an "interactive gaming" license must pay "a license fee of $500,000," with an annual renewal fee after the first two years of "$250,000." *Id.* § 463.765(1)(a), (d). The operator must then make available "responsible gaming options" including "[t]ime based exclusion from gambling settings." Nev. Gaming Comm'n Reg. 5A.120(4). The concept of a "market" is simply irrelevant to these laws.

Nor do state gambling laws promote national markets. Indeed, States require licensees to offer services only to individuals physically located within the State. In Nevada, operators must exclude users located "in an area unsuitable for interactive gaming." Nev. Gaming Comm'n Technical Standard § 6.130(3).

In short, state gambling laws treat regulated entities as local sources of revenue presenting substantial risks of harm. As a result, they are a poor conceptual fit for prediction markets. Prediction markets are national (or even global) platforms that serve their purpose only if they can connect diverse users from different locations. It thus makes little sense to shoehorn them into a regulatory scheme designed to tax local economic ventures to generate revenue for States but not to promote the safety and fairness of markets.

### C. Applying State Laws to Prediction Markets Would Have Detrimental Consequences

Shifting from exclusive CFTC regulation to state-by-state regulation would impose heavy costs on prediction markets and their users. Some States have purported to ban prediction markets altogether. *See, e.g.*, Minn. S.F. 4760, 94th Leg. (2026). But States that allow online gambling while requiring licenses also pose a threat to prediction markets and their users. Because those States rely on gambling licensing fees for revenue, they have a strong incentive to apply their gambling laws to prediction markets. *See* Frisch, *supra*. If those States are successful, every prediction market operator would need to apply for a license in every one of those States—an expensive and onerous process.

Thus, applying state gambling laws to prediction markets would risk grinding the industry to a halt. Every prediction market would need to alter its current operations and reconfigure itself to ensure compliance with dozens of different state laws. It would then need to devote resources to preparing dozens of applications and undergoing investigations by dozens of different regulators. At the end of that process, it would need to pay tens of millions of dollars in fees annually.

That patchwork of regulation would dramatically reduce prediction markets' utility. As already explained, every State that allows online gambling requires registered platforms to restrict access based on the user's location. If prediction markets were subject to these requirements, they would have to offer state-specific platforms with rigid geographical limits. That would make it impossible to cultivate a single nationwide market and lead to different prices for the same contracts in different states.

Imposing these restrictions on prediction markets would significantly hamper their core function: aggregating information from a wide range of diverse sources. Limiting prediction markets to individual States would create more homogenous groups of traders and decrease the

trading volume of markets for specialized questions, as individuals interested in obscure topics will be unlikely to find others interested in trading on that topic nearby.

Finally, allowing States to apply their gambling laws to prediction markets would lead to an uneven regulatory environment where certain types of event contracts are treated as gambling in some States but not in others. For instance, some States have focused exclusively on sporting events, while other States (like Nevada) have also taken the position that prediction markets for elections violate their gambling laws. *See* Motion for Stay at 7, *Nevada v. KalshiEX, LLC*, No. 26-1304 (9th Cir. Mar. 3, 2026), Dkt. 6.1. Without a uniform standard, there is no way to know which contracts States will target next.

## CONCLUSION

For the foregoing reasons, this Court should grant rehearing en banc.

Dated: September 21, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*
ELIZABETH B. PRELOGAR
*Counsel of Record*
EPHRAIM A. MCDOWELL

ELIAS S. KIM
DEV P. RANJAN
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel for Amicus Curiae The Coalition for Prediction Markets*

## CERTIFICATE OF COMPLIANCE

**Nos. 25-7516, 25-7187, 25-7831**

This brief complies with the type-volume limitation set forth in Circuit Rule 29-2 because it contains 4,199 words, including words manually counted in any visual images, and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: September 21, 2026

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

## CERTIFICATE OF SERVICE

I hereby certify that, on September 21, 2026, I electronically filed the foregoing Brief of *Amicus Curiae* The Coalition for Prediction Markets in Support of Plaintiff-Appellant's Petition for Rehearing & Rehearing En Banc with the United States Court of Appeals for the Ninth Circuit using the Court's electronic filing system, which will serve copies on all registered counsel.

Dated: September 21, 2026

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar