No. 25-7516

IN THE
# United States Court of Appeals for the Ninth Circuit

KALSHIEX LLC,
*Plaintiff-Appellant*,

v.

GEORGE ASSAD, *et al.*,
*Defendants-Appellees*,

NEVADA RESORT ASSOCIATION,
*Intervenor-Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Nevada
No. 2:25-cv-575 (Gordon, C.J.)

## PLAINTIFF-APPELLANT KALSHIEX LLC'S MOTION TO STAY MANDATE PENDING PETITION FOR A WRIT OF CERTIORARI

GRANT R. MAINLAND
ANDREW L. PORTER
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

November 9, 2026

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

Page

INTRODUCTION .......... 1

BACKGROUND .......... 3

REASONS FOR GRANTING THE STAY .......... 10

I. KALSHI'S PETITION WILL RAISE SUBSTANTIAL QUESTIONS .......... 11

A. The Panel's Decision Deepens Two Circuit Splits .......... 11

B. Whether Event Contracts Relating to Sports Fall Within The CFTC's Exclusive Jurisdiction Is A Substantial Question .......... 14

II. THERE IS GOOD CAUSE FOR A STAY .......... 21

CONCLUSION .......... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Bryant v. Ford Motor Co.*,
886 F.2d 1526 (9th Cir. 1989) .......... 11

*Comm'r v. Pepsi-Cola Niagara Bottling Corp.*,
399 F.2d 390 (2d Cir. 1968) .......... 18

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) .......... 19

*Epic Games, Inc. v. Apple, Inc.*,
73 F.4th 785 (9th Cir. 2023) .......... 1, 10, 11

*Hogan v. Bean*,
174 F.4th 1107 (9th Cir. 2026) .......... 14

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... 2, 12, 14, 15

*KalshiEX LLC v. Schuler*,
--- F.4th ----, No. 26-3196, 2026 WL 2884087
(6th Cir. Sep. 25, 2026) .......... 7, 8, 12, 13

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .......... 16

**STATUTES:**

7 U.S.C. §§

1a(47)(A)(ii) .......... 4, 15

1a(47)(A)(iv) .......... 4, 10

## TABLE OF AUTHORITIES—Continued

Page(s)

2(a)(1)(A) .......... 4, 19, 20

2(e) .......... 18

7a-2(c)(5)(B) .......... 5

7a-2(c)(5)(C)(i) .......... 5, 7, 15

7a-2(c)(5)(C)(ii) .......... 5, 7

16(e)(1)(B)(i) .......... 20

15 U.S.C. §§

8302(d)(1) .......... 4, 5, 8, 17, 18

8321(a)(2) .......... 4, 5, 18

8321(b) .......... 4, 5, 18

**RULES:**

9th Cir. R. 41-1 Circuit advisory committee's note .......... 10

Fed. R. App. P. 41(d)(1) .......... 1, 10

Sup. Ct. R. 10(a) .......... 4, 5, 18

**REGULATIONS:**

17 C.F.R. § 38.151(b) .......... 18

17 C.F.R. § 40.11(a) .......... 7

Further Definition of "Swap" – Inclusions,
91 Fed. Reg. 66,022 (Oct. 19, 2026) .......... 9, 10, 17

**TABLE OF AUTHORITIES—Continued**

Page(s)

Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969 (Oct. 19, 2026) .......... 9, 18, 20

Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026) .......... 8, 15, 16, 17

**LEGISLATIVE MATERIALS:**

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) .......... 5, 15

**OTHER AUTHORITIES:**

Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5 .......... 16

Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679 .......... 16

*Associate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) .......... 15

Ben Freeman, *A 2026 Midterms recap: The mega-mega blue tsunami*, Kalshi News (Nov. 4, 2026), https://perma.cc/RAU3-ZMCA .......... 4

Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win. Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM .......... 16

*CFTC Issues Impartial Access Requirements Interpretation*, CFTC Release No. 9323-26 (Nov. 5, 2026), https://perma.cc/WDC6-6K4T .......... 19

Christopher J. Kirkpatrick, *DCM Impartial Access Requirements*, CFTC (Nov. 5, 2026), https://perma.cc/76Y5-ENUK .......... 19

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Event*, Oxford English Dictionary (2026) .......... 15

Krystal Hur, *Cantor Lets Hedge Funds Place Big Bets on Kalshi's Prediction Markets*, Wall St. J. (Aug. 19, 2026), https://perma.cc/CY69-CYTZ .......... 16

Sasha Rogelberg, *Prediction markets are now 'bespoke insurance' for businesses, and a Los Angeles restaurant group's $60,000 hedge on Kalshi is the latest example*, Fortune (Oct. 19, 2026), https://perma.cc/AA9M-PDLM .......... 16

# INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 41(d)(1), Plaintiff KalshiEX LLC ("Kalshi") respectfully submits this motion for a stay of the mandate pending the filing and disposition of its petition for a writ of certiorari in the Supreme Court. This Court issued its decision in this case on August 28, 2026. Dkt. No. 201 ("Op."). Kalshi timely filed a petition for panel rehearing and rehearing en banc on September 9, 2026. Dkt. No. 206. This Court denied that petition on November 4, 2026. Dkt. No. 231. Kalshi contacted counsel for Defendants for their position on this motion. State Defendants oppose the motion; Defendant Nevada Resort Association had yet to indicate a position at the time of filing.

This Court has adopted a "general practice of granting a motion for a stay if the arguments presented therein are not frivolous." *Epic Games, Inc. v. Apple, Inc.*, 73 F.4th 785, 785 (9th Cir. 2023) (M. Smith, J., concurring). Kalshi's clearly are not. Rather, Kalshi seeks a stay of the mandate so that it can petition for Supreme Court review of an exceptionally important question of federal law on which the circuits are divided.

This case presents the question whether the Commodity Exchange Act ("CEA") preempts state regulation of event contracts, including those involving sports events, traded on federal derivatives exchanges. The panel

recognized that the CEA's grant of exclusive jurisdiction to the Commodity Futures Trading Commission ("CFTC") expressly preempts state law within its scope, Op.20-22, but it held that sports-related event contracts categorically fall outside that scope, Op.41. That holding splits from the Third Circuit's decision in *KalshiEX LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026), which concluded that "[t]he outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence," such that " 'Kalshi's sports-event contracts fit comfortably' … within the Act's definition of 'swaps' subject to the CFTC's jurisdiction." *Id.* at 227-228 (quoting *id.* at 233 (Roth, J., dissenting)). And a subsequent decision of the Sixth Circuit further deepened the split.

The panel's holding presents, at minimum, substantial questions on the merits. The panel acknowledged the "plain-language appeal" of the Third Circuit's conclusion but applied various extratextual doctrines to narrow the meaning of the CEA's plain text. Op.24. The panel's decision is further undermined by recent and imminent CFTC regulations that refute the central premises on which the panel's decision was based. For that reason, there is at least a substantial prospect that the Supreme Court will grant review of the question presented, either in this case or another one raising

the same issues, and disagree with the panel's conclusion that event contracts involving sports can never be swaps.

Good cause exists for a stay pending Supreme Court review. Forcing the district court to press ahead with proceedings on the merits would undermine judicial economy and create substantial practical difficulties if the Supreme Court ultimately disagrees with the panel's decision. In addition, three related appeals in this Court are stayed pending issuance of the mandate here, and briefing in those cases should not resume while this case remains subject to further review. Meanwhile, Defendants will suffer no prejudice. The district-court proceedings are already stayed, and Nevada has obtained a state-court injunction barring Kalshi from offering its sports-event contracts in Nevada. A stay would not change that.

## BACKGROUND

1. Kalshi is a derivatives exchange overseen by the CFTC, known as a designated contract market, or "DCM." As a "prediction market," Kalshi allows users across the country to trade derivatives called event contracts. Kalshi offers event contracts on various kinds of events, including weather events, entertainment events, political events like elections, and sports events.

An event contract is a derivative that pays out depending on whether a particular underlying event occurs. Because the price traders pay accords with their view of the probability the underlying event will occur, the market price reflects the wisdom of crowds, giving these contracts significant predictive value. For example, Kalshi's election-related markets during the midterm elections this year accurately predicted 98 percent of races.[1]

As a DCM, Kalshi is subject to the CEA's comprehensive regulatory framework for regulating derivatives exchanges. Under the CEA, the CFTC has "exclusive jurisdiction" over "accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery ..., traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). The CEA defines "swap" broadly, with a six-part definition that includes any contract "that provides for ... payment ... that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," as well as any "agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap." *Id.* §§ 1a(47)(A)(ii), (iv). Besides defining "swap" broadly in the first instance,

[1] Ben Freeman, *A 2026 Midterms recap: The mega-mega blue tsunami*, Kalshi News (Nov. 4, 2026), https://perma.cc/RAU3-ZMCA.

Congress expressly delegated to the CFTC the power to "further define" the term "swap." 15 U.S.C. § 8302(d)(1); *see id.* §§ 8321(a)(2), (b).

Congress recognized in a "Special [R]ule" that "event contracts" subject to the CFTC's jurisdiction could involve "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), such as contracts that turn on the outcome of sports events. *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statement of Sen. Lincoln) (the Special Rule would enable the CFTC to regulate event contracts on "sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament"). Rather than prohibiting those contracts, Congress in the Special Rule delegated to the CFTC the authority to determine whether such contracts are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC "may" determine that contracts involving "gaming" are contrary to the public interest, in which case it must prohibit the contracts. *Id.* §§ 7a-2(c)(5)(C)(i)-(ii). Absent an adverse public-interest finding, however, Congress required the CFTC to permit contracts involving gaming. *Id.* § 7a-2(c)(5)(B).

2. In January 2025, Kalshi began offering event contracts based on sports events such as the outcome of the Super Bowl or who will be named the NBA Finals MVP. Op.13. On March 4, 2025, Defendants issued a cease-and-desist letter to Kalshi, asserting that Kalshi's event contracts involving

elections and sports violate Nevada law and demanding that Kalshi cease offering them in Nevada. Op.14. The Nevada Gaming Control Board "expressly reserve[d] all rights to pursue criminal and civil actions based on Kalshi's past and future conduct within the state." 2-ER-98. Faced with the threat of civil or criminal enforcement, Kalshi brought suit in the District of Nevada and sought a preliminary injunction on the ground that the CEA preempts state regulation of trading on DCMs like Kalshi.

The district court initially granted a preliminary injunction, holding that the CFTC's "exclusive jurisdiction" preempts state law within its scope. 2-ER-75–77. But six months later, the court dissolved the injunction based on its conclusion that Kalshi's contracts are not "swaps" within the CFTC's exclusive jurisdiction. 1-ER-12–14. Kalshi appealed.

On August 28, 2026, this Court issued an opinion affirming the district court's dissolution of the preliminary injunction. The panel agreed with Kalshi that the CEA's grant of "exclusive jurisdiction" to the CFTC expressly preempts state law. Op.20-22. But it concluded that Kalshi's contracts are not swaps and therefore fall outside the CFTC's exclusive jurisdiction. Op.41. Specifically, the panel branded Kalshi's contracts as "gambling," and concluded that outcomes of sports events categorically do not count as "events" and categorically lack any association with potential financial

consequences. Op.24-28, 32-33. The panel adopted this reading notwithstanding what it acknowledged to be the "plain-language appeal" of Kalshi's argument, Op.24, principally on the ground that otherwise all sports bets would qualify as swaps that must be traded on DCMs, Op.30-31. Although Congress in the Special Rule specifically granted the CFTC authority to determine whether event contracts involving "gaming" are "contrary to the public interest," the panel concluded that an existing CFTC regulation imposed a categorical prohibition on event contracts involving gaming. Op.3, 13 (citing 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii); 17 C.F.R. § 40.11(a)). The panel concluded that this regulation meant that federal law posed no impediment to Nevada's attempt to prohibit Kalshi's contracts under its gambling laws. Op.36.

Kalshi petitioned for rehearing en banc. This Court denied Kalshi's petition on November 4, 2026.

Meanwhile, the Sixth Circuit resolved a similar appeal, reaching still another conclusion. The Sixth Circuit held that Kalshi's contracts are not swaps and that the CEA would not preempt state regulation even if they were. The panel's decision rested principally on the concern that if event contracts involving sports are swaps, then swaps would "likely cover all sorts of commonplace gambling activity that does not currently occur on federally

regulated exchanges." *KalshiEX LLC* v. *Schuler,* ---F.4th ----, No. 26-3196, 2026 WL 2884087, at *14 (6th Cir. Sep. 25, 2026). Kalshi has sought rehearing of that decision, supported by the CFTC. That petition remains pending.

3. Since this litigation commenced, the CFTC has responded to judicial decisions calling into question its exclusive jurisdiction by initiating three rulemakings.

*First*, in June 2026, the CFTC issued a Notice of Proposed Rulemaking ("NPRM") to revise Rule 40.11 and adopt a comprehensive framework for regulating event contracts under the Special Rule. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026). The NPRM proposes revising Rule 40.11 to clarify that contracts involving "gaming" are not categorically prohibited. Instead, the proposed rule sets out a detailed process for CFTC public-interest review of event contracts, including contracts involving sports events. *Id.* at 35,834-37. It proposes that many event contracts involving sports can be traded "consistent with the public interest." *Id.* at 35,836. It further proposes that many other sports-event contracts cannot be—including contracts involving pre-collegiate sports events, discrete in-game occurrences, player injuries, and others. *Id.* at 35,836-37. The CFTC plans to finalize this rulemaking in the next three

weeks. Fed. Defs.' Resp. at 2, *CFTC v. Johnson*, No. 26-4281 (9th Cir. Sep. 24, 2026), Dkt. No. 29.1.

*Second*, in October 2026, pursuant to Congress's grant of express authority to "further define" the term "swap," 15 U.S.C. § 8302(d)(1), the CFTC (joined by the SEC) revised its regulations to exclude from the "swap" definition contracts that are "regulated as gaming or gambling under applicable State or Tribal law" and "not traded on a board of trade" or other "organized exchange." Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969, 65,971-72 & n.27, 65,975 (Oct. 19, 2026). Analogizing to a 2012 rule similarly carving out insurance products from the scope of the definition, the CFTC explained that state-regulated gambling products "do not bear the structural characteristics of a CEA-regulated derivative" because they "are not inherently tradable, which is a strong indicator" that they are not a "derivative within the Commission's jurisdiction." *Id.* at 65,972-73. The CFTC thus rejected the "erroneous premise," accepted by this Court and the Sixth Circuit, "that if event contracts are swaps, then casino-style gambling products must also be swaps." *Id.* at 65,971. This rule is "effective immediately." *Id.* at 65,977.

*Third*, in October 2026, also pursuant to its express definitional authority, the CFTC (joined by the SEC) promulgated an NPRM proposing

to "expressly clarify that event contracts, including those based on sports-[events] … are swaps" subject to CFTC jurisdiction. Further Definition of "Swap" – Inclusions, 91 Fed. Reg. 66,022, 66,025 & n.38 (Oct. 19, 2026). The NPRM explains that the CEA's "swap" definition already encompasses event contracts involving sports, but that the regulation "provides an independent legal basis to deem these contracts as swaps" and avoids "uncertainty about whether particular underlying" sports events "have potential financial consequences." *Id.* at 66,025, 66,028. It adds that market participants "overwhelmingly" understand event contracts to constitute swaps, *id.* at 66,026, bringing them within the definition of "swap" encompassing any instrument "that is, or in the future becomes, commonly known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv). The comment period for this NPRM ends on November 18, 2026. 91 Fed. Reg. at 66,022.

## REASONS FOR GRANTING THE STAY

A stay of the mandate pending the filing of a petition for a writ of certiorari is appropriate where "the petition would present a substantial question and … there is good cause for a stay." Fed. R. App. P. 41(d)(1); *cf.* 9th Cir. R. 41-1 Circuit advisory committee's note (motion to stay the mandate "will be denied if the Court determines that the application for certiorari would be frivolous or is made merely for delay"). This Court's

"general practice" is to "grant[] a motion for a stay if the arguments presented therein are not frivolous." *Epic Games*, 73 F.4th at 785 (M. Smith, J., concurring). And a "party seeking a stay of the mandate … need not demonstrate that exceptional circumstances justify a stay." *Bryant v. Ford Motor Co.*, 886 F.2d 1526, 1528 (9th Cir. 1989).

The requirements for issuance of a stay are readily satisfied in this case. Kalshi's forthcoming petition for certiorari will raise substantial questions regarding the scope of federal preemption under the CEA that have divided the circuits and district courts that have considered them. And there is good cause for a stay to avoid unnecessary litigation during the pendency of the Supreme Court's review. A stay would not prejudice Defendants, who have already brought a state enforcement action against Kalshi and obtained a state-court order preventing Kalshi from offering its sports-event contracts in Nevada.

# I. Kalshi's Petition Will Raise Substantial Questions.

## A. The Panel's Decision Deepens Two Circuit Splits.

The circuits have split on whether the CEA preempts state regulation of swaps traded on DCMs and whether Congress categorically excluded event contracts involving sports from the definition of "swap."

The Third Circuit has squarely held that the CEA preempts state regulation of swaps traded on DCMs and that sports-event contracts can be swaps. The court correctly applied the plain text of the CEA to reject New Jersey's effort to ban event contracts involving sports. *Flaherty*, 172 F.4th at 227-228. It held that the CEA preempts state regulation of instruments subject to the CFTC's exclusive jurisdiction and that event contracts involving sports fall within that jurisdiction because they "fit comfortably" within the CEA's definition of "swap." *Id.* (quoting *id.* at 233 (Roth, J., dissenting)). The court explained that "[t]he outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence" for "stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *Id.*

This Court and the Sixth Circuit disagreed with the Third Circuit—and with each other. This Court agreed that the CEA preempts state regulation of swaps subject to the CFTC's exclusive jurisdiction. Op.20-22. But it held event contracts involving sports are not swaps. Op.41. More recently, a Sixth Circuit panel concluded that event contracts involving sports are not swaps and that the CEA does not preempt state gambling laws, because those laws are "ancillary regulations that only incidentally burden DCMs" and thus

"only indirectly affect the subject matter at the core of the CFTC's jurisdiction." *Schuler,* 2026 WL 2884087, at *21-22.

Other courts will soon weigh in. Kalshi has briefed and argued these issues in the Fourth Circuit and Massachusetts Supreme Judicial Court, and additional appeals are pending in the Second, Seventh, Eighth, and Tenth Circuits.[2]

The circuit split makes Supreme Court review, whether in this case or another vehicle, very likely. Sup. Ct. R. 10(a). That is particularly true given that these questions are exceptionally important. Resolution of these questions will determine whether states, for the first time since Congress created the CFTC and entrusted it with "exclusive jurisdiction," will be free to regulate or ban instruments the CFTC has approved for trading on the nationwide exchanges it oversees. As the CFTC has explained, the states' theory would result in "a seismic shift in the longstanding status quo between CFTC and state authority." CFTC Amicus Br. at 2, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2. If

[2] *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. argued May 7, 2026); *Commonwealth v. KalshiEX LLC*, No. SJC-13906 (Mass. argued May 4, 2026); *KalshiEX LLC v. Williams*, No. 26-1835 (2d Cir.); *KalshiEX LLC v. Cafferelli*, No. 26-2239 (2d Cir.); *United States v. Wisconsin*, No. 26-2636 (7th Cir.); *KalshiEX LLC v. Raoul*, No. 26-3267 (7th Cir.); *KalshiEX LLC v. Bird*, No. 26-2874 (8th Cir.); *KalshiEX LLC v. Cox*, No. 26-4100 (10th Cir.).

accepted, that theory would upend a multibillion-dollar industry and criminalize the conduct of every derivatives exchange that has received the CFTC's blessing to list event contracts involving sports—from Kalshi to the Chicago Mercantile Exchange.

This case is thus precisely the sort of case in which this Court routinely stays the mandate. *See Hogan v. Bean*, 174 F.4th 1107 (9th Cir. 2026) (mem.) (granting motion to stay issuance of mandate pending certiorari); Order, *Zavislak v. Netflix, Inc.*, No. 24-4156 (9th Cir. Nov. 7, 2025), Dkt. No. 67.1 (same); Order, *Duncan v. Bonta*, No. 23-55805 (9th Cir. Apr. 10, 2025), Dkt. No. 94 (same).

### B. Whether Event Contracts Relating to Sports Fall Within The CFTC's Exclusive Jurisdiction Is A Substantial Question.

1. Kalshi respectfully disagrees with the panel's holding that event contracts related to sports can never be swaps within the meaning of the CEA. This issue is undoubtedly a substantial one, as evidenced by the fact the Third Circuit, the District of New Jersey, the District of Arizona, the District of Minnesota, and the Northern District of Illinois have all issued decisions disagreeing with the panel's holding.

As the Third Circuit observed, "[a] plain reading of the [CEA]'s text suggests that Kalshi's sports-event contracts fit comfortably within the

statutory definition" of "swap." *Flaherty*, 172 F.4th at 227 (citation omitted). A swap includes any agreement providing for payment "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). An "event" is "[s]omething that happens." *Event*, Oxford English Dictionary (2026). And for an event to be "associated" with a potential financial consequence, it must be "connect[ed]" to such consequence. *Associate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). An event contract is therefore a swap if its underlying event has a connection to potential financial consequences. Many sports events fit the bill. The Special Rule confirms as much by describing "[e]vent contracts" as "agreements" and "swaps" that may be "list[ed] … by a designated contract market" and recognizing that some may involve "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). In referring to such "gaming" contracts, Congress was specifically contemplating event contracts related to sports. 156 Cong. Rec. S5906-07 (statement of Sen. Lincoln). And the Special Rule does not ban sports-related contracts, but instead gives the CFTC discretion regarding whether to allow such contracts to trade on DCMs.

Congress's decision to delegate this authority to the CFTC makes good sense. Sports "generate economic activity and materially affect both regional

and national markets" with "billions" of dollars at stake. 91 Fed. Reg. at 35,807-08, 35,830 (citation modified). Because they create substantial economic activity, they are associated with risks of various kinds that can be hedged. Indeed, the record of hedging on Kalshi grows all the time.[3] That traders in fact use Kalshi's sports-event contracts to hedge their exposure to sports-related risk refutes any contention that sports events categorically lack economic consequences. Nor does it matter that some traders are merely speculating—that is true in *all* financial and derivatives markets, which require liquidity provided by speculators to function. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) (the greater the number of speculators, the greater "[t]he liquidity of a futures contract, upon which hedging depends").

---

[3] *See* Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5; Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win. Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM; Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679; *see also* Sasha Rogelberg, *Prediction markets are now 'bespoke insurance' for businesses, and a Los Angeles restaurant group's $60,000 hedge on Kalshi is the latest example*, Fortune (Oct. 19, 2026), https://perma.cc/AA9M-PDLM; Krystal Hur, *Cantor Lets Hedge Funds Place Big Bets on Kalshi's Prediction Markets*, Wall St. J. (Aug. 19, 2026), https://perma.cc/CY69-CYTZ.

Were there any doubt, the CFTC has proposed a new rule further defining the term “swap” to include “event contracts, including those based on sports-[related] … events.” 91 Fed. Reg. at 66,025. The proposed rule relies on “authority” that Congress “‘expressly delegate[d]’ to” the CFTC “to give meaning to” specified “statutory term[s],” *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-395 (2024) (citation omitted), including the term “swap,” 15 U.S.C. § 8302(d)(1). If that proposal is finalized, it will strongly support reversal.

2. The panel broke from the Third Circuit and held that event contracts involving sports events can never be swaps. Kalshi respectfully submits that each of the panel’s grounds for reaching that conclusion is incorrect. At minimum, each raises serious questions warranting a stay.

*First*, the panel relied heavily on a soon-to-be-replaced CFTC regulation, Rule 40.11, which the panel viewed as a categorical prohibition on sports-event contracts. *See* Op.3, 13, 33-36; *see also* Op.50 (Lee, J., concurring) (noting Rule 40.11 “controls the outcome of this appeal”). While Kalshi submits that the panel’s interpretation of the regulation was never correct, *see* 91 Fed. Reg. at 35,815, it will be moot upon adoption of the NPRM confirming that Rule 40.11 is not a “categorical” bar, *id.* at 35,813. The panel acknowledged this forthcoming rule and stated that its holding

would apply "[u]ntil § 40.11(a) is amended in the manner described in the NPRM." Op.36.

*Second*, the panel believed that if sports-event contracts are swaps, then so are all sports bets, such that all sports bets must be traded on DCMs. *See* 7 U.S.C. § 2(e). Again, the CFTC's recent regulatory activity refutes that premise. Tracking an earlier regulation carving insurance products out of the swap definition for similar reasons, the regulation confirms that the "swap" definition does not include contracts "regulated as gaming or gambling under applicable State or Tribal law" and "not traded on a board of trade" or other "organized exchange." 91 Fed. Reg. at 65,975. The regulation was issued pursuant to the CFTC and SEC's congressionally delegated authority to define the term "swap," 15 U.S.C. § 8302(d)(1); *see also id.* §§ 8321(a)(2), (b), and is therefore binding as long as it is within the "range of reason," *Comm'r v. Pepsi-Cola Niagara Bottling Corp.*, 399 F.2d 390, 393 (2d Cir. 1968) (Friendly, J.).

*Third*, the panel concluded that DCMs are free to bar users in certain states from trading their contracts without running afoul of federal law. Op.42-43. That conclusion contradicts a CFTC regulation requiring Kalshi to offer "impartial access" to its users. 17 C.F.R. § 38.151(b). Once again, the CFTC has weighed in to explain that DCMs "must operate on a uniform basis

at a national scale in order to achieve the CEA's purpose."[4] And the CFTC has instructed that "DCMs must cease domestic geographic restrictions that violate the Impartial Access Requirements" by December 5, 2026, "or else submit to the Division of Market Oversight ('Division') an explanation for why such compliance is not feasible."[5] That instruction directly and unavoidably conflicts with the state-court injunction Defendants have secured that prohibits Kalshi from offering its sports-event contracts to users in Nevada, making impossibility preemption unmistakable. *See* Am. Order Granting Pl.'s Mot. for Prelim. Inj., *State ex rel. Nev. Gaming Control Bd. v. KalshiEX LLC*, No. 26-OC-00050-1B (Nev. Jud. D. Ct. May 18, 2026) ("Nevada PI Order").

*Fourth*, the panel's construction of the "swap" definition drew heavily from its conclusion that Kalshi's contracts are no different from gambling. Op.27-28. But states have long asserted that all forms of derivatives trading—including trading in traditional commodity derivatives such as grain futures—are a "species of gambling." *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888). Congress emphatically put a stop to that practice in 1974 when it

---

[4] Christopher J. Kirkpatrick, *DCM Impartial Access Requirements* at 4, CFTC (Nov. 5, 2026), https://perma.cc/76Y5-ENUK.

[5] *CFTC Issues Impartial Access Requirements Interpretation*, CFTC Release No. 9323-26 (Nov. 5, 2026), https://perma.cc/WDC6-6K4T.

created the CFTC and made its "jurisdiction" over derivatives exchanges "exclusive." 7 U.S.C. § 2(a)(1)(A). In doing so, Congress drew a clear line between on-DCM derivatives transactions and off-DCM wagers. It entrusted the former to the exclusive oversight of the CFTC but made equally clear that states may continue to regulate the latter. *Id.* §§ 2(a)(1)(A), 16(e)(1)(B)(i).

Congress made the CFTC's exclusive jurisdiction turn not on whether a state considers a transaction akin to gambling, but on how the transaction is structured and where it is traded. Event contracts are structured like every other derivative instrument—they are "traded on CFTC-registered national exchanges at market-set prices through the interaction of bids or offers placed on a central orderbook" where the exchange remains "neutral." 91 Fed. Reg. at 65,973-74. Sports bets are structured differently—they are bilateral contracts with odds set by a bookmaker, not by market forces, where sportsbooks are the counterparty to each bet and have incentives to win at the expense of their consumers. *See id.* Since the 1974 amendments to the CEA, the law has treated instruments with these different structures differently given the different risks and benefits they implicate. The CFTC underscored these important distinctions in its recent rulemakings, and these rulemakings further favor a stay.

## II. THERE IS GOOD CAUSE FOR A STAY.

There is also good cause for a stay. Issuance of the mandate would return this case to the district court for further proceedings, including on Kalshi's election contracts. Op.41 n.7, 47. It would make little sense for the district court—and other courts in this Circuit—to grapple with merits proceedings without waiting for the Supreme Court to resolve the questions presented.

A stay is particularly important because states in this Circuit and elsewhere have initiated *criminal* proceedings against Kalshi for offering event contracts on its exchange. Crim. Info., *State v. KalshiEX LLC*, Nos. CR2026-173-001, CR2026-173-002 (Ariz. Super. Ct. Mar. 16, 2026); Crim. Info., *State v. KalshiEX LLC*, AGO No. 9465862 (Utah 3d Jud. D. Ct. Oct. 28, 2026); Crim. Info., *State v. Mansour*, AGO No. 10085919 (Utah 3d Jud. D. Ct. Oct. 28, 2026); Crim. Info., *State v. Lara*, AGO No. 10085919 (Utah 3d Jud. D. Ct. Oct. 28, 2026). These criminal proceedings undoubtedly should not press ahead without the Supreme Court's guidance.

Issuance of the mandate will also start the clock on multiple pending appeals in which briefing is stayed pending the Court's issuance of the mandate in this case. *Nevada v. KalshiEX LLC*, No. 26-1304 (9th Cir.) (appeal of order remanding state enforcement action); *Washington v.*

*KalshiEX LLC*, No. 26-3106 (9th Cir.) (similar); *KalshiEX LLC v. Johnson*, No. 26-2978 (9th Cir.) (appeal of denial of preliminary injunction on basis of *Younger* abstention); *see also Nevada*, Dkt. Nos. 30, 37 (staying briefing until issuance of mandate in this case); *Johnson*, Dkt. No. 23 at 2 (same); *Washington*, Dkt. No. 31 at 1 (same). It would serve judicial economy for briefing in those appeals—which present issues related to those in this appeal—to wait until this case is resolved.

Conversely, a stay will not prejudice Defendants. The underlying district-court proceedings are already stayed. D. Ct. Dkt. No. 263. Meanwhile, Nevada has already brought a state-court enforcement action against Kalshi and obtained an injunction barring Kalshi from offering its sports-event contracts in Nevada. Nevada PI Order, *supra*. Kalshi has complied with that injunction. Staying issuance of the mandate would not alter this state of affairs and therefore would not cause any harm or prejudice to Defendants.

## CONCLUSION

The Court should stay issuance of the mandate pending the filing and disposition of the petition for a writ of certiorari.

Dated: November 9, 2026

Respectfully submitted,

*/s/ Neal Kumar Katyal*

Neal Kumar Katyal
Joshua B. Sterling
Colleen E. Roh Sinzdak
William E. Havemann
Natasha R. Khan
Samantha K. Ilagan
Milbank LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

Grant R. Mainland
Andrew L. Porter
Davis B. Campbell
Milbank LLP
55 Hudson Yards
New York, NY 10001

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A) and Circuit Rule 27-1(1)(c) because it contains 4,671 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f).

This motion complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this motion has been prepared using Microsoft Office Word for Office 365 in 14-point Georgia font.

November 9, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using ACMS on November 9, 2026.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by ACMS.

November 9, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal